**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| R. ALEXANDER ACOSTA, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Civil Action No. 17-1458 |
| J. NANOUH, INC., a corporation, d/b/a EXETER FAMILY RESTAURANT; and MICHAEL J. NANOUH, individually, and as a manager and corporate officer of the aforementioned corporation, | ) ) ) ) ) |
| Defendants. | ) ) ) |

**PLAINTIFF'S POST-TRIAL BRIEF**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... III

I.    INTRODUCTION ...................................................................................... 1

II.   FACTUAL BACKGROUND .................................................................... 3

   A.   Defendant J. Nanouh, Inc. d/b/a Exeter Family Restaurant is an
employer subject to the requirements of the FLSA. .......................................... 3

   B.   Defendant Michael Nanouh is an employer subject to the
requirements of the FLSA. ................................................................................. 4

   C.   Defendants' servers regularly worked hours beyond their scheduled shifts. .............. 5

   D.   Defendants failed to keep required records of hours worked and wages paid in
violation of the FLSA. ....................................................................................... 8

   E.   Defendants' pay practices for servers violated the FLSA's minimum wage and
overtime requirements. ...................................................................................... 9
        1.    Defendants paid less than $7.25 per hour. ........................................... 9
        2.    Defendants did not inform servers of the tip credit. ............................ 10
        3.    Defendants improperly deducted the cost of uniforms from servers' wages........ 11
        4.    Defendants did not pay overtime premiums to servers........................... 11

   F.   Defendants did not pay overtime wages to sous-chef Ivan Garcia-Lopez................ 12

III.  ARGUMENT ............................................................................................ 14

   A.   Defendant J. Nanouh, Inc. d/b/a Exeter Family Restaurant is a covered enterprise
under the FLSA................................................................................................... 14

   B.   Michael Nanouh is an employer under Section 3(d) of the FLSA. ......................... 14

   C.   Defendants violated Section 6(a) of the FLSA by failing to pay servers a minimum
wage of at least $7.25 per hour and failing to comply with the Section 3(m) tip credit
requirements....................................................................................................... 16
        1.    Defendants cannot claim the Section 3(m) tip credit because they failed to prove
              that they paid servers at least $2.13 per hour.................................... 17
        2.    Defendants cannot claim the Section 3(m) tip credit because they failed to prove
              that they informed each of their servers of the amount of the cash wage employees
              would be paid or the amount of the tip credit claimed. ........................ 27

D.    Defendants violated Section 6(a) of the FLSA by charging servers for the cost of required uniforms..................................................................................................... 30

E.    Defendants Violated the FLSA Overtime Provisions ................................................. 31
    1.    Defendants violated Section 7(a) of the FLSA by failing to pay their servers the proper time-and-a-half overtime premium. ........................................................... 31
    2.    Defendants violated Section 7(a) of the FLSA by failing to pay the proper overtime premium to Ivan Garcia-Lopez. ............................................................... 33

F.    Defendants Violated the FLSA Recordkeeping Provisions ....................................... 36

G.    Defendants' Violations Were Willful ........................................................................ 37
    1.    Defendants' violations are willful because they failed to pay any wages whatsoever for numerous hours worked. ............................................................... 38
    2.    Defendants' violations are willful because they failed to keep any records of claimed payments of wages in cash. ...................................................................... 38
    3.    Defendants' violations are willful because they deliberately paid cash for hours over 40 to avoid notifying their accountant that overtime might be due. ............. 39

H.    Defendants are liable for liquidated damages in an amount equal to their liability for minimum wage and overtime back wages. ................................................................ 39
    1.    The legal standard for liquidated damages. ........................................................... 40
    2.    Defendants failed to prove their subjective good faith. ........................................ 41
    3.    Defendants also failed to prove their belief they were in compliance was objectively reasonable. .......................................................................................... 43

I.    The Secretary is entitled to injunctive relief to restrain Defendants from continuing to violate the FLSA. .................................................................................................. 43

J.    Defendants are liable for $661,923.22 in back wages for Defendants' willful minimum wage and overtime violations through at least April 1, 2018. ..................... 45
    1.    Servers are owed the difference between $7.25 per hour for all hours worked during each workweek and any wages actually paid during that workweek. ........ 46
    2.    Servers are owed at least the cost of uniforms purchased during the relevant period. .................................................................................................... 46
    3.    Servers are owed an additional overtime premium of $3.63 for each hour over 40 worked in a workweek. ...................................................................................... 47
    4.    Ivan Garcia-Lopez is owed overtime premiums. .................................................. 47
    5.    Defendants failed to present precise and detailed evidence to rebut the Secretary's calculations. ......................................................................................................... 48

III.    CONCLUSION .................................................................................................... 52

# TABLE OF AUTHORITIES

## <u>Cases</u>

*A.H. Phillips, Inc. v. Walling*,
  324 U.S. 490 (1945) ............................................................................................. 1

*Alexander v. Caraustar Industries, Inc.*
  930 F.Supp.2d 947 (N.D. Ill. 2013) ................................................................. 23

*Anderson v. Mt. Clemens Pottery*,
  328 U.S. 680 (1946) ................................................................................... passim

*Auer v. Robbins*,
  519 U.S. 452 (1997) ........................................................................................... 34

*Ballaris v. Wacker Siltronic Corp.*,
  370 F.3d 901 (9th Cir. 2004) ............................................................................ 18

*Barrentine v. Arkansas-Best Freight System*, Inc.,
  450 U.S. 728 (1981) ..................................................................................... 16, 32

*Barvinchak v. Indiana Reg. Med. Ctr.*,
  Civ. A. No. 06-69, 2008 WL 1847163 (W.D. Pa. 2008) ................................. 31

*Brock v. Claridge Hotel and Casino*,
  846 F.2d 180 (3d Cir. 1988) ............................................................................. 32

*Brock v. Hamad*,
  No. 86-757-CIV-5, 1987 WL 46573 (E.D.N.C. Nov. 25, 1987) ..................... 43

*Brock v. Richardson*,
  812 F.2d 121 (3rd Cir. 1987) ............................................................................. 1

*Brock v. Wilamowsky*,
  833 F.2d 11 (2d Cir. 1987) ............................................................................... 40

*Brooklyn Sav. Bank v. O'Neil*,
  324 U.S. 697 (1945) ..................................................................................... 1, 16

*Brooks v. Village of Ridgefield Park*,
  185 F.3d 130 (3d Cir. 1999) ............................................................................. 41

*Cervantes v. Cotter & Sons, Inc.*, Civ. A.,
  No. 15-287, 2016 WL 2624957 (W.D. Tex. Apr. 7, 2016) ............................. 23

*Chao v. Hotel Oasis Inc.*,
  493 F.3d 26 (1st Cir. 2007) .............................................................................. 38

*Dole v. Haulaway, Inc.*,
  723 F. Supp. 274 (D.N.J. 1989) ....................................................................... 43

*Dole v. Solid Waste Serv., Inc.*,
  733 F. Supp. 895 (E.D. Pa. 1989) ................................................................... 36

*Donovan v. Burger King*,
  675 F.2d 516 (2d Cir. 1982) ....................................................................... 35, 36

*Donovan v. Rockwell Tire & Fuel, Inc.*,
  No. C-79—498, 1982 WL 2120 (M.D.N.C. Mar. 30, 1982) ........................... 43

*Elwell v. University Hospitals Home Care Services*,
  276 F.3d 832 (6th Cir. 2002) ........................................................................... 38

*Gamero v. Koodo Sushi Corp.*,
  272 F. Supp. 3d 481 (S.D.N.Y. 2017) .............................................................. 30

iii

*Guthrie v. Lady Jane Colleries, Inc.,*
    722 F.2d 1141 (3d. Cir. 1983) ................................................................... 34, 35

*Haybarger v. Lawrence Cnty. Adult Prob. and Parole,*
    667 F.3d 408 (3d Cir. 2012) ............................................................................ 15

*In re Enter. Rent-A-Car Wage & Hour Practices Litig.,*
    683 F.3d 462 (3d Cir. 2012) ...................................................................... 14, 15

*Keubel v. Black & Decker Inc.,*
    643 F.3d 352 (2d Cir. 2011) ............................................................................ 36

*Lenroot v. Kemp,*
    153 F.2d 153 (5th Cir. 1946) ........................................................................... 43

*Marshall v. Brunner,*
    668 F.2d 748 (3d. Cir. 1982) ................................................................ 14, 40, 43

*Marshall v. Van Matre,*
    634 F.2d 1115 (8th Cir. 1980) ......................................................................... 43

*Martin v. Cooper Elec. Supply Co.,*
    940 F2d 896 (3d Cir. 1991) ...................................................................... passim

*Martin v. Funtime,*
    963 F.2d 110 (6th Cir. 1992) ........................................................................... 44

*Martin v. Selker Bros., Inc.,*
    949 F.2d 1286 (3d Cir. 1991) ................................................................... passim

*Martin v. Tango's Restaurant, Inc.,*
    969 F.2d 1319 (1st Cir. 1992) .......................................................................... 28

*McLaughlin v. Richland Shoe Co.,*
    486 U.S. 128 (1988) ......................................................................................... 37

*Mendoza v. A & A Landscape & Irrigation, LP,* Civ. A.,
    No. 12-562, 2014 WL 6627741 (E.D. Tex. Nov. 21, 2014) .............................. 23

*Mitchell v. Hausman,*
    261 F.2d 778 (5th Cir. 1958) ........................................................................... 43

*Morgan v. Family Dollar Stores, Inc.,*
    551 F.3d 1233 (11th Cir. 2008) ....................................................................... 21

*Mumby v. Pure Energy Services (USA), Inc.,*
    636 F.3d 1266 (10th Cir. 2011) ....................................................................... 37

*Nat'l Rest. Ass'n v. Solis,*
    870 F. Supp. 2d 42 (D.D.C. 2012) ................................................................... 30

*Parker v. NutriSystem, Inc.,*
    620 F.3d 274 (3d Cir. 2010) .............................................................................. 1

*Prusin v. Canton's Pearls, LLC,* Civ. A.,
    No. 16-0605, 2017 WL 5126156 (D. Md. Nov. 6, 2017) .................................. 29

*Ramirez v. Rifkin,*
    568 F.Supp.2d 262 (E.D.N.Y. 2008) ................................................................ 38

*Reich v. Brenaman Electrical Service,*
    Civ. No. 95-3737, 1997 WL 164235 (E.D. Pa. Mar. 28, 1997) ........................ 41

*Reich v. Chez Robert,*
    28 F.3d 401 (3d Cir. 1994) ........................................................................ 17, 28

*Reich v. Chez Robert,*
    821 F. Supp. 967 (D.N.J. 1993) ................................................................. 31, 47

*Reich v. Cole Enter., Inc.,*
   901 F. Supp. 255 (S.D. Ohio 1993) ................................................ 43

*Reich v. Gateway Pres, Inc.,*
   13 F.3d 685 (3d Cir. 1994)............................................................. 19

*Reich v. Petroleum Sales,*
   30 F.3d 654 (6th Cir. 1994) ........................................................... 44

*Richard v. Marriott Corp.,*
   549 F.2d 303 (4th Cir. 1977) ......................................................... 29

*Rong Chen v. Century Buffet & Rest.,*
   Civ. A. No. 09-1687, 2012 WL 113539 (D.N.J. Jan. 12, 2012) ............................................ 49

*Rosano v. Twp. of Teaneck,*
   754 F.3d 177 (3d. Cir. 2014)................................................... passim

*Rothman v. Publiker Indus.,*
   201 F.2d 618 (3d Cir. 1953)........................................................... 35

*Safeco Ins. Co. of America v. Burr,*
   551 U.S. 47 (2007) ....................................................................... 37

*Salinas v. Starjem Rest. Corp.,*
   123 F.Supp.3d 442 (S.D.N.Y. 2015)................................................ 30

*Scherer v. Compass Group USA, Inc.,*
   340 F.Supp.2d 942 (W.D. Wisc. 2004)........................................... 35

*Sec'y United States Dep't of Labor v. Am. Future Sys., Inc.,*
   873 F.3d 420 (3d Cir. 2017)........................................................... 51

*Smiley v. E.I. Dupont De Nemours & Co.,*
   839 F.3d 325 (3d Cir. 2016).................................................... 18, 22

*Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123,*
   321 U.S. 590 (1944).......................................................................... 1

*United States v. Klinghoffer Bros. Realty Corp.,*
   285 F.2d 487 (2d Cir.1960)............................................................ 51

*United States v. Rosenwasser,*
   323 U.S. 360 (1945) ..................................................................... 14

*Walton v. United Consumers Club, Inc.,*
   786 F.2d 303 (7th Cir 1986) .......................................................... 40

*Williams v. Tri–County Growers, Inc.,*
   747 F.2d 121 (3d Cir. 1984)................................................... passim

*Wright v. Ristorante La Buca, Inc., Civ. A.,*
   No. 18-2207, 2018 WL 5259469 (E.D. Pa. Oct. 22, 2018) ............................................ 28, 29

## Statutes

29 U.S.C. § 201 .......................................................................................... 1
29 U.S.C. § 202(a) ..................................................................................... 1
29 U.S.C. § 203(m).............................................................................. 2, 17
29 U.S.C. § 203(m)(2)(A) ......................................................................... 27
29 U.S.C. § 203(m)(2)(A)(i) ..................................................................... 17
29 U.S.C. § 203(s)(1)(A) .......................................................................... 14
29 U.S.C. § 203(s)(1)(A)(i-ii) ................................................................... 14
29 U.S.C. § 206(a)(1)(c) ........................................................................... 16

29 U.S.C. § 207(a) ............................................................................................... 3
29 U.S.C. § 207(a)(1) ........................................................................................ 31
29 U.S.C. § 211(c) ....................................................................................... 37, 52
29 U.S.C. § 213(a)(1) ........................................................................................ 33
29 U.S.C. § 216(c) ............................................................................................. 39
29 U.S.C. § 217 ............................................................................................ 43, 45
29 U.S.C. § 255(a) ............................................................................................. 37
29 U.S.C. §§211(a), (c) ..................................................................................... 23
29 U.S.C. §§ 206(a), 207(a), 211(c) .............................................................. 1, 2

### Rules

Fed. R. Evid. 801(d)(2)(A) ............................................................................... 23

### Regulations

29 C.F.R. §516.2, 516.5(a) ............................................................................... 36
29 C.F.R. §531.3(d) ........................................................................................... 31
29 C.F.R. §785.18 .............................................................................................. 51
29 C.F.R. § 516.28 ............................................................................................. 37
29 C.F.R. § 516.6 ............................................................................................... 37
29 C.F.R. § 531.59(a) ........................................................................................ 17
29 C.F.R. § 531.59(b) ................................................................................... 28, 30
29 C.F.R. § 541.100(a) ...................................................................................... 33
29 C.F.R. § 541.100(a)(2) to (4) ....................................................................... 34
29 C.F.R. § 541.102 ........................................................................................... 34
29 C.F.R. § 541.602 ........................................................................................... 34
29 C.F.R. § 778.104 ........................................................................................... 51
29 C.F.R. § 778.223 ........................................................................................... 18
29 C.F.R. §§ 516.2(a)(1)-(12) ........................................................................... 37
69 Fed. Reg. 22122 (April 23, 2004) ................................................................ 34

### Other Authorities

*Wage and Hour Law: Compliance and Practice* § 8:22 (2008) .................................. 31

## I.    Introduction

The evidence at trial proved that Defendants willfully failed to pay their hourly servers the proper minimum wage and overtime from at least March 30, 2014 through at least April 1, 2018 ("relevant time period"), and failed to keep proper records of their employees' wages, hours, and other conditions of employment.  Defendants' policies and practices violated Sections 6(a), 7(a), and 11(c) of the Fair Labor Standards Act of 1938, 29 U.S.C. § 201, *et seq.* ("FLSA"). 29 U.S.C. §§ 206(a), 207(a), 211(c).  The Secretary's evidence at trial more than satisfied his burden of proof showing the amount and extent of uncompensated work Defendants' employees performed, entitling them to an award of back wages and liquidated damages totaling $1,323,846.44.  In addition to awarding full back wages and liquidated damages from Defendants J. Nanouh, Inc. d/b/a Exeter Family Restaurant ("Exeter") and Michael Nanouh ("Nanouh"), the Court should enjoin Defendants from committing future violations of the FLSA, a remedy warranted by Defendants' continued efforts to avoid FLSA compliance even during the pendency of this litigation.

The FLSA is a remedial statute designed to abolish substandard labor conditions, including protecting workers from substandard wages and oppressive hours.  29 U.S.C. § 202(a); *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945); *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 (1945); *Parker v. NutriSystem, Inc.*, 620 F.3d 274, 279 (3d Cir. 2010).  The humanitarian purpose of the FLSA requires its provisions to be interpreted and applied liberally, not in a narrow or grudging manner.  *Brock v. Richardson*, 812 F.2d 121, 123-24 (3rd Cir. 1987) (citing *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944)).

Defendants paid no wages whatsoever for certain hours worked by servers, regularly paid less per hour than even the minimal amount required to qualify for the tip credit, and never paid

1

overtime premiums.  Defendants ignored their own required, detailed records of servers' actual start and stop times, instead paying at most for scheduled shift time.  Defendants made no effort to pay overtime premiums to servers, instead hiding hours worked over 40 from the accountant who processed their payroll.  Defendants improperly charged servers for required uniforms. Defendants also improperly treated their sous chef as an exempt employee, and failed to pay him any overtime premiums.

Defendants, meanwhile, reaped the benefits – saving hundreds of thousands of dollars by underpaying servers and keeping them in the dark about their rights as tipped employees.  These are precisely the type of imbalanced and unfair working conditions that the FLSA seeks to remedy.  Over the course of four days, the evidence at trial – including testimony of Exeter employees and Wage and Hour Assistant District Director Jason Mowday, admissions from Exeter's Vice President of Operations Michael Nanouh, and Defendants' own documents – illustrated Defendants' disregard for the fundamental protections of the FLSA.  This is not simply ignorance or sloppy accounting.  Defendants made business decisions about how to pay their employees, and received significant financial benefits as a result of those decisions.  The FLSA requires that Defendants be held accountable and that their employees receive the wages and damages to which they are entitled under the law.

At all times relevant to this litigation, the federal minimum wage has been $7.25 per hour.  29 U.S.C. § 206(a).  Defendants paid their servers at most $2.83 per hour, attempting to claim a portion of their tips as a credit toward their minimum wage obligations under Section 3(m) of the FLSA.  29 U.S.C. § 203(m).  However, Defendants violated the FLSA by failing to meet their affirmative burden of complying with Section 3(m) in at least two ways, each separately and distinctly making Defendants liable for continued minimum wage and overtime

violations through at least April 2018.  Specifically, Defendants frequently failed to pay a direct or cash wage of at least $2.13 per hour.  Defendants also failed to inform servers of the tip credit as required by Section 3(m) and its implementing regulations.  Defendants did not tell servers that part of their tips would be credited toward the $7.25 per hour minimum wage, nor did they inform servers of the amount of such credit or the amount of cash wages servers would receive.

Defendants also violated the Section 7(a) overtime requirement.  Defendants did not pay servers the proper time-and-a-half overtime premium for hours worked in excess of 40 per workweek in violation of Section 7(a).  29 U.S.C. § 207(a).  Defendants also violated Section 7(a) by improperly treating their sous chef as an exempt employee and failing to pay him overtime premiums.

The Court must hold Defendants accountable under the law for their pervasive and willful violations of the FLSA.  Through at least April 1, 2018, Defendants' violations resulted in minimum wage and overtime back wages of nearly $662,000 due to the 45 current and former employees listed on Supplemental Schedule A to Plaintiff's Complaint.  Defendants are also liable for an equal amount of liquidated damages to compensate those employees for the time they have gone without the wages they were owed.

## II.     Factual Background

### A.     Defendant J. Nanouh, Inc. d/b/a Exeter Family Restaurant is an employer subject to the requirements of the FLSA.

Exeter Family Restaurant is a diner located outside Reading, Pennsylvania.  Since 1999 the business has been owned and operated by the Nanouh family.  Tr. at III:141:18.[1]  Defendant

---

[1] Citations are to the original docketed transcript.  If an amended transcript is docketed, the Secretary will provide amended citations if necessary.  Throughout this brief, the Secretary refers to the hearing transcript as (Volume No.):(Page No.):(Line No.).  The volume numbers

J. Nanouh, Inc., is the corporate entity that owns and operates Exeter Family Restaurant.  Answer ¶ 2 (ECF No. 5).  The business has more than $500,000 in gross annual sales and is engaged in commerce as defined by the FLSA.  Answer ¶ 5.

### B.  Defendant Michael Nanouh is an employer subject to the requirements of the FLSA.

Defendant Michael Nanouh manages the day-to-day operations of the restaurant for the Nanouh family and made and makes decisions about hiring, firing, and employee compensation. Answer ¶ 3, Government Exhibits ("GX") 9 and 10 each at ¶ 2, tr. at III:115:5-8, 116:18. Michael Nanouh is also Vice President of Operations for J. Nanouh Inc. and oversees day-to-day business at the Exeter Diner.  Nanouh holds himself out to both the public and his employees as manager of the diner.  He identified himself to the *Reading Eagle* and in customer comments as the Vice President of Operations.  Tr. at III:181:20, 182:13.  Inside the restaurant, he had full authority to hire, fire, or discipline employees, oversee schedules, and purchase supplies and equipment, "anything that—that I'd have to do to run a business."  Tr. at III:115:5-8, 116:18. For example, several of the servers who testified in this matter noted that he had interviewed them and hired them.  Tr. at I:36:11-12 (Kimberly Terra), I:80:25 (Ella Polonski); I:99:10 (Amanda Graul), II:6:16 (Ashley Hines).  Hines noted that when she had a problem because the server who was supposed to relieve her at 6 a.m. was consistently late the issue was not solved until she spoke to Michael Nanouh and the other server was terminated.  Tr. at II:48:10-12.

Nanouh directed the work of all of the servers, regardless of whether they worked on his shift, because he set general policies, called staff meetings, and in his own words was responsible

---

correspond with the 4 days of testimony and argument: July 23 (I), 24(II), 26(III) and 27(IV), 2018.

for "overlooking how everything is running and making sure, we're doing what we're supposed to be doing to get people in and out, happy."  Tr. at III:115:21-23.  He did this in large ways, such as directing the purchase and use of the point-of-sale system ("POS system"), tr. at III:119:15-19, and small ones, such as deciding how much ice cream goes into a free dessert.  Tr. at I:70:7-8.  He specifically set policies relating to compensation, such as the requirement that staff purchase their own uniforms (and then changing that policy after being told it violated the FLSA), tr. at III:201:4-6 and 206:4-11.  This was a change from his father's policy until 2014 of providing staff with uniforms free of charge.  Tr. at III:202:14-15.  "But I was just sick and tired of people, basically, we were throwing the $50.00 bill out the window, because . . .  we would train them, we would spend time training them, give them their uniform and then, they wouldn't show up after, like, three days."  Tr. at III:202:24 to 203:3.

Other rules and policies that Nanouh enforced included the rule that staff show up at least 15 minutes before each shift.  Tr. at I:70:22 to 71:1.  He also verified that sidework was finished before servers went home.  Tr. at III:123:16.  And Nanouh, as the manager on duty during second shift, would decide when to send servers home early if business was slow.  Tr. at III:123:19-24.

### C.     *Defendants' servers regularly worked hours beyond their scheduled shifts.*

The evidence at trial established that servers commonly worked beyond their scheduled shift hours, and recorded that time in Exeter's POS system.  Yet Defendants paid only for scheduled shifts rather than the actual time worked, resulting in employees' wages falling well below the minimum required by the FLSA.

Defendants posted a handwritten schedule each week showing the shifts assigned to each server.  Tr. at I:136:12-13, III:82:10-15.  Defendants delegated the scheduling of servers to Sue

Troxel.[2]  Tr. at III:82:8.  Servers were expected to arrive between 15 and 30 minutes prior to the

scheduled start of their shift.  Tr. at I:69:6, I:85:20-21, III:42:2.  Some servers were explicitly

instructed by Troxel or Defendant Nanouh to arrive 15 minutes before their shift start time.  Tr.

at I:104:12.  Servers were expected to be ready to serve customers by the scheduled shift start

time.

To prepare to serve tables, servers replenished clean flatware and dishes, stocked

condiments, and checked with the kitchen for specials and other menu updates.  Tr. at I:104:17 to

105:9.  These tasks were typical of preparing for service in any restaurant.  Not only was

management aware that these preparatory tasks were necessary for effective service, but servers

did this work at the direction of management.  Tr. at III:86:16-17.

Servers clocked in after storing their personal belongings and before starting their prep

work.  Tr. at I:85:24-25, III:41:16-18.  To the extent that servers ate a meal prior to starting their

shift, they clocked in after eating.  Tr. at I:104:2-4.  Servers clocked in by entering their personal

code into one of the point-of-sale ("POS") terminals.  Tr. at I:87:5-6.  Servers had to clock in to

do their jobs because the restaurant relied on the POS to take and process orders for food and

drink.  Tr. at III:150:13.  The POS system has been in place since approximately 2009.  GX-28 at

57:13-15.  Servers started picking up tables at or before their scheduled shift start time.  Tr. at

137:9-12.  Defendants did not update their handwritten schedules to show the time worked by

---

[2] Troxel kept at least two copies of the schedule -- one was posted at the restaurant and the other
she kept at home.  Tr. at III:97:25 to 100:6.  Defendants only produced the copies that were
posted at the restaurant, which did not reflect all of Troxel's personal notes of deviations from
the original schedule.  *See* Tr. At III:108:5-22.  Defendants did not use or refer to Troxel's home
copies of the schedules when submitting information to the accountant who did Defendants'
payroll.  *See id*; *see also* Nanouh Dep. at 55:1-7.

servers before the scheduled start of their shift.  Tr. at III:92:17.  Defendants only changed the handwritten schedules if a server started work an hour or more before their scheduled shift start time.  Tr. at III:80:92:3-11.

While servers' schedules varied, servers generally worked during three shifts: a first shift from 6 a.m. to 2 p.m., a second shift from 2 p.m. to 10 p.m., and a third shift from 10 p.m. to 2 a.m., although actual start times were sometimes staggered to account for customer flows (for example, some of the second shift crew would not come on until 4 p.m., closer to the start of the dinner rush, and some would leave before 10 p.m., as the evening slowed down).  Tr. at I:39:3, I:93:8-10, I:103:3-4, III:122:19-123:22.  Some servers were consistently scheduled to work more than one shift in a day, which they described as working a "double."  Tr. at I:139:16-24.  To the extent that servers took breaks, those breaks were less than 20 minutes long.  Tr. at I:42:5, I:105:23-24, Tr. at II:45:4.  Servers did not clock out for breaks.  Tr. at II:50:5.

Servers frequently ended their shifts later than their scheduled shift ending time.  If customers lingered at the end of the scheduled shift, servers had to stay until the table paid their check.  Tr. at I:43:24 to 44:5, I:89:4-5.  The POS system would not let a server clock out if a check was still open.  Tr. at I:89:13.  The server could choose to transfer the table to another server to close out, but would then forfeit the tip.  Tr. at I:144:11-17.  As a result, servers often stayed after their scheduled shift ending time.  Tr. at I:145:20 to 146:11.

This time was captured by the POS system because servers clocked out after closing out or transferring all checks and completing their sidework.  Tr. at I:146:17-25, II:45:25.  Servers had to clock out of the POS system to get a "Z strip" showing their sales and credit card tips.  Tr. at I:88:15-16, I:108:25 to 109:4.  They took the Z strip to the manager on duty or, on some shifts, a designated server, to receive cash in the amount of the credit card tips for the night.  Tr. at

I:109:22-25.  Without the Z strip, servers could not get their credit card tips for that night.  Tr. at I:89:13.

Servers were also required to perform "sidework" tasks before leaving the restaurant. These tasks included cleaning or replenishing the *bain marie* (steam table), rolling silverware, filling condiments, and stocking dishes.  Tr. at I:104:24-25, I:106:18-23.  Sidework was assigned to specific servers by the manager on duty.  Tr. at I:140:4-8, I:14:16-19, III:94:20.  The importance of completing sidework was reinforced by managers, including Defendant Nanouh, at staff meetings.  Tr. at I:142:3-11, I:143:11-15, II:13:13-17.  If their shifts were busy, servers had to complete their sidework after their scheduled shift ending time.  Tr. at III:95:16.

Servers clocked out after all of their tables were cashed out and their sidework was complete.  While some servers stayed to eat a meal or chat after clocking out, most simply went home.  Defendants did not annotate their handwritten schedules to reflect additional time worked by servers before or after the scheduled shift ending time unless it was a difference of a half-hour staying late or an hour starting early.  Tr. at III:80:14-23; 91:22--92:11.  Defendants never recorded the 15-minute early starts that all servers were expected to make on every shift.  Tr. at III:92:13-17.

### D.     *Defendants failed to keep required records of hours worked and wages paid in violation of the FLSA.*

Defendants' POS system recorded the exact time that servers clocked in and out each shift.  GX-1, 2; Tr. at II:59:16 to 61:24.  Although there are POS records for much of the relevant time period showing the actual hours worked, there are also periods when Defendants discarded POS records.   Defendants did not make any efforts to determine what records the POS system automatically retained.  Defendants left the default settings in place, which retained only one

year of data.  Tr. at III:139:13.  As a result, Defendants were unable to produce any POS time

records for work performed prior to August 31, 2015.  See GX-1, GX-2.

As further evidence of their reckless recordkeeping practices, Defendants paid the wages

of some servers through a combination of check and cash.  Tr. at I:47:12-24, 152:13-16.  The

split between check and cash payments of wages was not consistent among all servers, nor was it

consistent over time.  The servers who testified could not specify how much they were paid or

which weeks had cash payments.  Tr. at I:47:12-24 (Kim Terra), I:152:1-3 (Brenda Alena),

II:23:17-20 (Ashley Hines), III:44:18-19 (Rebecca Minicozzi).  Ella Polonski and Amanda Graul

said they did not get cash.  Tr. at I:90:7, 113:5.  The lone exception was Sue Troxel, who

testified that in addition to unspecified amounts of cash paid at $2.00 per hour for overtime work,

she got $100 per week for doing the schedules.  Tr. at III:84:11 (overtime cash), III:85:1-4

(schedule cash).  Defendants admittedly kept no records of cash paid to servers as wages.  Tr. at

III:156:21-157:1.  Defendants presented no evidence that any servers other than the individuals

who testified at trial received any wage payments in cash.

### E.  Defendants' pay practices for servers violated the FLSA's minimum wage and overtime requirements.

#### 1.  Defendants paid less than $7.25 per hour.

Defendants ignored the POS clock-in and clock-out records when they paid their

employees.  Tr. at III:121:15-16.  As a result, Defendants did not pay any cash wages whatsoever

for the time servers spent before their scheduled shift starting time preparing to pick up tables or

after their scheduled shift ending time closing out tables or finishing sidework.

Even for those hours that were paid, Defendants never paid $7.25 per hour, and often

paid less than either the promised $2.83 per hour or the $2.13 per hour required to qualify for the

Section 3(m) tip credit.  To the extent that Defendants kept records of the payment of direct

wages, most servers were paid $2.83 per hour, but only for (at most) their scheduled hours.  *See* GX 3-6.  However, between at least June 2014 when Wage and Hour began its investigative period, and April 2018, servers who worked the third shift were paid a flat rate of $30 for at least some of those third shifts.  Tr. at I:38:13-17 (Kim Terra); II:24:6-16 (Ashley Hines); III:40:21-23 (Rebecca Minicozzi).  If servers actually received $30 for a single shift, that amount generally covered at least $2.13 per hour as long as the shift was fourteen hours or less, but only covered approximately four hours at the full $7.25 minimum wage rate.  Defendants' failure to keep records of cash also makes it impossible to determine exactly how often servers working third shift may have been paid their shift pay in cash.  *See supra* Part II.D.  The flat payment for the third shift was also consistent with Defendants' practice of paying no overtime premiums, discussed below.

To the extent the evidence outlined the payment of wages in cash, such wages were, at most, $2.00 per hour.  Tr. at I:48:24,  Servers who confirmed that they received some wages in cash assumed that the difference between the hourly rates paid by check and by cash must be due to taxes.  Tr. at I:48:21.  These servers never received any tax documentation showing withholding from wages paid in cash, nor did they receive a Form 1099 or other document addressing the tax treatment of those wages.  Tr. at I:49:9, 153:18.

### 2. *Defendants did not inform servers of the tip credit.*

Defendants did not inform servers that Defendants planned to treat a portion of their tips as a credit toward the minimum wage requirements.  Tr. at I:37:24, I:82:19, I:133:19, II:7:24.  At most, Defendants posted an out-of-date flyer with generic information about the tip credit. Defendants' Exhibit 1.  And Defendants cannot claim to have told servers the amount of their hourly wage when the promised $2.83 per hour was not consistently paid.

3.      *Defendants improperly deducted the cost of uniforms from servers' wages.*

From at least March 30, 2014 through the end of March 2018, Defendants charged

servers for required uniform items.  Tr. at III:200:15-201.  Servers paid a total of $35.75 for a

shirt with Exeter's logo on it and a matching apron.  *Id.*  Servers were required to purchase at

least one shirt and one apron when they started their employment.  *Id.*  As discussed above, this

policy was conceived and implemented by Defendant Nanouh.  *See supra* Part II.B.  This policy

effectively reduced servers' wages during their first workweek, bringing their wages below the

statutory minimum regardless of any tip credit.

4.      *Defendants did not pay overtime premiums to servers.*

Defendants did not pay an overtime premium for hours worked by servers over 40 in a

workweek.  Tr. at III:193:1-13.  Several servers were regularly scheduled to work more than 40

hours in a workweek.  GX-7, GX-8.  Defendants' POS time records further confirm that some

servers frequently worked more than 40 hours in a workweek.  GX-1, GX-2, GX-8.

Defendants did not pay time-and-a-half the regular rate for those hours.  In fact,

Defendants deliberately reported only those hours worked up to 40 to their accountant for payroll

purposes, with the exception of a single occasion that has been noted in the record.  Tr. at

III:61:15.  Servers who testified that they received wages in cash said that Defendants paid at

most $2.00 an hour, even when their total hours for the week exceeded 40.  Tr. at I:73:12,

I:174:13, III:63:6.  Furthermore, because any wages paid in cash were based on the time shown

on the schedule – not the actual time worked as recorded by the POS system – some servers were

not paid anything at all for hours worked over 40.

Defendants continued this practice until approximately April of 2018, despite the fact that

this litigation had been pending for over a year.  Tr. at I:51:14.  Even then, instead of simply

paying for all time recorded on the POS, including time-and-a-half for overtime, Defendants

tried to avoid having servers record more than 40 hours in the system.  Defendants instructed

servers not to clock in before their shift started and to clock out immediately after so that the

POS time did not exceed 40 hours.  Servers sometimes had to work off the clock as a result.  Tr.

at I:51:21.  One server was given a separate card to use so that she could log into the system to

void checks or perform other actions prior to the start of her shift without clocking in.  Tr. at

I:52:10-22.

Defendant Nanouh was well aware hours over 40 should be paid at time-and-a-half.  Tr.

at III:195:24-25, GX-28 at 160:2-10 and 16-20.  He also knew the importance of creating

detailed business records – as evidenced by his implementation of the POS system.  Defendants

attempted to conceal their failure to pay overtime well into the Wage and Hour investigation and

even after the Complaint was filed.  During his deposition, Nanouh claimed that there was no

overtime being worked, when his business records showed this claim was patently false.  Tr. at

III:195:16, GX-1, GX-2, GX-8.  Likewise, Nanouh had no explanation for why the business

would pay unrecorded cash to employees and has produced no records of those payments

actually occurring.  Tr. at III:157:1-4.  The one time that Defendants reported overtime to their

accountants, the accountants paid the server, Rebecca Minicozzi, properly, at time and a half for

the hours worked.  Tr. at III:61:15, GX-5 at 54.

### F.    *Defendants did not pay overtime wages to sous-chef Ivan Garcia-Lopez*

Defendants did not pay time-and-a-half for overtime wages to Ivan Garcia-Lopez,[3] the

sous chef who works morning shifts alongside Executive Chef Darren Renninger.  Tr. at I:177:3-

---

[3] Various records in evidence refer to Mr. Garcia-Lopez by either "Garcia" (GX-8), "Lopez" (GX-3 and -4) or simply "Ivan" (GX-1).  Although all such references generally are to Mr. Garcia-Lopez, who identified that as his full name, tr. at I:176:8, note that the restaurant also employs Kim Garcia.

25.  Garcia-Lopez has worked in the diner's kitchen for the last 18 years.  Tr. at I:176:17.  He was hired as a line cook and promoted by Renninger to sous chef approximately 10 years ago. Tr. at I:177:1-187:1.  Garcia-Lopez works mornings, as does Renninger, and has the same duties from day to day: assisting Renninger as needed, making soups, checking inventory, and monitoring the line cooks.  Tr. at I 178:16-180:18.

Garcia-Lopez is now paid a flat salary and works no more than 40 hours a week.  Tr. at I:183:13.  His current pay comes entirely by check.  Tr. at I:184:23.  Prior to April of 2018, he worked approximately 50 hours per week Sunday to Friday and was paid $15 per hour for all hours worked regardless of whether they were overtime hours or not.  Tr. at I:183:16-184:11.  At that time he was paid a check for his Monday-Friday hours and cash for the Sunday hours.  Tr. at I:185:7-16.  That arrangement went back approximately nine years, when Garcia-Lopez started needing a check to show authorities that he was earning wages and paying taxes; prior to that he was paid entirely in cash.  Tr. at I:187:14-17.  This arrangement was obviously intended to hide the fact that Exeter was not paying the proper overtime premium for those Sunday hours.

Garcia-Lopez was clearly an hourly employee, not a salaried one.  Prior to April 2018, if business was slow and Garcia-Lopez was sent home early, or if he was unable to work, his pay was reduced corresponding to the hours that he missed.  Tr. at I:188:22-189:8.  For example, several times in the last four years if the weather was bad, Renninger would send Garcia-Lopez home and he was not paid.  Tr. at I:189:13-23 to 191:3.  Lopez is not paid bonuses.  Tr. at I:88:14.  He does not participate in profit sharing at the restaurant.  Tr. at I:188:18.

Garcia-Lopez is not a manager at the restaurant.  Although he monitors the work of the line cooks on his shift, he cannot hire and fire them or make schedules for any employees.  Tr. at I:181:16-25, III:200:3-9.  When he orders supplies, he uses a checklist written by Renninger to

13

ensure that stock levels are appropriate for each day of the week.  Tr. at I:180:16 to 181-5.

Garcia-Lopez and Renninger generally work the same shifts, so Renninger is never further away

than his personal office if Garcia-Lopez has a question.  Tr. at I:200:10-23.  On the one day a

week that Renninger is regularly off (Monday) while Garcia-Lopez works, or when Renninger is

on vacation, he typically leaves instructions for Garcia-Lopez to follow regarding specials and

ordering, and someone else is managing the restaurant during Garcia-Lopez's shift—usually

Eddie, a brother-in-law of Michael Nanouh.  Tr. at I:182:21 to 183:3, 192:10-12, and 203:11-13.

## III.    Argument

### A.    *Defendant J. Nanouh, Inc. d/b/a Exeter Family Restaurant is a covered enterprise under the FLSA.*

To be subject to the FLSA's minimum wage and overtime provisions, an employer must

be an "enterprise engaged in commerce or in the production of goods for commerce."  29 U.S.C.

§ 203(s)(1)(A); *see also* §§ 206(a) and 207(a).  Employees of an enterprise who handle goods or

materials that have been moved or produced in interstate commerce are subject to the FLSA.

*Marshall v. Brunner*, 668 F.2d 748, 751-52 (3d. Cir. 1982).  Additionally, business enterprises

must generate at least $500,000 in gross annual sales to be covered enterprises under the FLSA.

29 U.S.C. § 203(s)(1)(A)(i-ii).  Defendants admitted in their Answer that Defendant J. Nanouh

Inc., a corporation, is a covered enterprise subject to the FLSA under § 203(s)(1)(A) in that the

business is engaged in commerce and generates at least $500,000 in gross volume of sales per

year.  Answer ¶ 5 (ECF No. 5).  Accordingly, Exeter is subject to the FLSA.

### B.    *Michael Nanouh is an employer under Section 3(d) of the FLSA.*

The Third Circuit has recognized that the FLSA's definition of "employer" is "the

broadest definition that has ever been included in any one Act."  *In re Enter. Rent-A-Car Wage*

*& Hour Practices Litig.*, 683 F.3d 462, 467-68 (3d Cir. 2012) (quoting *United States v.*

*Rosenwasser*, 323 U.S. 360, 363 n.3 (1945)).  Courts utilize the "economic reality" test for determining whether individuals are employers under the FLSA.  *Id.* at 468-469.  "Economic reality" depends on the "totality of the circumstances" rather than on rigid "technical concepts of the employment relationship."  *Id.* at 467; *Haybarger v. Lawrence Cnty. Adult Prob. and Parole*, 667 F.3d 408, 418 (3d Cir. 2012).  "Significant control" is sufficient to establish employer status; ultimate control is not required.  *Enter. Rent-A-Car,* 683 F.3d at 468.

The Third Circuit acknowledged the flexibility and breadth of the FLSA's "employer" definition by adopting four non-exhaustive factors: (1) authority to hire and fire employees; (2) authority to promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; (3) day-to-day supervision, including discipline; and (4) control of employee records, including payroll, insurance, and taxes.  *Id.* at 469. The Court is not confined to these four criteria, but "must instead consider all the relevant evidence, including evidence that does not fall neatly within one of the above factors."  *Id.* Other indicia of "significant control" suggesting that a person was an employer of an employee "may be persuasive" when incorporated with these four factors.  *Id.* at 470.

Michael Nanouh is an employer as defined by the FLSA and the Third Circuit in *Enterprise*.  He has authority to hire and fire employees and has actually done so.  Tr. at III:116:18, see also tr. at I:36:11-12 (Kimberly Terra), I:80:25 (Ella Polonski); I:99:10 (Amanda Graul), II:6:16 and II:48:10-12 (Ashley Hines).  He made work rules, such as the requirement that employees arrive at least fifteen minutes early, tr. at I:70:22 to 71:1, and that they pay for their uniforms.  Tr. at III:201:4-6.  The uniform policy change showed that he was empowered to act against a previous policy made by his father, the nominal owner of the restaurant.  Tr. at III:202:14-15.  Michael Nanouh also changed the uniform rule when told that it was a problem

under the FLSA.  Tr. at III:206:1-11.  On a day-to-day basis, Nanouh also controlled assignments

by assigning and monitoring the completion of sidework.  Tr. at I:13:13-17, I:142:3-11, I:143:11-

15, III:123:16-18.  Although Nanouh delegated the actual schedule making, he controlled the

hours worked by employees by sending servers home early when the restaurant was slow.  Tr. at

III:122:19 to 123:22.  Nanouh also had control of employee records, as he took responsibility for

providing them to the Wage and Hour Division.[4]

Further, employees clearly considered Nanouh their supervisor.  He sent messages to

them through the point-of-sale system.  Tr. at I:143:22-25, III:146:17.  Nanouh called staff

meetings.  Tr. at II:13:7-9.  Nanouh held himself out as the vice president in public.  Tr. at

III:81:17 to 82:13.  Nanouh made the decision to purchase the point-of-sale system, and was able

to discuss in considerable detail the specific reasons for its use and benefits to him as a manager.

Tr. at III:119:11-25, 146:23, 149:24 to 152:7.  For example, he could use the system to monitor

the restaurant's sales and evaluate employee performance.  Tr. at III:154:15.  For all of these

reasons, Michael Nanouh was and is an employer with respect to the employees of the Exeter

Diner as per the FLSA.

### C.    Defendants violated Section 6(a) of the FLSA by failing to pay servers a minimum wage of at least $7.25 per hour and failing to comply with the Section 3(m) tip credit requirements.

Section 6 of the FLSA requires employers to pay employees a minimum wage of at least

$7.25 per hour for each hour worked.  29 U.S.C. § 206(a)(1)(c).  Employees cannot waive their

right to minimum wage.  *Barrentine v. Arkansas-Best Freight System*, Inc., 450 U.S. 728 (1981);

*Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697 (1945).  It is undisputed that Defendants never paid

---

[4] The fact that Michael Nanouh did a poor job of providing records to the WHD investigator
does not alter the fact that he claimed the ability to perform this task.

their servers hourly wages of $7.25 per hour.  Instead, Defendants unilaterally decided to pay servers a maximum of $2.83 per hour in wages.  And although an employer can pay employees a minimum wage as low as $2.13 per hour if it satisfies the requirements for claiming the FLSA tip credit, Defendants did not satisfy those requirements.  As detailed below, when taking into account all of the hours servers actually worked as recorded by the POS system, Defendants often paid servers less than the promised $2.83 per hour, and even less than the $2.13 per hour required by Section 3(m).  Paying $2.13 or less per hour is a *per se* violation of the FLSA's minimum wage requirements.  Defendants failed to meet their burden of proving that they complied with Section 3(m), making Defendants liable to their servers for the minimum wage for all hours worked.

Defendants argue that a portion of their servers' tips should be a credit toward the difference between their $2.83 hourly cash wage and the FLSA's $7.25 minimum hourly wage under Section 3(m).  29 U.S.C. § 203(m).  Defendants, however, bear the burden of proving compliance with the requirements for claiming tips as a credit under Section 3(m).  *Reich v. Chez Robert*, 28 F.3d 401, 403 (3d Cir. 1994).  Plaintiff need not prove a failure to comply with Section 3(m).  Defendants cannot avail themselves of the tip credit unless all requirements of Section 3(m) are met.  29 C.F.R. § 531.59(a).  Defendants failed to meet their burden in at least two distinct ways, each of which forms an independent basis to hold Defendants liable for the minimum wage of $7.25 per hour.

> 1. *Defendants cannot claim the Section 3(m) tip credit because they failed to prove that they paid servers at least $2.13 per hour.*

To show entitlement to the tip credit, an employer must establish that he paid a cash wage of at least $2.13 per hour.  29 U.S.C. § 203(m)(2)(A)(i); *see also* 29 C.F.R. § 531.59(a).  This requirement is mandatory and straightforward – it requires only that the employer pay of

payment of a small fraction of the minimum wage.  Defendants, however, failed to prove that they paid at least $2.13 per hour for all hours worked.  They have therefore failed to pay their employees the minimum wage required under the FLSA and are liable for the full $7.25 per hour.

a)      *Defendants paid servers nothing whatsoever for numerous hours worked.*

"Among the bedrock principles of the FLSA is the requirement that employers pay employees for *all* hours worked."  *Smiley v. E.I. Dupont De Nemours & Co.*, 839 F.3d 325, 330 (3d Cir. 2016), *cert. denied sub nom. E.I. Du Pont De Nemours & Co. v. Smiley*, 138 S. Ct. 2563 (2018) (citing 29 C.F.R. § 778.223; *Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901, 913 (9th Cir. 2004)) (emphasis added).  Defendants failed to meet this basic requirement by intentionally and willfully ignoring the clock-in and clock-out records created by their POS system and instead paying only for scheduled hours.  This pay-to-shift approach meant that Defendants did not pay for all hours worked.  These unpaid hours resulted in both minimum wage and overtime violations.

Despite implementing a computerized ordering system that created detailed records to track servers' activities, Defendants admit that they did not calculate servers' pay based on the time worked as reflected by the actual times that servers' clocked in or out – and still do not to this day.  Defendants recorded the actual clock-in and clock-out times, and refused to calculate servers' wages based on those actual work times.  Instead, Defendants paid (at most) for the time reflected on the schedule.  Defendants' computerized timekeeping data, as produced for approximately two years,reflects the minimum wage violations on the face of the resulting records.

18

Servers consistently testified that their practice was to clock in using the POS system after putting away their personal belongings and before starting to work.  Servers could not start taking orders until they were logged into the POS system.  When servers stayed beyond their scheduled shift, that time was captured by the POS system because servers typically clocked out after closing out or transferring all checks and completing their sidework.  Servers had to clock out of the POS system in order to get the Z strip and collect their credit card tips.

Servers, knowing that the POS system tracked their time and ordering, believed that they were being paid based on that information.  Defendants, however, intentionally ignored the POS records and instead paid only for those hours recorded on the handwritten schedule posted at the restaurant.  Defendants did not update those schedules to reflect servers' actual start and end times.  As a result, servers were paid no wages at all for work performed outside of their scheduled shift.  Printouts from Defendants' POS system show the exact time that each server clocked in and out.  (GX-1, GX-2.)  When compared with Defendants' payroll records (GX-3-6), it is evident that Defendants did not pay for all of the time that servers worked.  Thus, as to the period for which Defendants created and produced time records, there is a clear record of the time worked by servers.  Those records, in combination with the records of amounts actually paid, show that employees' hourly rates repeatedly fell below $2.13 per hour.

> (1)    To the extent Defendants kept time and pay records, such records obviate the need for reconstruction.

Employers are charged with the responsibility of creating accurate pay and time records. An employee generally must show that he "performed work for which he was not properly compensated."  *Rosano v. Twp. of Teaneck*, 754 F.3d 177, 188 (3d. Cir. 2014) (quoting *Anderson v. Mt. Clemens Pottery*, 328 U.S. 680, 687 (1946)); *see also Reich v. Gateway Pres, Inc.*, 13 F.3d 685, 701 (3d Cir. 1994).  Where employers keep the required records, "an employee easily

19

discharges this burden by securing the production of those records." *Rosano*, 754 F.3d at 188 (citing *Mt. Clemens*, 328 U.S. at 687). This is all the Secretary need do here.

With few exceptions, for the period from August 31, 2015 to August 31, 2017, Defendant created and maintained detailed records of employees' work times using their POS system. This data was generated contemporaneously by servers at the time that they entered their personal codes into the POS system. These computerized timestamps are the best available evidence of when servers started and stopped their individual workdays. Defendants admit, and the pay records confirm, that Defendants paid – at most – for only those hours shown on the handwritten schedule, not for the hours reflecting actual work times shown on the POS system. This is precisely the type of straightforward proof that courts anticipate where an employer has records of hours worked and amounts paid. *See Rosano*, 754 F.3d at 188 (citing *Mt. Clemens*, 328 U.S. at 687). This Court need not – and should not – look beyond those records to determine the existence of minimum wage violations for the period during which such records were kept.

> (2) *Even if reconstruction is necessary, Defendants' records remain the best evidence of hours worked.*

Defendants will argue that while time records exist, those records do not reflect actual work time. This argument does not entitle Defendants to the opportunity to create a *Mt. Clemens*-type reconstruction. Unlike any distraction campaign that Defendants may present in this litigation, the POS time records were contemporaneous, created by Defendants, and at all times controlled by Defendants' own instructions and requirements. Even if the time records do not show a to-the-second measure of actual time spent on specific work tasks, they remain – short of time travel – the best evidence of the hours worked.

Where an employer fails to keep accurate records, "the employee will only be required to 'submit sufficient evidence from which violations of the [FLSA] and the amount of an award

may be reasonably inferred.'" *Rosano*, 754 F.3d at 188, (quoting *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1297 (3d Cir. 1991) (citing *Mt. Clemens*, 328 U.S. at 688)).  The employee need only present enough evidence to support a "fair and reasonable" inference that work was performed for which the employee was not properly compensated.  *Mt. Clemens*, 328 U.S. at 687*; see also Williams v. Tri–County Growers, Inc.*, 747 F.2d 121, 128 (3d Cir. 1984).  Once an employee or the Secretary presents a reasonable reconstruction of the hours worked and wages owed, the burden shifts to the employer to rebut the reasonable inferences of liability and damages by presenting "evidence of the precise amount of work performed."  *See Selker Bros.,* 949 F.2d at 1297 (quoting *Mt. Clemens*, 328 U.S. at 687-88).  If the employer fails to meet its burden, the employee must be awarded damages, even if "the result may only be approximate." *Selker Bros.,* 949 F.2d at 1297 (quoting *Mt. Clemens,* 328 U.S. at 687).

Where an employer actually creates and maintains records, *Mt. Clemens* burden-shifting does not apply because there is no need for such "numerical approximation."  *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1279 (11th Cir. 2008).  *Mt. Clemens* is not intended to permit an employer to offer post-hoc rationalizations or alternative reconstructions in an effort to rebut their own records.  To the contrary – the law is clear that an employer's recordkeeping failures cannot be used to "penalize the employees by denying recovery based on an inability to prove the extent of the undercompensated work."  *See, e.g.*, *Selker Bros.*, 949 F.2d at 1297 (citing *Mt. Clemens*, 328 U.S. at 687)).  Rather, "having received the benefits of [the employees'] work," – and here the additional benefit of work at only 40 percent of the minimum wage rate – an employer "cannot object to the payment for the work on the most accurate basis possible under the circumstances."  *Id.* (quoting *Mt. Clemens*, 328 U.S. at 688).  Here, during the period for

which Defendants' produced their own detailed time records, those records are the most accurate basis on which to determine hours worked.

Courts clearly envision that employees and the Secretary should be able to rely on the mandatory records to establish liability and damages.  *See Rosano*, 754 F.3d at 188 (citing *Mt. Clemens*, 328 U.S. at 687).  Allowing employers to avoid liability by disclaiming or undermining their own records in litigation makes the FLSA's recordkeeping requirements meaningless. Defendants' after-the-fact disagreement with their own records is just the sort of "creative bookkeeping" that courts have rejected as contrary to the purpose of the FLSA.  *See, e.g.*, *Smiley v. DuPont De Nemours & Company*, 839 F.3d 325, 334 (3d. Cir. 2016), *cert. denied sub nom. E.I. Du Pont De Nemours & Co. v. Smiley*, 138 S. Ct. 2563 (2018).

"Creative bookkeeping" is a particularly apt description where, as here, the employer requires employees to clock in and out and creates a false impression that employees will be paid based on the computerized time records.  Defendants made deliberate and unilateral decisions about how to record and pay for employee's time.  Defendants had every opportunity – and every motivation, if they were truly attempting to comply with the FLSA – to correct any inaccuracies in its time records at or near the time they were made.  Thus, Defendants should not be permitted to avoid liability by disclaiming their own records or by offering a self-serving proof to undermine accurate records of employees work time.

The fact that courts permit employers to rely upon similar time clock records to counter employee testimony about the amount of time worked underscores the fundamental unfairness of permitting an employer to manufacture a factual dispute by contradicting its own required time records.  For example, in *Alexander v. Caraustar Industries, Inc.*, an employer relied on conflicts between employee declarations and the company's time clock records to undermine employees'

testimony about how long they spent donning and doffing PPE.  930 F.Supp.2d 947 (N.D. Ill.

2013).  In *Alexander*, defendant sought dismissal as a sanction, arguing that the inconsistency

between plaintiffs' statements as to work performed and the time records constituted perjury.  *Id.*

at 949-950.  The fact that the court granted this motion – despite the absence of any evidence that

the plaintiffs were aware of the clock-in and clock-out records prior to being confronted with

them at deposition – demonstrates the critical importance that courts place on an employer's time

records.  Permitting employers to selectively disclaim their time records inappropriately allows

such records to act as both sword and shield against employees.  This was clearly not the intent

of the recordkeeping requirements, which aimed, *inter alia*, to protect employees by requiring

records upon which they and the Secretary can rely in investigating or litigating matters under

the Act.  *See* 29 U.S.C. §§211(a), (c) (authorizing investigations and collection of data and

requiring employers to create and preserve records); *see also Rosano*, 754 F.3d at 188

(employees can meet burden of showing time worked and amounts paid by securing employer's

records of same) (citing *Mt. Clemens*, 328 U.S. at 687).

Furthermore, time records maintained and produced by an employer are admissions of a

party opponent.  *See* Fed. R. Evid. 801(d)(2)(A).  While few judicial decisions examine this issue

– perhaps because employers rarely attempt to disclaim detailed time sheets – those that do

support that an employer's time records be treated as admissions.  *See, e.g.*, *Cervantes v. Cotter*

*& Sons, Inc.*, Civ. A. No. 15-287, 2016 WL 2624957, *3 (W.D. Tex. Apr. 7, 2016) (citing

*Mendoza v. A & A Landscape & Irrigation, LP*, Civ. A. No. 12-562, 2014 WL 6627741, *2

(E.D. Tex. Nov. 21, 2014)).  Treating time records as admissions goes hand-in-hand with the

employer's obligation to create and keep records under the FLSA.  *See id*.  Thus, for the period

from August 31, 2015 to August 31, 2017, the only accurate and appropriate measure of hours worked is the detailed recorded clock-in and clock-out times from Defendants' POS system.

Defendants have failed to rebut the reasonableness or accuracy of the Secretary's evidence – either direct or reconstructed[5] – of the hours worked by servers.  Despite their unfettered access to their own records and employees, they have failed to meet their burden to present precise and detailed evidence to negate the reasonable inferences drawn by the Secretary. This failure is particularly troubling where Defendants would ask the Court to extrapolate evidence of compliance from the vague testimony of a few employees – in essence seeking, without legal authority, to apply *Mt. Clemens* to their own benefit.

Defendants will argue that the POS records are not accurate because servers sometimes forgot to clock out.  cannot show that these failures were more than isolated incidentsServers consistently testified that while they may have forgotten on a few occasions, their practice was to clock out at the end of the night so that they could retrieve their credit card tips.  The available POS records – which Mowday painstakingly compared with the handwritten schedules – confirm that there were few instances in which the POS records show a failure to clock out.  If servers in fact forgot to log out, it was obvious because the POS records showed clock-out and clock-in times within a minute or two of each other as the server clocked out and then immediately clocked back in upon arrival for the next shift.  ADD Mowday adjusted for such errors by using a clock-out time that reflected the hours typically worked by a particular employee.  Thus, even

_____

[5] As set forth in Part III.J.5, *infra*, reconstruction pursuant to *Mt. Clemens* was appropriate where there were gaps in the records, but such reconstruction can be – and was – properly based on the existing records.

with two years of POS records, Defendants cannot point to enough instances of servers' failing to clock out to present any meaningful challenge to the accuracy of those records.

With respect to wages paid, the Secretary – as intended by *Mt. Clemens* and its progeny – relied on Defendants' payroll records. Defendants' challenge to this approach, as discussed further in Part III.J.5, *infra*, falls well short of their burden to present specific and detailed evidence. *See, e.g.*, *Selker Bros.*, 949 F.2d at 1298  Furthermore, Defendants' arguments are more appropriately a question of damages – not liability – as they go to the scope rather than the presence of the minimum wage violations.

    (3) *Defendant's servers engaged in work both before and after their scheduled shift times.*[6]

Servers regularly clocked in and started work before the time reflected on the handwritten schedule. Servers were instructed to arrive between 15 and 30 minutes prior to the scheduled start of their shift. *See supra* Part II.C. They were expected to, and in fact did, use that time performing tasks necessary to prepare to serve customers, including checking and restocking tableware and condiments, and finding out the daily specials. *Id.* Servers also often continued working after the time reflected on the handwritten schedule. *Id.* They stayed late to complete sidework and to close out tables. *Id.* If customers were not finished when their servers' shift ended, their server had to either stay until the table cashed out or forfeit the tip for that table. *Id.* When servers stayed because one or more table lingered after the end of the shift, they remained

---

[6] The Secretary does not assert in this case that the tip credit should be denied based on an excessive amount of sidework or other typically non-tipped work performed by servers. Here, the amount of sidework goes not to whether these servers could qualify as tipped employees for Section 3(m) purposes, but rather to whether they performed work for which they were not compensated.

responsible for those tables, including refilling drinks and taking any checking to make sure customers were satisfied.  *Id.*

These activities clearly constitute work for which servers must be compensated.  Servers described these tasks as something that they knew they needed to do, even when not specifically instructed by management.  *See, e.g.*, Tr. at I:161:2-5.  These were typical tasks for diner servers, and were understood to be part of their jobs – at Exeter and at other restaurants where they worked.  Servers cannot serve without adequate flatware, dishes, and condiments.  They cannot take orders for specials of which they are unaware.  These tasks were sometimes accomplished before or after servers' scheduled shifts, but were also performed during the course of their scheduled shift.

> b)   *Even when Defendants paid servers, they frequently paid less than $2.13 per hour.*

While Defendants paid servers for some of their hours at $2.83 per hour, they paid many hours at a rate of less than the $2.13 per hour required to qualify for the Section 3(m) tip credit.

> (1)   *To the extent Defendants paid servers portions of their wages in cash, they failed to show that they paid at least $2.13 per hour.*

Defendants claim that they frequently paid servers portions of their wages in cash.  As discussed above, Defendants kept no records of these claimed cash payments, and the evidence at most supports that five servers who testified at trial received some wages in cash.  Those servers who said they received cash described that, with the exception of the $30 shift rate for third shift,[7] cash payments were made at a rate of approximately $2.00 per hour.   Servers were

---

[7] To the extent that there is evidence that individual servers actually received $30 for specific shifts, that amount would generally cover up to fourteen hours at $2.13 per hour or four hours at the $7.25 per hour.  Thus, the $30 shift rate is only arguably sufficient to the extent that

given the impression that the reduced hourly rate for cash payments was due to taxes. Servers never received tax documentation for these cash payments, nor is there evidence that Defendants actually calculated, withheld, or paid any taxes for these payments. Defendants cannot take credit for the payment of portions of wages that *could* have been withheld when they did not *actually* withhold those amounts. Thus, to the extent that there is any evidence of hourly wages paid in cash, those wages were paid at less than the required $2.13 per hour.

2. *Defendants cannot claim the Section 3(m) tip credit because they failed to prove that they informed each of their servers of the amount of the cash wage employees would be paid or the amount of the tip credit claimed.*

Defendants failed to meet their burden of proving that they informed their servers of their claim of the tip credit. This failure provides an independent basis for denying Defendants the Section 3(m) tip credit as to all servers and all workweeks. The FLSA makes clear that the tip credit "shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of [Section 3(m)]." 29 U.S.C. § 203(m)(2)(A). Regulations further codify employers' affirmative duty to inform their tipped employees prior to claiming the Section 3(m) tip credit:

> [1] The amount of the cash wage that is to be paid to the tipped employee by the employer; [2] the additional amount by which the wages of the tipped employee are increased on account of the tip credit claimed by the employer, [3] which amount may not exceed the value of the tips actually received by the employee; [4] that all tips received by the tipped employee must be retained by the employee except for a valid tip pooling arrangement limited to employees who customarily and regularly receive tips; and [5] that *the tip credit shall not apply to any employee who has not been informed of these requirements in this section*.

---

Defendants prove that they met all other requirements of the tip credit. Furthermore, Defendants' failure to keep records of their claimed cash payments makes it impossible to determine exactly how often servers working third shift may have been paid their shift pay in cash.

29 C.F.R. § 531.59(b) (emphasis added). The Third Circuit has long held that Defendants, as

employers, bear the burden of proving to the Court that they "inform" each tipped employee of

their claim of the tip credit:

> Section 3(m) therefore allows an employer to reduce a tipped employee's wage
> below the statutory minimum by an amount to be made up in tips, but only if the
> employer informs the tipped employee that her wage is being decreased under
> section 3(m)'s tip-credit provision. If the employer cannot show that it has
> informed employees that tips are being credited against their wages, then no tip
> credit can be taken and the employer is liable for the full minimum-wage.

*Reich v. Chez Robert, Inc.*, 28 F.3d 401, 403 (3d Cir. 1994) (*Chez Robert II*) (citing *Martin v.*

*Tango's Restaurant, Inc.*, 969 F.2d 1319, 1322-23 (1st Cir. 1992)). Courts have consistently

held that employers bear the burden of proof. For example, in *Tango's*, the First Circuit held that

Section 3(m) requires "at the very least notice to employees of the employer's intention to treat

tips as satisfying part of the employer's minimum wage obligations. It could easily be read to

require more…" 969 F.2d at 1322-23. This "more" was clearly codified in 2011 with the

implementation of 29 C.F.R. §531.59(b), and the specificity embodied in both Section 3(m) and

the regulations have been rigorously enforced by other courts in this district. For example, a

restaurant did not adequately "inform" a waiter of the tip credit where it failed to tell him (1) that

the restaurant would credit his tips against his wages (2) the amount of cash wages he would be

paid and (3) that the tip credit could not be applied to employees not informed of Section 3(m)

requirements. *Wright v. Ristorante La Buca, Inc.*, Civ. A. No. 18-2207, 2018 WL 5259469, at *5

(E.D. Pa. Oct. 22, 2018). Notably, the failure to provide notice of the amount of cash wages was

due, in part, to the fact that the waiter was paid a flat shift rate but worked shifts of varied

lengths, causing his hourly rate to fluctuate. *See id.*

Furthermore, a court cannot "alleviate the harsh results of the notice requirement by

reducing damages out of an equitable sense that some offset for tips should be allowed." *Id.*

28

District courts lack such discretion because of the clear and mandatory language of Section 3(m). *Id.* (citing *Richard v. Marriott Corp.*, 549 F.2d 303 (4th Cir. 1977) (rejecting mitigation of tip credit damages). Thus, the Third Circuit has made clear that while the sanctions for failing to meticulously comply with the requirements of Section 3(m) are harsh, they are mandatory.

Servers consistently testified that Defendants did not tell them – either in writing or verbally – that Defendants planned to claim the tip credit. Servers did not receive a handbook or offer letter. Servers were told, at most, that they would be paid $2.83 per hour and that they could keep their tips. Even if this were sufficient to meet the requirement to "inform" employees of the Section 3(m) tip credit, this information was simply not accurate. Servers were not paid $2.83 for all hours worked. Instead, they were paid a variety of different rates – some hours were entirely unpaid, others were paid at $2.00 or less, and some were paid at $2.83. This statement was even less accurate for those servers who were paid a $30 shift rate for third shift.

Defendants will argue that the twenty-year old generic labor law poster was sufficient notice under Section 3(m). Defendants presented no evidence, however, of what that poster actually said or whether it contained the information required by Section 3(m). The photograph provided by Defendants was taken from a distance, making it largely illegible. (*See* Defs. Ex. 1.) Without the ability to read the content of the poster, particularly any content purportedly relating to the tip credit, the Court cannot evaluate whether it meets any portion of the notice requirements of Section 3(m). *See, e.g.*, *Prusin v. Canton's Pearls, LLC*, Civ. A. No. 16-0605, 2017 WL 5126156, at *5 (D. Md. Nov. 6, 2017) (illegible photo of poster deprives court of ability to evaluate whether language complies with Section 3(m)). Furthermore, such generic postings fail to meet the requirements of Section 3(m) because they do not state the employer intends to take a tip credit as to a specific employee and they do not provide the amount of the

direct wage or the amount of the claimed credit.  ""*See, e.g.*, *Salinas v. Starjem Rest. Corp.*, 123 F.Supp.3d 442, 467 (S.D.N.Y. 2015) ("Although '[a] generic government poster could inform employees that minimum wage obligations exist, [it] could not possibly inform employees that their employers intend to take the tip credit with respect to their salary.'"); *Gamero v. Koodo Sushi Corp.*, 272 F. Supp. 3d 481, 505 (S.D.N.Y. 2017) ("At most, [Defendant] told Plaintiffs that she would be deducting a set "tip credit" from their hourly wages. [Defendant] did not . . . communicate[] to Plaintiffs that any tips they received would "be[ ] credited against their wages" in order to achieve minimum wage."").  A leading industry group directly acknowledged – and even relied upon – the insufficiency of the general FLSA poster for Section 3(m) purposes in an unsuccessful challenge to the Section 3(m) implementing regulations.  *See Nat'l Rest. Ass'n v. Solis*, 870 F. Supp. 2d 42, 60 (D.D.C. 2012) (arguing that 29 C.F.R. §531.59(b) is burdensome because "a poster…will not do").

Defendants failed to meet their burden of proving they informed each server that Defendants would credit tips against servers' wages.  Defendants further failed to show that they notified servers of the amount in cash wages that would be paid and the amount of the tip credit.  Under the plain text of Section 3(m), its implementing regulations, and Third Circuit precedent, Defendants' failure to inform each server that their wages would be reduced on account of tips, or the amounts of their cash wages or the claimed credits, precludes them from claiming the tip credit, making them liable for the minimum wage of $7.25 per hour for all hours worked by all servers after March 30, 2014.

### D. Defendants violated Section 6(a) of the FLSA by charging servers for the cost of required uniforms.

Defendants admit that from at least March 30, 2014, up to the point of Wage and Hour's investigation in June 2016, they charged servers for required uniform items.  Specifically, servers

paid a total of $35.75 for a shirt with Exeter's logo on it and a matching apron.  Servers were required to purchase at least one shirt and one apron when they started their employment.  Where the nature of the employer's business requires employees to wear a uniform, such uniforms are a benefit to the employer and cannot properly be deducted from employees' wages.  *See* 29 C.F.R. §531.3(d); *see also Barvinchak v. Indiana Reg. Med. Ctr.*, Civ. A. No. 06-69, 2008 WL 1847163, at *6 (W.D. Pa. 2008) (quoting *Wage and Hour Law: Compliance and Practice* § 8:22 (2008)) (cost of the uniforms cannot be imposed upon the employees if it would reduce the employee's wage below the minimum).

While these amounts were not directly deducted from servers' checks, requiring servers to pay out-of-pocket for these items had the same effect as a deduction in that it reduced their total direct wage payment for that workweek.  *See, e.g.*, *Reich v. Chez Robert*, 821 F. Supp. 967, 973 (D.N.J. 1993) (*Chez Robert I*), *vacated on other grounds*, 28 F.3d 401 (3d Cir. 1994)(treating cost of tuxedos purchased out-of-pocket by servers as reducing hourly wages below the minimum wage in some workweeks)(internal citations omitted).  Even if Defendants could properly claim the tip credit (which they cannot), tipped employees are at best minimum wage employees.  Thus, the $35.75 cost of their first uniform would cause servers' wages to drop below the minimum wage threshold in that workweek.  Thus, regardless of any tip credit, Defendants are still liable for the cost of servers' initial uniform purchase.

### E.  *Defendants Violated the FLSA Overtime Provisions*

####  1.  *Defendants violated Section 7(a) of the FLSA by failing to pay their servers the proper time-and-a-half overtime premium.*

Section 7 of the FLSA forbids an employer from employing any worker "for a workweek longer than 40 hours unless such employee receives compensation ... at a rate not less than one and one-half times the [worker's] regular rate" for the excess hours. 29 U.S.C. § 207(a)(1);*see*

*also Brock v. Claridge Hotel and Casino*, 846 F.2d 180, 183 (3d Cir. 1988), *cert. denied*, 488 U.S. 925 (1988).  Employees cannot waive their right to overtime under the FLSA; to permit otherwise would nullify the purposes of the statute and frustrate Congressional intent. *Barrentine*, 450 U.S. at 740 (1981).

Defendants failed – with one notable exception – to pay *any* overtime premiums to servers.  The handwritten schedules and POS time records establish that several servers regularly worked over 40 hours.  Other servers occasionally went over 40 hours.  Defendants' payroll records, however, only reflect servers' hours up to 40 in a workweek, even when the handwritten schedules show hours in excess of 40.  Servers consistently testified that they did not receive an increased hourly rate for hours worked over 40 in a workweek.

To the extent that there is any evidence that hours worked over 40 were paid at all, much less paid at time-and-a-half, it appears that certain servers were paid in cash for hours worked over 40.  With the exception of the $30 shift rate for third shift, which also fails to satisfy the overtime premium requirement, the cash payments were made at the same rate of $2.00 per hour regardless of whether there were hours worked over 40.  Thus, there is little dispute that Defendants failed entirely to pay overtime premiums to servers.

Notably, the payroll records reflect one instance in which a server's hours exceeded 40 in a workweek.  In that lone instance, Minicozzi was paid time-and-a-half for the reported hours over 40.  By reporting only hours up to 40, Defendants effectively avoided any automatic calculation of overtime or other checks that Defendants' payroll provider might have put on Defendants' flouting of the FLSA's overtime requirements.

2.     *Defendants violated Section 7(a) of the FLSA by failing to pay the proper overtime premium to Ivan Garcia-Lopez.*

Defendants violated Section 7 of the Act when they failed to pay the overtime premium to Ivan Garcia-Lopez in weeks that he worked more than 40 hours.  Prior to April of 2018, Garcia-Lopez routinely worked 50 hours a week across 6 days and was not paid any overtime premiums, a fact that is apparent on the face of the records and reinforced by testimony.  GX-8; tr. at I:198:4.  The FLSA Section 13(a) exemption does not apply to Garcia-Lopez because Defendants cannot show that his treatment meets either the duties or salary tests laid out in 29 C.F.R. Part 541 subparts B and G.

As an initial matter, Garcia-Lopez is presumed to be an hourly employee who is due overtime unless Defendants prove that he falls into the FLSA Section 13(a) exemption. *See Martin v. Cooper Elec. Supply Co.*, 940 F2d 896, 900 (3d Cir. 1991) (burden of proving FLSA exemption is on employer).  The FLSA exempts only "employee[s] employed in a bona fide executive, administrative, or professional capacity . . . (as such terms are defined and delimited from time to time by regulations of the Secretary)."  29 U.S.C. § 213(a)(1).  The Secretary's regulations are at 20 C.F.R Part 541.

Defendants appear to be arguing that Garcia-Lopez is a "salaried" employee who falls under the executive exemption, however he neither had a bona-fide salary as defined by Part 541 subpart G, nor does he meet the duties test of the subpart B executive exemption.  In order for him to have been exempt from the overtime rules, Defendants must meet both tests with regards to Garcia-Lopez's compensation.

Executive employees must be compensated on a salary basis and their primary duty must be "management of the enterprise" or of a "recognized department or subdivision," and they must direct the work of two or more employees.  29 C.F.R. § 541.100(a).  "Salary basis" is

placed first in that test because "the salary paid to an employee is the 'best single test' of exempt status." 69 Fed. Reg. 22122, 22165 (April 23, 2004) (Department of Labor statement accompanying implementation of Part 541). This is a long-held and well known position of the Department of Labor, having "existed largely in its present form since 1954." *Auer v. Robbins*, 519 U.S. 452, 457 (1997).

Defendants did not pay Garcia-Lopez a bona fide salary as defined by the regulations because both the records and his testimony show that he was paid on an hourly basis "subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602. A salary cannot be reduced because of "absences occasioned by the employer or by the operating requirements of the business." *Id.* For example, when the weather was bad or business was slow, Garcia-Lopez was sent home early without pay for the missed hours of his shift. Tr. at I:189:13-20. Defendants have not contradicted Garcia-Lopez's testimony on this point and it is their burden to prove that he had a bona-fide salary. As they have not met that burden, Garcia-Lopez does not qualify for the executive exemption.

Even if the Court were to find that Garcia-Lopez was paid a salary, he does not meet the other duties tests laid out by the regulations: management of a department, true supervision of two or more employees, and the ability to hire or fire employees. 29 C.F.R. § 541.100(a)(2) to (4). The Department has more specifically and extensively defined "management" at 29 C.F.R. § 541.102, and the Third Circuit has held that a manager is someone whose discretion is "critical to the successful operation of the enterprise." *Guthrie v. Lady Jane Colleries, Inc.*, 722 F.2d 1141, 1145 (3d. Cir. 1983). In *Guthrie*, the court found that the fact that mine foremen conducted safety inspections, ensured that work was done according to plan, trained new crew members and kept records made them managers under the FLSA. *Id.* In contrast, the circuit has

held that a "yard master" was not an exempt manager because although he oversaw a crew of employees, he was mostly a conduit for instructions from other departments to move, load, and unload railroad cars. *Rothman v. Publiker Indus.*, 201 F.2d 618, 620 (3d Cir. 1953). Another important factor identified by the Circuit is whether the putative manager operates independently. *Guthrie*, 722 F.2d at 1146 (citing *Donovan v. Burger King*, 675 F.2d 516, 521 (2d Cir. 1982).

When other courts have found restaurant personnel to be FLSA-exempt managers, those employees have been the most senior persons in the business at a particular time (*Burger King*, 675 F.2d at 521) or have been the "executive chef" who plan menus, make assignments, and decide supply levels. *E.g. Scherer v. Compass Group USA, Inc.*, 340 F.Supp.2d 942, 952 (W.D. Wisc. 2004) (exempt chef set menus, assigned tasks, determined supply levels, and could have staff extend their shifts to some degree).

Under both the regulations and case law, Garcia-Lopez is not a manager. He does not hire or fire, determine rates of pay for other employees, decide on techniques to use or equipment to purchase, among other things. When he orders supplies, he counts inventory and ensures stock is at levels that Renninger wants to maintain. Tr. at I:181:3-9. Even Michael Nanouh called the kitchen's ordering "a very simple process" during his testimony. Tr. at III:155:1. Renninger, not Garcia-Lopez, creates new dishes and specials for the restaurant. Tr. at I:180:1-7. Renninger or another manager are always present during Garcia-Lopez's shifts. Tr. at I:182:15-25. Similar to the yard master in *Rothman*, Garcia-Lopez may pass instructions to the line cooks, but Defendants have not produced any evidence that he has true discretion over their work;

rather, the line cooks (and Garcia-Lopez) are executing a menu planned by Renninger.[8]

Defendants have not identified any specific duties that both call for Garcia-Lopez's personal

discretion and are critical to the success of the enterprise.  Accordingly, he is not an exempt

employee and is entitled to overtime.

### F.     Defendants Violated the FLSA Recordkeeping Provisions

Defendants violated Section 11(c) of the FLSA by failing to make, keep, and preserve

records of employment.  Section 11(c) of the FLSA, 29 U.S.C. §U.S.C. 211(c), requires

employers to "maintain accurate records to ensure that all workers are paid…for every hour

worked."  *Williams v. Tri-County Growers, Inc.*, 747 F.2d 121, 128 (3d Cir. 1984).  The burden

is on the employer to keep accurate wage and time records.  *Dole v. Solid Waste Serv., Inc.*, 733

F. Supp. 895, 924 (E.D. Pa. 1989), *aff'd*, 897 F.2d 521 (3d Cir. 1990), *cert. denied*, 497 U.S.

1024 (1990).  An employer may not simply delegate its recordkeeping duties to its employees.

*Keubel v. Black & Decker Inc.*, 643 F.3d 352 (2d Cir. 2011).

Employers must maintain and preserve payroll records for at least three years.  29 C.F.R.

§516.2, 516.5(a).  Payroll records for employees subject to the Section 6 minimum wage and

Section 7 overtime requirements – which includes all of Defendants' servers and, as discussed

above, their sous chef – must include full names, home addresses, dates of birth, sex, occupation,

time and day of the start of their workweek, regularly hourly rate of pay, hours worked each day

and each workweek, total weekly straight-time earnings, total weekly overtime premium pay,

---

[8] Contrast Garcia-Lopez's lack of discretion with that of Michael Nanouh, who as second shift manager will send servers home when the restaurant is slow.  Tr. at III:123:2-22.  This is the type of "management" decision that courts have looked at in FLSA restaurant cases.  *Burger King*, 675 F.2d at 521.  There is no evidence that Garcia-Lopez had that power, or even the power to reassign a line cook.

total additions to or deductions from wages, total wages paid each pay period, and date of

payment and period covered by payment.  29 C.F.R. §§ 516.2(a)(1)-(12).  Employers must also

preserve "all basic time and earning cards or sheets on which are entered the daily starting and

stopping time of individuals" for two years from the date of last entry.  29 C.F.R. § 516.6.

Defendants admit that they violated the recordkeeping provisions of Section 11(c) of the

FLSA, 29 U.S.C. § 211(c), by failing to make, keep, and/or preserve records of the wages, hours,

and other conditions and practices of employment.  Defendants kept only a year of records

showing actual starting and stopping times.  Defendants admittedly kept no records of wages

paid in cash.  Defendants kept no records of the amount by which tipped employees' wages were

deemed increased by tips – in other words, the amount of the tip credit Defendants claimed –

under Section 3(m). 29 C.F.R. § 516.28.

### G.     *Defendants' Violations Were Willful*

While the general statute of limitations for minimum wage and overtime violations under

the FLSA is two years, an employer's willful conduct extends the back wage period by an

additional year. 29 U.S.C. § 255(a). A willful violation of the FLSA occurs when an employer

knows or shows reckless disregard for the matter of whether its conduct is prohibited by the

FLSA.  *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). Reckless disregard can be

shown through "action entailing an unjustifiably high risk of harm that is either known or so

obvious that it should be known."  *Mumby v. Pure Energy Services (USA), Inc.,* 636 F.3d 1266,

1270 (10th Cir. 2011) (*citing Safeco Ins. Co. of America v. Burr,* 551 U.S. 47, 68 (2007)). The

evidence at trial proves that Defendants' conduct and violations were willful under the FLSA in

several principal ways.

1.    *Defendants' violations are willful because they failed to pay any wages whatsoever for numerous hours worked.*

Defendants' decision to ignore their own detailed records of servers' actual start and stop times is beyond negligent.  This reflects a conscious business decision to violate the most basic requirement of the FLSA – that employees be paid at least the minimum wage for all hours worked.  The trial testimony, including that of the server charged with making and updating the schedules, establishes that servers trusted that they would be paid for all hours they worked based on their clock-in and clock-out times.  Defendants betrayed this trust by paying only for scheduled hours, effectively shaving off time on a daily basis to the detriment of workers already paid a small fraction of the minimum wage.  Defendants cannot credibly claim to be ignorant of the need to pay employees for all hours worked.  That Defendants, at least as of the time of Nanouh's deposition (GX-28 at 109:23-110:6), continued to pay only for scheduled time, reflects a complete disregard for this most fundamental requirement of the FLSA and supports a finding that Defendants' conduct was willful.

2.    *Defendants' violations are willful because they failed to keep any records of claimed payments of wages in cash.*

An employer's recordkeeping practices may corroborate willfulness in failing to properly compensate their employees.  *See Elwell v. University Hospitals Home Care Services*, 276 F.3d 832, 844 (6th Cir. 2002) (failure to keep records could suggest to the factfinder that the employer was acting to eliminate evidence that might be used against it); *Chao v. Hotel Oasis Inc.,* 493 F.3d 26, 35 (1st Cir. 2007); *Ramirez v. Rifkin*, 568 F.Supp.2d 262 (E.D.N.Y. 2008).  It is undisputed Defendants did not keep any records of cash wages they claim should negate or significantly reduces their liability.  Given the clear evidence Defendants failed to pay for numerous hours and failed to pay overtime, Defendants' failure to keep records demonstrates their violations were willful.

3.  *Defendants' violations are willful because they deliberately paid cash for hours over 40 to avoid notifying their accountant that overtime might be due.*

Defendants not only failed to pay overtime premiums – another basic requirement of the FLSA of which they acknowledge they were aware – but also structured their payments to servers to avoid notifying their accountant that employees were due overtime.  Defendants' payroll records reflected only those hours worked by servers up to 40 in a workweek. Defendants clearly did not report hours over 40 to their accountant despite the fact that both the handwritten schedules and POS time records regularly showed several servers exceeding the overtime threshold.  The one instance in which Defendants *did* report hours over 40 – shortly after they were visited by a Wage and Hour investigator – the payroll reflects that those hours were paid a the correct premium rate.  Thus, by not reporting hours over 40, Defendants avoided any automatic function that would require the payment of overtime, or any scrutiny that their accountant may have applied in processing servers' payroll.  By paying "overtime" in cash at a rate below the minimum wage, without any overtime premium, and without keeping any records reflects a deliberate effort to avoid well-known and longstanding overtime obligations.  These efforts to evade paying overtime continued until at least April 2018, further evidencing Defendants' willfulness in violating servers' rights to overtime pay.

**H.   Defendants are liable for liquidated damages in an amount equal to their liability for minimum wage and overtime back wages.**

Under Section 16(c), the Secretary may recover both unpaid wages and an additional equal amount in liquidated damages for violations of Sections 6 and 7 of the FLSA.  29 U.S.C. § 216(c).  Liquidated damages are not punitive, but compensatory – they compensate employees for losses they might suffer by reason of not receiving their lawful wage at the time it was due. *Cooper Elec. Supply Co.*, 940 F.2d at 907.

In challenging the appropriateness of liquidated damages, Defendants, not the Secretary of Labor, bear the "plain and substantial" burden of establishing both good faith and reasonable grounds for the violation. *Id.*; *Marshall v. Brunner*, 668 F.2d 748, 753 (3d Cir. 1982). "In the absence of such a showing, the district court has no discretion to mitigate an employer's statutory liability for liquidated damages." *Id.; Selker Bros., Inc.* 949 F.2d at 1299 ("If the employer fails to carry its burden of demonstrating good faith and reasonable grounds, the award of liquidated damages is mandatory."). An employer's burden of proof is thus "a difficult one to meet." *Cooper Elec. Supply Co.*, 940 F.2d at 908 (*citing Brock v. Wilamowsky,* 833 F.2d 11, 19 (2d Cir. 1987)). "Double damages are the norm, single damages the exception." *Id.* (*citing Walton v. United Consumers Club, Inc.,* 786 F.2d 303, 310 (7th Cir 1986)).

### 1. The legal standard for liquidated damages.

First, to carry its burden of establishing good faith, Defendants must first show they took affirmative steps to ascertain the FLSA's requirements, but nonetheless, violated its provisions. *Cooper Elec. Supply*, 940 F.2d at 908. Defendants must prove "an honest intention to ascertain and follow the dictates of the Act." *Brunner*, 668 F.2d at 753. Defendants presented no evidence to meet this first part of their burden of defeating otherwise mandatory liquidated damages. Further, any testimony that Defendants claim their employees did not complain about their illegal employment practices (*E.g.*, Tr. at I:63:22 to 64:2) is completely irrelevant:

> The fact that an employer has broken the law for a long time without complaints from employees does not demonstrate the requisite good faith required by the statute. Moreover, the employee need not establish an intentional violation of the Act to recover liquidated damages. Instead, *the employer must affirmatively* establish that he acted in good faith by attempting to ascertain the Act's requirements.

*Williams v. Tri-Cnty. Growers, Inc.*, 747 F.2d 121, 129 (3d Cir. 1984) (emphasis added, internal citations omitted).

Next, the "reasonableness" requirement requires that Defendants had objectively reasonable grounds for believing they were in compliance. *Id*. "The additional requirement that the employer have reasonable grounds for believing that his conduct complies with the Act imposes an objective standard by which to judge the employer's behavior." *Id.* To satisfy the standard the employer must act "as a reasonably prudent man" would under the same circumstances. "[I]gnorance alone is not sufficient in meeting the objective test." *Brooks v. Village of Ridgefield Park*, 185 F.3d 130, 137 (3d Cir. 1999). Merely proving that Defendants did not act intentionally, had good intentions, or were ignorant of the law is not sufficient to avoid liability for liquidated damages once a violation of the law is found. *Reich v. Brenaman Electrical Service*, Civ. No. 95-3737, 1997 WL 164235, at *8 (E.D. Pa. Mar. 28, 1997) (citing *Tri-Cnty. Growers, Inc.*, 747 F.2d at 129 ("[a] good heart but an empty head does not produce a defense" against liquidated damages)). Further, "[A]dherence to customary and widespread industry practices . . . is not evidence of an objectively reasonable good faith violation." *Cooper Elec. Supply Co.*, 940 F.2d at 910.

### 2. *Defendants failed to prove their subjective good faith.*

Defendants failed to meet their burden of proving subjective good faith because they not only made no attempt to investigate whether they were in compliance with the FLSA (GX-9, GX-10, at Admission 6), they took a variety of active steps to conceal their violations. Defendants claim to have paid cash wages to their employees, although they maintained no records of such payments. The cash to servers was at below-minimum wage rates, and the cash for overtime to servers and Ivan Garcia-Lopez was paid at straight time when it should have been time and a half. This suggests that at least one purpose of paying cash was to avoid making a record of evading the FLSA minimum wage and overtime requirements. Defendants knew that

if they reported overtime hours to their accountants, the accountants would pay time-and-a-half wages, as was done one time for Rebecca Minicozzi.  Tr. at III:61:15, GX-5 at 54.  So they did not report any overtime hours.  Michael Nanouh took the further step of claiming that no overtime was being worked even through his deposition in December of 2017.  Tr. at III:195:16. This despite the fact that the records he was turning over to the Secretary clearly showed that overtime was being worked.  GX-1, GX-2, GX-8.  Nanouh's own testimony was that he was aware that time and a half had to be paid for overtime hours and that he knew that sub-minimum wages were paid.  Tr. at III:195:24-25 and III:197:11.  It is impossible to conclude that Defendants were not aware that their pay practices violated the FLSA.

Moreover, Defendants' unsupported assertions that employees were "happy" or "did not complain" about Defendants' illegal compensation practices fails to demonstrate the good faith necessary to defeat an otherwise mandatory award of liquidated damages.  *Williams v. Tri-County Growers, Inc.*, 747 F.2d 121, 129 (3d Cir. 1984).  Finally, Defendants' unsupported assertion that their illegal compensation practices conformed to industry-wide practice fails to demonstrate the good faith necessary to defeat an otherwise mandatory award of liquidated damages.  *Cooper Elec. Supply Co.*, 940 F.2d at 910.  Defendants did not offer any evidence at trial in support of their affirmative burden of proving that they attempted to determine whether paying untaxed cash wages, straight time for overtime, and a flat $30 per overnight shift complied with the FLSA's tip credit, minimum wage, or recordkeeping provisions.  The fact that the same violations continued well after the Secretary's investigation began further demonstrates Defendants' lack of subjective good faith.

   3.   *Defendants also failed to prove their belief they were in compliance was objectively reasonable.*

No objectively reasonable employer could conclude that paying a cash wage less than the federal and state tipped minimum wages would somehow comply with the law.  Nor could any reasonable employer conclude that the failure to pay any overtime premium at all was compliant.  Similarly, Defendants cannot meet their burden of proving that their continued minimum wage, overtime, and recordkeeping violations after not only the Wage and Hour investigation began, but for months *after* Michael Nanouh was deposed about those violations in December 2017, was objectively reasonable.  Because Defendants failed to meet their burden of proving both their subjective good faith and objectively reasonable grounds for their FLSA violations, Third Circuit precedent requires the Court to award full liquidated damages equal to Defendants' back wage liability.  *Brunner*, 668 F.2d at 753; *Selker Bros.* 949 F.2d at 1299.

**I.**     **The Secretary is entitled to injunctive relief to restrain Defendants from continuing to violate the FLSA.**

Section 17 of the FLSA permits a court to enjoin violations of the FLSA.  29 U.S.C. § 217.  The question of whether the Court should issue an injunction is addressed to the sound discretion of the trial court.  *Dole v. Haulaway, Inc.*, 723 F. Supp. 274, 288 (D.N.J. 1989); *Donovan v. Rockwell Tire & Fuel, Inc.*, No. C-79—498, 1982 WL 2120, at *9 (M.D.N.C. Mar. 30, 1982) (citations omitted).  Ordinarily, a court should grant prospective injunctive relief, unless it is convinced that there is not a reasonable probability of a recurrence of the violations.  *See, e.g., Marshall v. Van Matre*, 634 F.2d 1115, 1118 (8th Cir. 1980); *Mitchell v. Hausman*, 261 F.2d 778, 780 (5th Cir. 1958*); Lenroot v. Kemp*, 153 F.2d 153, 156 (5th Cir. 1946); *Reich v. Cole Enter., Inc.*, 901 F. Supp. 255, 260 (S.D. Ohio 1993); *Brock v. Hamad*, No. 86-757-CIV-5, 1987 WL 46573, at *4 (E.D.N.C. Nov. 25, 1987).  In deciding whether to issue a prospective injunction, courts have considered (1) the employer's previous conduct, (2) its current state of

43

compliance, and (3) the dependability of any assurances that it will comply with the FLSA in the future.  *See, e.g., Reich v. Petroleum Sales*, 30 F.3d 654, 657 (6th Cir. 1994); *Martin v. Funtime*, 963 F.2d 110, 114 (6th Cir. 1992).  Plaintiff is entitled to injunctive relief under all three factors.

Defendants admit that their previous conduct consisted of paying less than minimum wage and not paying overtime.  Although the FLSA only allows the Secretary of Labor to seek up to three years of retroactive back wages, Defendants clearly engaged in these illegal practices for many years before Wage and Hour began its investigation.

Second, the trial record shows that these same illegal practices continued to the eve of trial.  As late as December 2017, Michael Nanouh was claiming that overtime was rare to unheard of at his restaurant despite the fact records plainly showed otherwise.  Defendants continue to assert that handwritten schedules were the appropriate way to calculate payrolls even though they had policies in place to require employees to start work and work later than the times on those schedules.  Defendants also revealed on the third day of trial that an additional set of the handwritten schedules had not been produced in discovery.  Tr. at III:98:13-15.

Third, any assurances Defendants will comply with the law are completely hollow.  The minimum wage and overtime provisions of the FLSA have existed for eighty years.  Throughout this contentious litigation, Defendants have offered no valid legal basis for any of their illegal practices, and have attempted to deflect responsibility onto non-managerial staff and ignore evidence of violations that were readily apparent on the face of records (once those records were produced).  These "defenses" have no merit under the law but demonstrate that if permitted, Defendants will continue to squeeze as much profit as possible out of their low-wage employees while claiming to treat them "like family."

The only assurance that Defendants will comply with the FLSA going forward is through an injunction requiring them to do so.  The Court should issue permanent injunctive relief requiring Defendants to comply with the FLSA, and with it, the fundamental protections of the minimum wage and overtime.  To provide complete relief to employees owed wages, the injunction should include an explicit prohibition on the continued withholding of such wages as provided for by Section 17 of the FLSA.  *See* 29 U.S.C. §217 (providing for injunction for "the restraint of any withholding of payment of minimum wages or overtime compensation").  Such an injunction will fully effectuate the remedial purposes of the statute and ensure that Defendants' employees do not continue to suffer from the same low wages and unpaid overtime as has been Defendants' practice for decades.

> ### J.        *Defendants are liable for $661,923.22 in back wages for Defendants' willful minimum wage and overtime violations through at least April 1, 2018.*

Defendants presented no evidence of damages.  The Secretary presented, through the testimony of ADD Mowday and Government Exhibit 8, a detailed calculation of amounts due as a result of Defendants' minimum wage and overtime violations.  Therefore, if the Court finds that Defendants violated the minimum wage and overtime requirements of the FLSA, the Court should award Defendants the back wages as calculated in Government Exhibit 8.

The Secretary of Labor has an obligation to seek all back wages and liquidated damages Defendants owe to their employees.  Consistent with this obligation, the Secretary submitted Supplemental Schedule A and an Amended Pretrial Report updating the total damages calculated and including additional individuals to whom wages are owed.  The Secretary incorporates by reference the arguments made in his Motion for Reconsideration and at oral argument on the same in support of the appropriateness of awarding wages due to all employees listed on Supplemental Schedule A.

1.    *Servers are owed the difference between $7.25 per hour for all hours worked during each workweek and any wages actually paid during that workweek.*

Defendants owe back wages for minimum wage violations from March of 2014 through April 2018, due to their failure to meet their burden of proving compliance with the Section 3(m) tip credit. Defendants paid their tipped employees $2.83 per hour on check-paid hours, but paid less for many cash-paid hours and failed to pay for some hours worked entirely.  This, as well as the other evidence of Defendants' failure to satisfy the tip credit requirements, means that Defendants owe the full $7.25 per hour minimum wage for all hours worked[9] minus actual wages paid.  Government Exhibit 8 contains the week by week amounts due for each server based on this formula, as well as a summary of amounts due.

2.    *Servers are owed at least the cost of uniforms purchased during the relevant period.*

Defendants effectively deducted $35.75 from servers' first week of pay.  Even if the Court concludes that Defendants are entitled to claim the tip credit for those weeks, despite the weight of the evidence to the contrary, Defendants owe each server who started between March 30, 2014 and July 1, 2016, the $35.75 spent for an initial uniform.  The Secretary identified sixteen servers in Supplemental Schedule A (and Exhibit A to his Amended Pretrial Report) who started work in this time range and are due at least the cost of their uniform.

---

[9] Hours worked were calculated based either on the POS records, where available, or based on a reconstruction where those records were not kept.  Defendants' schedules cannot be a primary source for hours worked because they do not account for time before and after shifts that servers were required to work.

       3.     *Servers are owed an additional overtime premium of $3.63 for each hour over 40 worked in a workweek.*

Overtime for servers is calculated at time-and-a-half the minimum wage rate of $7.25, making the overtime premium $3.63 ($7.25/2=$3.63).  This calculation applies regardless of whether Defendants qualify for the Section 3(m) tip credit.  *See, e.g., Chez Robert I*, 821 F. Supp. at 974-75 (calculating overtime premium for tipped employees based on half the full minimum wage rate).  Defendants simply did not pay overtime premiums for servers.  The Secretary calculated overtime based on the working time recorded by Defendants' POS system when those records were available, and based on reasonable estimates extrapolated from those records in their absence.  For each server, their actual or reconstructed hours over 40 in a workweek were multiplied by the $3.63 overtime premium to find the amount due.  The base wages due for these hours are included in the minimum wage calculations described above.  Defendants have presented nothing to contradict these calculations, and the court should award the full amounts of overtime premiums calculated for servers as shown in Government Exhibit 8.

       4.     *Ivan Garcia-Lopez is owed overtime premiums.*

The Court should award damages to Ivan Garcia-Lopez based on the calculations performed by the Secretary because he was not exempt from the overtime provisions of the FLSA.  Mr. Garcia-Lopez was paid straight time for all hours worked but was not paid any overtime premiums.  He is therefore entitled to the additional half time premium for each hour worked above 40 in a week.  This amount can be calculated by determining the regular rate of pay for each week, which is equal to the total amount paid divided by the number of hours worked.  Tr. at II:146:8-12.  That amount is then multiplied by the amount of hours worked above 40 in a week.  Tr. at II:146:24 to 147:10.  Since the Secretary had clear evidence of actual

cash payments being made each week for Mr. Garcia-Lopez, those were accounted for in the back wage calculations.  Tr. at II:147:21-22.

        5.      *Defendants failed to present precise and detailed evidence to rebut the Secretary's calculations.*

The Secretary presented calculations that include significant amounts of non-reconstructed time and pay comparisons that Defendants have not and cannot rebut.  For the period that Defendants failed to preserve their POS records (or payroll), the Secretary need only present a reasonable reconstruction of hours and wages.  The Secretary presented just such a reconstruction to fill the gaps left by Defendants' recordkeeping failures.  As explained by ADD Mowday, the existing POS and payroll records are necessarily at the core of the reconstructed portions of the Secretary's calculations.  ADD Mowday explained that where Defendants failed to keep or produce their POS printouts, he extrapolated estimates of actual time worked on an employee-by-employee basis using the available POS records for adjacent time periods.  Tr. at II:71:12-21  These estimates adjusted for apparent changes in servers' schedules reflected in the payroll or in available handwritten schedules.  Thus, for the periods from March 30, 2014 through August 31, 2015 and September 1, 2017 through April 1, 2018 and any intermediate periods for which records were not produced, the Secretary has met his burden under *Mt. Clemens* to provide a reasonable reconstruction of hours worked and wages paid.

Thus, to the extent that Defendants' recordkeeping failures resulted in the need to reconstruct time worked and wages paid, the Secretary took an entirely reasonable approach based on the available records.  *See supra* Part III.1.a)(2).  This is all that the law requires.  *See Mt. Clemens*, 328 U.S. at 687 (an employee need only present enough evidence to support a "fair and reasonable" inference of violations).  The burden then shifts to the employer to rebut the reasonable inferences of liability and damages by presenting precise and detailed evidence to

rebut that inference.  *See Selker Bros.,* 949 F.2d at 1297 (quoting *Mt. Clemens*, 328 U.S. at 687-88).  Defendants have failed to meet that burden.

> a)    *Defendants have not presented sufficiently precise evidence of cash payments.*

Defendants will argue that they paid additional wages in cash.  Defendants cannot shift the burden to the Secretary simply by claiming that they paid unknown amounts in cash.  As one court noted, "'precision' is the cross the employer must bear when it does not comport with its section 11(c) record-keeping duty." *Rong Chen v. Century Buffet & Rest.*, Civ. A. No. 09-1687, 2012 WL 113539, at *7 (D.N.J. Jan. 12, 2012) (citing *Mt. Clemens,* 328 U.S. at 687).  Precisely because it is the employer's burden to keep accurate records, any reconstruction or estimate provided by an employer must meet a higher standard than that produced by employees.  *See Selker Bros.*, 949 F.2d at 1298.  To meet its burden, an employer must present precise, accurate, and detailed evidence.  *See id.* (requiring "precise evidence of hours worked"); *Rong Chen*, 2012 WL 113539, at *7 (employer failed to "come forward with the accurate and detailed records needed").

Defendants admittedly kept no records of cash payments.  Throughout this litigation, Defendants failed to provide any evidence of specific cash payments, such as information showing how much was paid, to whom, and when.  At most, the evidence at trial shows that five of the seven servers who testified received some portion of wages in cash.  Defendants provided no overall estimate of cash paid, nor have they presented evidence that any server other than those five who specifically testified at trial was paid any cash at all.

Even those servers who testified they received cash could not confirm exactly how much they received, nor did all servers receive the same percentage of their overall wages in cash.  None but one could say how much they were paid or which weeks had cash payments.  Tr. at

I:47:12-24 (Kim Terra), I:152:1-3 (Brenda Alena), II:23:17-20 (Ashley Hines), III:44:18-19

(Rebecca Minicozzi).  Ella Polonski and Amanda Graul said they did not get cash.  Tr. at I:90:7,

113:5.  The exception was Sue Troxel, who testified that in addition to unspecified amounts of

cash paid at $2.00 per hour for overtime work, she got $100 per week for doing the schedules.

Tr. at III:84:11 (overtime cash), III:85:1-4 (schedule cash).

      To the extent that the Secretary's back wage calculations do not account for cash

payments to servers, the fault for that issue, and the burden of correcting it, is with Defendants.

*Mt. Clemens*, 328 U.S. at 688.  Defendants chose to pay cash and not keep any records.

Defendants had every opportunity – and every incentive – to gather evidence and present

witnesses to provide the detailed evidence of cash payments required to meet that burden.  They

did neither.

      Accordingly, the Court should not adjust the Secretary's back wage calculations for "cash

paid" because Defendants have not proven any consistent system of when cash was paid.  This

evidence is simply not detailed enough to rebut the overall reasonableness of the Secretary's

reconstruction, and it offers no proof of any payments beyond those explicitly testified to at trial.

Particularly in light of the lack of consistency and specificity of the evidence of cash payments,

the court cannot presume that employees who did not testify got cash at all.  *See Selker Bros.,*

*Inc.*, 949 F.2d at 1298.  Meanwhile, the records and testimony show that Defendants failed to

pay *all* servers *anything* for time that worked before and after their scheduled shifts at the

direction of management.  In the absence of detailed and precise evidence, Defendants failed to

overcome the just and reasonable inferences as to the hours worked and wages owed presented

by the Secretary.

   b)  *Defendants cannot show that unpaid time is offset by*
      *overpayments.*

Defendants will argue that their complete failure to pay servers any wages for certain

hours is somehow offset by purported overpayments.  Defendants will claim that because they

did not always amend their schedules to show when servers left before the end of their scheduled

shift, those servers were paid for hours in which they did not work.  The Secretary, however, has

given full credit to Defendants for all wages paid.  To the extent that servers were paid for more

hours than were recorded on the POS system, those wages benefit Defendants because they are

applied toward the amounts owed for other, unpaid hours in the same workweek.  Surplus wages

can, however, only be credited within the same workweek.  *See*, *e.g.*, *United States v.*

*Klinghoffer Bros. Realty Corp.*, 285 F.2d 487, 493 (2d Cir.1960) (permitting wages paid during a

single workweek to be applied across all hours worked to determine minimum wage

compliance); *see also* 29 C.F.R. § 778.104 (each workweek stands alone).

   c)  *Defendants cannot show that they are entitled to any offset for paid*
      *break time.*

Defendants will also claim that servers were overpaid because they were paid for breaks.

Defendants failed to establish, however, that servers took breaks that could be properly excluded

from hours worked.  The Third Circuit has explicitly approved the application of 29 C.F.R.

§785.18 as a bright-line rule requiring employers to compensate employees for all breaks that

last twenty minutes or less.  *Sec'y United States Dep't of Labor v. Am. Future Sys., Inc.*, 873

F.3d 420, 430 (3d Cir. 2017), *cert. denied sub nom. Am. Future Sys., Inc. v. Acosta*, 138 S. Ct.

2621 (2018).  The only concrete testimony regarding the length of breaks came from Amanda

Hines, who firmly and credibly testified that breaks were less than twenty minutes.  Any paid

breaks were, therefore, required to be paid and the payment of those wages cannot be used to

cover unpaid time.

### III.    Conclusion

The evidence at trial proved that Defendants willfully failed to pay their hourly servers the proper minimum wage and overtime from at least March 30, 2014 through at least April 1, 2018, failed to pay their sous chef overtime premiums during that same period, and failed to keep proper records, all in violation of the FLSA.  Even after the Wage and Hour investigation began in 2016, and continuing throughout the pendency of this litigation, Defendants continued to violate the FLSA.  Defendants failed to meet their burden to show that they were entitled to claim a tip credit under Section 3(m).  Defendants failed to prove that they actually paid at least $2.13 per hour – in fact they paid nothing at all for numerous hours worked by servers. Defendants failed to show that they informed servers of their claim of a tip credit in accordance with Section 3(m), the Code of Federal Regulations, or established Third Circuit precedent in *Chez Robert*.  Defendants have not met their affirmative burden of complying with Section 3(m) in these two distinct ways, each separately making Defendants liable for minimum wage violations through at least April 1, 2018.

Defendants also admit that they violated the recordkeeping provisions of Section 11(c) of the FLSA, 29 U.S.C. § 211(c), by failing to make, keep, and/or preserve records of their employees and of the wages, hours, and other conditions and practices of employment. Defendants ignored the detailed time records that they did keep, and failed to maintain time records for the required period.  Defendants kept no records at all of cash wages they claim were paid to employees.  These failures were part of Defendants' overall effort to avoid paying proper minimum wages and overtime.

The Secretary's evidence at trial more than satisfied his burden of proof of showing the amount and extent of uncompensated work Defendants' employees performed.  Defendants failed to present precise and detailed evidence to rebut the Secretary's conclusions.  Defendants'

generalized and hypothetical arguments are simply not sufficient to meet their burden to overcome the reasonableness of the clear inferences of extensive unpaid and underpaid time.

The FLSA, and in fact the basic premise of our economy, is rooted in the existence of a covenant between employer and employee.  Employees are expected to show up for work and conscientiously perform their duties to advance the employer's business.  Employers, in turn, are expected to pay employees for all of the time that they work.  Just as our economy and our society do not countenance pickpocketing, they do not – as the FLSA evidences – permit employers to unilaterally deny employees the wages they rightfully earn.  To allow such behavior is unfair to employees, prejudices law-abiding employers, and threatens the basic fabric of our system of commerce.

Here, the Court should not permit Defendants to ignore the basic requirements of the employment relationship: a full day's pay for a full day's work.  The Court should award the Schedule A employees $1,323,846.44 in back wages and liquidated damages.  Given Defendants' ongoing and willful violations of the FLSA, the Court should enjoin them from further violations of Sections 6, 7, and 11 of the FLSA.

Respectfully submitted,

Post Office Address:

Oscar L. Hampton III
Regional Solicitor
Office of the Solicitor
U.S. Department of Labor
Suite 630E, The Curtis Center
170 S. Independence Mall West
Philadelphia, PA 19106
Fax: (215) 861-5162

Kate S. O'Scannlain
Solicitor of Labor

Oscar L. Hampton III
Regional Solicitor

Adam F. Welsh
Regional Counsel for Wage and Hour

*/s/ Jordana L. Greenwald*
Jordana L. Greenwald
Senior Trial Attorney
PA ID# 93836
Greenwald.Jordana@dol.gov
(215) 861-5129

*/s/ Matthew R. Epstein*
Matthew R. Epstein
Trial Attorney
PA ID# 209387
Epstein.Matthew.R@dol.gov
(215) 861-5122

U.S. DEPARTMENT OF LABOR
Attorneys for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 19, 2018 a true and correct copy of Plaintiff's Post-Trial Brief was filed electronically and is available for viewing and downloading via the ECF system for the United States District Court for the Eastern District of Pennsylvania.  I further certify that a copy of Plaintiff's Post-Trial Brief was served on counsel for Defendants as listed below via the ECF system.

Michael D. Dautrich, Esquire
Dautrich & Dautrich Law Offices, PC
526 Court Street
Reading, PA 19601
mdautrich@comcast.net

<u>/s/ *Jordana L. Greenwald*</u>
Jordana L. Greenwald
Attorney