## AMENDED TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

```
R. ALEXANDER ACOSTA        :   CIVIL ACTION
                           :   17-CV-1458
            Plaintiff      :
                           :
            v.             :   Reading, Pennsylvania
                           :       July 23, 2018
J. NANOUH, INC., et al.    :
                           :
            Defendants     :   TRIAL - DAY I
- - - - - - - - - - - - - - - - - - - - - - - - - -
```

- - -

BEFORE THE HONORABLE JEFFERY L. SCHMEHL
UNITED STATES DISTRICT COURT JUDGE

- - -

APPEARANCES:

For the Plaintiffs:     JORDANA L. GREENWALD, ESQUIRE
                        MATTHEW R. EPSTEIN, ESQUIRE
                        U.S. DEPARTMENT OF LABOR
                        OFFICE OF THE REGIONAL SOLICITOR
                        Suite 630 East, The Curtis Center
                        170 South Independence Mall, West
                        Philadelphia, Pennsylvania 10106

For the Defendants:     MICHAEL D. DAUTRICH, ESQUIRE
                        DAUTRICH & DAUTRICH LAW OFFICES
                        526 Court Street
                        Reading, Pennsylvania 19601

- - -

Deputy Clerk/
ESR Operator:           Teri L. Lefkowith

- - -

TRANSCRIBED BY:         Drummond Transcription Service
                        Haddon Heights, New Jersey  08035

    Proceedings recorded by electronic sound recording,
transcript produced by computer-aided transcription
service.

1          (At 9:32 a.m. in Reading Courtroom 4.)

2          DEPUTY CLERK: All rise.

3          The United States District Court is now in session,

4     the Honorable Jeffrey L. Schmehl presiding, please be seated.

5          THE COURT:  Good morning, everybody.

6          ALL COUNSEL:  Good morning, your Honor.

7          THE COURT:  This is the time the Court has set aside

8     for a non-jury trial in the case of Alexander Acosta -- no, it's

9     Hugler, right -- who is --

10          MS. GREENWALD:  Your Honor, it was -- the caption was

11     amended to --

12          THE COURT:  Right.

13          MS. GREENWALD: -- include Mr. Acosta, it was

14     originally filed as Hugler.

15          THE COURT:  Okay.

16          So, I was correct, all right.

17          So, technically, it's now Mr. Acosta, who is the

18     current Secretary of Labor -- versus J. Nanouh, Inc. and Michael

19     J. Nanouh, individually and as Manager and Corporate Officer of

20     the Aforementioned Corporation.

21          Will everybody identify themselves for the record?

22          MS. GREENWALD:  Your Honor, this is Jordana Greenwald,

23     counsel for the Secretary of Labor.

24          MR. EPSTEIN:  Your Honor, Matthew Epstein, co-counsel

25     for the Secretary of Labor.

1              UNIDENTIFIED SPEAKER:  ... Wage and Hour Division

2    representative.

3              MR. DAUTRICH:  Michael Dautrich, attorney for the

4    defendants.

5              THE DEFENDANT:  Michael Nanouh, Manager at Exeter

6    Family Restaurant.

7              MR. J. NANOUH:  Joseph Nanouh, I'm --

8              THE COURT:  All right.

9              Mr. Dautrich -- on behalf of the defendants -- has

10   filed a motion *in limine*, I think, we'd have to deal with that

11   first, so Mr. Dautrich, I'll give you an opportunity to argue

12   your motion.

13             MS. GREENWALD:  The --

14             MR. DAUTRICH:  Thank you, your Honor.

15             MS. GREENWALD:  -- your Honor, if I --

16             THE COURT:  Right.

17             MR. DAUTRICH:  I think, probably, the people who are

18   in the courtroom shouldn't be present.

19             MS. GREENWALD:  That  was going to be my request, your

20   Honor, I believe, our witnesses in the courtroom will probably

21   be sequestered for this portion of the discussion.

22             THE COURT:  All right.

23             I guess, can we direct them to the witness rooms, is

24   there -- did we mark it plaintiff and defendant or not, I

25   thought, we had to?  All right.

1          Just direct them to the two conference rooms, please.

2          THE CLERK:  Okay.

3          THE COURT:  Would you please follow my clerk?

4          (Members of the audience leave the courtroom at 9:34

5     a.m.)

6          MR. DAUTRICH:  Judge, do you want me to come to the

7     podium or --

8          THE COURT:  No, you're fine there.

9          MR. DAUTRICH:  Okay, thank you.

10         THE COURT:  As long as I can hear you.

11         MR. DAUTRICH:  All right, very good.

12         Judge, so may -- may it please the Court, there's

13    basically two aspects of this motion, the first being the

14    plaintiff was required to make disclosures including damages'

15    disclosures in this case.

16         The last time, they've supplemented their disclosures

17    was March and April of 2018.  We filed -- we were required by a

18    court order to file our pretrial memorandums in this case and

19    the plaintiff filed theirs on, approximately, April 19th of this

20    year.  In that, they listed, twenty employees, that they alleged

21    were owed approximately, $250,000.00 through the various

22    allegations of -- well, and violations -- of the Federal Labor

23    Standard Act.

24         So, that was filed back in April and obviously,

25    there's a couple of rules at play here, Judge, so I've cited in

5

1    my motion, Rule 15, which includes filing amended or

2    supplemental pleadings, because obviously part of our defense,

3    we'd have to know whom the potential -- whom the witnesses they

4    say, are owed money, the employees whom they say are owed money,

5    so we can be prepared on that account and what their measure of

6    damages is.

7            So, the last we got that information was April of 2018

8    until July the 13th of this year, after -- this is just an aside,

9    ominously, Friday, the 13th, after business hours, they each

10   filed an amended pretrial memorandum.  In that, their claim went

11   from $250,000.00, approximately, to 1.32 million, approximately.

12   It also went from twenty or so employees to forty-five, alleged

13   employees.

14           So, the plaintiff has attempted to at the eve of

15   trial, amend and double their witness list, so the people that

16   are allegedly affected by under payment in some manner or

17   improper payment in manner of wages.

18           And then, on top of it, now there's a -- a claim for

19   damages that, you know, is five to six times what they were

20   asking before when they filed this complaint, originally, the

21   claim included the same twenty or so employees, but the amount

22   alleged was about $42,000.00.  So, now, we've gone from

23   $42,000.00 to $1.32 million.

24           So, the -- the late hour of this, they never asked for

25   the Court's permission to file an amended anything, a complaint,

6

1    Schedule A, whatever they're calling it.  They'll say, they

2    don't have an obligation to do that.

3           They never asked for the Court's permission to file a

4    supplemental pleading of any type, they just filed it.

5           So, obviously, Rule of Civil Procedure 15 comes in to

6    play about amended and supplemental pleadings.

7           And also, it was their obligation to make disclosures

8    to my clients and me under Rule 26 that was violated, because

9    they didn't make a timely disclosure of their new group of

10   people, that they claim were affected by being underpaid and the

11   amount of money they alleged were underpaid.

12          Add in to that, we're on the eve of trial and then

13   Local Rule 16.1 comes in to play, where I'm supposed -- where

14   we're supposed to have exchanged copies of our proposed

15   exhibits, thirty days before trial.  And thus, giving me or the

16   adverse party, fourteen days to make an objection, I guess, the

17   exhibits -- the proposed exhibits and some of them, obviously or

18   -- or many of them are exhibits that were provided by me in

19   discovery.

20          But the primary exhibit that the plaintiff wants to

21   use in this case, it's -- it's their proposed Exhibit No. 8,

22   which is a -- a document, that combines data from numerous

23   sources and compiles calculations of alleged people -- of

24   employees who are allegedly owed money, was that I've -- I've

25   not -- I did not see that until, I got a -- you know -- the

1  documents e-mailed to me on July 16th, which was a Monday and

2  that was after business hours, too.

3          So, I've only had these documents to object to them

4  for not even seven days, because that was a Monday, I got them

5  at eleven o'clock at night on my e-mail.

6          So, it's -- the lateness of the attempts by the

7  Government to make this case grow from something that it was

8  when they filed it to now, is incredible.

9          On top of that, Judge, they'll say, well, it's no

10  harm, no foul for a number of reasons, it's not no harm, no

11  foul, because the -- the Government had the information from the

12  beginning, their -- their investigation started some time in

13  August of 2016.  They were furnished with time-clock records

14  from my client and they were furnished with payroll records from

15  my client's accountant.  So, they had access to everything then,

16  that they have now.

17          Now, of course, they'll say, we didn't have all the

18  time-clock records, but the employees, who are listed who have

19  now been added -- I'll call -- additional effective witnesses in

20  the last filing, where they went from twenty to forty-five,

21  those people were -- many of them -- were employees at the

22  period of time during which -- or under which -- they received

23  the records back some time on or after August of 2016.

24          So, what the Court has to look at is, their -- what

25  I'll call -- failure to exercise due diligence to come up with

8

1   what they've alleged was done wrong by my clients and whom was

2   affected by that.

3        So, they can't now just say, well, we -- we kept

4   calculating it to the minute and maybe, they have another side

5   they want to try to throw in to it, I don't know, I haven't been

6   told that.

7        But it's -- even though, you know, they're -- they're

8   under the rules that a Court has, you know, discretion to allow

9   amendment or addition of these things -- you know, later in the

10  case -- many of the cases say, it's -- it's proper discretion to

11  exclude that type of information that is provided after

12  discovery is closed, when it was already in the possession of

13  the party, who is attempting to now inject it in to the case and

14  at the lateness of the hour.

15       So, what your Honor, I'm asking you to do is to limit

16  the witnesses that they're permitted to seek damages for to the

17  ones enumerated in the August 19th, 2018 pretrial, Schedule A

18  that they filed to that.

19       And the amount of damages, they're permitted to seek

20  to the amount set forth in that pretrial memorandum, which was,

21  approximately, $250,000.00 -- give or take -- for these dollars

22  and cents.

23       Because of the failure to disclose that information

24  that they say was, ah -- went to those calculations that was in

25  their -- their possession for years before or arguably the year,

1    plus, from the time they had it till we were scheduled to begin

2    this trial.

3            I'll also point out that I think, the Court should

4    also consider the position of the attorneys for the plaintiffs,

5    that she took when asking for the postponement of this trial.

6    This trial was previously scheduled by the Court -- discovery

7    was ordered to be completed in January -- and the Court,

8    initially, scheduled this for an April trial date.

9            Well, of course, we had ongoing pretrial conferences

10    and the Court then, entertained a motion by the attorney for the

11    Government to postpone the trial date.

12            And what she said in part at that conference was, they

13    wanted three contiguous or basically, three dates close in time

14    -- for the three days close in time to the trial -- rather than,

15    you know, let's see what happens and maybe, we'd need a third

16    day.  That was -- that was a primary reason that they made in

17    their motion, asking for this date in -- of May 16th to be

18    postponed.

19            Of course, they didn't -- they didn't file any amended

20    or re -- motion to request the Court to give permission to

21    amend.  Although in their -- in their April 19 pretrial memo,

22    the one they originally filed -- they did say, they anticipated

23    that they would file leave of Court to amend and to add other

24    witnesses, potentially, but they never did it.  They just

25    railroaded it in to the amended pretrial memo and thus, that's

1   -- leaving stuck where we are with it today.

2           I mean, not to mention the fact, that they are giving

3   me, essentially, less than a week to attempt to interview

4   witnesses, heretofore, not anticipated to be called, since they

5   weren't listed as effected parties.

6           So, and then, with respect to the exhibits that I've

7   objected to, obviously, I would consider by objections timely

8   because of the late -- ah -- the late exchange of these

9   documents.

10          With respect to Exhibit No. -- Exhibit No. 8 -- to the

11  plaintiffs -- the 303-pages document, I've objected to it on

12  numerous grounds and I think, properly so.

13          The first of those grounds being that these -- these

14  are -- the document is a summary and essentially, what it does

15  is, it goes employee by employee.  And then, it attempts to --

16  or it purports to extrapolate or take numbers from various

17  record sources and put them in to, like, an Excel-type of

18  spreadsheet, almost.

19          And I believe, what they intend to do is, they intend

20  to try to introduce the way they came up with the calculation of

21  the damages that they're requesting, I -- I believe, that's what

22  Mr. Modway is here to try to do, though, before -- before their

23  pretrial, he wasn't even listed.  He's not the agent who did the

24  investigation and I don't recall before April or so, being

25  provided his name.

1          But I think, what the plaintiff intends to do is

2    rather than calling witnesses, who they've had the access to

3    interview or depose, they're going to attempt to get the

4    representatives from the Department of Labor to sit up there and

5    say, I looked at this exhibit and these numbers that are

6    funneled into are all correct.

7          But we have on -- we have -- the task of trying to

8    compare what they've put into that exhibit for forty-five

9    employees, would take, probably, hundreds of hours to attempt to

10   determine whether they've put the correct number of hours for a

11   particular employee for a particular week.  And then, whether

12   that leads to a damage calculation that this Court should rely

13   on.  So, I'm asking that the Court exclude for that reason,

14   Exhibit No. 8.

15         In addition, I am asking the Court to exclude Exhibit

16   8, because the exhibit fails to demonstrate or take into account

17   in any manner that the employees, who the plaintiff is alleging

18   were not properly paid minimum wage and/or overtime, if they

19   interviewed any of them -- which I know they have -- they

20   meaning the representatives of the Department of Labor -- either

21   lawyers or agents of Mr. Modway or any of them, they could have

22   talked to every one of these employees.

23         In fact, from the beginning of this lawyer, I

24   encouraged them to, because they knew from the time they

25   interviewed, Michael Nanouh in August of 2016, that he said, we

1    pay employees part of their money in cash.

2            Yet, they want to suggest to this Court, that you

3    should just ignore that and they've created this document

4    knowing that those employees that were sitting here today, if

5    they've talked to them in preparation for this trial at any

6    point in this case, that those employees would say, yes, we were

7    paid hours in cash and yes, we were paid for the hours we worked

8    and if it wasn't in our paycheck, we were in cash for that, I'm

9    summarizing, of course.

10           But that's what these employees, if they did anything

11   to investigate this case at all, should have known, yet it's not

12   in that document that they represent to me and to this Court, is

13   a fair and accurate computation of what my clients should owe.

14           I also have objected, because the -- to that document

15   -- because I expect the plaintiff will attempt to not call the

16   witnesses or many of the witnesses, who are listed as employees

17   that are owed money in some manner and they'll call one or two.

18   And then, say, well, because one or two may have not been paid

19   from the payroll system, the hours tracking on the payroll

20   check, that you should consider every employee that was listed

21   on that exhibit, not to be paid the proper number of hours,

22   because we've said so and from the checks.

23           Again, not taking into account that these employees

24   will say under oath, that they've been paid for the hours

25   they've worked, if it didn't come in the check, they were paid

1   in cash.

2          So, it's -- I also -- I -- I will also emphasize to

3   the fact, that I don't think that the Court can rely on the

4   witness from the Department of Labor to testify in lieu of -- of

5   the testimony --

6          THE COURT:   All right.

7          Well, I don't want to talk too much about exhibits

8   now.

9          MR. DAUTRICH:  All right.  Okay.

10          Well, then, I mean, that's -- that's going to be a

11   primary focus -- I expect that will be a large percentage of

12   what they've based it on.

13          But that exhibit is, essentially, ah, the numbers that

14   -- the gross numbers that are in the pretrial -- amended

15   pretrial memo and those documents that were provided on July

16   13th, give or take.

17          THE COURT:  All right, thank you.

18          MR. DAUTRICH:  Thank you.

19          THE COURT:  Response.

20          MS. GREENWALD:  Your Honor, I -- I appreciate you

21   taking the time today to go over all of this information, I just

22   want to move through a couple of the objections that were

23   raised.

24          With respect to -- starting with the issue of the

25   Supplemental Schedule A that was filed, it's directly linked to

14

1   both the number of employees as well as the amount of damages

2   that are at issue in this case.

3          The reason that there was no motions filed, it's

4   because Supplementing Schedule A is, essentially, a ministerial

5   matter for the -- that doesn't need approval of the Court.  The

6   Schedule A, in fact, is actually not required to be filed with

7   an FLSA complaint.  There are two different sections of the FLSA

8   that provides for damages and we did not actually identify any

9   of them in the complaint, it's the idea that supplementing

10  Schedule A at a later date to acknowledge the -- the realities

11  of evidence that has been reviewed and found, in no way

12  prejudices the other side.

13         These are all their employees, they are their

14  employees, who -- of whom -- they've acknowledged that they had

15  records, the same records that were provided to us and probably

16  more records, that may not have been provided to us in addition

17  to what we've gotten.

18         So, there is nothing that's new or a surprise, the --

19  the naming of these individuals is part of the ongoing attempts

20  for the Secretary to identify anybody and everybody, who may be

21  due wages, just as -- it's an acknowledgment that at trial,

22  there may be evidence that's going to be presented and we expect

23  there will be evidence that will be presented that will show

24  that all of these employees are owed wages.

25         These are not -- ah -- in any way, an amendment to the

1   complaint, the complaint specifically states, that it intends to

2   seek redress for any and all individuals, known or unknown at

3   the time of the filing of the complaint, who may be owed back

4   wages as the result of failures to comply with the minimum-wage

5   and overtime requirements of the Act and --

6          THE COURT:  Don't you -- but you still have to comply

7   with the rules and give them notice.

8          MS. GREENWALD:  I understand, your Honor, and we -- as

9   soon as we actually had a firm identification of everyone, who

10  we could confirm, we believed to be due wages, we provided that

11  information and the amounts that we believed that they were due.

12         The -- this was --

13         THE COURT:  But there is no reason why we couldn't

14  have had that before April.

15         I mean, I -- I do find it fundamentally unfair that

16  you asked for a continuance, because you say, you need more time

17  and then, during the two or three months that we've continued

18  the case, you know, you add all these extra witnesses onto the

19  case and then, you let them know at the eve of trial.

20         MS. GREENWALD:  Your Honor, we haven't added any extra

21  witnesses --

22         THE COURT:  Well --

23         MS. GREENWALD:  -- and I want to -- I want to --

24         THE COURT:  -- you went from twenty to forty-four.

25         MS. GREENWALD:  Those are people, who are due wages

1  under the Act, those are not witnesses.  And we did not add a

2  whole long list of witnesses to -- even to our amended pretrial

3  memorandum, out of --

4          THE COURT:  But how are they supposed to --

5          MS. GREENWALD: -- fairness to the other side.

6          THE COURT:  -- properly defend themselves when they'd

7  get that notice at such a late date?

8          MS. GREENWALD:  There is no -- there is no information

9  that the additional people on that list, would be expected to

10  provide, that wouldn't be provided by the same representative

11  testimony that we intended to provide earlier on in this case

12  and we intend to provide today, which the courts are bound to

13  accept, the representative testimony of employees.

14          It's the -- under the FLSA, it is the employers

15  obligation, not the Department's to keep a record of what was

16  paid and when people were.

17          Essentially, in this case, they've attempted to place

18  that burden onto us to figure out, what happened and to

19  reconstruct, exactly, what it was that went on at their place of

20  business.

21          And now, they're trying to tell us, that we and the

22  employees, who are affected cannot recover, because it took us

23  this much time to undo what they did by failing to keep records.

24  That's essentially, what they're trying to do, is to shift the

25  burden of proof to us to keep records when it clearly lies with

17

1    them.

2            And as Mr. Dautrich acknowledged, he's not wrong that

3    it would take time to check every single entry.  And, you know

4    what, it took hours and hours and hours of the Department's time

5    to examine, enter and then analyze all of the information that

6    was --

7            THE COURT:  But you didn't want to check them --

8            MS. GREENWALD:  -- provided.  Hmm?

9            THE COURT:  -- you didn't want to check them before?

10           MS. GREENWALD:   This was all -- this was --

11           THE COURT:  So, in April, if they would have said,

12   okay, we'll pay the $250,000.00, the case would be over?

13           MS. GREENWALD:  That -- I can't speak to that, because

14   that offer wasn't made --

15           THE COURT:  Well, no, you can speak to that, because

16   that's what we were discussing.

17           MS. GREENWALD:  -- the offer wasn't make to pay

18   $250,000.00.

19           THE COURT:  Well, all right.

20           MS. GREENWALD:  There was at no time, an offer

21   anywhere close to that amount, that's -- the settlement

22   discussions that are not -- are appropriate even to be before

23   the Court at this point, the --

24           THE COURT:  Well, what were you going to base it on at

25   that point in time, you didn't have anything else, that would

1    have been the maximum.

2            MS. GREENWALD:  In that -- part of the problem  --

3    part of the issue that the Department has stated in this case,

4    is a continual pushing back on us of its -- you know, they have

5    information, they said that cash was paid, they said, employees

6    had information, but none of that is being presented to us,

7    because there is no record of it.  We have done our best to

8    gather the information that we could from --

9            THE COURT:  Well, how can there be --

10            MS. GREENWALD:  -- from --

11            THE COURT:  -- how can there be a record of cash?

12            MS. GREENWALD:  -- from -- from reluctant employees.

13            There absolutely can be a record of cash, it is not

14    that hard to write down, we get it all the time whether it's on

15    a piece of paper, whether it's on the envelope or whether it's

16    actually, an organized bookkeeping system.

17            There is nothing wrong with paying cash, if you keep

18    records of it.  But that's not what happened here and they've

19    acknowledged that.  We're not obliged to take account for that

20    and that's a separate issue that I'll get to with respect to

21    Exhibit 8.

22            But ultimately, these are all -- it includes all

23    information that the Department has had to go and look for and

24    dig up and reconstruct, because they didn't keep records.  And

25    now, somehow, it becomes our -- our --

1          THE COURT:  Well, what do you mean --

2          MS. GREENWALD:  -- fault --

3          THE COURT:  -- look for?  What did you look for that

4     wasn't given to you by them?

5          MS. GREENWALD:  We -- the infor -- part of the

6     information that became clear as we approached the initial trial

7     date, which I've raised during the telephone conference that we

8     had about, the -- the request for a continuance, was that it

9     started to appear that there might be a reason to -- to not --

10    that the defendants would not be able to make out their

11    affirmative defense to show that they could properly claim the

12    tip credit for all of these employees.

13          And that accounts for a majority of the additional

14    wages that are in there, it's not a lot of additional people

15    with unpaid hours that were off the clock.

16          THE COURT:  Well, if a person says, they got paid

17    cash, isn't that proof that they got paid cash?

18          MS. GREENWALD:  Your Honor, when there is no record

19    kept under Mount Clemens Pottery, which is the Supreme Court

20    decision in Mount Clemens Pottery, when there are no records

21    kept, all that the Department needs to come do is to make a

22    reasonable reconstruction, based on the information that they

23    have and are provided and that's reliable --

24          THE COURT:  I --

25          MS. GREENWALD:  -- about --

20

1          THE COURT:  -- I understand -- I understand that,

2     but that can be refuted by actual testimony.

3          MS. GREENWALD:  It can be refuted by actual testimony,

4     but it has to be refuted by detailed information about the hours

5     worked for the amounts paid.  And the detailed information about

6     the amounts paid is what we don't have.

7               Asking somebody to remember what exact amounts they

8     were paid, three -- four years ago, isn't a reliable exercise.

9               If, ultimately, the Court determines that the

10    testimony here warrants crediting the cash payments, that's

11    ultimately, not at hand.  But the Department of Labor is

12    entitled to make a determination that there isn't sufficiently

13    reliable testimony or information to de -- in any detailed

14    fashion to extrapolate cash paid to employees.  You will also

15    hear today, some employees who weren't paid any cash, except for

16    their tips.

17              So, there is no way across the board to apply cash to

18    everybody, it's not something that can be determined by a

19    representative testimony, because it's specific to each and

20    every employee.

21              And the Department of Labor is not obliged to track

22    down and interview every single one of fifty or some employees,

23    that may have worked for the defendants over the course of this

24    four-year period in order to -- to determine down to the dollar

25    or even estimate the amounts of cash paid, especially, when the

21

1  defendants have done nothing to try to reconstruct that or

2  provide any actual evidence, other than generic statements that

3  cash was paid.

4         And that's what we've been dealing with in this case,

5  I mean, the Department has done the best that it could with the

6  resources that it had to work towards making sure that we'd

7  compute the wages that are due.

8         And ultimately -- with respect to the additional folks

9  that are added -- as I said -- these are based on the records

10 that were provided, this is nothing new to the employer.

11        The -- the records that we're talking about -- and

12 while we did have them -- they are detailed and we've gone

13 through them in detail and have tried to make the best

14 accounting that gives every dollar of credit to the defendants

15 for what they, actually, paid and can show that they paid.

16        And we shouldn't be penalized for trying to have

17 accurate calculations nor should we be estopped from moving

18 forward with recovering all of the wages that we believe, the

19 testimony at trial will show is due.

20        It would have been equally as unfair to not make any

21 notification that we believe, that the testimony will fail to

22 support the tip-credit defense and to just -- at the end of the

23 trial, move to -- move to increase the amount of the damages.

24        When we had a number to provide that we believed was

25 accurate based on the information at that time, we've provided

1   it as soon as it was available.  And provided much more backup

2   documentation and detailed information than we normally do in

3   these cases, because of the level of detail that we went into in

4   -- in attempting to come up with these calculations.

5         And it's ultimately the --

6         THE COURT:  But you weren't just adding numbers, you

7   were adding employees?

8         MS. GREENWALD:  The -- the individuals that were

9   added, your Honor, as I explained, the vast majority of those

10  people, are owed wages, primarily, because we don't believe that

11  the tip-credit defense requirements will be met in this

12  situation.

13        And that's their burden and their defense and if they

14  can't make it out, they owe money that bridges the gap between

15  whatever wages were actually paid and the 7.25 minimum wage.

16        Because you're only entitled to take a credit against

17  the tips, if you meet certain statutory and regulatory

18  requirements to provide notice and to actually, pay them the

19  minimum reduced wage that's permitted.

20        And that's always been an issue in this case, it was

21  discussed at Michael Nanouh's deposition, it's always been part

22  of the case, but ultimately, it rests on the defendants not us.

23        And we've attempted to engage in -- in providing as

24  much information as we've had about what we expected the proof

25  at trial would show.  And, therefore, updated our pretrial

1  memorandum, which we were not necessarily required to do in that

2  much detail.

3        So, with respect to the amendment of -- there is no

4  amendment to the complaint and I think, the courts have been

5  consistent that Schedule A is not amend -- supplementing it or

6  adding, it is not an amendment to the complaint, it's a

7  ministerial matter that should be accepted as a matter of

8  course.

9        There is no -- we were not calling any witness --

10       THE COURT:  Yes, but you're adding additional evidence

11 and witnesses, than you had when the trial was originally

12 scheduled and when you asked for a continuance.

13       MS. GREENWALD:  Your Honor, when we spoke on the

14 phone --

15       THE COURT:  And it seems fundamentally, unfair for you

16 to have continued the case and then, add evidence and witnesses.

17       And if you are correct, I also feel that a quarter of

18 a million dollars is probably a sufficient fine or penalty or

19 whatever to -- you know -- alert these people, that what they're

20 doing is wrong and they'd need to change it.

21       MS. GREENWALD:  Your Honor, it's not a question of a

22 fine or a penalty, these are all amounts that are due to

23 employees and the amounts that are due --

24       THE COURT:  Well, the liquidated damages is a penalty.

25       MS. GREENWALD:  The liquidated damages, your Honor,

1   are very clearly under the law, not a penalty, they represent a

2   lost opportunity cost and we were calculatinig a need for a

3   complicated interest, which is very difficult to do.

4           And the statutes and the courts have been clear that

5   they are both mandatory in the absence of some affirmative

6   showing of good faith and not a penalty, they are not paid to

7   the Department of Labor, they go directly to employees.

8           In addition, the Third Circuit has been very clear,

9   that a failure to make out a defense on a tip-credit claim is

10  and should be something that is -- if the evidence supports it

11  -- is upheld regardless of the amount of damages involved.

12          It is very simple -- as the Third Circuit has pointed

13  out in Chez Robert to give adequate notice and adequate

14  information as well as to pay this tiny fraction of the minimum

15  wage that you're permitted to pay when you pay -- when you have

16  a tip-credit situation.  And those are the basic requirements,

17  they're not difficult to meet, they're not onerous.  And when a

18  employer does not meet them, they are subject to --

19          THE COURT:  Right.

20          Well, we're not -- I'm not getting -- we're not

21  getting into the facts --

22          MS. GREENWALD:  But, your Honor, then the --

23          THE COURT:  -- of that.

24          MS. GREENWALD:  -- the additional -- the majority of

25  the additional amounts that you're talking about when we're

1    talking about the $250.000.00 that was discussed earlier on and

2    the amount on the update pretrial memorandum, the majority of

3    that is because we do not believe, that the defendants can make

4    out a defense, that they can properly claim as tip credits, it

5    has nothing to do with --

6             THE COURT:  Oh, not that the people didn't get the

7    money, it's just that they can't prove it.

8             MS. GREENWALD:  That's cor -- your Honor, that's

9    correct, the --

10            THE COURT:  We're here for fairness.

11            MS. GREENWALD:  -- it's not unfair to expect the

12   defendants to make out a defense on which the burden clearly

13   rests on them.

14            And it is not ultimately, our responsibility to update

15   all of these computations, we did so because we did not want it

16   to be a complete surprise that we believe the evidence at trial

17   will not support the tip credit.  But it is not our burden to

18   plead it or prove that.

19            THE COURT:  Well, whether it will not support the tip

20   credit for twenty people or forty-four people, that's not the

21   issue.  The issue is the additional evidence, the piling on

22   after you've asked for a continuance, so to speak.

23            MS. GREENWALD:  Your Honor, there is no new or

24   additional evidence, other than an explanation of how we got the

25   specific numbers.  There is no new --

1          THE COURT:  But the numbers changed drastic -- you

2     submitted a pretrial memorandum before the last trial with

3     specific witnesses, specific numbers and specific requests and

4     then, you asked for a continuance and then, you added numbers,

5     witnesses and requests.

6          MS. GREENWALD:  Your Honor --

7          THE COURT:  I'm not arguing with your case, I'm -- I'm

8     arguing with your -- your supplemental.

9          MS. GREENWALD:  I understand, your Honor.

10         However, I -- I've both previewed that this issue was

11    likely to arise when we talked about the continuance and that

12    there were additional calculations that -- that were likely to

13    be forthcoming.

14         It, unfortunately, took us longer than we wanted it

15    to, in order to get to a point where we were -- felt the

16    calculations were accurate and reliable and presentable to the

17    Court in an understandable fashion.  And the complexity of that

18    is created entirely by the defendants, so it was their records.

19         In -- in addition, there is no -- when we talked about

20    new evidence, there is no -- we didn't do any additional

21    discovery, we didn't -- you know -- we didn't get additional or

22    give additional information.  We're not presenting any new

23    witnesses or --

24         THE COURT:  Well, if I heard him right, his defense

25    is, these people are going to say, we did get what we were owed

1   and we got what we were owed every week and if we didn't, we

2   would have quit.

3       MS. GREENWALD:  Your Honor, we're talking about the

4   same people, their witness -- they've added, I think, two

5   witnesses to their witness list since their pretrial memorandum

6   was filed.  And I think, we may have put one other person, but

7   we're not ultimately, I think, going to call that person.

8       We're talking about the same set of witnesses, there

9   is no different witnesses that we expect to be presented in this

10  case, there's no substantial difference in what individual

11  servers might or might not say about it.

12      They've always been under the same burden to come

13  forth with detailed information about hours worked and there has

14  been no such information forthcoming.  They intended -- based on

15  all of the information we've received -- to rely on the same

16  people and we are, in fact, replying on -- basically -- the same

17  group of witnesses.  And it will be in your Honor's hands to

18  determine, ultimately, what that evidence shows.

19      But it's not new evidence, it's the same witnesses,

20  presenting the same information as representatives of the

21  entirety of this group of folks, who are due money.

22      THE COURT:  So, your witnesses come from these twenty

23  employees --

24      MS. GREENWALD:  Yes.

25      THE COURT:  -- and you added twenty-three more

1   employees and none of them are witnesses?

2            MS. GREENWALD:  They're not.

3            (Pause at 10:07 a.m.)

4            MS. GREENWALD:  I mean, they're -- we've attempted to

5   -- to be fair in doing this and not to try to put on surprise

6   witnesses --

7            THE COURT:  I'm sure that sounds fair.

8            MS. GREENWALD:  -- as -- this is, ultimately,

9   regardless of the timing, the evidence that's shown at trial,

10  should be what people -- and the evidence that we would present

11  at trial would not substantially change whether we're talking

12  about twenty-three or forty-three --

13           THE COURT:  If only the defense had sufficient notice

14  of the evidence, you are going to present at trial, so they can

15  prepare a defense at trial, that's --

16           MS. GREENWALD:  They haven't articulated, your Honor,

17  anything that would have changed in their defense.  They have

18  just said, they're upset because the number went up.

19           So, all along in this, your Honor, they have put it --

20  again, put it on the Department, you should talk to our

21  employees and you should find information, no declarations or

22  affidavits, no -- just no statement in any detail.

23           THE COURT:  Well, they could say that all they want,

24  but you know, it's your opport -- it's your -- when we're coming

25  to trial, you have to prove your case.

1          MS. GREENWALD:  And, your Honor, in -- as we started

2     getting close to the original trial date, some of the -- the

3     information that was provided to -- to the Department, was

4     information that suggested that we needed to look more closely

5     at whether they were going to be able to make out, their tip-

6     credit defense.  And in fact, over the last week or so, we had

7     further concern, that they will not be able to do so and that's

8     really where these additional people and most of the additional

9     money comes from.

10          So, there's -- there's -- I -- I understand, that we

11     have different views -- the Department has different views about

12     the impact of this, but the reality is, that they're not new

13     pieces of information, it's all information that was given -- in

14     their possession -- they knew and know, what information they

15     did or didn't provide to employees and whether or -- and -- and

16     should be thinking about whether or not, they can make a

17     defense, it's not my job to make their defense for them.

18          All I can do is provide information to assist the

19     Court in ultimately at the end of trial determining what damages

20     should be owed.

21          Additionally, your Honor, I -- I wanted to move on

22     from the issue of Schedule A and talk about Exhibit 8 in

23     particular.

24          Mr. -- I wanted to -- to specify, first off, that Mr.

25     Mowday was identified not only in supplemental --

1          THE COURT:  All right.

2          Well, when we start, is he going to be your first

3   witness?

4          MS. GREENWALD:  He's not, your Honor.

5          THE COURT:  All right.

6          Well, are you going to call the people first --

7          MS. GREENWALD:  Yes.

8          THE COURT:  -- the employees first?

9          MS. GREENWALD:  -- your Honor, we want to get the

10   employees in and out.  We don't anticipate that Mr. Mowday --

11          THE COURT:  All right.

12          MS. GREENWALD:  -- will testify until --

13          THE COURT:  Well, here's what I --

14          MS. GREENWALD:  -- tomorrow.

15          THE COURT:  -- well, here's what I'm going to say, I'm

16   going to preliminarily rule in Mr. Dautrich's favor until I hear

17   testimony, but I'll give you a chance at some point in time to

18   ask me to reconsider my decision.

19          And I want to start the case, I want to get these

20   people in and out and as -- as I hear more testimony, I might

21   have a better reason and basis to make some of these rulings.

22          MS. GREENWALD:  Your Honor, I would -- I would ask

23   that with respect to Exhibit 8, I haven't had the opportunity to

24   present any -- any argument about Exhibit 8.

25          THE COURT:  Well, you're not going to present it until

1   he testifies, right?

2          MS. GREENWALD:  Exhibit 8, will be presented when he

3   testifies, but that's -- you know -- and he will testify about

4   it and he will -- but there are a number of legal issues that

5   were raised by Mr. Dautrich, concerning -- greatly, in terms of

6   the -- the potential evidentiary rulings in this case.

7          If -- I may very briefly, I -- I want to get --

8          THE COURT:  All right --

9          MS. GREENWALD:  -- the employees on, too.

10          THE COURT:  -- all right.

11          MS. GREENWALD:  The -- as you've acknowledged, there

12   will be testimony about how the information was transcribed and

13   how it was analyzed that will address the issues with respect to

14   the accuracy of the summary.

15          Additionally, ah, the -- the fact that it relies on

16   estimations or it doesn't include specific information, it's all

17   a matter for a determination by the Court of the reasonableness

18   of the reconstruction, it has to be made at the time that it's

19   presented and based on all of the evidence at trial, not merely

20   on the representations of the defendant in preliminary motions

21   practice.

22          I -- I did also want to raise with respect to the

23   other exhibits to which there were objections, those objections

24   are untimely.  All of those exhibits were listed in the original

25   pretrial memorandum, all of those exhibits were provided to Mr.

1    Dautrich in discovery some time ago.

2            Also, with regard to Exhibit 16, which is the redacted

3    employee statements, those are not hearsay under 801.B2B,

4    they're statements of current employees about their employment

5    conditions.

6            And there are -- there are certainly statements in the

7    other items, should we choose to use them, that we'd like to be

8    admitted, but those are items that I -- that I would say, if --

9    I would ask, your Honor -- if in fact, that if we do attempt to

10   introduce them, that you'd withhold ruling until the time that

11   they're being introduced, because the manner in which they are

12   being introduced and the reason for which they are being

13   introduced, it's probably not going to be hearsay.

14           THE COURT: No, I -- I was planning on that anyway and

15   I thought I said, I'm going to withhold ruling on exhibits --

16           MS. GREENWALD:  Oh.

17           THE COURT:  -- till the exhibits come up and in the

18   context in which they come up.

19           MS. GREENWALD:  Thank you, your Honor.

20           (Pause at 10:13 a.m.)

21           MR. DAUTRICH:  Judge, would it be possible to take

22   five minutes, so my clients can go to the restroom, quickly,

23   before we go --

24           THE COURT:  All right.

25           Is there anything else, before we'd call the first

1    witness?

2            MS. GREENWALD:  Your Honor, yes, I'm sorry and if I

3    may?

4            THE COURT: Go ahead.

5            MS. GREENWALD:  If we are -- if your Honor is

6    preliminarily ruling -- if your ruling is the sustained, I would

7    object to the testimony of Robin Taney and Theresa Ziemba, both

8    are witnesses that were not previously disclosed and those are

9    witnesses that were on the additional list of employees.

10           I would not object to them, if in fact, there will be

11   -- ah -- the Department will be permitted seek damages on behalf

12   of all of the employees on the Supplemental Schedule A, but if

13   in fact, those people are being excluded, it should not be

14   available to them -- that testimony, because those people were

15   not previously identified.

16           Similarly, there has been a -- another exhibit that

17   was turned over to us, I believe, on Thursday evening --

18           MR. DAUTRICH:  Thursday or --

19           MS. GREENWALD:  -- Thursday evening or Friday morning,

20   which was a -- it was purported to be a photograph of a notice

21   for -- ah -- it was not identified in the defendants' original

22   pretrial exhibits and it was not -- as far as I can tell, though

23   I would be -- I took over another attorney -- as far as I can

24   tell, it wasn't actually turned over in discovery.

25           So, if -- I would ask that that -- those be excluded,

1    depending how the -- the proceedings go.  But I did not formally

2    submit a written motion because we -- in terms of what we

3    anticipated, we would get the motion from Mr. Dautrich before

4    this morning, but I would place those before the Court.

5              THE COURT:  All right.

6              So, noted, I will hold them in abeyance and in

7    general, the -- I think the same rules should apply to both

8    sides, so, all right?

9              So, we're ready to proceed, who is going to be your

10   first witness?

11             MS. GREENWALD:  I -- I'm sorry, thought we were

12   taking --

13             THE COURT:  Well, we are, but wanted to know who the

14   witness is and we can get the witness in here and when we come,

15   so we're ready to go after the break.

16             MS. GREENWALD:  Certainly, your Honor.

17             The department will call Kimberly Terra.

18             THE COURT:  All right.

19             We'll take a five-minute break.  When we get back,

20   we'll have her on the box then, we'll start the testimony.

21             (A brief recess is held at 10:15 a.m.)

22             (Resumed in open court at 10:17 a.m.)

23             DEPUTY CLERK: All rise.

24             Court is now in session, you may be seated.

25             THE COURT:  All right.

1          Let the record reflect, counsel are present, the

2     parties are present and the witness is in the stand, please

3     stand, state your full name and be prepared to be sworn in.

4          MS. TERRA:  Kimberly Terra.

5          DEPUTY CLERK:  Please raise you right hand.

6          KIMBERLY TERRA, PLAINTIFF WITNESS, SWORN.

7          THE WITNESS:  I do.

8          DEPUTY CLERK:  State your name and spell your last

9     name for the record.

10          THE WITNESS:  Kimberly Terra, T-e-r-r-a.

11          DEPUTY CLERK:  Thank you, you may be seated.

12          THE WITNESS:  Thank you.

13          THE COURT:  All right, your witness, Counsel.

14          MS. GREENWALD:  Thank you, your Honor.

15                    <u>DIRECT EXAMINATION</u>

16     BY MS. GREENWALD?

17     Q.   Good morning, Ms. Terra.

18          I just wanted to make sure, do you understand that

19     we're here today because there has been a lawsuit filed by the

20     Department of Labor against Exeter Family Restaurant?

21     A.   Yes.

22     Q.    Okay.

23          Are you currently, an employee of Exeter Family

24     Restaurant?

25     A.   I am.

1    Q.    What's your job there?

2    A.    I'm a server.

3              THE COURT:  Just speak in to the microphone.

4              THE WITNESS:  Thank you.

5    Q.    And how long have you been a server at Exeter Family

6    Restaurant?

7    A.    Ah, going on eight years.

8    Q.    So, have you had any other jobs there?

9    A.    No.

10   Q.    When you were hired about eight years ago, who -- who hired

11   you?

12   A.    I think, it was a cross between -- ah -- Marlene and

13   Michael.

14   Q.    And who -- who is Marlene?

15   A.    Michael's sister.

16   Q.    Who -- when we're talking about Michael, who -- who is he?

17   A.    Michael --

18   Q.    Do you know his last name?

19   A.    -- Nanouh.

20   Q.    Is he here today in the courtroom?

21   A.    He is.

22   Q.    And when you were hired, were you interviewed?

23   A.    I was by Michael.

24   Q.    Who told you that you were getting the job as a server?

25   A.    Both Marlene and Michael.

1   Q.   Who --

2   A.   Marlene called on the phone and Michael interviewed me, so,

3   both.

4   Q.   When you hired, did anybody tell you anything about how you

5   were going to be paid?

6   A.   We went over some kind of arrangement, but I don't think

7   that I asked that question.

8   Q.   What do you -- what do you remember about what the

9   arrangement was that was discussed?

10  A.   To be honest, I don't remember the exact words, it's been a

11  while.

12  Q.   Did -- and who did you have that discussion with?

13  A.   I would think, it would have been Michael while we were in

14  our interview.

15  Q.   Were you told, how much you'd be paid per hour?

16  A.   I want to say, yes, 2.83.

17  Q.   Were you told why it would be 2.83 rather than a larger

18  number?

19  A.   No.

20  Q.   Did anyone discuss with you, what the regular minimum-wage

21  rate was?

22  A.   I don't remember that.

23  Q.   Did anybody explain to you, anything about or tell you

24  anything about, a tip credit?

25  A.   No.

1  Q.   Were you ever provided with an amount that the restaurant

2  said, that they were taking credit for out of your tips towards

3  you wages?

4  A.   No.

5  Q.   Were you given a handbook when you started working?

6  A.   No.

7  Q.   Did you get an offer letter or other letter in writing when

8  you started about what your job was going to be?

9  A.   No.

10  Q.   At any time later during your employment, did you get any

11  information from anyone employed at Exeter about changes to your

12  wages?

13  A.   I don't think, I understand that question.

14  Q.   Were you -- were you always paid, 2.83 an hour?

15  A.   No, I had two different pays.

16  Q.   Can you explain that to me?

17  A.   Third shift, I had a flat rate of $30.00 a night.

18         And then, my second shift was the 2.83 an hour.

19  Q.   Let's talk about that, have you worked the same shift, the

20  entire time you've worked for Exeter?

21  A.   I've worked all three shifts.

22  Q.   From the time, about the spring of 2014 going forward, what

23  -- what schedule did you work?

24  A.   All three shifts.

25  Q.   All three shifts.

1              THE COURT:  All right.

2              Before we go a little further, let's get it on the

3    record, what three shifts did the Exeter Restaurant use?

4    A.   6:00 to 2:00, 2:00 to 10:00 and the third, 10:00 to 6:00.

5              THE COURT:  Okay, thank you.

6              So, now we know, that's the first, second and third,

7    all right.

8    BY MS. GREENWALD:

9    Q.   So, you're schedule then -- did your schedule change all

10   time?

11   A.   Not all the time, but I had a set schedule and then, if

12   needed, I was more than happy to come in.

13   Q.   So, what would you typical schedule be from 2014, let's

14   say, the spring of 2018?

15   A.   Well, it changed twice in that time.

16   Q.   Okay.

17   A.   In the beginning of 2014, I was mostly second shift and

18   then, weekend doubles, so second and third on Friday and

19   Saturday.

20             And then, the fall of 2016, I went permanently to the

21   third shift, continuing my doubles and then, I stopped my

22   doubles and I just worked Saturday afternoon until up to this

23   January and then, I worked Saturday mornings.

24   Q.   So, when you were working doubles and the third shift,

25   about how many hours a week, were you working?

Kimberly Terra - Direct                                    40

1    A.   Anywhere from sixty to seventy hours.

2    Q.   And that's about the hours you were scheduled to work?

3    A.   Correct.

4    Q.   And how did you know, when you were scheduled to work?

5    A.   In the early -- in 2014, it was posted up on the board and

6    it pretty -- it stayed pretty steady.

7    Q.   But who -- who posted it?

8    A.   In 2014, Nancy.

9    Q.   Do you know who Nancy -- what Nancy's job is?

10   A.   She was our scheduler.

11   Q.   And after 2014, how did you -- how did you know what your

12   schedule was going to be?

13   A.   It -- it changed to Sue, so again that was still on the

14   board, up until recently it changed over to the computer.

15   Q.   And when you say, on the board, what was on the board?

16   A.   Oh, like a bulletin board, paper with our names and our

17   schedule.

18   Q.   Was that a typewritten or a handwritten document?

19   A.   Handwritten.

20   Q.   And how -- can you explain to us, when you had a shift to

21   work, you knew, you had a shift to work, ah, if you were

22   scheduled to work second shift, when did you typically arrive at

23   work?

24   A.   If I was scheduled for 4:00, I should show up at 3:30.

25   Q.   Why would you come in at 3:30?

Kimberly Terra - Direct                                            41

1   A.   I like to set up for myself to get prepared for my job.

2   Q.   And when you say, set up, what is it that you do?

3   A.   I check the tables, see if they have sugar, salt, pepper,

4   ketchup.

5            I see if anyone has menus and are waiting to be waited

6   on.  I make sure, there's lemons, creamers, the coffee is

7   prepared, check the vegetables.  I just make sure that I am

8   ready for my job.

9   Q.   Okay.

10            When you come in and start doing those tasks, do you

11   have some way to log in or let someone know that you're there?

12   A.   We -- we punch in, ah, the computer and everyone can see

13   that I'm there, so.

14   Q.   Can you describe for us, how you punch in in the computer?

15   A.   I use my last five -- four digits of my Social Security

16   number.

17   Q.   Is there a -- a touch screen or a type --

18   A.   A touch screen.

19   Q.   And on that touch screen, does it ask you any questions

20   when you log in?

21   A.   You clock in, you put the number in and you enter.

22   Q.   Can you -- as a server, I assume, that it's part of your

23   job is to take orders at tables and to take -- make sure that

24   food gets to customers, is that accurate?

25   A.   That's correct.

Kimberly Terra - Direct                                    42

1   Q.   Okay.

2        And can you order food for a customer without logging

3   in to that system?

4   A.   No.

5   Q.   Did you take any -- any breaks during a typical shift?

6   A.   Very rarely.

7   Q.   Did you have duties during the course of your shift other

8   than taking orders from customers and making sure the food got

9   to them?

10  A.   Yes.

11  Q.   What were those duties?

12  A.   Ah, I -- you'd clean as you go, you'd bring out the stock.

13  I also take cash and clean my tables.

14  Q.   When you say, bring out the stock, what do you mean?

15  A.   Just the plates that you'd need to be at the salad bar and

16  the silverware and the glasses, the things we'd use.

17  Q.   And when do you have time to do that during -- during

18  service?

19  A.   Any time is a good time.

20  Q.   Okay.

21       Do you have to do that, sort of in between serving at

22  -- at specific tables?

23  A.   Sure.

24  Q.   At the -- as you'd get to the end of your shift, if you

25  were working the second shift, I think you said, the typical end

1   time would be 10:00, is that right?

2   A.   Hm-hmm.

3   Q.   So, as you'd get close to 10:00 p.m., how do you start

4   getting ready to close out your shift?

5   A.   Well, when I worked the second, then I was getting done at

6   10:00, the third shift would be arriving.  So, they would be

7   taking anybody new.  I would finish out my customers or if we

8   knew if they sat a long time and wanted some -- you know, time

9   -- we'd transfer them over to the next shift.

10          And then, we'd just finish cleaning, rolling our

11   silverware and bring out our stock.

12   Q.   So, those things of -- of rolling the silverware and

13   bringing out the stock, were those -- and cleaning -- did you

14   have to do all of those before you left for the -- for the

15   shift?

16   A.   That's the good co-worker thing to do.

17   Q.   Did someone tell you, you were expected to do those things?

18   A.   No, that's -- not if you're a waitress a long time, no,

19   those are the things that are done.

20   Q.   And what would happen if, like you said, if someone was

21   lingering at a -- at a table, maybe, after your shift was

22   scheduled to end?

23   A.   We can transfer them.

24   Q.   And did you always transfer them?

25   A.   No, not always, sometimes, I waited, depending on who the

1  customer is.

2  Q.   And if you waited while there was a customer still

3  finishing at their table, what would you be responsible for

4  during that time?

5  A.   Just that table and my cleaning that I had been finishing

6  up.

7  Q.   And when you -- all of your customers have left or you've

8  transferred all of your customers to another server -- what do

9  you do in order to -- do you have to do something in the system

10 in order to --

11 A.   We'd punch out, we'd do the same process, if we clocked in,

12 we'd clock out and then, we'd get our tally.

13 Q.   And when you say, the tally, what -- what is that?

14 A.   It's our -- it's our sheet where our sales and everything

15 is on it, what we had sold that day and our credit-card tips and

16 our credit-card sales.

17 Q.   Do you do anything with that or just take it home?

18 A.   No, I -- I would leave it at the restaurant, I'd -- we'd

19 pick up our money.

20 Q.   When you say, you'd pick up your money, what -- what -- are

21 you talking about wages or -- or something else?

22 A.   The credit-card tips that are on the tally.

23 Q.   What's the process for getting the credit-card tips that

24 are on the tally?

25 A.   I hand the paper over to the host, the host hands me my

1   money and I tell them to have a good night.

2   Q.   And can you get your -- you get cash in return from the

3   host?

4   A.   Correct.

5   Q.   Can you get that money, if you haven't logged out and

6   gotten the slip?

7   A.   You shouldn't, you should wait until you give your log-out

8   paper.

9   Q.   Have you ever gotten cash without actually logging out?

10  A.   No.

11  Q.   Have you -- have you ever been responsible for keeping

12  those slips and -- and cashing out tips?

13  A.   I am responsible for that.

14  Q.   And tell me when -- when you're responsible for that?

15  A.   Well, now I'm on third shift, so the second -- the girls

16  that are leaving at 10:00 do that for me, so they'd bring up

17  their slip.  I -- I'd check it and they'd cash out with me.

18  Q.   Where do those slips go?

19  A.   I'd put them under the drawer.

20  Q.   Have you ever forgotten to log out of the system?

21  A.   Sure.

22  Q.   How often would you say, that happened?

23  A.   Not very often, 'cause we like our money, but it happens.

24  Q.   What happens if you -- you or someone else -- forgets to

25  log out?

1   A.   We probably don't realize until we'd try to clock back in,

2   so that night  -- the next night or the next shift that we'd

3   come in, when we'd clock back in, it will tell us that we're

4   clocking out.

5             So, then we'd go to the host or the manager and we'd

6   tell them that we forgot to clock out.  Then, we'd give us our

7   money and we'd clock back it, we'd start over.

8   Q.   And does the manager at that point have an opportunity to

9   -- to change the records in the system?

10  A.   I'm not quite sure what they do.

11  Q.   Have you -- you've talked about, how you got credit card --

12  cash for your credit-card tips, did you get any other forms of

13  payment?

14  A.   Like --

15  Q.   Not for credit-card tips, did you get any other forms of

16  payment for tips or wages?

17  A.   Not for tips.

18  Q.   And what about for wages?

19  A.   I'd get a paycheck.

20  Q.   Okay.

21             And when do you get a paycheck?

22  A.   Well, it's like, every other Sunday.

23  Q.   Who gives you your paycheck?

24  A.   Mine is in the drawer, 'cause I come in late, so I'd get --

25  I'd get it myself.

1   Q.   Do you know, who leaves it there for you?

2   A.   Ah, not any more, I do not.

3   Q.   Who did it used to be, do you know?

4   A.   It used to be Nancy.

5   Q.   And when you get your paychecks, is it always the same

6   amount?

7   A.   No, it changes.

8   Q.   Do you get anything besides a paycheck?

9   A.   Not any more.

10  Q.   Not any more, okay.

11        Before was there any time when you got something,

12  other than a paycheck?

13  A.   Well, I got cash, too, we had two different.

14  Q.   Can you explain that to me?

15  A.   Ah, in early 2014, I was on a flat rate, so that was on,

16  like, that was in cash.  And my second shifts would have been in

17  cash, I mean, I'm sorry, my second shifts would have been on my

18  check and my third shift would have been in cash.

19        Then, when we went -- I went full time at first, my

20  thirty day -- a night was on the check and my second shift was

21  in cash.

22        And then, I guess, about a -- I don't know how long

23  it's been -- but we just -- we stopped doing the thirty-dollar

24  flat rate and we went to 2.83 an hour.  So, anything over the

25  eighty hours would then be in cash.

Kimberly Terra - Direct                                          48

1    Q.    Okay.

2          You're talking about eighty hours for a two-week

3    period?

4    A.    Hm-hmm.

5    Q.    You would get that in -- in cash?

6    A.    Afterwards.

7    Q.    Afterwards, okay.

8          And how -- how much an hour would you get in cash when

9    you were working over the eighty in -- in the pay period?

10   A.    It's not -- by the hour, we'd just get an amount.

11   Q.    Would you get coins in there or just bills?

12   A.    No, just bills.

13   Q.    Were they, typically, small bills or -- or larger bills?

14   A.    It depended on how many hours I worked, like, if it was

15   $40.00, it would be twenties, like --

16   Q.    Did it --

17   A.    -- it was in, like, small bills.

18   Q.    -- do you know, if it added up to, at least, 2.83 a hour?

19   A.    I'm not -- I don't think so.

20   Q.    And why don't you think so?

21   A.    Because I think, I -- I was under the impression that it

22   was calculated as $2.00 an hour, 'cause they were taking taxes.

23   Q.    Did somebody tell you that --

24         THE COURT:  Anything over eighty --

25         THE WITNESS:  Yes.

Kimberly Terra - Direct                                    49

1          THE COURT:  -- anything over eighty was calculated at

2     $2.00 an hour?

3          THE WITNESS:  It was just cash, yes.

4     BY MS. GREENWALD:

5     Q.   And what gave you the impression that there were taxes

6     being taken out of the cash?

7     A.   Because Nancy had explained that to me.

8     Q.   And did you ever get some kind of tax statement that

9     covered that cash amount?

10    A.   No.

11    Q.   At any point when you worked, you know, you talked about it

12    before, working fifty hours in -- in a workweek, did you ever

13    get more than, either, a 2.00 or 2.83 an hour rage for those

14    hours?

15    A.   Once.

16    Q.   When was that?

17    A.   When we switched the three hundred dollar flat rate to the

18    2.83, my paycheck then had overtime in there.

19    Q.   I just want to clear up, when you say, do you mean three

20    hundred dollars an hour or -- or are you talking about the

21    thirty dollars a shift?

22    A.   The -- my paycheck was just the $300.00 flat rate, 'cause I

23    worked ten days at thirty -- $30.00 a night, so it was just the

24    three hundred flat rate.

25             THE COURT:  But you normally worked -- you normally

1    worked, five days a week out of seven, right?

2           THE WITNESS:  I-- I normally worked six days a week

3    out of seven, but that extra sixty day was --

4           THE COURT:  Cash?

5           THE WITNESS:  -- considered, my second shift, so it

6    would have been cash.

7    BY MS. GREENWALD:

8    Q.   And you said, one -- it was one paycheck, that you remember

9    having -- ah -- an additional amount for hours worked over

10   forty?

11   A.   Yes.

12   Q.   Do you remember what time that was?

13   A.   I don't remember the exact date.

14   Q.   Was it in 2018 or do you think, it was 2017?

15   A.   I think, it might have been sooner than -- later than that,

16   2016.

17   Q.   And after that one time, that you remember it being an

18   additional amount that you believe represented overtime special

19   pay, what -- what happened after that, did you -- did you

20   continue working more than forty hours in a week?

21   A.   For a little while, yes.

22   Q.   And were you paid for those hours over forty in a week in

23   any way?

24   A.   In cash.

25   Q.   Was that the same -- what you believed to be about $2.00 an

1  hour?

2  A.   Hm-hmm.

3  Q.   At some point, were you ever told to change your schedule

4  or do anything different with how many hours you were working?

5  A.   Not at -- I have been told, but that was just this past

6  couple of months.

7  Q.   But tell me about that, what -- what happened and what were

8  you -- what happened in the past couple of months that you

9  thought, you were supposed to change what you were doing?

10  A.   I was just told that we'd have to -- we would -- we will be

11  staying under forty hours.

12  Q.   Who told you that?

13  A.   Sue.

14  Q.   When -- when about did that happen?

15  A.   Ah, I want to say, it was around April.

16  Q.   And after that time, were there -- did you ever work more

17  than forty hours?

18  A.   Occasionally.

19  Q.   When you still worked more than forty hours, what happened?

20  A.   It just -- forty hours.

21  Q.   Did you get paid for the time over forty at all?

22  A.   No.

23  Q.   Were you continuing to log in and log out of the system as

24  we've described?

25  A.   I -- ah -- was trying to log out -- log in -- a little bit

1   later and log out a little bit earlier just to keep -- I was

2   trying to keep the time under.

3   Q.   Do you -- under forty hours, is that what you mean?

4   A.   Hm-hmm.

5   Q.   And did you change your sort of routine that you've

6   described in terms of when you arrived for your shift?

7   A.   I did.

8   Q.   And just tell me, what changed for you?

9   A.   I stopped coming in early and so, I'd -- when I'd get

10  there, I'd just have to get on the floor.

11  Q.   Has anyone ever asked you to do any tasks before your

12  scheduled shift started in the last -- we're talking about since

13  about April?

14  A.   No.

15  Q.   Then, you were never -- has anyone asked you to do a -- a

16  void or change something in the system?

17  A.   If the girls need a void, then I'd do the void.

18  Q.   And how do you -- can you do that without being logged in

19  to the system?

20  A.   I have a card.

21  Q.   And who -- who gave you that card?

22  A.   It was left in the drawer for me.

23  Q.   Did someone tell you that you should use that card?

24  A.   Sue.

25  Q.   Sue.

1          And when did -- when did Sue tell you that?

2     A.   It was, probably, about two weeks after the forty-hour-week

3     thing, 'cause we were trying -- I was trying to help, how we can

4     figure out, how to stay under forty hours, when I just worked

5     forty hours.  So, I'm not able to stay a minute later or come in

6     a minute earlier, so I was trying to help.

7     Q.   And did -- are you still using that card to process --

8     A.   I do not --

9     Q.   -- transactions?

10    A.   -- I do not.

11    Q.   About how long had you used that card for?

12    A.   Probably, about two weeks.

13    Q.   Is there a reason that you stopped using that?

14    A.   It's only one computer that it's used for, it was becoming

15    hostile and I was afraid that I would be in trouble for using

16    it.

17    Q.   Was there a reason, you were concerned about being in

18    trouble for using it?

19    A.   'Cause I didn't wan to lie about working my hours.

20          (The witness is crying at 10:51 a.m.)

21    A.   I really like working there, ma'am, I really do, I loved

22    the family, I -- I don't want to have to watch my seconds, I

23    just want to be able to do my job.

24    Q.   I understand, Ms. Terra, why don't you take just a moment,

25    do you need a Kleenex, there's some right there.

 1                    (Pause at 10:52 a.m.)

 2     BY MS. GREENWALD:

 3     Q.   I just want to go back and touch on one other area.

 4             Do you have to wear a uniform?

 5     A.   We do wear a uniform.

 6     Q.   And what -- what does your uniform consist of?

 7     A.   Ah, black pants, a black polo.  We can wear pretty much

 8     anything underneath the top.

 9     Q.   Do you have to wear anything with a logo on it?

10     A.   The apron -- well, the shirt has a logo and the apron has a

11     logo as well.

12     Q.   And who provides the shirt and the apron?

13     A.   The restaurant.

14     Q.   And do you have to pay for the shirt and apron?

15     A.   I don't know if I paid for my apron.  If I want more than I

16     do, ah, but we pay for our shirt, I pay for my shirts.

17     Q.   Okay.

18     A.   I work a lot, so I have a good amount.

19     Q.   Did you remember how much you paid for your shirt?

20     A.   I think it was -- ah -- twenty-one -- 21.59 or something.

21     Q.   Do you remember when you paid for your shirt?

22     A.   I don't, I think, it's been three or two years, I'm not

23     sure.

24     Q.   And you also mentioned the -- you mentioned, there was a --

25     a written schedule up on the board.

Kimberly Terra - Direct                                        55

1          Have you ever seen anyone make changes to the

2    schedule?

3    A.   We all make changes to the schedule.

4    Q.   You -- you -- I'm sorry -- you do or you don't?

5    A.   When it was on the board, we -- we did.

6    Q.   Okay.

7          Would you change the schedule if -- you know -- you

8    ended up leaving a couple of hours early?

9    A.   We -- we do.

10   Q.   And what about if you were called in a couple of hours

11   early to cover for somebody else?

12   A.   Absolutely.

13   Q.   Did you change the schedule to reflect that you got there

14   at 1:30 for your two o'clock shift?

15   A.   No, I did not.

16   Q.   And did you ever change the schedule to reflect, you know,

17   if you had a table that stayed till 10:15 or 10:25 on a second

18   shift, did you ever changed the schedule for that?

19   A.    If it was till, like, 11:00, then you have -- if there was

20   an extra hour -- then, you have -- but not for fifteen or twenty

21   minutes, no.

22           (Pause at 10:54 a.m.)

23           MS. GREENWALD:  No further questions at this time.

24           THE COURT:  Thank you.  Cross-examine, Mr. Dautrich.

25           MR. DAUTRICH:  Thank you.

1                        CROSS-EXAMINATION

2   BY MR. DAUTRICH:

3   Q.   Good morning, ma'am, how are you?

4   A.   All right, good, how are you?

5   Q.   Good.  Okay.

6            Just a couple of questions for you, Kim.

7            I understood that you said when you worked the third-

8   shirt hours, there -- back in 2014 until more recently, there

9   was a $30.00 flat rate for the third shift, is that right?

10  A.   That's correct.

11  Q.   And that was -- those were -- ah, that was paid to you in

12  cash, right?

13  A.   That's correct.

14  Q.   Okay.

15           So, if you worked the third shift any particular day

16  of the week, I believe, you said, the third shift was 10:00 p.m.

17  to 6:00 a.m. --

18  A.   Yes.

19  Q.   -- is that right?

20  A.   Hm-hmm.

21  Q.   And would you agree that there is, obviously, because it's

22  a twenty-four-hour restaurant, there's people arriving for their

23  shifts and people leaving for their shifts at different times?

24  A.   Yes.

25  Q.   Are there times, when people leave early, because it's

1   slow?

2   A.    Yes.

3   Q.    Are there times, when people leave early, because they have

4   an appointment?

5   A.    Yes.

6   Q.    Are there times when people leave early, because -- ah --

7   they just feel sick or something?

8   A.    Yes.

9   Q.     The $30.00 an hour, that was the flat --

10           THE COURT:  A night -- a night, per shift.

11           MR. DAUTRICH:  Oh, I'm sorry.  Thank you, Judge.

12   BY MR. DAUTRICH:

13   Q.    The $30.00 for the third shift, flat rate, that was to

14   cover the period of 10:00 p.m. to 6:00 a.m., right?

15   A.    That's correct.

16   Q.    Okay.

17           And during the time from 2014 till -- you know -- some

18   time earlier this year or at any point, do you -- did you feel

19   like there were hours that you worked that you were supposed to

20   be paid for, they didn't pay you anything for?

21   A.    When?

22   Q.    At any time?

23   A.    Just recently.

24   Q.    And this is where you were talking about the forty hours,

25   where they -- where Sue or somebody said, you're not getting

1   scheduled for more than forty hours, right?

2   A.   That's correct.

3   Q.   Did -- obviously, you know, Michael Nanouh, right?

4   A.   Of course.

5   Q.   And you know Joseph Nanouh?

6   A.   I did.

7   Q.   Have either Michael or Joseph at any point in time, ever

8   told you what to say when you came to court today?

9   A.   Absolutely not.

10  Q.   Did either Michael or Joseph or anybody at the restaurant,

11  who is -- you know -- affiliated with them tell you, you were

12  gonna be in trouble, if you came to court and -- and testified?

13  A.   No.

14  Q.   Did you ever feel pressured by them at all?

15  A.   No.

16  Q.   You spoke with me a couple of times about -- about

17  potentially testifying in this case, is that right?

18  A.   That's correct.

19  Q.   Did I ever tell you, what you should say?

20  A.   No.

21  Q.   Did you ever get interviewed by anybody in person before,

22  you know, the last couple of weeks in this case from the

23  Department of Labor?

24  A.   Before -- ah -- you know, the past couple of weeks, no.

25            I spoke to her on the phone --

1    Q.    Okay.

2    A.    -- a few weeks ago and answered some more questions --

3    Q.    Okay.

4    A.    -- that you had asked.

5    Q.    Let's -- just as a -- a point of reference, you've talked

6    about being paid some money in cash and some money in the check,

7    right?

8    A.    Correct.

9    Q.    Can you just talk -- ah, I'm sorry, I'm having a little

10   hard time hearing --

11   A.    I'm sorry --

12   Q.    -- that?  Yeah.

13   A.    -- I've been up all night --

14   Q.    -- you --

15   A.    -- so, I think, I'm just really tired.

16   Q.    -- that's my fault, I might be a little hard of hearing.

17         When you got your paycheck, you were paid every two

18   weeks, right?

19   A.    Yes.

20   Q.    And it was a Sunday, where you could pick it up?

21   A.    Yes.

22   Q.    And when you picked up your paycheck or when you got at

23   your next shift where it was available to you, it was in an

24   envelope, is that right?

25   A.    It is.

Kimberly Terra - Cross                                        60

1    Q.   And in the envelope was a check from the payroll service?

2    A.   Correct.

3    Q.   And also, written on the envelope was your name and then, a

4    dollar amount, right?

5    A.   Correct.

6    Q.   And the dollar amount was the cash that was in the envelope

7    along with the check?

8    A.   That's correct.

9    Q.   So, you were paid -- ah -- some wages by check and the

10   third shift, primarily, were the ones you were paid the $30.00

11   per shift, right --

12   A.   Yes.

13   Q.   -- in cash?

14        And then, you did say until recently when the overtime

15   hours were supposed to stop, you were paid overtime in cash,

16   also?

17   A.   Yes.

18   Q.   Okay.

19        Now, with respect to your work as a server, before you

20   started working at Exeter Family Restaurant, did you ever work

21   as a server before?

22   A.   Twenty-six years.

23   Q.   Twenty-six years.  So --

24        THE COURT:  Twenty-six years prior to Exeter?

25        THE WITNESS:  No, I'm sorry, not prior to Exeter --

1          THE COURT:  Okay.

2          THE WITNESS:  -- twenty-six years in full.

3   BY MR. DAUTRICH:

4   Q.   So, if I use my Mount Penn math, you've worked there about

5   eight years, so that would eighteen --

6   A.   Eighteen.

7   Q.   -- approximately, you worked at other restaurants?

8   A.   Correct.

9   Q.   And so, you knew when you were being interviewed by Exeter

10  Restaurant that a server or a waitress was paid a minimum was of

11  approximately, $2.83 give or take per hour, right?

12         MS. GREENWALD:  Objection, your Honor.

13         He's -- it's not relevant, what she knew at the time

14  that she was hired.  What's relevant is what she was informed of

15  by her employer.

16         THE COURT:  Well, I'm going to -- I'm going to give

17  him a little leeway here.  All right.

18         So, you can answer the question, if you can?

19         THE WITNESS:  Yes.

20  BY MR. DAUTRICH:

21  Q.   Okay.

22         When you had the discussions during the process where

23  you were getting interviewed at Exeter Restaurant, you were the

24  one that wanted to be hired there, right?

25  A.   That's correct.

Kimberly Terra - Cross                                        62

1    Q.   Okay.

2         So, you applied or stopped in and asked if they needed

3    help?

4    A.   No, ah, an employer -- an employee that worked there,

5    called me and asked me, if I was interested --

6    Q.   Oh, so somebody you knew --

7    A.   -- in working there.

8    Q.   -- reached out to you?

9    A.   Correct.

10   Q.   Okay.

11        So, when you had your discussions that -- we'll call

12   it interviews with Michael and Marlene Nanouh -- were you told

13   that you were going to be paid a minimum of $2.83 an hour to be

14   a server?

15   A.   I think, it was just -- not as a minimum -- I think, it was

16   just -- you know -- our wages are 2.83 an hour.

17   Q.   Okay, perfect.

18        And did -- and also, you understood and were told that

19   you got to keep your tips received on your shift, right?

20   A.   I don't know, if we discussed that, but that was common

21   knowledge.

22   Q.   Okay.

23        So, when you -- when you had a customer -- if I came

24   and had a $10.00 bill and left a $3.00 tip, you got to keep the

25   three -- if it was in cash -- you got to keep the $3.00 in cash

Kimberly Terra - Cross                                          63

1   as a tip for that shift, right?

2   A.   Yes.

3   Q.   So, all cash tips that the customers left for you during

4   any shift, you got to take those home with you every night,

5   right --

6   A.   Yes.

7   Q.   -- or every time you left, correct?

8   A.   Correct.

9   Q.   And then, if someone paid with a credit card, that was what

10  had to be printed out off of the point-of-sale system and then,

11  whatever amount of credit-card tips were paid for customers you

12  served at any given shift, somebody gave you the money out of

13  the cash register in cash, right?

14  A.   Correct.

15  Q.   So, every night or morning after you left the restaurant

16  finishing a shift, you walked out of there with all of your cash

17  tips and all of the credit-card tips, you earned paid to you in

18  cash by some host or other employee of the restaurant?

19  A.   That's correct.

20  Q.   And with respect to your employment with Exeter Family

21  Restaurant, you've indicated that you're a happy employee there?

22  A.   I am.

23  Q.   Is it fair to say, it's like a family atmosphere there?

24  A.   Very much so.

25  Q.   Do you feel like you have good rapport and relationship

Kimberly Terra - Cross                                    64

1   with the Nanouh family?

2   A.   I do.

3   Q.   Do you feel like they're acting in your best interests?

4              MS. GREENWALD:  Objection, relevance and --

5              THE COURT:  Sustained --

6              MS. GREENWALD:  -- speculation.

7              MR. DAUTRICH: Okay.

8              THE COURT:  -- sustained.

9   BY MR. DAUTRICH:

10  Q.   Let's talk just a -- a minute or two about the card that

11  you've mentioned.

12             Sue -- Sue -- we're talking about Sue Troxel, right --

13  A.   Correct.

14  Q.   -- that's her name.

15             Is she a supervisor of some sort?

16  A.   She's the scheduler.

17  Q.   So, she makes up the weekly schedule of how many hours

18  whatever an employee is supposed to work, right?

19  A.   Yes.

20  Q.   And I mean, you've been on the same general shift, so to

21  speak for quite some time, right?

22  A.   Yes.

23  Q.   And the same days of the week more or less?

24  A.   Yes.

25  Q.   So, Sue -- I guess -- well, do you tell her, if you don't

1    want to work a specific day or do you just work under the

2    understanding, you're going to keep working the normal days you

3    work for that shift?

4              MS. GREENWALD:  Objection, compounded and vague.

5              MR. DAUTRICH: Well, let's say --

6    BY MR. DAUTRICH:

7    Q.   Do you know the hours that you work?

8    A.   I work 9:30 to 6:00.

9    Q.   Okay.

10             And -- so, how do you know from week to week that

11   you're working a specific day from that shift?

12   A.   I just know that it's seven -- or Sunday through Thursday,

13   if it changes then, she lets me know.

14   Q.   So, if she doesn't let you know, the understanding is,

15   you're going to be working your regular shift and hours?

16   A.   Correct.

17   Q.   And the -- coming to begin the shift at -- before the shift

18   actually begins, for example, you're coming because you want to

19   get ready, right?

20   A.   Correct.

21   Q.   And maybe, there's somebody that is arriving, you know,

22   some time a few minutes before ten o'clock p.m., when the shift

23   starts, that shows up and wants to be served and the ongoing

24   shift is going to be leaving, right?

25   A.   Correct.

1    Q.   Are there times when you've come at -- ah -- 9:30 and then,

2    the second-shift people leave before ten o'clock, 'cause you've

3    already arrived and you're covering it?

4    A.   It's -- sometimes.

5    Q.   Are there times -- obviously, you finish you shift at

6    approximately six o'clock a.m., right?

7    A.   Yes.

8    Q.   Is it fair to say that, people who are working on the first

9    shift may arrived before 6:00 a.m. and, essentially, relieve you

10   early?

11   A.   Correct.

12   Q.   Okay.

13        And let's talk about the people, who you serve as

14   customers, is it fair to say, you see a lot of regular customers

15   working there -- coming to eat there?

16   A.   Yes.

17   Q.   And, you know, the evening shift or the third shift, that's

18   a -- you know, a different shift, right?

19   A.   Yes.

20   Q.   So, if -- it's fair to say, you regularly have customers

21   that you've had for repeat business since you've worked at that

22   restaurant, right?

23   A.   Correct.

24   Q.   Are there times when -- you know -- a customer might come

25   towards the end of your shift and you're -- you know -- you're

1  socializing, 'cause they want to sit there and talk to you and

2  drink their coffee --

3  A.   Hm-hmm.

4  Q.   -- is that right?

5  A.   Yes.

6  Q.   And you're not discouraged to -- ah -- clock off and run

7  out the door, are you?

8  A.   No.

9  Q.   Okay.

10        And this card that Sue Troxel, that you've discussed

11  being in the drawer and Sue Troxel told you, it was there for if

12  you needed it, are there times when something has to be voided

13  during the third shift when you've placed an electronic order?

14  A.   Yes.

15  Q.   And how do you do the void?

16  A.   I use my numbers for the void for my shift --

17  Q.   Okay.

18  A.   -- and then, I put a description of why I voided it off, so

19  that manager knows why.

20  Q.   Is there a host or hostess, who is there from 10:00 p.m.

21  until 6:00 a.m.?

22  A.   No.

23  Q.   So, is it fair to say that as a third-shift server, you

24  also may seat people?

25  A.   I do.

1    Q.    And then, take their money at the cash register?

2    A.    I do.

3    Q.    Okay.

4          And with respect to the statement you made about the

5    policy -- I guess -- changing to a forty-hour-workweek, do you

6    remember what we're talking about?

7    A.    Hm-hmm.

8    Q.    Okay.

9          So, that wasn't something you were told, you weren't

10   allowed to work, was it, you weren't allowed to work at all?

11   A.    I don't understand what you mean --

12   Q.    Okay.

13   A.    -- I'm sorry.

14   Q.    At some point, you said, ah, Sue started telling you, you

15   were only going to be scheduled for forty hours during the

16   week --

17   A.    Right.

18   Q.    -- all right?

19         And that they were -- that you were expected to try to

20   stick to the forty hours?

21   A.    To -- standard.

22   Q.    All right.

23         You were never told at any other time before that,

24   that you were expected to come at 9:30 for a ten o'clock start,

25   were you?

Kimberly Terra - Redirect                                        69

1   A.   I think on the manager paper, it says, quarter of your

2   shift.

3   Q.   Okay.

4        So, quarter of -- ah -- meaning that, it's hoped that

5   the servers coming on to the shift would show up fifteen minutes

6   ahead of time?

7   A.   Correct.

8   Q.   And then, of course, when the people that were coming for

9   the shift following yours, they would be coming then, too, and

10  you could proceed to cash out and do what you needed to do?

11  A.   Hm-hmm.

12  Q.   Okay.

13       MR. DAUTRICH:  Judge, I have no other questions.

14       THE COURT:  Any further questions of this witness?

15       MS. GREENWALD:  I do have a -- I have just a couple.

16       THE COURT:  All right.

17                    <u>REDIRECT EXAMINATION</u>

18  BY MS. GREENWALD:

19  Q.   Ms. Terra, you just -- you mentioned a -- a manager paper,

20  what -- what is that about?

21  A.   Well, when we have our meetings, there is a manager, his

22  notes that he goes over the meetings are always on the bulletin

23  board.

24  Q.   And how often do you have meetings?

25  A.   Ah, I don't go to a lot them, so I -- I don't know,

1   exactly, how many.  I -- I'm -- I come to a few.

2   Q.   And the ones that you've been at, who runs those meetings?

3   A.   Michael.

4   Q.   And what does -- does Michael give instructions to the

5   servers during those meetings?

6   A.   Yes.

7   Q.   What kind of instructions?

8   A.   How he would -- you know -- like his guests to be treated,

9   ah, how much ice cream to use for the free dessert.

10          Ah, if we're charging for our extras, I think, normal

11  -- I know it's hard -- I think, just normal restaurant stuff,

12  but I understand that --

13  Q.   I want to -- I'm sorry --

14  A.   -- you don't know.

15  Q.   -- I didn't mean to interrupt you.

16  A.   That's okay.

17  Q.   And what about the fifteen minutes before the shift that

18  you said was in -- in notes somewhere, were those Michael's

19  notes?

20  A.   Yes.

21  Q.   Okay.

22          And where did you see them?

23  A.   They're on the bulletin board.

24  Q.   And did he discuss at a meeting that you were at, that

25  servers should come fifteen minutes before their shift was

Kimberly Terra - Redirect                                    71

1   supposed to start?

2   A.   That we would make it -- yes, that he would like it.

3   Q.   And did anybody else tell you that you should be there more

4   than fifteen minutes before your shift?

5   A.   Our co-workers want us there, fifteen -- thirty minutes

6   before our shift, we do that for each other.

7   Q.   And what about Sue, is she --

8   A.   She would like that thirty minutes before our shift as

9   well.

10  Q.   Have you ever had -- Sue or anyone else -- ah, you know,

11  upset with your or unhappy -- seem unhappy with you, when you

12  didn't come thirty minutes before the shift?

13  A.   I make it on time.

14  Q.   When you arrive -- when you -- at the point when you were

15  arriving thirty minutes before your shift regularly, were there

16  other serves in the restaurant at that time?

17  A.   Yes.

18  Q.   And were there managers there?

19  A.   Yes.

20  Q.   And who would typically be there when you were arriving for

21  your shift?

22  A.   Such as the servers or the --

23  Q.   Manager, I'm sorry.

24  A.   -- the manager?

25  Q.   What -- what managers are --

1   A.   Ah --

2   Q.   -- typically there when you arrive for your shift?

3   A.   Either Faez or Michael.

4   Q.   Were you ever told that you were not permitted to arrive

5   more than fifteen minutes before your shift started?

6   A.   No.

7   Q.   I want to go back for just a minute to talk about, this

8   cash that you received and -- and to clarify something.

9           Did you ever get paid the $30.00 a shift rate, other

10  than in cash?

11  A.   Yes, it switched over to the paycheck, so the paycheck then

12  was the thirty night in the check and then, my second shift was

13  in cash.

14  Q.   And when you were getting your second shift in cash, how

15  much cash were you receiving for -- for those hours?

16  A.   It all depended on how many hours and I -- we didn't

17  calculate the hour, so it was hard to judge the formula.

18  Q.   And just in case, I didn't get it --

19           THE COURT:  So, you're saying on some days you worked

20  two o'clock in the afternoon till 6:00 in the morning?

21           THE WITNESS:  Very many days, Saturday, I would 12:00

22  to 4:00, that was my shift.

23  BY MS. GREENWALD:

24  Q.   When you -- when you got cash for the second shift, do you

25  know if it came out to -- to 2.83 an hour?

Kimberly Terra - Redirect                                73

1  A.    I'm not -- I don't think so, but I'm not sure.

2  Q.    And did anyone ever tell you what the rate was going to be

3  when you were getting paid cash for your -- for an hourly rate

4  as opposed to $30.00 a shift?

5  A.    No.

6  Q.    Were there -- ah -- I think, you'd testified in response to

7  a question from Mr. Dautrich that you were getting overtime in

8  cash and I just wanted to make sure that we're clear on this.

9          When you were talking about the overtime, I believe,

10 that's at approximately, $2.00 an hour you said, you were

11 getting in cash for your hours over eighty in a pay period, am I

12 -- am I right on that?

13 A.    Yes.

14 Q.    Okay.

15          (Pause at 11:14 a.m.)

16 BY MS. GREENWALD:

17 Q.    When you work and -- and receive your tips, do you pay any

18 of -- any portion of that -- the tips to anybody else?

19 A.    Bus -- I do not, 'cause I do not have bus servers, but on

20 the second shift, we have bussers.

21 Q.    And what -- what happens with the bussers?

22 A.    They work for us, so we tip them out.

23 Q.    Who -- did anyone tell you, that you were supposed to do

24 that?

25 A.    Yes.

Kimberly Terra - Redirect                                        74

1  Q.   Who told you that?

2  A.   I don't know, if it's just a co-worker -- just when you

3  first start, we tip -- it's not -- waitresses know, they tip out

4  the bussers.  Tip out the bartenders.  You tip out the people

5  that work for you.  We don't have a bartender, we have bussers

6  on -- I want -- I just want to say, that that might have been

7  Robin, she trained me and it was probably the person that

8  trained me, that's it ten percent.

9  Q.   So, ten percent of -- then percent of what?

10  A.   The money that I make.

11  Q.   The cash and credit-card tips?

12  A.   Correct.

13  Q.   Have you ever not paid that amount out?

14  A.   I tip more, 'cause they work hard for me.

15  Q.   And you work hard, don't you?

16  A.   I try to.

17  Q.   And on third shift when you work, I think, Mr. Dautrich

18  used the term, different and can you describe a little bit about

19  what's different about that shift?

20  A.   Well, people are going -- they're either trying to go to

21  home from somewhere or go to bed, that's your ten o'clock.

22       Twelve o'clock it gets a little, college kids

23  partying.

24       Two o'clock, the bars are letting out, so you know,

25  we'd get a couple alcoholic -- ah -- yeah, and I -- I'm not

Kimberly Terra - Redirect                                    75

1   going to say the word, right --

2            (Laughter at 11:15 a.m.)

3   A.   -- ah, everyone is drunk.

4            THE COURT: People, who want to get something to eat

5   after the --

6            THE WITNESS:  Before they go to bed.

7            THE COURT:  -- before they go to bed.

8            THE WITNESS:  And then, at 4:00 in the morning, I'd

9   start getting people that are ready for work and regulars and

10  then, you know.

11  BY MS. GREENWALD:

12  Q.   And on third shift when you're -- you've got folks coming

13  in who may have a little bit to drink, do you ever have issues

14  with customer's behavior?

15  A.   Once in a while.

16  Q.   Okay.

17           And can you give an example of that?

18  A.   Ah, they like to get loud, curse.  They usually settle down

19  once they're told to settle down.

20  Q.   Who tells them to settle down?

21  A.   That would be me.

22           (Laughter continues at 11:16 a.m.)

23  BY MS. GREENWALD:

24  Q.   Very brave.

25           What -- have you ever had to do something else to

1   resolve a situation in the restaurant?

2   A.   I've called the police once or twice.

3   Q.   And talking about your -- ah -- your tips, can you give us

4   a sense about how much in cash versus credit-card tips, would

5   you say, you would get?

6   A.   It all depends on a certain night and how many people are

7   using their credit cards, it can be -- one night, it could be

8   twenty percent on the credit card and then, another nights it

9   could be ninety-five percent on the credit card.  It all depends

10  when their payday hits and what they're paid.

11  Q.   And do you know, Sue Troxel is -- I'm sorry, if I asked you

12  this already -- did she -- she worked as a -- a server?

13  A.   Yes.

14  Q.   All right.

15       Do you know how she got paid?

16  A.   No.

17       MS. GREENWALD:  No further -- no further questions.

18       THE COURT:  Anything further, Mr. Dautrich?

19       MR. DAUTRICH:  Just briefly, your Honor.

20                    <u>RECROSS-EXAMINATION</u>

21  BY MR. DAUTRICH:

22  Q.   Kim, with respect to the statements that you had made

23  about, you know, people coming in and being loud or making

24  noise, did anybody ever -- anybody from the manager team -- ever

25  discourage you from calling the police, if you needed to?

Kimberly Terra - Recross                                77

1   A.    No.

2   Q.    I mean, this is -- well, how --

3           THE COURT:  What -- what is this line of questioning

4   about --

5           MR. DAUTRICH:  I --

6           THE COURT:  -- is this an issue?

7           MR. DAUTRICH:  -- I don't know, I -- she brought it

8   up, so I just --

9           THE COURT: Well, what purpose did you bring that up

10  for?

11          MS. GREENWALD:  Your Honor, I -- I raised the issue in

12  terms of the type of work that Ms. Terra is doing, I think,

13  there's a -- an unfortunate perception of this being a job that,

14  isn't strenuous or difficult and there's some real challenges

15  involved, ah, I think it really emphasizes the importance of --

16  of paying the proper wages.

17          THE COURT:  No.  Let's -- let's just end this here.

18          MR. DAUTRICH:  Well, they won't let me -- she won't

19  let me ask if I'm -- if she enjoys working there and then, she

20  goes right back to it on redirect.

21          MS. GREENWALD:  I -- your Honor, I did not object to

22  them talking about whether she liked working there or whether

23  she was friends with the family and we got to a point where it

24  became irrelevant and speculative and that was why I objected.

25          THE COURT: Believe it or not, the Court has eaten at

1    restaurants, so I know what the job of the waitress -- of a

2    waitress is.

3            So, you know, let's -- let's move on, we don't need to

4    talk about --

5            MR. DAUTRICH: That's fine, Judge, and I --

6            THE COURT:  -- people at 2:00 in the morning, we don't

7    need those things.  All right.

8            Thank you, you're excused, you can go home and go to

9    bed.

10           THE WITNESS:  Thank you, sir.

11           (Witness excused at 11:19 a.m.)

12           (Pause and discussion held off the record at 11:20

13   a.m.)

14           MS. GREENWALD:  The Secretary calls Ella Polanski and

15   Michael, my co-counsel is going to pick up the witness.

16           THE COURT:  Okay.

17           MS. GREENWALD:  If I may approach, your Honor?

18           THE COURT:  Yes, you may.

19           We're going to go to approximately, 12:00 -- just so

20   Counsel know, we're going to go approximately to 12:00 and then,

21   we're going to take a testimony break from 12:00 to 1:30 and

22   then, we're going to go close to 5:00.

23           So, I may try to talk to Counsel, either, together or

24   alone, since I'm -- soon.

25           (Discussion held off the record at 11:20 a.m.)

1          DEPUTY CLERK:  Please raise your right hand.

2          ELLA POLONSKI, PLAINTIFF WITNESS, SWORN.

3          THE WITNESS:  Yes.

4          DEPUTY CLERK:  State your name and spell your last

5    name for record.

6          THE WITNESS:  My name is Ella Polonski, P-o-l-o-n-s-k-

7    I.

8          DEPUTY CLERK:  Thank you.

9                      DIRECT EXAMINATION

10   BY MS. GREENWALD:

11   Q.   Good morning, Ms. Polonski.

12   A.   Good morning.

13   Q.   I just want to confirm, you understand that we're here

14   today because the Secretary of Labor filed a lawsuit against

15   Exeter Family Restaurant, do you understand that?

16   A.   Yes.

17   Q.   And do you currently work for Exeter Family Restaurant?

18   A.   Yes, I do.

19   Q.   How long have you worked there?

20   A.   A year, a year and a half.

21   Q.   And what's your job there?

22   A.   I'm a waitress there.

23   Q.   Have you had any other jobs in the time you've been working

24   there for --

25   A.   No.

1    Q.    -- Exeter?

2    A.    No.

3    Q.    When you --

4           THE COURT:  And before we go on, is there -- are we

5    talking about a specific time frame here?

6           MS. GREENWALD:  We're talking about, generally, the

7    time frame from the end of March of 2014 -- ah -- through the

8    present, but --

9           THE COURT:  I --

10          MS. GREENWALD:  -- at the very least through April of

11   -- the beginning of April of 2018 in terms of what's been

12   calculated to date.

13          THE COURT:  -- and what about the time when they

14   changed their policy?

15          MS. GREENWALD:  Your Honor, the -- I think, I -- I

16   don't want to necessarily discuss it in front of the witness,

17   but in terms of any changes that were made, those were accounted

18   for in the calculations that were done.

19          THE COURT:  All right, thank you, proceed.

20   BY MS. GREENWALD:

21   Q.    When you -- when you were hired at Exeter, did you have an

22   interview?

23   A.    Yes, I did.

24   Q.    And who interviewed you?

25   A.    Sue interviewed me and then, I had an interview with

1      Michael.

2  Q.   And when we're talking about Sue, do you know what Sue's

3  last name is?

4  A.   No, I don't.

5  Q.   I want to -- do you think, it might be Sue Troxel?

6  A.   Yeah, she was a manager.

7  Q.   Okay.

8       And what's her position?

9  A.   She's a -- hires people.

10  Q.   And does she have any other job at the restaurant?

11  A.   She's a waitress, too.

12  Q.   Okay.

13       And when we're talking about Michael, who -- who is

14  Michael?

15  A.   Sitting over there.

16  Q.   Okay.

17       Is that Michael Nanouh sitting --

18  A.   Hm-hmm.

19  Q.   -- at the defense table?

20  A.   Hm-hmm.

21       MR. DAUTRICH: Judge, I'll stipulate, she's talking

22  about the gentleman sitting to my right in a blue polo shirt.

23       THE COURT:  All right, thank you.

24  BY MS. GREENWALD:

25  Q.   And who -- who told you, that you had gotten the job as a

Ella Polonski - Direct                                    82

1   server?

2   A.   Sue did.

3   Q.   And did Sue or anybody else tell you, what you would be

4   paid?

5   A.   Sue did.

6   Q.   What did she tell you?

7   A.   2.83 an hour.

8   Q.   Anything else?

9   A.   And just my tips.

10  Q.   Okay.

11       Did Sue or anybody else at Exeter tell you anything

12  about why you were getting 2.83 instead of a higher wage?

13  A.   'Cause that's the minimum wage.

14  Q.   That's the minimum wage?

15  A.   Yes, for a waitress.

16  Q.   Did they explain that to you?

17  A.   Yes, they did.

18  Q.   Okay.

19       And did they tell you anything about a tip credit?

20  A.   No, they didn't.

21  Q.   Did anyone ever tell you how much money might be getting

22  credited towards you wages in -- out of what you were making in

23  tips?

24  A.   No, they didn't.

25  Q.   Did anybody tell you that, all the tips belonged just to

Ella Polonski - Direct                                         83

1   you and only to you?

2   A.   No.

3   Q.   Were you ever asked to pay tips to anybody else?

4   A.   Just to the bus person, that's it.

5   Q.   How much did you pay to the --

6   A.   Ten percent of what I made.

7   Q.   Who told you, that that was what you were paying?

8   A.   That's what I -- I've been doing waitressing for forty-five

9   years and that's what I always did.

10  Q.   Did you get a handbook when you started working at Exeter?

11  A.   No.

12  Q.   Did you get any kind of written offer or letter?

13  A.   No.

14  Q.   Did you -- do you wear a uniform for you job?

15  A.   Yes, I do.

16  Q.   And what's -- what's your uniform?

17  A.   It was black pants, black shirt and a green apron.

18  Q.   Did you buy all of that?

19  A.   Yes.

20  Q.   Did you have to buy a specific shirt or -- or apron or

21  pants?

22  A.   It's the shirt that says, Exeter and the apron says,

23  Exeter.

24  Q.   Who --

25        THE COURT:  Well, let -- let me ask you this, when you

Ella Polonski - Direct                                    84

1   were hired, what shift did you work?

2             THE WITNESS:  I hired for second shift, your Honor.

3             THE COURT:  And you've always been second?

4             THE WITNESS:  I've always been second shift.

5             THE COURT:  All right, thank you. Continue.

6   BY MS. GREENWALD:

7   Q.  For the shirt and the apron that said, Exeter on it, where

8   did you get those from?

9   A.  They -- they supply it to us.

10  Q.  Who -- who gave it to you?

11  A.  Ah, Sue gave it to me, the day I started working.

12  Q.  Did you pay for that?

13  A.  It was taken out of my pay.

14  Q.  And -- okay.

15            Do you know how much that was?

16  A.  I don't remember.

17  Q.  Was it taken out of that first paycheck that you got?

18  A.  Yes.

19  Q.  And you said, you worked second shift --

20  A.  Hm-hmm.

21  Q.  -- how many shifts a week, do you work?

22  A.  I work three or four shifts, that's all I work.

23  Q.  What days a week?

24  A.  I work Monday, Thursday, Saturday and Sunday.

25  Q.  Has that been consistent through the whole time you've been

Ella Polonski - Direct                                        85

1   there?

2   A.   That's my set schedule.

3   Q.   And just for the court reporter, I wanted to make sure that

4   -- let me finish my question, I know --

5   A.   Okay.

6   Q.   -- you want to get to the end.

7            And how did you know what shifts that you were

8   assigned to work and which days?

9   A.   I asked for those shifts, because that's the shifts that I

10  was available and they worked with me.

11  Q.   Who did you ask?

12  A.   Sue.

13  Q.   Were there -- was it always the same days or were they ever

14  changes?

15  A.   Always the same days.

16  Q.   When -- when you work second shift, your -- your start time

17  would be what time?

18  A.   From 2:00 to 8:00 or 2:00 to 10:00, that's my starting.

19  Q.   When do you actually arrive at the restaurant to start

20  work?

21  A.   I don't arrive till quarter of -- quarter of 2:00 and

22  that's when I clock in at quarter of 2:00.

23  Q.   And when you arrive, what do you do after you start the

24  clock?

25  A.   I put my pocketbook -- I -- I find out where my station is

1  and I get my station ready.

2  Q.   When you say, get your station ready, I don't work in a

3  restaurant, so can you describe to me, what you mean?

4  A.   Make sure my creamers and my lemons, that everything I need

5  for the night, make sure it's nice and clean and everything is

6  done, so I can start the day.

7  Q.   And did someone instruct you, that that's what you needed

8  to do before you started?

9  A.   No, it's just a habit, because I did it all my life and

10  that's how I work.

11  Q.   Did anybody else in the restaurant when you arrived and

12  started do that?

13  A.   Everybody is different, you know, this is how I do it, I've

14  been doing it for a long.

15  Q.   Okay.

16        Are there any managers in the restaurant when you

17  usually get there to start the second shift?

18  A.   Yes.

19  Q.   Who is usually there?

20  A.   Eddie is there.

21  Q.   Anybody else?

22  A.   No.

23        THE COURT:  Where did you waitress previously?

24        THE WITNESS: I've worked in Philadelphia all -- I'm

25  from Philadelphia, originally, I've worked at The Clubhouse on

Ella Polonski - Direct                                              87

1    Street Road.  I've work there, thirty-two years, your Honor.

2           THE COURT:  Okay, thank you.

3    BY MS. GREENWALD:

4    Q.   What -- when you say, you'd clock in, describe for me, how

5    you'd clock in?

6    A.   There's a computer I use the four digits on my -- the end

7    of my Social Security number, that's how I clock in.

8    Q.   When you -- ah -- during your shift, do you have any other

9    responsibilities, other than taking orders and making sure the

10   orders get to the table?

11   A.   Just help out with the -- that the silverware is rolled,

12   just make sure what needs to be and then, I'd wait on customers.

13   Q.   How do you know what needs to be done?

14   A.   Like, I said, it's with the habit by being a waitress

15   forty-five years.

16   Q.   And as you get to the end of your shift, either, at eight

17   o'clock or ten o'clock, tell me how you'd go about starting to

18   get ready to leave?

19   A.   I make sure that all my salt and pepper shakers, I make

20   sure my ketchups are done, I make sure the station, I've worked

21   is wiped and then, I clock out.

22          And when I clock out, I push my four digits and I

23   clock out.

24   Q.   After you've clocked out, do you just go for the day or are

25   you --

1    A.    No, I go up to the manager --

2    Q.    -- do you have something else, you have to do?

3    A.    -- on the floor and they'd give me my tips, what I make and

4    then, I tip the -- the busboy and then, I'd go home.

5    Q.    When you say, they'd give you your tips, what do they give

6    you?

7    A.    Whatever was left on my credit cards.

8    Q.    How do they know what to give you?

9    A.    Because it's all computers, when it's left on the credit

10   cards, it goes automatically on my slip.

11   Q.    Do you get a piece of paper from the machines?

12   A.    It comes out of the -- when I clock out.

13   Q.    Who do you take it to?

14   A.    I take it to the manager on the floor, that -- that night.

15   Q.    Who is that, usually when you work?

16   A.    Usually, it's -- if Michael is working or Faez, they'd say

17   that I work, that's --

18            THE COURT:  And then, you add the cash you got --

19            THE WITNESS: Yes.

20            THE COURT:  -- and the money you'd get --

21            THE WITNESS:  Hm-hmm.

22            THE COURT:  -- and then, you'd give your busboys ten

23   percent --

24            THE WITNESS:  Yes.

25            THE COURT:  -- and then, you'd leave?

1          THE WITNESS:  Then, I leave, your Honor.

2    BY MS. GREENWALD:

3    Q.   And what -- when you leave, is it always exactly at 8:00

4    p.m. or 10:00 p.m.?

5    A.   It depends, if it's -- if it's a little busy, I stay and

6    help them out.  If it's not, my shift is done, I go home.

7    Q.   And when you're saying, you'd helping them out, what would

8    you be doing?

9    A.   I'd stay on the floor and pick up a couple more tables and

10   I make sure that everything is done for the next person that

11   comes in.

12   Q.   And are there ever -- can you get your cash or your credit-

13   card tips without logging out of the system?

14   A.   No, you can't.

15   Q.   Have you ever tried to?

16   A.   Never.

17   Q.   You've never forgotten to log out?

18   A.   No.

19   Q.   How do you -- tell me about how you get paid, other than

20   the tips, we've already talked about?

21   A.   I get a paycheck every two weeks.

22   Q.   What is -- what's your understanding of what you're getting

23   paid?

24   A.   I'm getting paid for the hours that I did and then, they

25   tax the tips and then, I get -- I never hardly look at my

1  paychecks, I just put them right in the bank.

2  Q.   Is your check always the same?

3  A.   Sometimes, it's a little -- it depends on what I make in

4  tips in a week, because they tax me for my tips.  It depends,

5  sometimes, it's higher, sometimes, it's lower.

6  Q.   Did you ever get any cash, other than the tips that we've

7  already talked about?

8  A.   No, I didn't.

9  Q.   And it sounds like you -- did you ever work over forty

10  hours in a workweek?

11  A.   No, I didn't.

12        With my disability, I'm not allowed to work over forty

13  hours and that's why Exeter works with me and they allow me to

14  work the hours that I'm allowed to work.

15        THE COURT:  So, sometimes, you work less then --

16        THE WITNESS:  Sometimes, I work less.

17        THE COURT:   -- if you're 2:00 to 8:00, that's only

18  six in a day, right?

19        THE WITNESS:  It's -- yeah, it never goes over -- I

20  never went over thirty hours since I've been there.

21  BY MS. GREENWALD:

22  Q.   And I you're scheduled for 2:00 to 8:00, that's on the

23  written schedule, right?

24  A.   That's on the written schedule --

25  Q.   And --

1  A.   -- but if it's slow, I'm -- they let -- I'm the first one,

2  that I can go --

3  Q.   Okay.

4  A.   -- and I never went over -- thirty-two hours is the most or

5  thirty-four I've worked.

6  Q.   I understand.

7            (Pause at 11:32 a.m.)

8            MS. GREENWALD:  No further questions for this witness.

9            THE COURT:  All right.

10           Mr. Dautrich, how long do you think you're going to

11  take with this witness?

12           MR. DAUTRICH:  Three or four minutes at the most.

13           THE COURT: Okay.

14           Well, then let's do this witness, then we'll take a

15  short break, because we've been going for --

16           THE WITNESS:  Good -- good morning, good to see you --

17           THE COURT:  We'll get her home --

18                    CROSS-EXAMINATION

19  BY MR. DAUTRICH:

20  Q.   Good morning, how are you?

21           THE WITNESS:  -- good to see you.

22           THE COURT:  -- we'll get her home.

23  Q.   Nice to see you.

24           MR. DAUTRICH:  Thank you, your Honor.

25           THE WITNESS:  I've waited on the gentlemen, I know

1    this gentlemen, how are you?

2              MR. DAUTRICH: I'm well, thank you.

3              THE WITNESS: You're quite welcome, nice to see you

4    again?

5              MR. DAUTRICH: Thank you, you, too.

6    BY MR. DAUTRICH:

7    Q.   Your -- Exeter Restaurant understood what your scheduling

8    needs were and they have you the days --

9    A.   Yes.

10   Q.   -- the days that you asked for, right?

11   A.   Yes, they did.

12   Q.   And Sue does your scheduling?

13   A.   Yes.

14   Q.   And when you get your paycheck, I imagine, it's in an

15   envelope with your name on it on a Sunday?

16   A.   Yes, it is.

17   Q.   Every two weeks?

18   A.   Hm-hmm.

19   Q.   Never worked overtime there?

20   A.   No.

21   Q.   Your sister works there, too, doesn't she?

22   A.   Yes, she does.

23   Q.   Is she on second shift with you?

24   A.   My sister is on second shift with me, too.

25   Q.   So, when you are getting ready to leave for the evening

1   when -- sometimes, if it slow and they ask, if anybody wants to

2   leave, you might even leave early?

3   A.   Yes.

4   Q.   And most of time, you're not staying overtime -- you're not

5   staying past the time your shift is ending?

6   A.   No, no.

7   Q.   Is that because the third shift crew shows up?

8   A.   No.

9        Because there's three other servers or four other

10  servers, so they -- to eliminate some of us, we don't -- we all

11  don't need to be there.

12  Q.   It's not always crowded, right?

13  A.   No.

14  Q.   Okay.

15       THE COURT:  But you do check out?

16       THE WITNESS:  Yes.

17       THE COURT:  And you only get paid for the hours you've

18  worked?

19       THE WITNESS:  Yes.

20       You can't leave, ah, I can't get my tips till I clock

21  out and it's a habit, they're automatically clocking in and

22  clocking out.

23  BY MR. DAUTRICH:

24  Q.   And every time, you're done with a -- a shift -- when you

25  leave the restaurant, you have your -- the cash tips you've

1    made, plus the credit-card tips paid to you in cash?

2    A.   Yes.

3    Q.   Okay.

4              MR. DAUTRICH:  Judge, I'd have no other questions.

5              THE COURT:  Okay.

6              Any followup from this witness?

7              MR. EPSTEIN:  Yes.

8              MS. GREENWALD:  Just one minute.

9              (Pause at 11:34 a.m.)

10             MS. GREENWALD:  No further questions of this witness,

11   your Honor.

12             THE COURT:  All right, thank you, you're excused.

13             THE WITNESS:  Thank you, your Honor.

14             (Witness excused at 11:34 a.m.)

15             THE COURT:  All right.

16             We're going to take a short, five-minute break and

17   then, we'll resume.  Thank you.

18             (A brief recess is held at 11:35 a.m.)

19             (Resumed in open court at 11:45 a.m.)

20             THE COURT:  Good morning, everyone.

21             Let the record reflect, Counsel are present and the

22   parties are present.

23             You're going to be sworn in first, raise your right

24   hand.

25             AMY WOLAK, PLAINTIFF WITNESS, SWORN.

1              THE WITNESS:  I do.

2              DEPUTY CLERK:  State your name and spell your last

3      name on the record.

4              THE WITNESS:  Amy Wolak, W-o-l-a-k.

5              DEPUTY CLERK:  Please be seated.

6              MR. DAUTRICH:  Judge, I might just make one very brief

7      remark for the record at this point.

8              THE COURT:  All right.

9              MR. DAUTRICH: This witness was not listed on the

10     Exhibit A, provided by the plaintiff in their pretrial

11     memorandum in April of 2018, but it was on the one provided in

12     July of 2018, so this witness wasn't on --

13             THE COURT:  But I thought we'd talked about that, that

14     we weren't going to proceed with any other witnesses at this

15     time.

16             MS. GREENWALD:  I -- I apologize, your Honor, I

17     thought she was on the list, my apologizes.

18             MR. DAUTRICH:  I don't -- I mean, I'm -- I'm just

19     putting that on there, it's going to be up to you what to

20     decide, but I'm just pointing it out, that they made a

21     representation the Court, that all of the witnesses they

22     intended to call were in that submission back in April and this

23     not the case.

24             MS. GREENWALD:  Your Honor, if we may confer for just

25     a minute?

1          THE COURT:  Do what -- okay, why don't you confer,

2    briefly.

3          (Discussion held off the record at 11:46 a.m.)

4          THE COURT:  Technically, I don't see her name on the

5    most recent one, either, am I missing this?

6          THE DEFENDANT:  She isn't even on --

7          THE COURT:  Oh, but she's not on the witness list.

8          (Pause and discussion continues off the record.)

9          THE COURT:  Her name appears on the Schedule A, but

10   she's not on the witness list.

11         (Discussion held off the record continues at 11:48

12   a.m.)

13         MS. GREENWALD:  Your Honor, I apologize, I think that

14   that was -- there was some confusion on our -- on my end and I

15   -- I did not mean to cause additional confusion for Ms. Wolak, I

16   appreciate her coming today.

17         I think at this point, I agree that I did not put her

18   on the list and in light of that, we would only be putting her

19   testimony on as rebuttal.  So, we hold that for another point,

20   if necessary.

21         THE COURT:  Okay.

22         So, what we're going to do is, you're going to have to

23   talk to them, I'm going to let you go right now, but you're

24   going to be subject to recall, you could get recalled back

25   tomorrow or Thursday, all right?

1         MS. WOLAK:  Okay.

2         THE COURT:   Sorry.

3         MS. WOLAK:  That's okay.

4         MS. GREENWALD:  And my apologies for any

5    inconvenience.

6         (Ms. Amy Wolak is excused subject to recall at 11:49

7    a.m.)

8         MS. GREENWALD: Please give us a moment, your Honor,

9    we're trying to accommodate everybody's --

10        THE COURT:  All right, I understand.

11        MS. GREENWALD:  -- schedules on the other end.

12        THE COURT:  I understand, I understand.

13        (Pause and discussion off the record continues.)

14        (At 11:51 a.m. in open court.)

15        MS. GREENWALD: Your Honor, the Secretary calls Amanda

16   Graul and counsel is going to get her.

17        (Pause and discussion off the record continues.)

18        DEPUTY CLERK:  Please raise your right hand.

19        AMANDA GRAUL, PLAINTIFF WITNESS, SWORN.

20        THE WITNESS:  I do.

21        DEPUTY CLERK: State your name on the record and spell

22   your last name.

23        THE WITNESS: Amanda Graul, G-r-a-u-l.

24                        DIRECT EXAMINATION

25   BY MS. GREENWALD:

Amanda Graul - Direct                                    98

1    Q.   Good morning, Ms. Graul.

2    A.   Good morning.

3    Q.   I want to just confirm before we get into the details, that

4    you understand, we're here today because the Secretary of Labor

5    filed a lawsuit against Exeter Family Restaurant?

6    A.   Yes.

7    Q.   And do you currently work at Exeter Family Restaurant?

8    A.   I do not.

9    Q.   What -- where do you currently work?

10   A.   Yorgey's National Cleaners on 17th and Fairview.

11   Q.   And did you work for Exeter Family Restaurant at some

12   point?

13   A.   Yes, I did.

14   Q.   What -- what was your job there?

15   A.   Waitress.

16   Q.   When did you work there?

17   A.   A year and a half ago.

18   Q.   Okay.

19            When did you -- do you know when you started working

20   for Exeter?

21   A.   Ah, it was 2016 and 2017.

22   Q.   About how long did you work there?

23   A.   A year.

24   Q.   Were you a waitress that entire time?

25   A.   Yes.

Amanda Graul - Direct                                99

1          THE COURT:  So, you worked for a total of twelve

2    months, approximately?

3          THE WITNESS:  Yes, sir.

4    BY MS. GREENWALD:

5    Q.   When you -- when you were hired as a waitress, did you fill

6    out an application?

7    A.   Yes, I did.

8    Q.   Did you have an interview?

9    A.   Yes, I did.

10   Q.   Who interviewed you?

11   A.   Sue and Michael Nanouh.

12   Q.   Do you know -- do you know Sue's last name?

13   A.   I don't.

14   Q.   So, do you know what her job is?

15   A.   She is a waitress and manager.

16   Q.   And who is Michael Nanouh?

17   A.   Sitting over there.

18          MR. DAUTRICH:  Again, Judge.

19          THE COURT:  The record will reflect, he's sitting at

20   counsel table.

21   BY MS. GREENWALD:

22   Q.   What's your understanding of what his job is at Exeter?

23   A.   Manager.

24   Q.   Who told you that you got the job as a server?

25   A.   Michael.

1    Q.    And did anybody tell you, about what you would be paid as a

2    server?

3    A.    No, they did not.

4    Q.    Did anyone from Exeter explain to you anything about a tip

5    credit?

6    A.    No, they did -- no, they did not.

7    Q.    Did they tell you any amount that would be credited against

8    your wages that you were making in tips?

9    A.    They did not.

10   Q.    Did you get a handbook when you started working there?

11   A.    No.

12   Q.    Did you get an offer letter?

13   A.    Yes.

14   Q.    What were -- did anyone tell you anything about how you

15   needed to dress?

16   A.    Yes.

17   Q.    And what were you told?

18   A.    Ah, black shirt with the Exeter logo and their -- their

19   green apron with the logo as well and black slacks.

20   Q.    Who told you about that?

21   A.    Michael did.

22   Q.    And when did he tell you about that?

23   A.    At my interview.

24   Q.    Who -- how did you get the shirt and apron and slacks?

25   A.    Michael.

1   Q.   Did -- did they provide pants for you?

2   A.   No.

3   Q.   Who provided -- how did you get pants?

4   A.   I got those myself.

5   Q.   And what about the apron and the shirt?

6   A.   Michael provided the shirt and the pants, but I had to pay

7   for it.

8   Q.   When did you have to -- to pay for it?

9   A.   Two days after my training.

10  Q.   Do you remember, how much you had to pay?

11  A.   The apron was about, $7.00, the shirt was about thirteen.

12          THE COURT:  So, you just gave him money?

13          THE WITNESS:  Yes.

14          THE COURT:  It didn't come out of your paycheck?

15          THE WITNESS:  No.

16          THE COURT:  All right.

17  BY MS. GREENWALD:

18  Q.   Do you -- can you explain to us, what shifts you typically

19  worked during the period from -- ah -- 2016 to 2017?

20  A.   I worked the second shift and then, about halfway through

21  it, I would do second and first, when I was needed for the first

22  shift.

23  Q.   Okay.

24          And what -- when you say, the first shift, what do you

25  mean?

Amanda Graul - Direct                                    102

1   A.   Ah, from 7:00 in the morning till about 2:00, 2:30 in the

2   evening.

3   Q.   When you say, second -- second shift, what time are you

4   talking about?

5   A.   2:00 to 10:00 p.m.

6   Q.   Did that ever change?

7   A.   No.

8   Q.   And how did you know, which shifts you were going to work

9   each week?

10  A.   It was on my schedule.

11  Q.   Where -- when you say a schedule, did you get handed

12  something?

13  A.   No, it was hanging up in the -- in the kitchen.

14  Q.   Was it something that was a typewritten document or a

15  handwritten?

16  A.   Handwritten.

17  Q.   Do you know, who wrote those schedules out?

18  A.   Sue.

19  Q.   I want to make sure, I -- I'm clear -- you said, that

20  during the first part of the time, you worked there, you worked

21  mostly second shift, correct?

22  A.   Second shift, yes.

23  Q.   When -- when you were working mostly second shift, ah, how

24  many shifts a week were you working?

25  A.   Four.

Amanda Graul - Direct                                    103

1    Q.    Do you know what days you were working?

2    A.    Saturday, Sunday, Monday, Tuesday.

3    Q.    And was that always, 2:00 p.m. to 10:00 p.m.?

4    A.    On Saturday and Sundays, would be 2:00 to 10:00 shift and

5    my Monday and Tuesday would be 4:00 to 10:00.

6    Q.    And that was your scheduled time?

7    A.    Yes.

8    Q.    And do you know about when that changed?

9    A.    Ah, like, towards the end me being employed there.

10         I would work my 2:00 to 10:00, Saturday and Sundays

11   and 4:00 to 10:00, Monday, Tuesday or I would get a phone call

12   from Sue and ask if I could be -- if it's a Saturday or a

13   Sunday, she would call and ask, if I could switch and do the

14   first shift and the other person would do my second shift.

15   Q.    Okay.

16         So, for about how many months towards the end of your

17   employment, would you say, that you had more changes in terms of

18   whether you were working first or -- or second shift?

19   A.    About four or five months.

20   Q.    So, can you describe for me, what -- when did you arrive,

21   when you -- during the time you were working consistently,

22   second shift, when did you arrive at work?

23   A.    Between 1:30 and 1:45.

24   Q.    And why did you come at that time?

25   A.    So, I could eat.

Amanda Graul - Direct                                    104

1   Q.   Okay.

2        And when you were done eating, what did you do?

3   A.   I waited till it was time for me to clock in.

4   Q.   So, you didn't clock in until you ate?

5   A.   Until after I ate.

6   Q.   Did someone give you instructions about the process for

7   arriving and clocking in?

8   A.   No.

9   Q.   Was there a specific time, when you were supposed to clock

10  in?

11  A.   1:45.

12  Q.   Who told you that?

13  A.   Michael.

14  Q.   And when did he tell you that?

15  A.   When I first was with the interview.

16  Q.   Okay.

17       And when you clocked in, what did you start doing?

18  A.   I would see if my tables needed anything, like, salt and

19  peppers, if they needed to be filled.

20       If not, I went to the back to see if there was any

21  side work that needed to be filled and then, waited for tables

22  to come in, so I could start work.

23  Q.   And when you say, side work, can you explain what you mean

24  by that?

25  A.   Seeing if there was any silverware that needed -- that

Amanda Graul - Direct                                                105

1    could have been wrapped, any cups to be brought out, tea to be -

2    - to be made for the -- for the second shift.

3    Q.   Was there specific work that you were expected to do,

4    before tables started coming in for you to handle?

5    A.   No.

6         Just making sure that things were in order for that

7    shift.

8    Q.   And how did you know that -- that was something you needed

9    to do?

10   A.   It was just something that I knew that had to be done.

11   Q.   When you came in when you were working second shift and you

12   came in to the restaurant, was -- was there typically, a manager

13   there?

14   A.   About an hour after, we would arrive.

15   Q.   And who -- who would be the manager on duty then?

16   A.   Monday and Tuesdays, it would be Michael and then, Saturday

17   and Sundays, it would be his cousin, Faez.

18   Q.   And what was your understanding of what the manager on that

19   shift was responsible to do?

20   A.   To help seat people, to help run the register and if we

21   would need help, help us with what we needed as well.

22   Q.   When you -- ah -- were working during the course of the

23   shift, did you typically take any breaks?

24   A.   Just a quick -- slide out real quick, a two-second smoke

25   and right back in.

Amanda Graul - Direct                                    106

1   Q.   Did you ever work more than one shift in a row and --

2   A.   Yes.

3   Q.   -- and around what time during your employment did that

4   happen?

5   A.   Ah, right around, maybe, for like, the first or second

6   month that I first started.

7   Q.   Do you know about how many weeks or months, you were doing

8   shifts back to back?

9   A.   It was only, like, for like, two or three weeks.

10  Q.   Okay.

11        During that time, do you know if your hours ever -- if

12  you did forty in one week?

13  A.   I don't remember.

14  Q.   During your shift or before your shift started -- during

15  your shift -- did you have any responsibilities for anything,

16  other than taking the orders and getting the food to the tables?

17  A.   Just making sure that our station stayed clean.

18  Q.   When you say, your station, can you describe what -- what

19  you mean by that?

20  A.   Our computer system, kept it wiped down, our -- to make

21  sure that we had napkins, if -- make sure that our menus were

22  stacked nicely.

23  Q.   So, say if it was slow for a little bit in the afternoon,

24  what -- what would you be doing?

25  A.   I would help with sort of side work or --

Amanda Graul - Direct                          107

1          THE COURT:  You would help with what?

2          THE WITNESS:  Side work.

3          THE COURT:  Say it's like, three o'clock or 3:15 --

4          THE WITNESS:  Hm-hmm.

5          THE COURT:  -- it's kind of slow -- 3:30 --

6          THE WITNESS:  I --

7          THE COURT:  -- tell us exactly what you were doing?

8          THE COURT:  -- I would help prep, either, the tartar

9    sauce, the cocktail sauce.  Ah, if the sour cream needed to be

10   refilled, swap out what needed to be done.

11   BY MS. GREENWALD:

12   Q.   Did somebody tell you what it was, you were supposed to do

13   during those --

14   A.   No.

15   Q.   -- slower times?

16   A.   No.

17   Q.   Did -- describe for us as your shift came to an end, what

18   did you do to start getting ready for the end of your shift?

19   A.   Starting to make sure all the side work was done, make sure

20   all of our tables were cleaned, the salt and peppers filled.

21          Ah, making sure to see if there was any cocktail or

22   tarter sauce that needed to be re-made, make sure the bain-marie

23   was restocked.  Ah, the dessert tray, make sure that was

24   stocked.

25   Q.   And when you -- ah -- if you had tables towards the end of

Amanda Graul - Direct                                          108

1  your shift, ah, what would happen, if you had a table that was

2  still eating or still drinking their coffee and your shift was

3  scheduled to end?

4  A.   I would still stay.

5        But if I had noticed that it was getting to be a

6  little bit later than normal, I would ask my third-shift co-

7  worker, if she would like to take it.

8  Q.   So, that would be if you were working the second shift?

9  A.   Yes.

10 Q.   Okay.

11       And about -- when you say, longer than normal, what

12 would be longer than normal for you?

13 A.   Between 10:30, going on 11:00.

14 Q.   So, more than thirty -- thirty minutes --

15 A.   Yes.

16 Q.   -- or so?

17       So, would it be unusual for someone to linger for more

18 than thirty minutes over their table?

19 A.   Of course.

20 Q.   Okay.

21       And you would stay, ah, unless it was an usual length

22 of time?

23 A.   Yes.

24 Q.   When you were done with all your tables, what did you do

25 to finish up your shift?

Amanda Graul - Direct                                          109

1    A.    I would just double check and make sure all of the side

2    work was done, everything was good back in the kitchen, up

3    front, got to the computer, clock out, get my Z strip, go up to

4    the front end of the house and get my credit-card wages for the

5    night.

6    Q.    And did that -- did that process change at any point while

7    you were working there?

8    A.    No.

9    Q.    And when you're talking about logging out, describe to me,

10   what you had to do to log out?

11   A.    It's a computer system, we would have to put in our last

12   four digits of our Social Security number, a thing would come up

13   to tell us, what we needed to put it in at the end of the night.

14            And then, it would let us clock out and the Z strip

15   would come out and there would be -- it would just say, like,

16   what our sales were for the night.  And then, at the bottom, it

17   would have our -- ah -- credit-card tip on there.

18   Q.    What did you -- you said, you put the Z strip somewhere,

19   where -- where did you take it?

20   A.    To the front register.

21   Q.    And what happened when you got to the front register with

22   your Z strip?

23   A.    I would wait for, either, Kim or Becca to come up, she

24   would look at it, see what -- what I was owed, she would go into

25   the computer, I would get my money and then, I would leave for

Amanda Graul - Direct                                         110

1    the night.

2    Q.    So, you were getting cash for the credit-card portion of

3    your tips, correct?

4    A.    Yes.

5    Q.    And when you say, Kim or Becca, do you know what -- what

6    their last names are, just so we can try to be clear about who

7    we're talking about?

8    A.    Kim Terra and Becca Mc -- it starts with an M, but I can't

9    pronounce it, I'm sorry.

10   Q.    That's fine.

11         Did you -- if you worked first shift, which you said,

12   I think -- when did you come in, if you were working first

13   shift?

14   A.    7:00.

15   Q.    You came in at 7:00 a.m.

16         And when --

17   A.    7:00 a.m.

18   Q.    -- and when was your scheduled start time for first shift?

19   A.    7:00 a.m. till 2:00 p.m.

20   Q.    So, what time did you arrive at the restaurant?

21   A.    About 6:45.

22   Q.    And when did you clock in?

23   A.    6:50.

24   Q.    And what did -- and what did you do after you clocked in,

25   if you got there at 6:50?

1   A.   I would make sure that my tables had their syrups, butters,

2   creamers, ah, napkins, if it needed to be there or if there was

3   a party in the back room, make sure, you know, that it was set

4   up for, say, ten guests, make sure that it was set up for -- for

5   that time.

6   Q.   And how would you know that it was a party that needed a

7   specific number of places set?

8   A.   They would let us know.

9   Q.   And who typically, let you know something like that?

10  A.   The first shift manager who -- or who would be there in the

11  morning.

12  Q.   During the time that you were working first shift, who was

13  typically managing the first shift?

14  A.   The first shift, Eddie.

15  Q.   When you worked first shift, was there any -- and your

16  shift was coming to a close -- did you handle the end of your

17  shift on first shift any differently than what you described the

18  second shift?

19  A.   Absolutely not.

20  Q.   Could you get that cash for your credit-card tips, if you

21  didn't log out of the computer system?

22  A.   No.

23  Q.   Could you take orders for customers, if you weren't logged

24  in to the computer system?

25  A.   No.

Amanda Graul - Direct                                    112

1    Q.   And in your experience, did you -- do you ever remember

2    forgetting to log out of the computer system?

3    A.   A few times, I did forget.

4    Q.   About how many times would you say?

5    A.   I'd say, maybe, three.

6    Q.   What happened in those situations?

7    A.   If I couldn't log in, I would have to put in my numbers, it

8    would say, ah, clock out and then, I was able to clock back in

9    to start my shift.

10   Q.   So, it would -- it wouldn't be -- would it be the next day

11   or the next --

12   A.   Yes, it would be the next day.

13   Q.   Okay.

14            (Pause at 12:08 p.m.)

15   BY MS. GREENWALD:

16   Q.   What -- other than the tips that we've been talking about,

17   what else were you paid?

18   A.   Ah, it was my credit-card tips, my hourly wage.

19   Q.   How did you get your -- your hourly pay?

20   A.   Paycheck.

21   Q.   How often did you get a paycheck?

22   A.   Biweekly.

23   Q.   Who gave it to you, though?

24   A.   Nancy.

25   Q.   Was it always Nancy?

Amanda Graul - Direct                                        113

1   A.   If Nancy wasn't there, Eddie would give it to us.

2   Q.   When you -- was it always the same amount?

3   A.   No.

4   Q.   Did you ever get any cash, other than amounts that were

5   tips that you had earned?

6   A.   No.

7   Q.   When you -- do you know whether the paycheck that you got

8   paid, the promised wages for all of the hours that you worked?

9   A.   I'm not sure.

10  Q.   Why do you say that?

11  A.   It never really added up.

12  Q.   Well, when you -- you told me, though, you got a

13  handwritten schedule, correct?

14  A.   Yes.

15  Q.    And did you ever -- did you or somebody else ever make

16  changes to the schedule?

17  A.   Sue would.

18  Q.   Okay.

19       And so, just -- just as an example, would she change

20  the schedule, let's say, if she asked to switch with someone

21  else for their shift?

22  A.   Yes.  She would change that.

23  Q.   Okay.

24       So, she would cross off the shift you were supposed to

25  work?

Amanda Graul - Direct                                    114

1   A.   Yes.

2   Q.   And when what?

3   A.   And then, put in the new one.

4   Q.   Okay.

5        And what about, were you ever asked to come in, you

6   know, a couple of hours early before your shift was normally

7   starting?

8   A.   Yes.

9   Q.    And would you -- would someone change the schedule then?

10  A.   I don't know, if they had ever changed it or not, I never

11  really took notice.

12  Q.   Okay.

13       When you -- on the schedule -- your memory -- did --

14  did you ever make any changes or did Sue make any changes to

15  change from your two o'clock start time to 1:45?

16  A.   No.

17  Q.   If you stayed say, till 10:30 on a second shift for --

18  because customers were lingering, do you know if anyone changed

19  the schedule to reflect that?

20  A.   No.

21  Q.   Did you ever see that happen?

22  A.   No.

23            (Pause at 12:11 p.m.)

24  BY MS. GREENWALD:

25  Q.   Did you -- and we've talked about the -- paying for the

Amanda Graul - Direct                                    115

1   uniform, were there ever any deductions made from your pay for

2   -- ah -- making a mistake in the system?

3   A.   No.

4   Q.   What about for breaking a -- you know -- a dish or

5   something like that?

6   A.   No.

7   Q.   Did anyone ever told you that -- tell you -- that

8   deductions would be made?

9   A.   Yes.

10  Q.   Who told you that?

11  A.   Michael Nanouh.

12  Q.   And can you give me an example of the situation, where you

13  were told that deductions would be made from your pay?

14  A.   If a -- an item would come out, I would be very busy, I

15  would get it to a table, it would clearly be on the check, you

16  know, say, no parsley on top of the fish, whatever, I would take

17  it back to the kitchen, I would call either, Michael or Faez

18  back, be like, look, this was an accident, can we please, you

19  know, give a free fix.  Well, it should have been done right the

20  first time.

21  Q.   Okay.

22        Did you ever have money actually taken out of your pay

23  for that?

24  A.   No.

25  Q.   Did you believe that Michael had the power to do that?

Amanda Graul - Direct                                    116

1    A.    Yes.

2    Q.    During the time that you were working, were you ever given,

3    sort of new instructions about when to log in or log out of the

4    system?

5    A.    No.

6    Q.    Okay.

7                MS. GREENWALD:  Just a moment.

8                (Pause at 12:12 p.m.)

9    BY MS. GREENWALD:

10   Q.    Going back for a minute to the end of your shift --

11   A.    Hm-hmm.

12   Q.    -- you talked about doing different tasks in terms of

13   cleaning and setups, were those tasks something that -- could

14   you leave without doing those tasks?

15   A.    It was frowned upon if you did.

16   Q.    And would it be frowned upon, what do you mean?

17   A.    Just, you know, the next shift would not be too happy about

18   having to do it.

19   Q.    Was there anyone, other than the next shift to do that

20   work?

21   A.    It would be -- well, it would be the third shift and then,

22   if the third shift didn't do it, then it would be -- it would

23   have to be first.

24   Q.    But that wasn't the bussers responsibility to do it?

25   A.    No.

Amanda Graul - Cross                                    117

1    Q.   The wait -- the wait staff was responsible for that work?

2    A.   (No verbal response.)

3    Q.   Did that work ever -- did finishing that work ever cause

4    you to work longer than the end of your scheduled shift?

5    A.   Sometimes, yes, it did.

6    Q.   And when you were doing that, that work after the end of

7    your scheduled shift, did you log out before you started doing

8    it or after you finished it?

9    A.   After I finished.

10        MS. GREENWALD: I don't have any further questions,

11   your Honor.

12        THE COURT: Thank you.  Cross-examine.

13        MR. DAUTRICH:  Thank you.

14                       CROSS-EXAMINATION

15   BY MR. DAUTRICH:

16   Q.   Hi, Amanda.

17   A.   Hello.

18   Q.   Okay.

19        With respect to your job as a server at Exeter Family

20   Restaurant, you were trained before you actually started handing

21   customers and tables on your own, is that right?

22   A.   That is right.

23   Q.   And during part -- part of the training, obviously, you

24   were shown the location of where the employees' schedule is,

25   right?

Amanda Graul - Cross                                  118

1   A.   Yes.

2   Q.   And would you agree with me, that the employees' schedule

3   is on, kind of like, a -- a board, maybe, a little smaller than

4   the TV but it's posted on the wall in a common area of the

5   restaurant?

6   A.   Yes, sir.

7   Q.   And in addition to that schedule, there is other papers

8   there, right?

9   A.   Yes, sir.

10  Q.   Like, papers that talk about what the minimum wages are and

11  things like that, right?

12  A.   Yes.

13  Q.   All that information is posted on that -- on cork board or

14  whatever that board is, where the schedule is, right?

15  A.   Can you say that one more time, please?

16  Q.   Sure.

17       The information that's -- the other things that are on

18  that board, telling you about minimum wages and things like

19  that, that's posted on the same board where the schedules is,

20  right?

21  A.   Yes, sir.

22  Q.   And that's continuously there any time you're in the

23  building?

24  A.   Yes.

25  Q.   And when you began working as a server at some point in

Amanda Graul - Cross                                119

1   time, you were -- it was discussed that -- you know, what shift

2   you were going to work or what time periods, right?

3   A.   Yes.

4   Q.   And you had those discussions with Sue?

5   A.   Yes.

6   Q.   And then, I think, you said, you work -- you typically

7   worked 2:00 to 10:00 p.m. on Saturday and Sunday and 4:00 to

8   10:00 p.m. on Monday and Tuesday?

9   A.   Yes.

10          MS. GREENWALD:  Objection, your Honor, it's un -- it's

11   vague and to what time period we're talking about and I think,

12   she was very specific as to what shift she was working during

13   what time period.

14          THE COURT:  All right.

15          THE WITNESS:  Oh, my God.

16          THE COURT:  Objection -- objection is noted, rephrase

17   the question.

18          MR. DAUTRICH:  Okay.

19   BY MR. DAUTRICH:

20   Q.   You only worked there for about a year, right?

21   A.   Yes, I did.

22   Q.   And you basically worked the same schedule, unless you

23   switched days -- were asked to switch with somebody, right?

24   A.   Yes.

25          MS. GREENWALD: Objection, he's misstating the

1   witness's testimony.  She clearly stated that she --

2                MR. DAUTRICH:  This is cross-examination.

3                MS. GREENWALD:  -- worked one schedule.

4                THE COURT: Yeah.

5                Now, that objection is overruled, she can answer that

6   question.

7   BY MR. DAUTRICH:

8   Q.   I'm -- I'm not trying -- I'm not trying to trick you, I'm

9   just -- you worked there about a year, right?

10  A.   Yes.

11  Q.   And during the time you worked there from 2016 to 2017, you

12  basically worked the second shift, right?

13  A.   Yes.

14  Q.   Except when times, where you were called by Sue, who did

15  the scheduling and asked, if you could switch to a first shift

16  with somebody else?

17  A.   Yes.

18  Q.   So, maybe, somebody had an appointment or something and

19  needed to switch, it could be, right?

20  A.   Yes.

21  Q.   So, is it fair to say that, your co-workers at the

22  restaurant -- meaning the other servers, et cetera -- you worked

23  as a -- you worked as a team?

24  A.   Yes.

25  Q.   And is it also fair to say, that the shift -- the people

1  who worked on the different shifts in some ways, worked as a

2  team, too, because when you arrived in the beginning of your

3  shift, you were expecting that the station would be clean and

4  ready to go, right?

5  A.   Yes.

6  Q.   And just like, you were talking about doing these jobs of,

7  you know, filling various items that you might use during the

8  time you were serving the people their meals, when you were

9  slow, you were filling those, right?

10 A.   Yes.

11 Q.   Lemons and things like that?

12 A.   Yes, sir.

13 Q.   And you'd see the other servers doing the same thing?

14 A.   Yes.

15 Q.   And when you talked about the end of the shift, when you

16 were trying to -- you were, basically, for lack of a better way

17 to put it -- trying to restock the silverware and napkin-type

18 stuff?

19 A.   Yes.

20 Q.   And you said, if you didn't have time to do it and didn't

21 do it, it was frowned upon by the people -- the servers, who

22 were coming after you?

23 A.   Yes.

24 Q.   And in the same respect, if somebody on the first shift

25 didn't do it when you came in, you'd be, like, seriously?

Amanda Graul - Cross                                   122

1   A.   Yes.

2   Q.   Okay.

3        So, it was a -- everybody was expected to kind of make

4   things stocked for the next people coming in?

5   A.   Yes.

6   Q.   You never worked more than -- ah -- the four shifts,

7   except, maybe, once if your shift -- well, every now and then,

8   if you'd switch with somebody?

9   A.   Every -- yes.

10  Q.   And that shift that you would have switched for, would have

11  been another, you know, approximately, an eight-hour shift?

12  A.   Yes.

13  Q.   Okay.

14       Now, we've talked -- you talked about how you were --

15  how you were paid at the restaurant, you said, you got paid for

16  the hours that you worked by check biweekly, right?

17  A.   Yes, sir.

18  Q.   And that you also received cash tips, right?

19  A.   Credit-card tips.

20  Q.   Did you ever get cash tips?

21  A.   Yes.

22  Q.   Okay.

23       I'll -- I'll get to the credit-card one.

24       So, if I paid for the -- for -- a $10.00 bill and I

25  left $13.00 and the bill was ten, you'd keep the $3.00, right?

Amanda Graul - Cross                                      123

1    A.    Yes, sir.

2    Q.    So, that was a cash tip?

3    A.    Yes.

4    Q.    And then, if I paid with a credit card for the same thing

5    and put $3.00 on there, at the end of the shift and you printed

6    your paper out, you'd get $3.00 in cash for that $3.00 credit-

7    card tip?

8    A.    Yes.

9    Q.    Okay.

10          So, every night or day -- whatever -- when you left

11   after the end of the shift, you left with all -- you know -- all

12   your tips from customers who paid in cash only and those, who

13   paid with credit cards, right?

14   A.    Yes.

15   Q.    And I think, you said, your check wasn't always the same,

16   right?

17   A.    No.

18   Q.    And credit-card tips were reflected on your check, right?

19   A.    Yes.

20   Q.    So, if one shift, ten percent or twenty percent of the

21   customers paid with a credit card, that check might look

22   different than if fifty, sixty or more paid with a credit card,

23   right?

24   A.    Yes, it would.

25   Q.    So, that would be why -- those -- those things varied on

1   your check --

2   A.   Yes.

3   Q.   -- that's what you meant when you said that, right?

4   A.   Yes.

5   Q.   Okay.

6           So, it was because the payroll check reflected the

7   credit-card tips that you received for that particular pay

8   period?

9   A.   It would be both of them, my hours would be different as

10  well.

11  Q.   Right.

12          If you were working an extra shift, you know, or you

13  switched a two hour -- you switched a -- instead of working 4:00

14  to 10:00, maybe, you'd switched with the first shift and worked

15  6:00 to 2:00, so you might have picked up two other hours,

16  right?

17  A.   Hm-hmm.

18          THE COURT:  So, it would be different if you worked

19  twenty-eight hours versus thirty-two hours?

20          THE WITNESS:  Yes, sir.

21  Q.   Right.

22          That's what -- that's what you mean when you said

23  that?

24          THE COURT:  And --

25          MR. DAUTRICH:  I'm sorry.

1              THE COURT:  And -- and it would also be different,

2    though, because they took taxes out of your credit-card tips,

3    correct?

4              THE WITNESS:  Yes.

5              THE COURT:  What would you say, roughly, the

6    percentage is of people paying with credit cards versus cash for

7    tips, if you know, it's no --

8              THE WITNESS: I really, honestly, don't understand.

9              THE COURT:  All right.  Let's move on.  Anything else?

10             MR. DAUTRICH:  No, Judge, thank you.

11             THE COURT:  All right, any followup?

12             MS. GREENWALD:  Just a couple, your Honor.

13             THE COURT:  All right.

14             (Pause at 12:21 p.m.)

15                      REDIRECT EXAMINATION

16   BY MS. GREENWALD:

17   Q.   Just a couple more questions, Mr. Graul.

18             When -- when you would get all of your credit-card

19   tips at the end of the night and also have your cash tips in

20   hand as you've described, did you actually take all of that

21   money home with you?

22   A.   Yes.

23   Q.   Did you ever pay any of your tip money to anybody else?

24   A.   No, except for the bussers.

25   Q.   Oh, how much did you pay to the bussers?

1    A.    Depending on what you made that night, they'd be getting

2    between thirteen -- twelve, $13.00 out of each and every person.

3    Q.    Was there -- did someone tell you how much you were

4    supposed to pay to them?

5    A.    No.

6    Q.    How much, typically, was there, like, a percentage or an

7    amount you paid?

8    A.    Just a percentage.

9    Q.    What was the percentage that you paid?

10   A.    Normally, it was, like, five to six percent.

11   Q.    Were there ever times when you didn't pay in to the

12   bussers?

13   A.    Once or twice.

14   Q.    So, whatever you took home with your tips, were you tips

15   minus whatever you paid the --

16   A.    Yes.

17   Q.    -- the bus staff?

18   A.    Yes.

19   Q.    Do you tip out anybody else?

20   A.    No.

21   Q.    I think that Mr. Dautrich described, like, a -- a display

22   of information in the restaurant, do you recall testifying about

23   that?

24   A.    Yes.

25   Q.    Did anyone ever direct you to read or review the

Amanda Graul - Recross                                    127

1   information in that display?

2   A.   No.

3   Q.   And did any -- based on the information -- do you have any

4   memory of what -- what was in the display?

5   A.   Ah, our schedules, our -- like, for the OSHA, the hourly

6   wage.

7   Q.   Okay.

8        Did it show the hourlies that you were, personally,

9   getting?

10  A.   2.83.

11  Q.   Do you know if that was on the poster or not?

12  A.   I don't remember.

13  Q.   Okay.

14        (Pause at 12:23 p.m.)

15        MS. GREENWALD:  No further questions for this witness.

16        THE COURT:  Anything further, Mr. Dautrich?

17        MR. DAUTRICH:  Just briefly, Judge.

18        THE COURT: All right.

19                    RECROSS-EXAMINATION

20  BY MR. DAUTRICH:

21  Q.   You worked usually four shifts a week, how much were you

22  making in tips on any given night?

23  A.   Okay.

24        With my 2:00 to 10:00 shift, it would roughly, between

25  a hundred to a $120.00.

1          If it was my Monday and Tuesday shift, between roughly

2  eighty-five and ninety.

3  Q.   And that's just in the credit card and cash tips, that's

4  not figuring in your pay check, too, right?

5  A.   That's right.

6          MR. DAUTRICH:  Okay.

7          No question, Judge, thank you.

8          THE COURT:  Anything else?

9          MS. GREENWALD:  No, your Honor.

10         THE COURT: All right.

11         Thank you, you're dismissed, you can go.

12         THE WITNESS:  Thank you, sir.

13         THE COURT:  All right.

14         We're now going to take our lunch recess.  Court is in

15  recess until 1:30.  Thank you.

16         DEPUTY CLERK:  All rise.

17         (Luncheon recess is held at 12:24 p.m.)

18                            *  *  *

19

20

21

22

23

24

25

1          A F T E R N O O N   S E S S I O N

2          (Resumed in open court at 1:34 p.m.)

3          DEPUTY CLERK:  All rise.  Court is now in session.

4     Thank you, you may be seated.

5          THE COURT:  All right.

6          Let the record reflect the parties are present,

7     Counsel are present.  We have another witness up on the witness

8     stand.  Could you please stand and raise your right hand?

9          BRENDA ALENA, PLAINTIFF WITNESS, SWORN.

10         THE WITNESS:  I do.

11         DEPUTY CLERK:  State your name and spell your last

12    name on the record.

13         THE WITNESS: Brenda Alena, A-l-e-n-a.

14         DEPUTY CLERK:  Thank you.

15         Please make sure you speak into the microphone.

16         THE COURT:  What is it, again, A --

17         THE WITNESS:  A-l-e-n-a.

18         THE COURT:  All right.  Thank you.

19                    DIRECT EXAMINATION

20    BY MS. GREENWALD:

21    Q.   Good afternoon, Ms. Alena.

22         Before we get into any details, I want to confirm, do

23    you understand that we're here today -- and that you're here

24    today -- because the Secretary of Labor filed a lawsuit against

25    Exeter Family Restaurant, do you understand that?

1    A.   I do.

2    Q.   And do you currently work for Exeter Family Restaurant?

3    A.   Yes, I do.

4    Q.   And what's your position there?

5    A.   Server.

6    Q.   How long have you worked there?

7    A.   I have worked at the Exeter Restaurant over twenty some

8    years.

9    Q.   And was the -- when you started working at the restaurant,

10   was the restaurant under the same ownership that it is now?

11   A.   No.

12   Q.   Have you worked there continuously --

13   A.   Yes.

14   Q.   -- that entire time?

15   A.   Yes.

16   Q.   During the period and let me talk about the specific period

17   of time, I want you to focus on, you've worked there a long

18   time.

19          During the period from about the end of March of 2014

20   until -- up until recently -- did you continue to work as a

21   server through that period of time?

22   A.   Yes, I did.

23   Q.   Did you have any other jobs during that period of time at

24   Exeter Family Restaurant?

25   A.   No.

1   Q.   And during that period of time, who were -- who, if anyone,

2   would you have considered your supervisor?

3   A.   Ah, Michael Nanouh.

4   Q.   Anybody else?

5   A.   Joe Nanouh.

6   Q.   And what is your -- ah -- what is your understanding of

7   what Michael Nanouh's position is with the restaurant?

8   A.   Ah, several positions, manager, host, cashier,

9   disciplinarian.

10   Q.   Okay.

11        When you say, manager, what -- what is your

12   understanding of what -- what his role is as the manager?

13   A.   Ah, oversees what we are doing as servers and making sure

14   the customers are seated properly and the cash is taken.

15        And he kind of lets us know when we're able to leave,

16   if there are some girls that are -- we're kind of slow -- ah, or

17   whatever, we will be able to get relieved and leave.  He gives

18   us that, okay.

19        And if we'd need to stay later, because the restaurant

20   might be very busy, ah, then we continue on till ten o'clock.

21   Q.   Did -- and you mentioned, you know, another role as

22   disciplinarian, why -- why do you say that?

23   A.   Well, just to make sure that we're all doing what we're

24   supposed to do.

25   Q.   Has there ever been a -- a time when Michael Nanouh had a

Brenda Alena - Direct                                    132

1   discussion with you or he thought you weren't doing something

2   that you were supposed to do?

3   A.   No.

4   Q.   Anything that happened with other servers?

5   A.   No.

6   Q.   Did you have a meeting at the restaurant --

7   A.   Yes.

8   Q.   -- for -- for servers?

9   A.   Sure.

10  Q.   Would it be servers or -- or other employees?

11  A.   Ah, it just depended on what he wanted to address as far as

12  what might be going on that he wanted to address.

13  Q.   And just to be clear for the record, when we're talking

14  about, he, who are you talking about?

15  A.   Michael Nanouh.

16  Q.   Okay.

17       And would Michael Nanouh have -- have held those sorts

18  of meetings during the period of time -- 2014 -- up until

19  recently?

20  A.   Yes.

21  Q.   Was there anyone else, who would have run those types of

22  meetings?

23  A.   No.

24  Q.   At any point -- and I want to talk about the time from the

25  point where the -- Nanouh -- J. Nanouh, Incorporated or the

Brenda Alena - Direct                                    133

1    Nanouh family -- or -- do you understand that that's who owned

2    Exeter Family Restaurant?

3    A.   Yes.

4    Q.   Okay.

5         And I think you mentioned that you considered Joe

6    Nanouh to be one of your superiors there, too?

7    A.   Hm-hmm.

8    Q.   Okay.

9         Since the time that the ownership had come in to the

10   restaurant, has anybody discussed with you what your pay would

11   be as a server?

12   A.   Ah, no, because it actually just continued from the

13   previous owner, they just -- we just continued it that way.

14   Q.   Okay.

15        And did anybody, after -- and again, this is, I'm

16   talking about the point from which J. Nanouh, Incorporated took

17   over the restaurant -- did anyone discuss with you, that a tip

18   credit would be taken?

19   A.   I'm not sure what you mean by a tip credit.

20   Q.   Did anyone ever talk to you about something called, a tip

21   credit?

22   A.   Not that I'm aware of.

23   Q.   Did -- and, again, talking about the period from -- since

24   J. Nanouh, Incorporated had owned or operated the restaurant --

25   did anyone give you an amount of money that was being treated --

1   from your tips -- but being treated as part of your wages?

2   A.   We got cash, part cash and part check, but whenever we got

3   our credit-card tips, we got all cash.

4   Q.   Did anyone ever explain to you an hourly amount that would

5   be treated as wages, even though it was given to you as tips?

6   A.   No, it just -- it was just a continuation on my part.

7   Q.   And did you -- let's talk about when you were working.

8          What did you -- have you worked the same schedule for

9   the entire period from the end of March, 2014 up until the

10  present time?

11  A.   Basically, it's an -- it's alternated, because others that

12  might be on vacation, you might fill in for them or there might

13  be a holiday that comes in to the -- you know, that part and

14  then, we -- we'd work that.

15         So, it's -- it's basically, what I've done is the

16  three days a week and if need be, fill in for others or stay

17  longer for others or it's just -- just the way, the restaurant

18  world rolls.

19  Q.   Okay.

20         Well, when you say, three days a week, which -- which

21  days -- and not -- and taking aside times, when you might be

22  covering for someone else --

23  A.   Hm-hmm.

24  Q.   -- or working on a special occasion or a holiday, but when

25  you're talking about three days a week, which three days were

Brenda Alena - Direct                                            135

1   you working?

2   A.   Tuesday, Wednesday, Thursday.

3   Q.   Okay.

4        And what was your -- what shift time -- what times

5   were you scheduled to work on a Tuesday?

6   A.   I worked the second shift, ah, for several years, it was

7   all three days, 2:00 to 9:00 -- 2:00 to 8:00, 2:00 to 9:00 --

8   like I said, that varies when you might be able to get released

9   or stay on.

10       And then, recently, I backed off on a Thursday and now

11  it's 4:00 to 9:00 or 10:00.

12  Q.   And when you say, recently, how recently was that that your

13  schedule changed a little bit?

14  A.   Ah, about a year ago.

15  Q.   But up until that point about a year ago, you were -- I

16  just wanted to make sure, I understand, you -- it sounds like,

17  you were working --

18  A.   I was.

19  Q.   -- three days a week --

20  A    Sure.

21  Q.   -- and you were working a shift that was scheduled for,

22  either, 2:00 to 8:00 or 2:00 to --

23  A.   2:00 to 8:00 and then, it went up to 2:00 to 9:00, because

24  we have busy periods, where the restaurant needs more of us to

25  help.

1          So, it just depends on the time of the year and -- ah

2     -- you know, we all work with each other and that's how we do

3     that.

4     Q.   What -- ah --

5          (Pause at 1:43 p.m.)

6     BY MS. GREENWALD:

7     Q.   Given that there were some variations in when your -- the

8     time of the shift that you were working, how would you know

9     exactly which hours you were expected to be at the restaurant?

10    A.   The schedule.

11    Q.   And where did the schedule come from?

12    A.   The schedule was in the back, ah, it was a paper schedule

13    and we had it marked in there.

14         And after you'd do the job for so many years, you

15    basically, know your routine schedule and if not, when you'd

16    come for your first day of the week, you'd check your schedule.

17    And you might have been shifted around a little bit or maybe,

18    they didn't need you that certain day, someone would fill it for

19    you for another reason.  And that's how you looked at your

20    schedule for the week.

21    Q.   Now, tell me about -- ah -- what you would do when you

22    arrived at the restaurant for your shift and we're talking -- I

23    wanted to make sure, I've got this right -- we're talking about

24    shifts that were starting, usually, scheduled to start at 2:00,

25    correct?

1   A.   Correct.

2   Q.   Okay.

3        When you arrived, first of all, what time did you

4   arrive?

5   A.   Ah, two o'clock, I'd get there by 2:00.

6   Q.   You'd get there by 2:00?

7   A.   Hm-hmm.

8   Q.   Have you ever arrived earlier?

9   A.   Somewhat and that varied, because the girls are ready to

10  leave and we have a couple that come on at the same time, so

11  some girls pick up more tables then and that gives them a little

12  bit more time to make money.

13  Q.   And when -- when you'd get to the restaurant, what's the

14  first thing you have to do?

15  A.   We clock in, if we'd remember, we'd clock in and -- ah --

16  check and see what the vegetables are for the day and it's just

17  kind of routine.

18        Go out, look at out station, make sure everything is

19  ready to go for your shift and ask if the other girls, that are

20  leaving, if they need anything or anything needs to be

21  transferred over, possibly, because they want to leave and start

22  your day.

23  Q.   When you say, logged -- logged in or -- I can't remember,

24  if you said, log in or clock in -- can you describe to me, how

25  that works?

Brenda Alena - Direct                                            138

1    A.   Well, we log in on the computer, our last digits of our

2    Social Security number and then, that brings our screen up and

3    that means, we're ready for our shift.

4    Q.   And do you do that as soon as you get to the restaurant,

5    typically?

6    A.   Typically.

7         I don't want to say that I'm every time on the minute

8    with that, but I might realize when I put my first table in, oh,

9    I forgot to clock in and that's okay.

10   Q.   But when you get to the restaurant and start working and

11   you've described you're checking certain items --

12   A.   Sure.

13   Q.   -- to make sure the service is ready, are there -- is there

14   a manager there on duty?

15   A.   Ah, there is one, when I get there, yes.

16   Q.   And who is, typically, the manager there when you get there

17   around two o'clock?

18   A.   Eddie Farris.

19   Q.   Okay.

20        And then, is there -- does that team manager stay

21   throughout the -- the time that you're working, typically?

22   A.   Ah, basically, he stays on because everything slows up at

23   that time.  So, ah, normally, it does.

24        And then, we'd have three girls there, so we kind of

25   help each other out with the seating and so forth.

Brenda Alena - Direct                                    139

1          And, ah, he leaves and we have the four o'clock girls

2    come in and then, we just keep everything going.

3    Q.    Is there another manager that comes on duty after Eddie

4    leaves?

5    A.    Ah, not immediately.

6          THE COURT:  And then, when does it pick up at 5:00 for

7    the dinnertime?

8          THE WITNESS:  Ah, it can pick up around five o'clock,

9    it can pick up later, like I said, it just depends on what's

10   going on in the township, if they have events or things like

11   that, then, things happen later.

12   BY MS. GREENWALD:

13   Q.    When does -- when does the next manager come on?

14   A.    Ah, when I'm there on a Tuesday and a Wednesday, it's

15   Michael Nanouh and then, on a Thursday, it's Faez.

16   Q.    And around what time, does the next manager get there

17   during -- during your regular time that you're working?

18   A.    Ah, 4:30, around that time, right before suppertime kicks

19   in.

20   Q.    Talk me through as your shift is -- as the -- your normal

21   scheduled work time is coming to an end.

22          So, if you're on the schedule for 2:00 to 9:00 for a

23   particular day --

24   A.    Sure.

25   Q.    -- as it gets close to nine o'clock, do you do anything to

1    start preparing for the end of the shift?

2    A.    Sure.

3    Q.    What do you do?

4    A.    We all have the side work -- side work, that the manager

5    fills out, a sheet that we have, it's a daily sheet and we all

6    are assigned different spots and we'd do our side work, whatever

7    it might be and sometimes, we'd get a check, 'cause we're pretty

8    good with it on second shift.  So, ah, we'd do that.

9          And then, do our fills and we might still have people

10   that are still seated, customers, so that way, we can still

11   continue to work our way out and still take care of our

12   customers.

13   A.    Okay.

14         Let me -- I want to unpack it, you explained a couple

15   of different things.

16         When you said, the manager makes a list, can you

17   describe what that list is?

18   A.    Well, we -- someone certainly can't take care of everything

19   that needs to be done at night, as far as doing ice cream and

20   the bain-marie which is where we keep our condiments and things

21   like that.

22         Everyone has a different thing, we clean the trays, we

23   take pretty much care of everything that needs to be cleaned up

24   for the third-shift girl.

25   Q.    And when you say, we, who are you talking about?

1   A.   All of the other servers, we all have a designated -- ah --

2   spot, that we take care of, it's -- our names are written across

3   it and -- and we do it, we bring stock up or things like that or

4   napkins and spoons and everything that you'd need.

5   Q.   Who makes that list?

6   A.   The host -- the host, whoever the host is that's on.  If

7   Michael is there, we take it to him and -- ah -- he fills it out

8   for us and then, we'd go from there.

9        Some of us are able to leave earlier, so they can get

10  started with theirs earlier, so that's -- that's the way we'd

11  get everything all cleaned up.

12  Q.   But those tasks are specifically assigned by -- by a

13  manager?

14  A.   Sure.

15  Q.   What -- you also said and I want to make sure, I understand

16  what you're talking about -- you also said, some of us might get

17  a check, are you talking about -- well, in the period where

18  you're getting the side work done -- were you talking about you

19  might also be able to pick up another table --

20       (Coughing at 1:50 p.m.)

21  Q.   -- or -- I'm not sure, what you -- what you mean by a

22  check?

23  A.   Ah, I was talking about our side work being checked, so

24  that we're sure that we are doing our job.

25  Q.   Okay.

1              So, when you talked about your side work being

2     checked, what -- what does that involve?

3     A.   We just go through the -- what -- the paper that we have,

4     the list and our -- whoever's name is behind it, that is what's

5     checked off as far as, yes, you did, yes, you did, oops, you

6     missed this, maybe, you'd want to go back and correct it.

7     Q.   Who does this checking off?

8     A.   The -- the host or the manager, whoever, it doesn't happen

9     every time, because like I said, some of us are better at doing

10    it and making sure, so the host is kind of comfortable knowing

11    that some of us take care of it.

12             When you're there a long time, you know what to do at

13    the end of the night.

14    Q.   Okay.

15             And for those people, who may not have been there that

16    long and aren't as familiar --

17    A.   Hm-hmm.

18    Q.   -- have you ever seen anyone get in -- in any kind of

19    trouble for not completing their side work task?

20    A.   Ah, I don't want to say, get in trouble, they get  -- it

21    gets addressed.

22    Q.   How does -- how does -- how have you seen it get addressed?

23    A.   Ah, well, it comes from the other girls that come in from

24    the night before, if they'd come in or if we'd come in at second

25    shift and see that the first shift did not take care of

1   business, ah, we'd tell the boss.

2   Q.   And what does the boss do?

3   A.   Checks over it and addresses it.

4   Q.   And when you talk about the boss, who are you talking

5   about?

6   A.   Michael Nanouh.

7   Q.   Have you ever been there when the -- the -- when Michael

8   Nanouh has addressed a problem with the side work not getting

9   done?

10  A.   Sure.

11          We get -- we've gotten a note already in regards to

12  it, that -- ah -- just a little warning that you're not taking

13  care of your -- your work and you're leaving it for the others

14  when they'd come in, which is unfair.  And just like, we don't

15  like to get it in the afternoon, they don't like to get it in

16  the morning.

17  Q.   Where did that note come from?

18  A.   The computer, it's on our computer.

19  Q.   Oh, okay.

20          Tell -- can you describe to me, how that works, I'm

21  having trouble envisioning it?

22  A.   Ah, if we -- if we clock in and he has a message for all of

23  us to get all at one time, then he can type it in and we'd just

24  -- it comes up on our screen and we can see what -- if a meeting

25  is coming or what he desires.

Brenda Alena - Direct                                          144

1  Q.   Do you get a lot of messages that way?

2  A.   No.

3  Q.   When you -- you talked -- we got -- you talked a little bit

4  about what work, you'd need to do before you leave for the night

5  or you leave at the end of the scheduled shift.

6        What happens, if there's a table that isn't done yet

7  when you're scheduled to leave?

8  A.   Ah, well, that becomes an issue, because you cannot clock

9  out until your -- all the customers have been -- their tabs have

10 been paid.

11       So, that's still on your -- on your screen, so in

12 order to be able to punch out, that customer has to pay, so that

13 we can do that.  Otherwise, we'll just do whatever we have to do

14 as far as side work goes and check on that customer.

15       And if it continues after and after, then the next

16 third-shift girl that comes in, we can kind of just transfer it

17 and we give up that tip.

18 Q.   Okay.

19       So, if you were to leave, then you would give the tip

20 on the -- on the table, if it's -- if it's the next --

21 A.   That's the deal.

22 Q.   -- shift, okay.

23       And while you're -- if you have a table or two that

24 you're waiting for them to leave towards the end of --

25 A.   Hm-hmm.

Brenda Alena - Direct                                    145

1   Q.   -- your shift, you've described you're doing side work.

2         What are your responsibilities for that particular

3   table that might be lingering?

4   A.   Well, we're open twenty-four-hours a day, so I can't

5   really, ah, make it a point to tell them, we're closing.

6         So, it just depends on -- on what is going on as far

7   as the third-shift girl, if she come in to a whole lot of

8   customers, then, ah, like, I said -- we might transfer it or we

9   might just tell the customer, kindly, that in order for us to

10  leave, as a server, we'd have to have you be able to cash out,

11  you may stay as long as you'd like, you can stay here all night,

12  if you'd like, but -- ah -- in order for us to be able to clock

13  out and go home, that has to be cleared.

14  Q.   Okay.

15        THE COURT:  For you to get paid?

16        THE WITNESS:  Yes.

17  BY MS. GREENWALD:

18  Q.   And what is the -- when someone stays there for a long

19  time, do you continue to visit their table?

20  A.   Ah, I will -- I will tell them, like, I said, if it's -- if

21  it's even being transferred, I will go to them and tell them,

22  I'm leaving for the evening, but if you need anything else, so

23  and so, whoever that might be will help you and we'd go from

24  there.

25  Q.   If it's not being transferred or say maybe they've only

Brenda Alena - Direct                                                    146

1   been there for fifteen or twenty minutes, would you continue to

2   check on them --

3   A.   Sure --

4   Q.   -- would you bring them --

5   A.   -- to see if they need anything else before I'd come to

6   that conclusion.

7   Q.   Would -- would you bring them, drinks if they'd ask for

8   them?

9   A.   Sure.

10  Q.   And are you the only person at that point, who is

11  responsible for servicing that particular table?

12  A.   And my station.

13  Q.   When -- once you actually, do either transfer everybody or

14  everybody has gone on their -- their way for the evening --

15  A.   Hm-hmm.

16  Q.   -- what -- what do you do to close out for your work time?

17  A.   Well, I -- if everything is done as far as my side work

18  goes and I -- I have my screen cleared for the go ahead, I just

19  clock out.  And I get my -- my sales and things from the day and

20  I take it up to the register and whatever my credit-card tips

21  are, ah, or if I have any extra cash that I might have, that

22  might help them through the night as far as change and cash it

23  and we get it.

24  Q.   Okay.

25       And when -- so, when you log out or clock out, is that

Brenda Alena - Direct                                    147

1  through the same computer system that you described before?

2  A.   Sure.

3  Q.   And you take a slip to -- who do you take your slip to --

4  A.   Ah --

5  Q.   -- at the end of the night?

6  A.   -- someone that -- that has the authority to -- to do that

7  for us, because once we clock out, we cannot get in to the

8  register at all, because we've been cleared.

9        So, we'd have to clock back in to get there, so we

10 need someone that can open that up and give our tips to us.

11 Q.   And during the period -- again, we're talking about -- from

12 about the end of March of 2014 until the present, who -- who

13 would that person typically be for you when you're finishing up

14 your work?

15 A.   Michael Nanouh.

16 Q.   So, then, you've got -- you get cash for the credit-card

17 tips --

18 A.   Hm-hmm.

19 Q.   -- is there anything else that you take home with you on a

20 daily basis?

21 A.   No.

22 Q.   Do you take home all of the cash that you receive in tips,

23 either, credit card or otherwise?

24 A.   I do.

25        Ah, like, I said, sometimes, I will see if they need

Brenda Alena - Direct                                      148

1   any change through the night for the third shift, because they

2   need dollar bills, $5.00 bills or whatever and if we can help

3   that way and take the bigger bills, then we'd do that.

4   Q.   Do you have to -- do you contribute tips to any other

5   workers in the restaurant?

6   A.   Yes.

7   Q.   To whom?

8   A.   To the busser.

9   Q.   And how much do you contribute to the bussers?

10  A.   Well, we see how much our tips are on our credit cards that

11  can be pulled up by the manager and he'll tell us, you have --

12  you made $37.00 and whatever you have in your pocket, you count

13  and then, you -- however -- ah -- you feel about it, you -- you

14  don't have to give a certain amount, but if you get used to your

15  girls cleaning and helping you make your money, then you treat

16  them accordingly.

17  Q.   For you, what -- what does that usually mean in terms of

18  how much you give them?

19  A.   Ah, well, it depends on how busy we were, it depends on how

20  much they helped us, individually, because they have a lot to

21  cover.  And I usually give ten to $12.00.

22  Q.   And what -- what percent?

23       THE COURT:  You don't use percentages or you use that

24  as a base?

25       THE WITNESS:  Ah, it's usual -- because it usually

Brenda Alena - Direct                                        149

1   comes out to something like that, so if I feel like I want to

2   give her a little more because she helped me, then that's my

3   gift to her.

4           THE COURT:  Well, we haven't had anybody that

5   testified to exactly what the bussers do.

6           So, they do more than clean off the tables, do they

7   bring the food out?  What exactly do they --

8           THE WITNESS: Ah --

9           THE COURT:  -- what exactly do they do?

10          THE WITNESS:  They -- they clean, they clean, they

11   clear the tables, they -- they clean them and, of course, take

12   all of the bus stands and things back.

13          And come back and place the new silverware on there

14   for the next customers that come in.  And they bring the ice up.

15   BY MS. GREENWALD:

16   Q.   Do you know, do they make tips, other than whatever you are

17   putting in for them?

18   A.   I'm not aware of that, I don't know.

19   Q.   Do you know how much they get paid?

20   A.   I do not.

21   Q.   And you've described to me in a -- I'm trying to just put

22   myself in -- in that moment.

23          You described to me that manager pulls up, something

24   about how much you --

25   A.   Hm-hmm.

Brenda Alena - Direct                                    150

1    A.   -- made that night.

2         Where is that happening?

3    A.   Ah, in the front at the desk, at the front --

4         THE COURT:  It's printed out, isn't it?

5         THE WITNESS: It's printed out.

6         THE COURT: It comes out of a machine and she sees, she

7    made $72.00 in tips.

8    BY MS. GREENWALD:

9    Q.   Well, does that -- is there a discussion when -- when you

10   take your slip up --

11   A.   Hm-mm.

12   Q.   -- you give it to the manager --

13   A.   Hm-hmm.

14   Q.   -- correct?

15        And they give you cash?

16   A.   Correct.

17   Q.   Do they also tell you, anything about how much you should

18   be paying in to the bussers?

19   A.   No.

20   Q.   Okay.

21        Who do you give the money to for the bussers?

22   A.   Ah, it just depends if there's one or two on.  If there's

23   two on, then we -- we have a list that we have up front with

24   each of the servers names and then, we give that to the cashier

25   or the host, whoever it might be.

Brenda Alena - Direct                                      151

1            And they'd put it in the drawer and they added it up

2   at night and then, when the busser leaves, that's added up and

3   given to her.

4   Q.   Okay.

5            So, in your case, would that normally be Michael

6   Nanouh, who would be receiving the money and the list?

7   A.   Yes.

8            (Pause at 2:01 p.m.)

9   BY MS. GREENWALD:

10  Q.   What -- ah -- were there -- how did you get pay, other than

11  tips?

12  A.   My biweekly paycheck.

13  Q.   And when did you get a paycheck, what -- what day of the

14  week?

15  A.   Ah, I'm not there on Sunday, because that's when they get

16  the checks, so when I come in on Tuesday, I will retrieve my

17  check.

18  Q.   And where is that when you retrieve it?

19  A.   Ah, usually, locked up in the office in the back and -- ah,

20  Eddie, if he's on at that time or if Michael -- I'd miss Eddie

21  and Michael comes in, then, he will get it for me.

22  Q.   Is your paycheck always the same amount?

23  A.   No.

24  Q.   Does you paycheck pay for all of the hours that you've

25  worked in the week or two-week period?

Brenda Alena - Direct                                    152

1   A.   My paycheck does not pay for all of the hours on the check,

2   it's half check and half cash, not any longer, it's not like

3   that, I just get -- I've decided to make it all check.

4   Q.   You decided that?

5   A.   Well, I -- it's better.

6   Q.   Okay.

7        So, tell me about how -- how much of -- how many of

8   your hours would, typically, be paid through the check -- and

9   again, we're talking about the period from 2014 -- strike that

10  for a second.

11       When did -- when did that change in terms of you

12  getting cash in addition to a check?

13  A.   Ah, I don't know exactly when I started doing that, I was

14  going through a divorce and I had to make sure that everything

15  was shown on my checks, so that I could work with that.  So, ah,

16  that was my personal reason for that.

17  Q.   Do you know about when that was?

18  A.   Maybe, three years ago, two years ago.

19  Q.   So, after that point, you were not receiving any cash other

20  than your tips, is that correct?

21  A.   Ah, I would -- I would get half -- half of it, ah, I would

22  get half check and half cash.

23       So, if it was the ten hours on my check, ah, then, the

24  other ten hours, if it was twenty hours for the week, then, ah,

25  the other twenty, I would get $20.00, ten dollars times two

1   dollars, $20.00.

2   Q.   Okay.

3        So, when you were getting cash, you were getting how

4   many dollars an hour?

5   A.   Two dollars.

6   Q.   And when you were getting a check, how many dollars an hour

7   were you getting on the check?

8   A.   2.83.

9   Q.   Is there a reason that you know of for that difference?

10  A.   Ah, no, not really, other than it was, maybe, we kind of

11  thought everything was just gonna go to the tax part of that end

12  of the two dollars and felt good about that part.

13  Q.   Who -- did anyone tell you that, you were getting paid two

14  dollars rather than 2.83, because of tax reasons?

15  A.   No.

16  Q.   Did you ever get a separate statement of taxes withheld

17  from the cash that you received?

18  A.   No.

19          THE COURT:   So, most weeks you worked how many hours?

20          THE WITNESS:   Well, it's 2:00 to 10:00 or 2:00 to 8:00

21  or 2:00 to 9:00, however, you want to look at it, ah, sixteen to

22  twenty.

23          THE COURT:   So, usually, never more than thirty?

24          THE WITNESS:   No.

25          THE COURT:   Or eight, eight and eight, what would that

1    be?

2             THE WITNESS:  Twenty-four.

3             THE COURT:  Okay.

4             So, you only worked two days a week, really?

5             THE WITNESS:  Sure.

6             THE COURT:  So, you never exceeded forty?

7             THE WITNESS:  No.

8             I'm not gonna say, never --

9             THE COURT:  All right.

10            THE WITNESS:  -- because it's been four years, like I

11   said, if I might have filled in for someone's shift when they

12   went on vacation, but it was far and few between.

13   BY MS. GREENWALD:

14   Q.   And I just wanted to make sure, I -- I clarify, I -- I

15   thought I understood and maybe, I misunderstood.

16            At some point, did you stop receiving half of your

17   check in cash and -- half of your pay in cash and half of your

18   pay on the paycheck?

19   A.   Yes.

20   Q.   Okay.

21            And I want to make sure, as to when, do you know, when

22   that happened --

23   A.   I think --

24   Q.   -- that change happened?

25   A.   -- I think, it's about two years ago.

1   Q.   Now, typically, how many hours show up on your paycheck?

2   A.   Biweekly, it can be thirty, thirty-one.  Like, I said, it

3   all depends on what goes on during the day, sometimes, we can

4   leave early and -- and we -- we're at, you know, three hours or

5   it's taken off of our pay, because we're not there, we didn't

6   work it.

7          So, it just -- it's not a given of how many hours.

8   Q.   So, did you -- ah -- if you stayed after your shift,

9   because there was someone, who was lingering at their table --

10  A.   Hm-hmm.

11  Q.   -- would you mark that down somewhere on the schedule?

12  A.   There wouldn't be a reason to.

13  Q.   Why not?

14  A.   Because I'm clocking out and I have a paper that says, how

15  many hours I worked, 'cause I can't leave until I -- until that

16  is cleared.

17  Q.   And I just wanted to confirm, you said, when you were

18  getting cash, did you -- and I'm talking about not your tips --

19  A.   Hm-hmm.

20  Q.   -- but cash that you understood to be part of your hourly

21  pay --

22  A.   Hm-hmm.

23  Q.   -- ah, did you ever get coins as part of that?

24  A.   No.

25  Q.   Always bills?

Brenda Alena - Direct                                   156

1   A.   Always.

2   Q.   How did you get the cash?

3   A.   In an envelope with the check.

4   Q.   And who -- would that just be in there when you retrieved

5   it?

6   A.   Yes.

7   Q.   Do you know, who put the cash in there?

8   A.   No.

9        MS. GREENWALD: If I can just take a moment.

10       (Long pause and discussion held off the record at 2:08

11   p.m.)

12       MS. GREENWALD:  Just a moment.

13       (Pause continues.)

14       MS. GREENWALD:  I don't have any further questions for

15   the witness at this time.

16       THE COURT:  All right.

17       Mr. Dautrich, you may cross-examine.

18                        CROSS-EXAMINATION

19   BY MR. DAUTRICH:

20   Q.   Hi, Brenda, how are you?

21   A.   Hello, good, thank you.

22   Q.   So, just a few questions, maybe, Brenda.

23       When you started working -- well, let me go back.

24       You worked at Manny's before that restaurant became

25   the Exeter Family Restaurant, right.

Brenda Alena - Cross                                    157

1   A.   Yes, I did.

2   Q.   And you continued to remain employed in the same building

3   after it was bought by Joe Nanouh, right?

4   A.   Correct.

5   Q.   So, you were there before Joe was, so to speak?

6   A.   Yes.

7   Q.   When -- when Joe took over and bought the restaurant from

8   whoever the prior owners were, you had already been there,

9   right?

10  A.   Yes.

11  Q.   And you -- did your pay -- ah -- how you were paid, half

12  check and half cash, change in any when Mr. Nanouh took over?

13  A.   No.

14  Q.   Okay.

15       Obviously, somebody must have had a discussion that

16  you knew what -- you knew what you were getting paid, right?

17  A.   Yes.

18  Q.   Okay.

19       And the -- the amount -- the hours you were paid in

20  cash -- oh, excuse me, strike that.

21       The hours you were paid by a check from the time of

22  the spring of 2014 until you went to check only, ah, the hours

23  you were in -- by a check were at 2.83 an hour?

24  A.   Correct.

25  Q.   And you indicated, that you were -- I believe, the prior

Brenda Alena - Cross                                         158

1   attorney asked you about talking about at tip credit, do you

2   know -- do you know what that means?

3   A.   I really don't, I don't really know.

4   Q.   Okay.

5        You've been -- you've been a server at that -- at that

6   restaurant for, like, twenty-five years, haven't you?

7   A.   Yes, I have.

8   Q.   Okay.

9        So, did you believe that you had to be instructed on

10  how to do your job when the new owner took over?

11  A.   No.

12       MS. GREENWALD:  Objection, your Honor --

13       THE COURT: Sustained.

14       MS. GREENWALD:  -- it's argumentative.

15  BY MR. DAUTRICH:

16  Q.   There is a -- a bulletin board, so to speak, where things

17  are posted or there was -- where things are posted for the

18  employees, is that right?

19  A.   Yes.

20  Q.   So, on that bulletin board, would be, the schedule, right?

21  A.   Yes.

22  Q.   And there was other -- there were other things posted

23  there, like, talking about health -- or, I mean, safety in the

24  workplace, right?

25  A.   Hm-hmm.

Brenda Alena - Cross                                    159

1   Q.   And --

2            MS. GREENWALD:  Objection, your Honor, we're not --

3   there is no idea what time period, we're talking about here,

4   it's especially, vague.

5            THE COURT:  All right.  Please clear up.

6            (Coughing at 2:12 p.m.)

7            MR. DAUTRICH:  All right.

8            THE COURT:  Yes.

9   BY MR. DAUTRICH:

10  Q.   Has that bulletin board been there since you -- since Joe

11  took over the restaurant?

12  A.   Yes.

13  Q.   All right.

14           So, that we're talking about the same bulletin board

15  that's been there for twenty-some years, right?

16  A.   Yes.

17  Q.   All right.

18           And on that bulletin board, there is information about

19  safety, right?

20  A.   Yes.

21  Q.   And there's information about minimum wages and stuff like

22  that, right?

23  A.   Sure.

24  Q.   Okay, yes --

25  A.   Yes.

1   Q.   -- sorry, the Judge can't see you nodding.

2   A.   I'm sorry, yes.

3   Q.   All right.

4        So, when you -- when you were talking about the -- the

5   responsibilities you have as a server at the restaurant, I mean,

6   it seems like, there was a lot of discussion about, these side

7   jobs or the things that are not serving the food to the

8   customers and taking orders, okay, do you remember that stuff?

9   A.   Yes.

10  Q.   Before the Nanouhs bought that restaurant, did you do the

11  -- similar kinds of side jobs, like, check on condiments and

12  wipe down --

13  A.   Yes.

14  Q.   -- various spots?

15  A.   Yes.

16  Q.   And is it fair to say, that as a -- a server, you have a

17  designated station or a section of the restaurant, you're

18  responsible for?

19  A.   Yes.

20  Q.    And in that, you check the condiments and the spices at

21  your tables, right?

22  A.   Yes.

23  Q.   And if they need sugar, you'd put sugar there --

24  A.   Yes.

25  Q.    -- things like that?

Brenda Alena - Cross                                              161

1   A.   Sure.

2   Q.   Are those unusual tasks in your experience as a server?

3   A.   That's your station and you make sure it's ready for the

4   next customer.

5   Q.   Okay.

6        You talked about Michael and his responsibilities and

7   what you see him doing while he's there, is it fair to say that

8   there is a -- a period of time between -- during your shift --

9   where Eddie leaves and then, there is nobody -- and there's no

10  manager or host there?

11  A.   For a while.

12  Q.   Okay.

13       And during those times, the people who are servers

14  then would seat customers and ring them out at the cash

15  register, right?

16  A.   Yes.

17  Q.   All right.

18       So, that's not unusual --

19  A.   Not at all.

20  Q.   -- in your experience, right?

21       And when you -- when you see Michael at the

22  restaurant, you've talked about him having a bunch of different

23  things, he does, but he's -- he's at the host or hostess station

24  in the front of the restaurant for a good bit of time while he's

25  there, isn't he?

Brenda Alena - Cross                                    162

1   A.   Yes.

2            MS. GREENWALD:  Objection, vague -- what -- when are

3   we talking about?

4            THE COURT: The objection is sustained or clarify it --

5            MR. DAUTRICH:  All right.

6            THE COURT:  -- re-ask -- ask the question again.

7   BY MR. DAUTRICH:

8   Q.   I -- I guess, when I ask -- when I'm asking a question,

9   unless I say a specific date range, Brenda, I'm going to be

10  asking about from March of 2014 until March or April of 2018,

11  okay?

12  A.   Yes.

13  Q.   So, during those four year -- that four years, is it fair

14  to say, that when Michael was in the restaurant, a fairly

15  significant amount of his time was spent at the host or hostess

16  section?

17  A.   Yes.

18            And if we need him, if he's in his office and we need

19  him, it gets busy or whatever, ah, we knock on the door and he

20  comes out and he takes care of --

21  Q.   Okay.

22  A.   -- everything.

23  Q.   So, while he's at the host or hostess section, he's seating

24  customers, right?

25  A.   Yes.

Brenda Alena - Cross                                    163

1   Q.    He's -- maybe, if it's really busy -- he's taking people's

2   names down for a table?

3   A.    Yes.

4   Q.    And he's also running the cash register when people go up

5   to pay at the end of their meal?

6   A.    Yes.

7   Q.    This is the -- the station and it's not quite -- it's

8   bigger than this podium -- but it's -- you know -- a squared-off

9   section of the front of the restaurant, where the doors are,

10  right?

11  A.    Yes.

12  Q.    Okay.

13          Now, you -- we've talked about the -- the amount or

14  roughly, the amount of money that you were contributing towards

15  the bus -- the bussers, right?

16  A.    Yes.

17  Q.    On average -- and again, between the -- between the time

18  frame of March of 2014 to March or April of this year, what did

19  you typically average on a shift where you worked 2:00 to 8:00

20  or 9:00 in tips when you left at the end of the night?

21  A.    Well, once again, that depends on how busy we were, it

22  depends on the season, typically, busier around Christmastime,

23  lots of shoppers, Walmart, Target, they stop in at the

24  restaurant.

25          So -- and there's a lot of -- ah -- concerns and

Brenda Alena - Cross                                              164

1    things, so we get busier.  Ah, we might have snow periods of

2    time, where -- when it snows and ice, I mean, we don't get the

3    business, so of course, our money decreases.

4           And it's usually, I'll walk away with about eighty --

5    $80.00.

6    Q.   So, eighty per night or per shift would be about an average

7    for you?

8    A.   That's about an average.

9    Q.   So, some nights, you could make seventy or sixty --

10   A.   Right.

11   Q.   -- some nights, you could make a hundred --

12   A.   Correct.

13   Q.   -- or something like that?

14   A.   Correct.

15   Q.   And when you are at the end of your shift and you go to the

16   point-of-sale computer or whatever and you clock out as we're

17   referring to it, you punch your number in, I guess, and then,

18   you're able to print out your credit-card sales for that period

19   of time, you were in the computer?

20   A.   Yes.

21   Q.   It knows who you are and assigns those to you, right?

22   A.   It knows everything about what we did the whole time.

23   Q.   All right.

24          So, then you take it to the person at the cash

25   register and they look at it and if it says, $55.00 for example,

Brenda Alena - Cross                                          165

1    they give you $55.00?

2    A.    Yes.

3    Q.    And then also, if you have a person that pays for their

4    check in cash and leaves a -- some -- sometimes, people just

5    leave cash on the table when they're done, right?

6    A.    Yes.

7    Q.    You don't take the check up to the register for the

8    customers and ring it out, they go up there themselves,

9    typically, right?

10   A.    Yes.

11   Q.    Okay.

12         So, if I -- if I'm done with my meal and I pick my

13   check up and I say, thanks, Brenda and I leave five bucks on the

14   table and walk up to the cashier, you accept that as a tip,

15   right?

16   A.    Correct.

17   Q.    So, you keep those and daily, you take your cash tips and

18   the credit-card tips home with you?

19   A.    Yes, I do.

20   Q.    And you're saying, you're averaging about $80.00, that's

21   after you've already tipped the bus staff or does that -- maybe,

22   maybe not?

23   A.    Maybe, maybe not.

24   Q.    All right.

25         Now, you indicated that the way you were paid changed

Brenda Alena - Cross                                    166

1   at some period in the last two or three years and I believe, I

2   heard you say, that that was something that coincided, maybe,

3   with a divorce you were going through?

4   A.   Well, sort of, yes.

5   Q.   Okay.

6        So, this was something that changed how you were being

7   paid, you initiated that on your own, right, you asked somebody

8   to change that?

9   A.   Ah, to all check?

10  Q.   Yes.

11  A.   Yes.

12  Q.   Okay.

13       So, you weren't told, we're changing this, Brenda,

14  whether you like it or not?

15  A.   No.

16  Q.   That was your request?

17  A.   It was mine.

18  Q.   Okay.

19       And as far as how things work at the -- between the

20  different shifts of servers, for example, it looks like you're

21  normally on a second-shift hours --

22  A.   Yes.

23  Q.   -- basically, all right.

24       So, is it fair to say that as a second-shift server,

25  that you would rely on the first-shift servers to have the

1   napkins and silverware prepared and have everything stocked when

2   you arrived that day?

3   A.   Yes.

4   Q.    And is it fair to say, that the third-shift folks that

5   overlapped or come in after you, expect the same from you?

6   A.   Sure.

7   Q.   And the -- the servers, who work at the restaurant, whether

8   they work on the same shift or not, is it fair to say that the

9   shifts cooperate in a way to have stuff stocked for the next

10  shift?

11  A.   Yes.  And if not, we address it.

12  Q.   So, in other words, if I was working first shift and I

13  didn't stock your station, when you saw me the next time, you'd

14  give me little bit of your --

15  A.   Feedback.

16  Q.   -- piece of mind?  Okay.

17          So, it's basically, it's -- to some extent, it sounds

18  like, the co-workers talk amongst each other and try to hold

19  each other a little accountable, 'cause they --

20  A.   Oh, yes.

21          MS. GREENWALD:  Objection, relevance, I don't know

22  where we're going with that.

23          THE COURT:  Sustained, let's move on.

24          MR. DAUTRICH:  Well, Judge with respect, they've been

25  allowed to ask about condiments and all those -- I think, this

1   is -- you know -- important for the Court to understand, how the

2   shifts overlap.

3            THE COURT:  Well, I think, we've heard enough about --

4            MR. DAUTRICH:  Okay --

5            THE COURT:  -- how the shifts overlap --

6            MR. DAUTRICH:  -- well --

7            THE COURT:  -- I mean, really.

8            The first shift has to get it ready for the second

9   shift --

10            MR. DAUTRICH:  Okay.

11            THE COURT:  -- the second shift has to get it ready

12   for the third shift, the third shift has to get it ready for the

13   first shift, did I --

14   BY MR. DAUTRICH:

15   Q.   With respect --

16            THE COURT:  -- did I say that, right?

17            THE WITNESS:  You absolutely got it perfect.

18            MR. DAUTRICH:  Okay.

19            THE COURT:  And if the people shirk their duties,

20   they're going to hear about it --

21            THE WITNESS:  You've got it.

22            THE COURT:  -- we've heard it again and again and

23   again and again.

24            MR. DAUTRICH: They're their witnesses, Judge, I'm

25   just --

Brenda Alena - Cross                                        169

1          THE COURT:  I know, I'm not -- I'm just saying --

2          MR. DAUTRICH:  All right.

3          THE COURT:  -- right now, that we've heard --

4          MR. DAUTRICH:  Okay.

5          THE COURT:  -- from several servers, we're starting to

6    repeat ourselves.

7    BY MR. DAUTRICH:

8    Q.   When you have -- when your shift is coming to an end, if

9    you still have a customer or a table or two, I think, you said,

10   you -- you can choose to ask them to pay the bill, if they'd

11   like to?

12   A.   Ah, each one of us, is different in that respect.  Some of

13   us, you know, might wait a little longer, we don't wait too much

14   longer, because we're ready to go by that time.

15          And then there's people on the new shift that's coming

16   in, so then, we kind of work with them first.  And if not, then

17   we'd just approach the table, kindly and everyone is always very

18   nice and doesn't understand that we can't -- they do but they

19   don't think of it -- that we can leave -- cannot leave, excuse

20   me -- without them clearing or paying their tab.

21   Q.   Okay.

22          So, you are giving the flexibility to make your own --

23   take your own approach to it?

24   A.   I am.

25   Q.   And you're not given any kind of reprimand for doing that

Brenda Alena - Cross                                           170

1   from --

2   A.   No.

3   Q.   -- the management?

4   A.   No.

5   Q.   Okay.

6        And then, with respect to the -- with respect to your

7   biweekly pay, you say, you get that when you arrive for your

8   Tuesday shift?

9   A.   Correct.

10  Q.   And when you were getting some pay in cash and some pay as

11  a check, that was all in the same envelope --

12  A.   Yes.

13  Q.   -- and it would have your name on it --

14  A.   Yes.

15  Q.   -- and then, it would have a dollar figure written on

16  there?

17  A.   Correct.

18  Q.   And that was -- the dollar figure written on it, was what

19  you got in cash, right?

20  A.   Yes.

21  Q.   From the period of time, March of 2014 to this year, 2018,

22  March, April, do you -- do you believe that you were not

23  properly paid by the Nanouhs?

24  A.   I was fine with getting my check, the way I did, half

25  check, half cash and I had my tips at the end of the night.

1        And, actually, the wage is very important, I

2   understand how important our wages are, but in regards to that,

3   we don't really -- we can -- can't really make a living off of

4   our wage, because of being tipped, so we kind of deal with it

5   that way and it all worked for some of us.

6   Q.   And so, from the time of 2000 -- you know, again, March of

7   2014 to this year, you -- are you satisfied as an employee

8   there, you --

9   A.   Yes.

10  Q.   Okay.

11       So, when -- when they've changed some policies of

12  whatever kind during that time frame, it wasn't something that

13  made you want to leave?

14  A.   If --

15       MS. GREENWALD:  Objection, your Honor, there has been

16  no testimony in evidence that any change in policy --

17       THE COURT:  Okay, sustained --

18       MS. GREENWALD:  -- that this witness was told about.

19       THE COURT:  -- sustained, sustained.

20       Let me ask you this, at any time knowing that the

21  minimum wage is 7.25, did you feel that your tips and the money

22  combined, did not equal the minimum wage?

23       THE WITNESS:  No, because -- actually, I do not feel

24  like that, but I don't really know that, I took it into context

25  -- context, I'm not sure, I just don't even think about the

Brenda Alena - Cross                                172

1   7.25, because it's 2.83.

2            THE COURT:  Right.

3            THE WITNESS:  -- and that's where I stand with that.

4            I mean, I don't take my amount of --

5            THE COURT:  But if you worked six hours and you make

6   $60.00, then -- then that would --

7            THE WITNESS:  Sure, yes.

8            MR. DAUTRICH:  Okay.  No other questions.

9            THE COURT:  Anything -- anything further from this

10  witness?

11           MS. GREENWALD: Give -- give me just a moment, your

12  Honor, I --

13           THE COURT:  Sure.

14           MS. GREENWALD:  -- other questions.

15           (Pause and discussion held off the record at 2:25

16  p.m.)

17           THE COURT: Yeah, we weren't asking you to be an

18  accountant, we were just asking generally.

19           THE WITNESS:  Yes.

20           (Pause continues.)

21           MS. GREENWALD: Just a couple of questions.

22                        REDIRECT EXAMINATION

23  BY MS. GREENWALD:

24  Q.   Ms. Alena, you -- you comply with whatever rules there are

25  at work, right?

Brenda Alena - Redirect                                    173

1    A.    Sure.

2    Q.    And you understand that there are some rules about what

3    your employer is supposed to pay you, correct?

4    A.    Yes.

5    Q.    Okay.

6          And you've told us that you were receiving cash,

7    approximately, $2.00 an hour for about half of the hours you

8    were working, correct?

9    A.    Correct.

10   Q.    In your understanding, was that following the rules?

11   A.    I don't know that it was following the rules, but I feel as

12   though, if we weren't -- or I wasn't satisfied with it, I could

13   have approached it and went all on check or I could walk away.

14   Q.    Do you feel like it's your responsibility to figure out,

15   how much the law requires you to be paid?

16   A.    No.

17              MR. DAUTRICH:  Objection.

18              THE COURT:  It's asked and answered.

19              THE WITNESS:  I'm sorry?

20              THE COURT:  It's okay, you answered the question, you

21   felt that it's not your responsibility.

22              THE WITNESS: It's not my responsibility.

23   BY MS. GREENWALD:

24   Q.    Whose responsibility is that?

25   A.    Could you repeat the question?

1   Q.   Whose responsibility is --

2         MR. DAUTRICH:  Objection to that.

3   A.   Could you repeat the original question?

4   Q.   To -- whose -- whose responsibility is it to figure out how

5   much you're supposed to be paid?

6         MR. DAUTRICH:  I'd object to that, Judge.

7         THE COURT:  Overruled.

8   A.   Well, whatever the -- whatever the wage is, I would say,

9   the owner is responsible for letting us know, how much we should

10  get and it was half check and half cash.

11  Q.   Are they responsible for actually paying you all of the

12  wages that you're supposed to be earning?

13  A.   I assume that the $2.00 was for -- the other eighty-three

14  cents went toward taxes, so like I said, we just kind of

15  accepted it or we could have walked away.

16  Q.   When you said, you'd changed to getting paid all in a

17  check, who did you -- who did you ask about getting that

18  changed?

19  A.   I can't really remember, who I asked about it, I just

20  decided that's how I wanted to work it and that was best for my

21  personal reasons.

22  Q.   You don't remember, who -- who you talked to about it?

23  A.   I do not.

24        MS. GREENWALD:  No further questions.

25        THE COURT:  All right.

1          Mr. Dautrich, anything else?

2          MR. DAUTRICH:  No, Judge, thank you.

3          THE COURT: All right, thank you, you're excused.

4          THE WITNESS:  Thank you very much.

5          (Witness excused at 2:28 p.m.)

6          THE COURT:  Let's take a brief recess at this time and

7   I'll see Counsel back in the jury room.

8          (Discussion held off the record.)

9          (Recess is held at 2:29 p.m.)

10                              * * *

11          (Resumed in open court at 3:31 p.m.)

12          DEPUTY CLERK:  All rise.

13          Court is again in session.  Thank you, you may be

14   seated.

15          THE COURT:  All right.

16          Let the record reflect, the witness is in the box,

17   counsel are present, the parties are present.

18          Sir, please raise your right hand.

19          IVAN GARCIA-LOPEZ, PLAINTIFF WITNESS, SWORN.

20          THE WITNESS:  I do.

21          DEPUTY CLERK:  State your name and spell your last on

22   the record.

23          THE WITNESS:  Ivan Garcia-Lopez.

24          MR. EPSTEIN:  He didn't spell it.

25          DEPUTY CLERK:  You have to spell your last name.

Ivan Garcia-Lopez - Direct                                          176

 1          THE WITNESS:  Oh, I-v-a-n, G-a-r-c-I-a.

 2          DEPUTY CLERK:  Thank you, you may be seated.

 3                     <u>DIRECT EXAMINATION</u>

 4   BY MR. EPSTEIN:

 5   Q.   And is it Mr. Garcia or Mr. Garcia-Lopez?

 6   A.   I normally use, just Garcia, but --

 7   Q.   Okay.  Good afternoon.

 8   A.   -- Garcia-Lopez, yeah.

 9   Q.   Thank you for coming in.

10   A.   You're welcome.

11   Q.   Just to kind of confirm for the record, you understand that

12   the Department of Labor is suing your employer, Exeter Family

13   Restaurant?

14   A.   Yes, I do.

15   Q.   Okay.

16          How long have you worked for the restaurant?

17   A.   Eighteen years.

18   Q.   Eighteen years.

19          What job were you hired to do at first?

20   A.   Ah, I was a line cook.

21   Q.   Okay.

22          How long were you a line cook?

23   A.   About maybe, eight years.

24   Q.   Okay.

25          Who hired you to be a line cook?

1   A.   Darren.

2   Q.   And who is Darren?

3   A.   Darren Renninger, he's the executive chef.

4               THE COURT:  Is the what?

5               THE WITNESS:  Executive chef --

6               THE COURT:  Okay.

7               THE WITNESS: -- for the restaurant.

8               THE COURT:  Thank you.

9   BY MR. EPSTEIN:

10  Q.   And the name is Darren --

11              THE COURT:  Please sit closer and speak into the

12  microphone.

13              THE WITNESS:  Okay.  I'll fix it.

14  Q.   You said, it's Darren Renninger?

15  A.   Renninger, yeah.

16  Q.   Does Mr. Renninger still work there?

17  A.   Yes.

18  Q.   Is he still the executive chef?

19  A.   Yes.

20  Q.   Okay.

21              You said, that you were a line cook for eight -- eight

22  years, what -- what job did you take after that?

23  A.   I started being a sous chef.

24  Q.   Okay.

25              And are you still a sous chef?

Ivan Garcia-Lopez - Direct                                          178

1   A.    Yes.

2   Q.    Okay.

3               What are your duties as a sous chef?

4   A.    Well, I normally prep, do some of the prepping and I follow

5   up whatever Darren needs for -- you know -- for the restaurant.

6   Q.    Okay.

7               How many days a week do you work?

8   A.    I would work Mon -- Monday through Friday.

9   Q.    Okay.

10              And that's currently, right?

11  A.    Yes.

12  Q.    Okay.

13              We'll come back to your schedule a little more.

14              What's involved in the prep work that you've

15  described?

16  A.    Well, ah, you know, I normally, like, cut whatever Darren

17  needs for the day or, you know, I make -- make the soups and

18  just try to help him out.

19  Q.    Okay.

20              Is there anybody else in the kitchen that -- between

21  you and Darren -- in terms of hierarchy?

22  A.    There's also what?

23  Q.    Is there anybody -- is there anybody in the kitchen between

24  you and Darren, who is -- who is, like, your -- I'll try to

25  phrase this question, correctly.

Ivan Garcia-Lopez - Direct                    179

1          Darren is your -- is Darren your direct boss?

2    A.   Yes.

3    Q.   Okay.

4          Are there any other -- any other sous chefs?

5    A.   No.

6    Q.   Okay.

7          How many line chefs are there?

8    A.   Line cooks?

9    Q.   Yes.

10   A.   Ah, there's three cooks in the morning during my shift.

11   Q.   When is your shift?

12   A.   In the morning.

13   Q.   Mornings, okay.

14   A.   Yeah.

15   Q.   Have you always worked the morning shift or --

16   A.   Yes.

17   Q.   Okay.

18          The whole eighteen years?

19   A.   Ah, yes.

20   Q.   Okay.

21          Do you ever work night shifts?

22   A.   Ah, I used to fill in, sometimes, when the guy doesn't show

23   up, I used to work.

24   Q.   Okay.

25          Does the menu change at all from day to day?

1   A.   It changes, like, often -- like, every season, just the

2   inserts of the menu.

3   Q.   Okay.

4        Who makes those changes?

5   A.   Darren.

6   Q.   Do you create any new dishes for the kitchen?

7   A.   No.  He does that all on his own.

8   Q.   Okay.

9        Do you order any supplies for the kitchen?

10  A.   No.

11  Q.   Okay.

12       Do you order any food for the kitchen?

13  A.   No, I -- I do the dairy ordering, ah --

14  Q.   Okay.

15       How do you do the dairy ordering?

16  A.   Ah, Darren has this -- ah -- paper for -- ah -- for me to

17  order and I just -- you just go and do an inventory, that he has

18  for the week and for the weekend.

19  Q.   Okay.

20       So, you -- you used this piece of paper and then,

21  order what --

22  A.   Order --

23  Q.   -- fill -- fill in -- makes sure the stock is at a certain

24  level?

25  A.   Yeah.

Ivan Garcia-Lopez - Direct                    181

1   Q.   Okay.

2   A.   Yeah.

3        He wants -- ah -- certain amount, you know, during the

4   week and a certain amount during the weekend.  So, I just have

5   to match up and then --

6   Q.   All right.

7   A.   -- I mean, the numbers, I'm sorry.

8   Q.   Do you order any other food or supplies for the kitchen?

9   A.   No.

10  Q.   Okay.

11       Do you direct the work of the line cooks?

12  A.   Ah, sometimes, when they're not doing something properly, I

13  go tell them, you know, ah, they're not doing their job right.

14  Q.   Okay.

15       Do you hire or -- do you hire any of the line cooks?

16  A.   No.

17  Q.   Okay.

18       Have you -- have you ever fired any of the line cooks?

19  A.   No.

20  Q.   Okay.

21       Who does that?

22  A.   Ah, normally, Darren.

23  Q.   Okay.

24       Do you make any of the schedules for the kitchen?

25  A.   No.

1    Q.   Okay.

2         And I -- I guess, I should say, kitchen employees, not

3    the kitchen?

4    A.   Yeah.

5    Q.   Okay.

6         Who makes the schedule for the kitchen employees?

7    A.   Darren.

8    Q.   Okay.

9         Who is in charge of the restaurant, while you are

10   there?

11   A.   Ah, when I'm there --

12   Q.   Yes.

13   A.   -- and then, Darren is there?

14   Q.   Yes.

15   A.   Darren.

16   Q.   Darren, okay.

17        Is there anybody else -- are there any other managers

18   in the restaurant --

19   A.   Ah --

20   Q.   -- during your shift?

21   A.   -- well, sometimes, when -- when Darren is there and then,

22   ah, Eddie.

23   Q.   Who is Eddie?

24   A.   Eddie is the owner's -- ah -- son-in-law.

25   Q.   And what's his job?

Ivan Garcia-Lopez - Direct                                    183

1   A.   He works, the register.

2   Q.   Does he -- is he a manager?

3   A.   Yeah.

4   Q.   Okay.

5        Does he hire people?

6   A.   Ah, I don't -- I'm not sure about that.

7   Q.   Okay.

8        So, you said, you're currently working Monday to

9   Friday, how long have you worked the Monday-to-Friday schedule?

10  A.   Ah, I recently -- just since April.

11  Q.   Okay.

12       What changed in April?

13  A.   I was put on -- ah -- on a salary.

14  Q.   Okay.

15       What -- what was your schedule before April?

16  A.   I used to work, ah, fifty hours a week.

17  Q.   And was that still Monday to Friday or were there other

18  days?

19  A.   It was -- ah -- Monday to Friday -- Monday to Friday and

20  Sunday.

21  Q.   So, what time would you start working on a normal day prior

22  to April?

23  A.   Hmm, I used to do, ah, 5:00 to 6:00 on Monday and then,

24  from Tuesday to Friday, I do 6:00 to 2:00 and then, Sundays, I

25  used to come at five o'clock in the morning till two o'clock.

Ivan Garcia-Lopez - Direct                                184

1   Q.   So, you said, on Mondays, you worked from 5:00 in the

2   morning till 6:00 at night, is that correct?

3   A.   Five o'clock in the morning till two o'clock --

4   Q.   Oh, two o'clock.

5   A.   -- in the afternoon.

6   Q.   Okay.

7        Who gave you that schedule?

8   A.   Ah, Darren.

9   Q.   Okay.

10       How much were you paid prior to April?

11  A.   Ah, I was paid -- getting paid $15.00 an hour.

12  Q.   Okay.

13       What are you paid right now?

14  A.   Ah, I'm not sure, I'm on -- on a salary.

15  Q.   Okay.

16       Do you know what your check says before taxes are

17  taken out?

18  A.   Before taxes?

19  Q.   Yes.

20  A.   It's -- ah -- I think, $1400.00.

21  Q.   Okay.

22       Is there any cash paid to you right now?

23  A.   No.

24  Q.   Okay.

25       Before April, do you know what your -- your check was

Ivan Garcia-Lopez - Direct                                185

1   before taxes were taken out?

2   A.   Ah, my check?

3   Q.   Yes.

4          (Pause at 3:40 p.m.)

5   A.   It was nine hundred something.

6   Q.   Okay.

7          Before April were you paid any cash?

8   A.   Yeah.

9   Q.   Okay.

10         And how were you paid cash?

11  A.   Ah, just for my hours that I work on Sunday.

12  Q.   Okay.

13  A.   It's pretty much nine hours --

14  Q.   So, how much cash would you be paid --

15  A.   -- ten -- ten hours, I'm sorry.

16  Q.   -- ten.

17         Were you paid every other -- every week or every other

18  week?

19  A.   Every other week.

20  Q.   Okay, okay.

21         And so, when you were being paid cash and a check, how

22  would you get the -- well, tell me, how you got your check

23  first?

24  A.   Well, as I'm -- I get my check, like, every other week --

25  Q.   Hm-hmm.

Ivan Garcia-Lopez - Direct                                    186

1    A.    -- and then, my ten hours cash in my envelope.

2    Q.    Okay.

3          Where -- where did you get the check from?

4    A.    From who?

5    Q.    Well, yeah, did somebody give you the check or was it left

6    for you?

7    A.    No, somebody handed it to me.

8    Q.    Okay.

9          Who gave you -- who would give the check?

10   A.    Ah, Nancy.

11   Q.    Okay.

12         Do you know Nancy's last name?

13   A.    Nave.

14   Q.    Nave, is that N-a-p-e?

15   A.    N-a-v-e.

16   Q.    Okay.

17         So, there would be a check and then, there -- there

18   would be cash?

19   A.    Yeah.

20   Q.    Okay.

21         And do you know how -- you said, was the cash being

22   paid at $15.00 an hour?

23   A.    Yes.

24   Q.    Okay.

25         And the check was also for $15.00 an hour?

1    A.    Yes.

2    Q.    Okay.

3              Was it -- so, you would have a check for $40.00 for --

4    A.    My check was forty --

5    Q.    -- forty hours at -- forty hours --

6    A.    -- my check was for forty hours.

7    Q.    Okay.

8              How long did -- how long -- how far does it go back,

9    that you were getting a check for forty hours and cash for

10   additional hours?

11   A.    Ah, I think, it was from -- nine years ago.

12   Q.    Okay.

13             Why do you think, nine years?

14   A.    Well, I was in an immigration situation and when I finally

15   got my working papers, I was told that I'd need to pay taxes, so

16   I -- you know -- that's when I come -- become on the -- on the

17   books.

18   Q.    Okay.

19             So, when you were hired, were you paid just cash?

20   A.    Just cash.

21   Q.    Okay.

22             When you -- in the -- in the past four years when

23   you've been paid cash, has it been -- have you gotten coins or

24   -- or bills -- is it -- is it --

25   A.    Just bills.

1    Q.    Just bills?

2    A.    Yeah.

3    Q.    Okay.

4          Is it usually, in tens or ones or --

5    A.    $20.00 bills, yes.

6    Q.    -- twenty, okay.

7          So, there -- are there ever any smaller bills?

8    A.    No.

9    Q.    Okay.

10         Just a nice round number?

11   A.    Yeah.

12   Q.    Okay.

13         Did you ever get any bonuses?

14   A.    No.

15   Q.    Okay.

16         Did you ever get any profit-sharing from the

17   restaurant?

18   A.    No.

19   Q.    Okay.

20         If you worked for less than forty hours in a week, did

21   you -- did you still get your full pay?

22   A.    No.

23   Q.    Okay.

24         Can -- do you remember, a time when you worked less

25   than forty hours a week?

1  A.   Ah, yeah, the last time, I think, I got sick --

2  Q.   Okay.

3  A.   -- and I didn't work, maybe, three days, four days --

4  Q.   Okay.

5  A.   -- and my -- my check was less than normal.

6  Q.   Okay.

7       Do you remember when -- when that was?

8  A.   I think, it was last year.

9  Q.   Okay.

10      What about if the restaurant is slow or there's a snow

11 day or something like that, have you ever been sent home early

12 for that?

13 A.   Hmm, yeah, sometimes, yes.

14 Q.   Does it happen very often or --

15 A.   Sometimes, when --

16 Q.   -- or --

17 A.   -- it snows, so you know, when it's -- it's hot out and we

18 don't have, you know, enough customers --

19 Q.   Okay.

20 A.   -- there's sometimes, nothing to do, so.

21 Q.   Who would tell you -- who tells you to go home in that

22 situation?

23 A.   Darren.

24 Q.   Okay.

25      Are you paid for the hours that -- that -- if you're

1  sent home?

2  A.   No.

3  Q.   Okay.

4       When you were hired, do you recall being given a

5  handbook or anything like that?

6  A.   No.

7  Q.   Okay.

8       Is it -- do you know, if there's ever been, like, an

9  employee manual for the restaurant?

10 A.   Not for a cooking position.

11 Q.   Okay.

12      Just one moment, your Honor.

13      (Pause and discussion held off the record continues at

14 3:46 p.m.)

15      MR. EPSTEIN:  Sorry.

16 BY MR. EPSTEIN:

17 Q.   Does Nancy still give you your check?

18 A.   Yes.

19 Q.   Okay.  Okay.

20      And I asked you about being sent home early, you know,

21 if your shift -- if the weather was bad or business was slow,

22 has that happened at any time in the last four years, that you

23 remember?

24 A.   Yeah.

25 Q.   Okay.

Ivan Garcia-Lopez - Direct                                        191

1          Do you remember on how many occasions?

2     A.    Last year, it was a couple of times, I'll say, maybe,

3     around eight times.

4     Q.    Okay.

5          When you got cash in your pay envelope, was it always

6     the same amount of cash or -- or did the amount vary?

7     A.    Well, if I'd work all my hours --

8     Q.    Okay.

9     A.    -- yeah.

10    Q.    So, it was -- normally, it would be ten hours --

11    A.    Cash.

12    Q.    -- ten hours -- over two weeks, so ten times one fifty

13    times two, so it was $300.00 cash --

14    A.    Yeah.

15    Q.    -- in the envelope, okay.

16         And I just wanted to make sure to just get your --

17    your pre-April schedule is clear.

18         So, Mondays you start work -- start work from 5:00 to

19    2:00?

20    A.    Yes.

21    Q.    Okay.

22         And then, Tuesdays through Fridays, was it 6:00 to

23    2:00?

24    A.    6:00 to 2:00.

25    Q.    Okay.

1           And then, Sunday it's 5:00 to 2:00, again?

2   A.    Yes.

3   Q.    Why come in earlier on Mondays and Sat -- Sundays?

4   A.    Ah, because we have deliveries, like, only --

5   Q.    Okay.

6   A.    -- only on Mondays, we have deliveries.

7           And Sundays, I normally work -- ah -- by myself in the

8   back.

9   Q.    Okay.

10          Are the other -- is Darren there the other days?

11  A.    Ah, he's only there from -- with me -- from Tuesday to

12  Friday.

13  Q.    Okay.

14          Is there -- sorry.

15  A.    And Saturday is my day off, so he'll -- he's there.

16  Q.    Okay.

17          So -- but since April have you worked more than forty

18  hours in a week?

19  A.    No.

20  Q.    Okay.

21          So, what does your current schedule look like?

22  A.    6:00 to 2:00.

23  Q.    Just Monday to Friday?

24  A.    Monday to Friday.

25  Q.    Okay.

Ivan Garcia-Lopez - Direct                          193

1        Did anybody tell you, why your schedule was changed to

2    just be under forty hours?

3    A.   Ah, well, they told me, that I needed to work only forty

4    hours.

5    Q.   Okay.

6        Because -- if there -- was there a reason given or --

7    A.   Ah, no, he just -- I was just told, only forty hours.

8    Q.   Okay.   Thank you.

9        MR. EPSTEIN:  Nothing further, your Honor.

10       THE COURT: All right.

11       Mr. Dautrich, you may cross-examine.

12       MR. DAUTRICH:  Thank you.

13                       CROSS-EXAMINATION

14   BY MR. DAUTRICH:

15   Q.   Hi, Ivan.

16   A.   Hello.

17   Q.   Okay.

18       Let's go back to before April of this year, when your

19   schedule changed to five days a week, all right.

20       So, even though I let it go, the time period we're

21   talking about is March of 2014 to April of this year, okay?

22   A.   Okay.

23   Q.   Those are the only questions, I'm asking you about.

24       So, if I don't say, the specific time period, that's

25   what I'm talking about, all right?

Ivan Garcia-Lopez - Cross                                    194

1   A.   Okay.

2   Q.   So, before April of this year, you worked six days a week,

3   right?

4   A.   Before, yes.

5   Q.   And you worked two of those days when Darren was not even

6   on -- in the building, right?

7   A.   Monday and Sunday.

8   Q.   All right.

9        So, Darren is off on Sunday and Monday, right?

10  A.   Yes.

11  Q.   So, when Darren is off, you're in charge of the kitchen,

12  right?

13  A.   Ah, not really.

14  Q.   Not really?

15  A.   Yes.

16  Q.   Okay.

17       So, is there somebody else that comes in instead of

18  Darren?

19  A.   Well, I can make the decision, ah, you know, the kitchen, I

20  can tell the guys, what to do, but that's about it.

21  Q.   So, when you're -- when Darren is not scheduled to work and

22  you're -- and he's not in the kitchen -- you're in -- you're in

23  charge of supervising the line cooks, right?

24  A.   Yes.

25  Q.   You're in charge of the kitchen staff -- you -- you're

1  supervising the kitchen staff --

2  A.   Yes, yes.

3  Q.   -- on days -- so -- so, Sunday and Monday from April of

4  2014 or March of 2014 --

5  A.   Yes.

6  Q.    -- until your schedule went to five days, there were

7  always those two days, Darren wasn't there, right?

8  A.   Yes, yes.

9  Q.   Okay.

10        And if you thought somebody was, you know, not doing

11  their work and not listening, you could -- ah -- suggest that

12  they'd be fired, couldn't you?

13  A.   No.

14  Q.   You couldn't say to Darren or a manager, you know, this guy

15  is really not doing his job, he's screwing around, I think, you

16  should let him go?

17  A.   Ah, when somebody was acting like that, I'd normally go to

18  Darren, but then, he would talk to them.

19  Q.   Right.

20        And Darren took your input on that, right?

21  A.   Yeah.

22  Q.   And let me understand, how you were paid before you went to

23  five days a week.

24        So, you were paid some money in your check and some

25  money in cash, right?

Ivan Garcia-Lopez - Cross                                    196

1   A.   Yes, correct.

2   Q.   And your -- the case that you'd be given, would be put in

3   the envelope with your paycheck, right?

4   A.   Correct.

5   Q.   So, there were -- it would be in an envelope that said, I

6   Ivan and it would have -- ah --

7   A.   My check and my cash.

8   Q.   -- your check and cash?

9   A.   Yes.

10  Q.   Did it have something written on the front besides your

11  name, did it have the amount of cash or anything?

12  A.   No.

13  Q.   Okay.

14           You said, ah, at some point -- strike that.

15           You said, if you worked -- when you were working six

16  days a week, that you were paid for ten hours in cash, right?

17  A.   Correct.

18  Q.   And the rest was on your paycheck?

19  A.   Correct.

20  Q.   Okay.

21           And do you know what -- what your hourly pay -- how

22  many -- how much an hour you were paid?

23  A.   $15.00 an hour.

24  Q.   From April of 2000 -- from May of -- yeah -- March of 2014

25  to April of this year?

1  A.   Yes.

2        I went, like, four years without a raise.

3  Q.   Were there times, when you were paid more than $300.00

4  every two weeks in cash?

5  A.   When I worked the overtime.

6  Q.   Okay.

7        So, you were paid -- when you say, overtime, what do

8  you mean, six days a week?

9  A.   Ah, yes, when I worked more than fifty hours --

10  Q.   Okay.

11  A.   -- a week.

12  Q.   And then, you were paid more cash?

13        THE COURT:  I thought at some time, he was paid five

14  hundred?

15  BY MR. DAUTRICH:

16  Q.   Was there sometimes, you were paid five hundred cash?

17  A.   No.  Three hundred.

18  Q.   Okay.

19        So, when you -- if you worked more than your fifty

20  hours, you got paid the -- the extra hours in cash, too, right?

21  A.   Correct.

22  Q.   All right.

23        So, there is no question here, the hours that you

24  worked, you were paid for?

25  A.   Correct.

1    Q.   Okay.

2         THE COURT:  Well, if you worked more than forty, what

3    did you get per hour, do you know?

4         THE WITNESS:  The same about, $15.00 an hour.

5         THE COURT:  All right.

6    BY MR. DAUTRICH:

7    Q.   Now, are you saying, Ivan, that you were never made aware

8    that you were -- ah -- when Darren was not in the kitchen, that

9    you were in charge of the staff back there?

10   A.   I -- when he wasn't in the kitchen?

11   Q.   Right.

12   A.   Yeah.

13   Q.   So, and -- and you'd agree with me, would you not, that

14   when Darren is there on a scheduled day that he's normally

15   there, there is quite a bit of time, he's down in his office and

16   not even in the kitchen, right?

17   A.   Correct.

18   Q.   And during those times, you're in charge of the kitchen

19   staff?

20   A.   Correct.

21   Q.   So, he could spend half of his day down in his office doing

22   -- who knows what -- and you're up in the kitchen supervising

23   the kitchen staff --

24   A.   And --

25   Q.   -- right?

Ivan Garcia-Lopez - Cross                                    199

1   A.   -- and doing my job, yes.

2   Q.   And doing your job?

3   A.   Yes.

4   Q.   And -- and doing -- getting the specials ready and making

5   the soups and prep cooking --

6   A.   Correct.

7   Q.   -- basically, whatever needed to be done, you were doing

8   it?

9   A.   Correct.

10  Q.   Including if -- you know -- one of the line cooks wasn't

11  doing it how he was supposed to, you would go over and talk to

12  him?

13  A.   Yes.

14  Q.   Okay.

15       And that -- those were days when Darren didn't -- the

16  two days a week, that you were there that he wasn't, right?

17  A.   Hm-hmm, correct.

18  Q.   And then, even times when he was in the building, there's

19  quite a few times -- hours during the day -- where he's not even

20  in the kitchen, right?

21  A.   Correct.

22  Q.   Okay.

23       MR. DAUTRICH:  Judge, I have no other questions.

24       THE COURT:  Any -- any redirect?

25       MR. EPSTEIN: Yes, your Honor, a few questions.

Ivan Garcia-Lopez - Redirect                    200

1                        <u>REDIRECT EXAMINATION</u>

2    BY MR. EPSTEIN:

3    Q.    How far away is Darren's office from the kitchen?

4    A.    Ah, it's down in the basement.

5    Q.    Okay.

6          Could you yell from the kitchen and he'd hear you in

7    the office?

8    A.    No.

9    Q.    Okay.

10         Is it -- does it take you five minutes from the

11   kitchen to his office?

12   A.    No.

13   Q.    Okay.

14   A.    I'd have to go down the steps to -- and -- and get him.

15   Q.    Okay.

16         So, if you have a question, do you generally just --

17   A.    Yeah, I have to walk --

18   Q.    -- answer it yourself or do you go get Darren?

19   A.    Yeah, I'd have to go -- walk down.

20   Q.    Okay.

21         And you and Darren both work in the mornings, is that

22   correct?

23   A.    Correct.

24   Q.    Okay.

25         Who is in charge of the kitchen, the other sixteen

Ivan Garcia-Lopez - Redirect                                    201

1   hours a day?

2   A.   Well, sometimes, there's -- I don't know, when -- only when

3   Michael's around.

4   Q.   Okay.

5        Is there -- is it just, otherwise, it's just line

6   cooks in the kitchen?

7   A.   Yeah.

8   Q.   Okay.

9        So, the kitchen pretty much -- does that mean, the

10  kitchen can -- do they know what to do most of the time?

11  A.   Hmm, not really.

12       (Laughter at 3:59 p.m.)

13  BY MR. EPSTEIN:

14  Q.   Let me ask you this question, what percentage of your time

15  do you think you spend telling other cooks what to do versus

16  your time -- the time that you spend just cooking food?

17  A.   They pretty much know what to do, sometimes.

18  Q.   Okay.

19       How much of your day, do you spend cooking food or --

20  what you said?

21  A.   Cooking?

22  Q.   Yes.

23  A.   Ah, I'll say, maybe, like sixty percent of my day.

24  Q.   Okay.

25       So, the line cooks, they're -- they're -- what part of

1    the cooking do you do, let me ask it that way?

2    A.   Well, I -- you know, get there and make sure, you know, I

3    start my soups and I start all the specials.

4              THE COURT:  You get stuff ready for lunch, right?

5              THE WITNESS:  Ready for lunch and --

6              THE COURT:  You're not cooking breakfast, are you?

7              THE WITNESS:  -- and dinner.  No.

8              MR. EPSTEIN:  Okay.

9              THE WITNESS:  That's the line cooks.

10             THE COURT:  The -- the line cooks do that.

11   BY MR. EPSTEIN:

12   Q.   So, the line cooks are answering the orders that come in?

13   A.   Yes.

14   Q.   Okay.

15             THE COURT:  They can make eggs, right?

16             THE WITNESS:  Yes.

17             (Laughter at 3:59 p.m.)

18             MR. EPSTEIN:  Right.

19   Q.   Do the soups change from day to day very much?

20   A.   Every day --

21   Q.   Okay.

22   A.   -- they're different.

23   Q.   Do you decide what soups to make?

24   A.   No.

25   Q.   Okay.

Ivan Garcia-Lopez - Redirect                          203

1          Who makes that decision?

2     A.    Darren.

3     Q.    All right.

4          When Darren is off, does he leave you -- how do you

5     know what soups to make?

6     A.    We have a -- ah -- you know, we know pretty much what soups

7     to make and we also have, like, a cooking book.

8     Q.    Okay.

9          When -- if Darren goes on vacation, how do you know --

10    how do you know what to do for the week?

11    A.    Ah, when he goes on vacation, he normally does the ordering

12    ready and I just go and get my prep work ready for -- like,

13    every day.

14    Q.    Okay.

15         Who changed your schedule in April of this year?

16    A.    Ah, Darren did.

17    Q.    Okay.

18         Did he tell you, if it was at anybody else's direction

19    or did he --

20    A.    Yes.

21    Q.    -- who -- who did he say?

22    A.    Joe's.

23    Q.    Okay.

24         Who is Joe?

25    A.    Joe, the owner, Joe Nanouh.

Ivan Garcia-Lopez - Redirect                                    204

1    Q.   Okay.

2              Is that -- Mr. Nanouh, who is sitting here --

3    A.   Yeah.

4    Q.   -- in the white shirt?

5    A.   Yeah.

6    Q.   Okay.

7              MR. EPSTEIN:  Just a moment.

8              (Pause at 4:01 p.m.)

9    BY MR. EPSTEIN:

10   Q.   Do you make any decisions about what vendors to use --

11   A.   Ah --

12   Q.   -- for, like, who provides food or dairy or anything like

13   that?

14   A.   No.

15   Q.   Okay.

16             MR. EPSTEIN:  No further questions, your Honor.

17             THE COURT:  Anything else?

18                         RECROSS-EXAMINATION

19   BY MR. DAUTRICH:

20   Q.   The area of the kitchen where you're set up on a daily

21   basis, the line cooks are on their own line, basically, right?

22   A.   Correct.

23   Q.   And you and Darren are on a different line than the line

24   cooks --

25   A.   Yeah --

Ivan Garcia-Lopez - Recross                     205

1   Q.   -- meaning there's different --

2   A.   -- right behind them.

3   Q.   -- different, ah, prep area, a different area where you

4   cook and everything else, yes?

5   A.   Correct.

6   Q.   And you're in charge of -- daily -- doing all the desserts,

7   the preparation, right?

8   A.   Well, desserts --

9   Q.   Yeah, the desserts?

10  A.   -- we have somebody else do that part.

11  Q.   You don't do the desserts?

12  A.   We have somebody else do that part.

13  Q.   Okay.

14       When Darren is on vacation, they don't hire another

15  cook to come in and -- and manage the kitchen, do they, it's

16  you?

17  A.   They put an extra help for -- for -- for me.

18  Q.   And extra line cook?

19  A.   No, an extra prep person.

20  Q.   Okay.

21       Well, what I'm saying is, is there anybody -- when

22  Darren is not there -- is there anybody that is a cook or a

23  kitchen staff that's telling you what to do?

24  A.   No.

25  Q.   Okay.

1          MR. DAUTRICH:  No other questions.

2          (Pause and discussion held off the record at 4:03

3     p.m.)

4          MR. DAUTRICH:  Judge may I just -- a little, briefly?

5          THE COURT:  Go ahead.

6     BY MR. DAUTRICH:

7     Q.   The -- the -- I think, I misspoke earlier, what I -- what I

8     mean was, you do the ordering for the dessert -- for the

9     desserts that are going to be made in the kitchen throughout the

10    week or period of time, you make the ordering, don't you?

11    A.   Sometimes, when Darren doesn't have time.

12    Q.   So, some parts of his job duties, you do even when he's

13    there, ordering dessert ingredients, for example or types of

14    desserts?

15    A.   When he doesn't have time -- have time, yes.

16    Q.   Okay.

17         MR. DAUTRICH:  No other questions, Judge, thank you.

18         THE COURT:  Anything else?

19         (No verbal responses.)

20         (Pause and discussion held off the record at 4:06

21    p.m.)

22              CONTINUED REDIRECT EXAMINATION

23    BY MR. EPSTEIN:

24    Q.   When you order ingredients for desserts, does that -- do

25    they, change from week to week or is it, the same ingredients,

1  pretty much week to week?

2  A.   They're the same --

3  Q.   Okay.

4  A.   -- but I don't order the cakes, Darren makes the list and

5  they just call and then, I just tell them, what's -- what's

6  Darren's order.

7  Q.   Okay.

8       Do you -- do you guys make desserts in-house or are

9  they supplied from somewhere else?

10  A.   Ah, we -- we get them from somebody else.

11  Q.   Oh, okay.

12       Have you ever gone to Darren and said, hey, I think

13  this guy is not working out and I think, you should fire him?

14  A.   No.

15  Q.   Okay.

16       Have you ever gone to him and said, hey, I think you

17  should hire somebody?

18  A.   No.

19  Q.   Okay.  All right.

20            MR. EPSTEIN:  Thank you.

21            MR. DAUTRICH:  Nothing else, Judge, thank you.

22            THE COURT:  Thank you, sir, you're excused.

23            THE WITNESS:  Thank you.

24            (Witness excused at 4:06 p.m.)

25            THE COURT:  Do you have another witness today?

1          MS. GREENWALD:  Can we just confer for just a moment?

2          THE COURT:  Okay.

3          (Long pause and discussion held off the record.)

4          MS. GREENWALD: Your Honor, at this -- at this time,

5     ah, I think, we would respectfully -- I don't know if -- if it's

6     a new -- if you were looking to break for the day, if we're not

7     going to present another witness?

8          THE COURT:  Right.

9          But I thought you said, there was a witness here?

10         MS. GREENWALD:  We -- we do have one more witness here

11    and we can -- I know that the defendant -- ah --

12         THE COURT:  What?

13         MS. GREENWALD:  -- seems to be planning to present her

14    in their case, so I'm trying to figure out what --

15         THE COURT:  Okay.

16         So, she can testify tomorrow.

17         MS. GREENWALD:  I don't know if she's available -- I

18    don't think she's available tomorrow.

19         THE COURT:  So, then Wednes -- Thursday morning.

20         MS. GREENWALD:  So, it would be Thursday.  I mean, I

21    don't know if we would be done, otherwise, tomorrow, anyway,

22    it's --

23         THE COURT:  How long would she be?

24         MS. GREENWALD:  It shouldn't be long.

25         MR. EPSTEIN:  Not very long.

1        THE COURT:  Well, is she a half an hour, do you want

2    to call her today or not, I mean, it's up to you?

3        MS. GREENWALD:  Can we check -- I want to check one

4    more thing before --

5        (Long pause and discussion held of the record

6    continues at 4:08 p.m.)

7        MS. GREENWALD:  Your Honor, I think that we would from

8    -- from our end release the -- the witness for today.  We would

9    ultimately intend to call her on the --

10       THE COURT:  All right.  All right, very good.

11       Then, Court is adjourned for today, we're in recess.

12       Let me see Mr. Dautrich first and then I'll see

13   counsel from the Department of Labor.

14       MR. DAUTRICH:  May I go to the restroom on my way

15   there?

16       THE COURT:  Yeah, you can go to the restroom and your

17   clients, well, they probably should stay.

18       MR. DAUTRICH: All right.

19       (Adjourned int his matter at 4:09 p.m.)

20                              *  *  *

21

22

23

24

25

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| KIMBERLY TERRA | | | | |
| By Ms. Greenwald | 35 | | | |
| By Mr. Dautrich | | 56 | | |
| By Ms. Greenwald | | | 69 | |
| By Mr. Dautrich | | | | 76 |
| ELLA POLONSKI | | | | |
| By Ms. Greenwald | 79 | | | |
| By Mr. Dautrich | | 91 | – | – |
| AMY WOLAK | | | | |
| By Ms. Greenwald | 95 | (Sworn) | | |
| AMANDA GRAUL | | | | |
| By Ms. Greenwald | 98 | | | |
| By Ms. Dautrich | | 117 | | |
| By Ms. Greenwald | | | 125 | |
| By Mr. Dautrich | | | | 127 |
| BRENDA ALENA | | | | |
| By Ms. Greenwald | 129 | | | |
| By Mr. Dautrich | | 156 | | |
| By Ms. Greenwald | | | 172 | – |
| IVAN GARCIA-LOPEZ | | | | |
| By Mr. Epstein | 175 | | | |
| By Mr. Dautrich | | 193 | | |
| By Mr. Epstein | | | 199 | |
| By Mr. Dautrich | | | | 204 |
| By Mr. Epstein | | | 206 | – |

* * *

C E R T I F I C A T E

        I, a court-appointed transcriber, certify
that the foregoing is a correct transcript from the
electronic-sound recording of the proceeding in the above-
entitled matter.


_____        Date: August 25, 2018
Gail Drummond                   Amended: November 20, 2018
28 8th Avenue
Haddon Heights, New Jersey  08035
(856) 546-6270