Michael D. Dautrich, Esquire
DAUTRICH & DAUTRICH LAW OFFICES, P.C.
526 Court Street
Reading, PA 19601
610-375-9455
Attorney I.D. #77187
Email: mdautrich@comcast.net

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EDWARD C. HUGLER, | : | CIVIL ACTION - LAW |
| Acting Secretary of Labor, | : | |
| United States, Department of Labor, | : | |
|     Plaintiff | : | |
| | : | |
| vs. | : | |
| | : | NO. 5:17-cv-01458 |
| J. NANOUH, INC., a corporation, D/B/A | : | |
| Exeter Family Restaurant; and | : | |
| Michael J. Nanouh, individually, and as | : | |
| manager and corporate officer of the | : | |
| aforementioned corporation, | : | |
|     Defendants | : | |

## DEFENDANTS' POST-TRIAL BRIEF

### I.       INTRODUCTION

On or about August 16, 2016, at least one agent of the Department of Labor,

Wage and Hour Division began an investigation into wages paid to employees at the

Exeter Family Restaurant.  During the investigation, the Defendants voluntarily turned

over various time and wage records to the Department's agent, submitted to personal

interviews with the agent, and gave the agent access to interview employees.  During the

investigation, Defendant Michael Nanouh and Joseph Nanouh and the agent met on

numerous occasions at the request of the agent, and the Nanouhs turned over documents

and provided information to the agent.  During the investigation, the agent obtained

numerous payroll records from J. Nanouh, Inc.'s accountant.  J. Nanouh, Inc. is the

corporation that operates the Exeter Family Restaurant.

On February 7, 2017, the agent conducted a final conference with Joseph and Michael Nanouh at the restaurant.  At that time, the agent informed the Nanouhs of numerous recordkeeping violations and a total of wage violations regarding 20 servers in an amount of $21,029.89 plus $21,029.89 in liquidated damages, making the Department's total damages demand at $42,059.78, which the agent demanded at that meeting.

On April 11, 2017, Plaintiff filed its Complaint in this case in the United States District Court for the Eastern District of Pennsylvania, and the case was assigned to the Honorable Jeffrey L. Schmehl.  Plaintiff's complaint had Schedule A attached, which listed the 20 employees it alleged were underpaid wages in some fashion by Defendants from August 10, 2014 to August 7, 2016.

The initial pretrial conference with the Court occurred on July 27, 2017.  After the Court held the initial conference, paper discovery commenced.  On October 19, 2017, the Court held a status conference and it was resolved that the Parties would complete discovery by January 2018.  The Parties exchanged paper discovery, and the attorney for the Government took Michael Nanouh's deposition on December 21, 2017.

On January 19, 2018, the Court held a status conference at which time, it was agreed the Parties would need three (3) days for trial.  An Order followed scheduling a bench trial for April 2018.

On or about March 18, 2018, Plaintiff filed Supplemental Disclosures as required by Federal Rule of Civil Procedure 26 and alleged the damages it was seeking in this case were a total of $254,285.54 for the period covering March 31, 2014 to March 18, 2018. Pursuant to a deadline set by the Court, on April 19, 2018, Plaintiff filed its Pretrial Memorandum.  In that Memorandum, Plaintiff listed its total claim for damages allegedly

owed to the 23 enumerated employees as $250,692.08, which included back wages and liquidated damages.  Plaintiff also noted it expected to file a "Motion for Leave to File Supplemental Schedule A to include an additional six tipped employees identified in discovery who are due back wages for violations of Sections 6 and 7 of the FLSA." (Plaintiff's Pretrial Memorandum, ¶7. c.).

This case was previously scheduled for a bench trial to begin on May 16, 2018. On April 27, 2018, counsel for Plaintiff filed a motion for continuance of trial wherein she listed the reasons Plaintiff needed a continuance of the trial for May 16, 2018 as the length of its case, the unfairness to the Plaintiff if the case went beyond two (2) days and was deferred to a later, non-contiguous date to complete the trial, and allegedly "new" factual allegations about cash payments made to employees.  Defendants objected to the Plaintiff's request to postpone the trial.

On May 2, 2018, the Court held a telephonic status conference to address Plaintiff's motion for continuance, at which time the Plaintiff's counsel said she wanted three (3) contiguous days for trial.  The Court advised counsel the upcoming trial date for May 16, 2018 did not have three (3) contiguous days set aside for trial, but the Court had intended to proceed ahead to trial on May 16th and 17th and schedule another day, if necessary.  However, on May 3, 2018 the Court issued an Order that granted Plaintiff's request for a continuance and postponed the May 16, 2018 trial date.  Shortly thereafter, the Court rescheduled trial for July 23, 24, and 26 2018.

On Friday, July 13, 2018 after the close of business hours, Plaintiff e-filed its Amended Pretrial Memorandum and Supplemental Schedule A.  In the Amended Pretrial Memorandum, Plaintiff made a total damages claim of $1,323,846.44 (up from the amount set forth in its prior Pretrial Memorandum filed on April 19, 2018) that it alleged

was due to 45 of Defendants' employees.  Supplemental Schedule A enumerated the names of the 45 employees (up from 20 listed in its prior Pretrial Memorandum filed on April 19, 2018)  Plaintiff never filed a motion for leave of Court to file a supplemental Schedule A.  Further, Plaintiff never filed Supplemental Disclosures Pursuant to Rule 26 after the one it filed in April 2018.

After receiving the July 13, 2018 Amended Pretrial Memorandum and Supplemental Schedule A that Plaintiff filed, Defendants filed a Motion *in Limine* to Exclude Evidence Not Properly Disclosed Prior to Trial.  On July 23, 2018, the Court held oral argument on this Motion, and entered an Order granting the relief requested by Defendants.  The bench trial then proceeded immediately thereafter.

## II.    BRIEF STATEMENT OF THE FACTS OF THE CASE

Exeter Family Restaurant is a 24-hour a day 7-day a week restaurant located on Perkiomen Avenue in Exeter Township, Berks County, Pennsylvania.  Joseph Nanouh bought Exeter Family Restaurant in 1999 with a partner and in 2001 has been the sole owner since he bought out his partner.  Joseph Nanouh is the final say in all business related decisions.  J. Nanouh, Inc. operates the Exeter Family Restaurant, and Joseph Nanouh is the only shareholder, officer, and director.  Joseph's son, Michael Nanouh, is the General Manager and runs day-to-day operations at the restaurant.  Many of its servers are long time employees, and numerous servers worked at the restaurant even prior to Joe Nanouh's ownership of the restaurant.

During the time at issue in this lawsuit, J. Nanouh, Inc. paid all servers at the Pennsylvania tipped minimum wage rate of $2.83 per hour.  In addition, for a period of time, Defendants paid third shift servers a flat, guaranteed rate of $30.00 per shift.  The third shift would generally be from 10:00 p.m. until no later than 6:00 a.m., but servers

on third shift often arrived for work at 9:30 p.m.  In addition, the restaurant paid some of their servers' partial wages in cash, but did not keep records of doing this.  Defendants have ceased making any cash payments to their employees.

In the lawsuit filed against the Defendants, there are three classes of alleged violations by the Secretary against the Defendants: uniform violations, minimum wage and overtime violations, and third shift (flat rate) server violations.  At trial, Defendants conceded that J. Nanouh, Inc. did charge some employees for their first uniform, rather than providing that for free.  With respect to the wage and overtime alleged violations, Defendants contested those allegations, and the affected employees testified at trial that they got paid for all hours worked in an appropriate amount whether it be by check, or check and cash.  In addition, servers who fell under the $30.00 flat rate or third shift testified that they were properly compensated for any and all third shift hours worked.

With respect to the alleged record keeping violations, Defendants concede that their use of the electronic timekeeping system was not done strictly enough.  Frankly, during most of the time covering this case, J. Nanouh, Inc. did not pay servers by using the electronic timekeeping system, but used the handwritten schedules.  There are numerous times throughout a scheduled week where servers might leave early due to the business being slow or for personal reasons, which favored the employees.  Paying servers by using the handwritten schedule was the long-standing practice at the restaurant.

### III.    SUMMARY OF THE TESTIMONY PRESENTED AT TRIAL

### Kimberly Terra

Kimberly Terra testified as the first witness of the trial.  As of the time of trial, she was an employee approximately eight years at the Exeter Family Restaurant.  Prior to

working at Exeter Family Restaurant as a server, she was a server at other restaurants for 18 years.  (Notes of Testimony, Trial Day 1, p. 61).  She was aware before working at Exeter Restaurant that servers were paid $2.83 per hour.  (Day 1, p. 61).  Michael Nanouh or his sister Marlene hired her as a server.  (Id. at 36).  Michael Nanouh told her she was going to be paid $2.83 per hour (Id. at 37, 62-3), or she would get a flat rate of $30.00 per night for third shift (10:00 p.m. to 6:00 a.m.), and she kept all of her tips received on her shift and took them home with her every night.  (Id. at 38, 62-3).  During the timeframe in question, she worked approximately 60 to 70 hours per week.  (Id. at 39-40).  Ms. Terra did not recall paying for her first uniform while working at the restaurant. (Id. at 54).

When Ms. Terra worked second shift, it would end at approximately 10:00 p.m., and she would begin getting ready to close out her shift, as the third shift employees would be arriving.  (Id. at 43).   She would prep for third shift by stocking items needed for food service such as rolling silverware, bringing out stock, and finishing cleaning her area.  (Id.).  Third shift employees would be begin taking new customers after they arrived.  (Id.).  At the end of her shift, she would punch out at the computer point of sale system and print out her credit card receipts to get her credit card tips.  (Id. at 44).  She got paid all of her credit card tips and cash tips were retained at the end of every shift. (Id. at 44-45).  When she was working third shift, she would maintain responsibility to pay the second shift servers their credit card tips from the cash register, upon presentation of the slips printed out from the credit card sales.  At the end of every shift, all servers left with all their cash tips and their credit card tips except for any amount they chose to share with a bus staff employee(s).  (Id. at 45-46).  There were times she forgot to clock out over the course of time through the computer.  (Id. at 46).

The employer paid Ms. Terra some of her wages via paycheck, which varied in the amount, and she also received cash payments for some of her wages. (Id. at 47). During the timeframe in 2014, Ms. Terra received her second shift hours through paycheck and her third shift (10:00 p.m. to 6:00 a.m.) was paid in cash at the rate of $30.00 per shift. (Id.). After 2014, her third shift wages of $30.00 per shift were paid on check and her second shift hours were paid in cash. (Id.). There was a time when the $30.00 flat rate was changed to $2.83 per hour. (Id.). In addition, any hours worked over 80 hours for a two-week pay period were paid in cash at $2.00 per hour. (Id. at 48). Ms. Terra usually worked five days per week on third shift at the rate of $30.00 per night for the hours between 10:00 p.m. and 6:00 a.m., and the sixth day she worked during the week was a second shift for which she was paid cash at $2.00 per hour. (Id. at 49-50). She changed the schedule on the schedule board if her hours varied during her shift. (Id. at 55). During her time employed at Exeter Restaurant, Kim Terra observed people come and go on their shifts at various times, would leave early when the business was slow, would leave early when they had appointments, or when they would feel sick. (Id. at 56-7).

When Kim Terra was working third shift and would arrive at approximately 9:30 p.m. There were times when the second shift employees would leave early because she arrived at 9:30 p.m. for third shift, and the first shift employees who would arrive before 6:00 a.m. would relieve her on her shift and she could leave early. (Id. at 66). The expectation for the servers was to be there 15 minutes in advance of the beginning of your shift, but she chose to come in earlier than that. (Id. at 68-9, 71).

Ms. Terra indicated neither Michael nor Joseph Nanouh told her what to say in court; they did not tell her she would be in trouble if she came to court and testified in

this case; and she never felt pressured by them at all due to coming to court and testifying (Id. at 58).  She described the atmosphere at the Exeter Family Restaurant as family atmosphere and she was a happy employee.  (Id. at 63).  She loved working at the restaurant, and she loved the owners and their family.  (Id. at 53).

### Ella Polonski

Ella Polonski worked for the Exeter Family Restaurant for approximately one and half years as a server.  (Id. at 79).  Sue Troxel and Michael Nanouh interviewed her prior to hiring her at the restaurant.  (Id. at 80-81).  When she was hired, Sue Troxel told her she would paid $2.83 an hour and would keep all her tips.  (Id. at 82).  Her initial uniform costs when she started were deducted from her pay.  (Id. at 84).  She worked second shift only three or four shifts per week between the hours of 2:00 p.m. and 8:00 p.m. or 2:00 p.m. and 10:00 p.m.  (Id. at 85).  She clocked in at the beginning of her shift at approximately 15 minutes before the start time and would clock out using the computer. She also put all her orders in on the computer and got a list of her credit card tips at the end of her shift from the computer.  (Id. at 88).  She was never paid any cash other than her tips and never worked over 40 hours in a week.  (Id. at 90).  Sometimes, she left early from her shift, if the restaurant was not busy, and she never stayed after her shift ended. (Id. at 93).

### Amanda Graul

Amanda Graul worked for the Exeter Restaurant as a server between 2016 and 2017.  (Id. at 98).  Sue Troxel and Michael Nanouh interviewed her for the job.  (Id. at 99).  She claimed she was not told at all how she was going to be paid, but took the job anyway.  (Id. at 100).  She paid $20.00 total for her first apron and shirt.  (Id. at 101). She worked various shifts including first shift from 7:00 a.m. to 2:00/2:30 p.m. and

second shift from 2:00 p.m. to 10:00 p.m.  She typically worked Saturdays and Sundays from 2:00 p.m. to 10:00 p.m. and Monday and Tuesday from 4:00 p.m. to 10:00 p.m. during the time she worked at the restaurant.  (Id. at 103).  Ms. Graul was paid bi-weekly by paycheck and never received any cash for hours worked.  (Id. at 112).  During her employment at the Exeter Family Restaurant, all the Federal wage and hour information was posted on the employee corkboard, and she looked at it at least once a day.  (Id. at 118, 127).

The servers worked as a team on their shifts, and with the servers on the other shifts, by restocking various items needed to serve the customers, such as silverware and napkins, lemons, creamers, etc.  (Id. at 121-22).  Every night after her shift, Ms. Graul would leave with all of her cash and credit card tips.  (Id. at 123).  She gave the bussers approximately 5% to 6% of the tip she earned on the shift, which would be about $12.00 to S13.00 per night.  (Id. at 126).  On her eight-hour shifts, her tips would be approximately $100 to $120 per shift and on six-hour shifts it was $85 to $90.00 per shift in tips.  (Id. at 127-28).

**Brenda Alena**

Brenda Alena was a server at the Exeter Family Restaurant for over 20 years as of the time of this trial.  (Id. at 129).  She started at the restaurant under the prior ownership group and worked continuously until the time of trial.  (Id. at 130).  She continued to get paid in the same manner under the prior ownership when the new owners took control of the restaurant.  (Id. at 133).  Michael Nanouh was her supervisor.  (Id. at 132).  Before Joe Nanouh took over the restaurant, the prior owners paid her half in check and half in cash, and Mr. Nanouh continued that pay practice based on a discussion they had when he took over the restaurant.  (Id. at 157).  When she left at the end of the night with her

tips after paying the bussers, she would leave with an average of about $80.00 per shift in total tips.  (Id. at 164).  She got to keep all of her credit cards and cash tips.  (Id. at 134).

She typically worked Tuesday, Wednesday, and Thursday between the hours of 2:00 p.m. and either 8:00 p.m. or 9 p.m., or until approximately one year ago when her times on Thursdays got changed to 4:00 p.m. to 9:00 p.m. or 10:00 p.m.  (Id. at 135). However, she only worked three days a week.  (Id. at 136).  The restaurant paid her bi-weekly, half of her hours on her paycheck and half of her hours by cash.  (Id. at 151-52). The hours she was paid by check were at $2.83 per hour, the hours paid in cash were at $2.00 per hour.  (Id. at 153).  Approximately two years ago, because she was going through a divorce, she asked that all of her pay go on her paycheck, at that time she was paid $2.83 for every hour.  (Id. at 152-53, 166).  For approximately the last two years, she typically worked 30 to 31 hours per two-week pay period, and her wages always equaled to at least $7.25 per hour.  (Id. at 155, 171).

Ms. Alena discussed the employee bulletin board in the server's areas where their schedules were posted that the servers looked at a daily basis, which contained information about minimum wages and information pertaining to their pay.  (Id. at 159).

### Ashley Hines

Ashley Hines worked for Exeter Family Restaurant as a server from September 2012 to April 2018.  (N.T. Trial Day 2, p. 4).  She was informed during her interview with Michael Nanouh that she would earn $2.83 per hour plus tips.  (Id. at 7, 43-4). However, when she began working, she got her first uniform for free.  (Id. at 8).  When she started working at Exeter Restaurant, she worked three days a week from 4:00 p.m. to 10:00 p.m.  (Id. at 10).  When she worked third shift, which was between the hours of 10:00 p.m. and 6:00 a.m., she received $30.00 per shift in cash and all other hours in her

bi-weekly paycheck.  (Id. at 24).  There was a period of time after the third shift hours

were no longer paid at the rate of $30.00 for that shift, and she got paid all hours on her

paycheck at the rate of $2.83 per hour.  (Id. at 25).  There were weeks when Ms. Hines

worked overtime, but she did not receive a higher pay for overtime hours.  (Id. at 29).

There were times when her bi-weekly pay envelope had half of her money in cash for

hours worked and half of her money in check for hours worked.

 Ms. Hines explained because it was a 24 hour a day restaurant the shifts would

relieve the other shifts and people would often be leaving early because the shift worker

following them would come in half an hour beforehand.  (Id. at 37).  The servers all

cooperated from one shift to the next by filling silverware, napkins, condiments, etc. for

the oncoming shift, which was the standard in practice.  (Id. at 43).  She routinely took

smoke breaks or just breaks to walk outside during her shifts while on the time clock.

(Id. at 39).  For third shift it was typical to arrive at around 9:30 p.m. and work until

relieved by the first shift at approximately 5:30 a.m.  (Id. at 40).  Every night or day when

she left the restaurant, she took all of her credit card tips and cash tips with her, which

averaged approximately $100.00 to $150.00 per shift in tips for a regular 8-hour shift.

(Id. at 40-41).

 Jason R. Mowday is an Assistant District Director for the United States

Department of Labor Wage and Hour Division and has been in that capacity since

approximately one year prior to trial.  (Id. at 57).  In this case, Mr. Mowday used time

records and payroll records to calculate what employees were paid based on the hours

they worked and extrapolated amounts allegedly owed to employees when no records

existed for those time periods.  (Id. at 58-9).  Mr. Mowday examined time clock records

from the employer from August 31, 2015 through August of 2017.  (Id. at 67).  Mowday

did not have any written records of cash paid to employees during the timeframe of his review of the records, so Ex. G-8 does not contain any cash payments made by the Employer to its servers and Mowday did not factor this into his damages calculations. (Id. at 70-1).

When viewing Gov. Ex. 8 for Kim Terra, Mr. Mowday considered when she worked from 5:00 p.m. until 10:00 p.m., and then third shift from 10:00 p.m. to 6:00 a.m., as one shift together, rather than as two separate shifts wherein she was being paid some hours for second shift in cash and paying between 5:00 p.m. and 10:00 p.m., and the third shift hours between 10:00 p.m. and 6:00 a.m. in increments of $30.00 for that shift on her paycheck. (Day 2, p.86)  This is inconsistent with what Kim Terra testified about how she was paid and skewed the DOL's calculations of alleged underpayments of the employer, because Mowday considered every time Kim Terra worked a double shift as one shift, rather than as two shifts for which she was paid cash for the hours in one shift (five hours i.e., between 5:00 p.m. and 10:00 p.m.) as unpaid hours rather than her being paid in cash for those hours.  (Day 1, p. 47).

Mr. Mowday acknowledged that the handwritten schedules he used to compare to the time clock punches were "generally pretty close". (Day 2 p. 88).

Mr. Mowday started preparing Gov. Ex. 8 in January of 2018 (Id. at 160), but he started working on the case in approximately November of December 2017.  (Id. at 158).

Although he did not personally interview any employees, he said it is acceptable for employees to tell the Government what they were paid in cash and that should be factored into any wage calculations. (Id. at 161).  Mr. Mowday acknowledged that Gov. Ex. 8 does not include any cash payments to any employees.  (Id. at 163) and that Gov. Ex. 8 does not include any $30 cash payments made to Kim Terra for working thirds

shifts as no cash was credited on Gov. Ex. 8 for any cash paid to Kim Terra, despite the fact that she testified to receiving multiple different cash payments. (Id. at 166-69).

Mr. Mowday admitted that Investigator Ianelli, who visited Exeter Family Restaurant, noted a Department of Labor Poster was posted in the kitchen area of the restaurant in her investigative report, and the Department of Labor Poster is intended to inform employees of their rights under the Fair Labor Standard Acts. (N.T. Trial Day 3, pp. 3-5). Mr. Mowday also acknowledged that Agent Ianelli made notes in her initial investigation report that some employees acknowledged being paid some of their hours in cash. (Id. at 9).

Mr. Mowday acknowledged that the entries made on Gov. Ex. 3 for cash tips were actually tips on credit cards received by the servers. (Id. at 10). During questioning by the Judge, Mowday conceded the following:

1.      Every work week must stand alone for each employee under the regulations and that a calculation could be made based on cash paid to employees per hours worked based upon the testimony he heard in this trial. (Id. at 18).

2.      Even if the Judge were to consider each employee at issue requiring full minimum wage pay of $7.25 per hour that the court should credit $2.00 per hour for all hours paid to those employees in cash. (Id. at 19).

3.      All employees should be given a credit for the $2.00 hourly payments they testified to receiving from the employer. (Id. at 26).

These are very important issues that the attorney for the Government had previously denied throughout the course of this case.

The DOL offered a Declaration of Sandra Wilson as Gov. Ex. No. 29 in its case-in-chief. In that declaration, Sandra Wilson asserted the following:

1.      She was paid cash for all hours she worked over 40 hours, which amount

of cash was included with her paycheck.

2.      Sandra Wilson worked as a server for the predecessor of the Exeter Family

Restaurant and has worked as a server at the Exeter Family Restaurant since it

was purchased by Mr. Nanouh

(Gov. Ex. 29 ¶¶ 1, 2).

Rebecca Minicozzi was employed at the Exeter Restaurant as a server for

approximately 7 to 8 years as of the time of trial.  (Day 3, at 38).  When the restaurant

hired her, she was hired to work third shift and was told the shift (9:30 p.m. to 6:00 a.m.)

and that she would be paid $30.00 per shift for that time.  (Id. at 51).  She mostly worked

third shift, but she did also add some second shift hours during the time period in

question.  (Id. at 40).  Third shift was generally 9:30 p.m. to 6:00 a.m., and second shift

was 2:00 p.m. to 10:00 p.m.  (Id.).  She did not typically work overtime.  (Id. at 49).

Additionally, she was familiar with where the schedule is posted for all servers, and on

the same area where the schedule is posted is the federal wage board, (Id. at 51-2), and

recognized Defendants' Exhibit 1 as the picture of the Federal Wage Board on the wall in

the servers area of the kitchen where the schedule was posted, which she looked at

everyday she was at work.  (Id. at 54-5).

For third shift hours, she got paid $30.00 per shift (9:30 p.m. to 6:00 a.m.) at the

rate of $30.00 per shift, which equates to $3.53 per hour for 8 ½ hours.  She got paid cash

for all hours she worked second shift at the rate of $2.00 per hour.  (Id. at 44, 48, 63).

She got paid bi-weekly by check and cash in the same envelope.  (Id. at 47).  Her third

shift hours switched from $30.00 flat rate to $2.83 per hour during her employment in the

relevant timeframe.  (Id. at 48).  Her second shift tips ranged between $60.00 and

$180.00 per shift, and her third shift tips ranged between $120.00 and $150.00 per shift. (Id. at 56-7). Ms. Minicozzi always made more than $7.25 per hour. (Id. at 57). Upon being crossed examined about whether she was properly paid, she insisted she got paid for all hours worked for the second shift and all other shifts. (Id. at 73-4).

Ms. Minicozzi testified quite clearly that she was aware of what tip credit was, but she never made less than $7.25 an hour for any hour worked so that never affected her in having to be paid the difference. (Id. at 77-8). Her understanding of the tip credit was based on her overall knowledge of being a server and from the posters on the board at the restaurant where the servers' scheduled is located. (Id.). With respect to hours worked, if she worked over her scheduled shift she was encouraged to change the schedule manually and put that on the written schedule. (Id. at 80).

Michael Nanouh testified that his Father owns the Exeter Family Restaurant, and he is a manager who has hiring and firing authority. (Id. at 114-116). Michael Nanouh is not an officer, director, or shareholder of J. Nanouh, Inc. and does not do the scheduling for employees. (Id. at 117). Michael Nanouh said the servers at the restaurant are like family to him, and many of them were there before his dad bought the restaurant. (Id. at 118). Michael Nanouh acknowledged that he instituted the computerized point of sale system in approximately 2009, primarily to make placing orders for the servers more efficient. (Id. at 119-20). However, the restaurant paid the servers based upon the handwritten schedule, as far as he knew, even though he did not do payroll. (Id. at 121; Gov. Ex. 28 p. 53).

Michael Nanouh identified Defendants' Exhibit 1, which is a picture of the poster located on the server line. (Id. at 125). It is the same place where the servers' schedules are located (p.125, 127; Gov. Ex. 28, p. 224).

15

With respect to the alleged uniform violations, Mr. Nanouh admitted uniform violations by making the following employees pay for their first uniforms:

> Nichole Canzaman,
> Alicia Clark,
> Kristina Grim,
> Margaret Kazimierowicz,
> Mary Jo McCord,
> Ella Polanski,
> Sophia Polanski,
> Kelly Robinson,
> Vanessa Schlegel,
> Ashley Smith,
> Virginia Spatz,
> Bianca Trump,
> Ericka Winslow, and
> Janel Yost.

(Id. at 132).

Mr. Nanouh detailed his involvement in the investigation by meeting with Agent Ianelli somewhere between six and eight times, even sometimes outside of the restaurant he indicated he gave Agent Ianelli everything she asked for.  (Id. at 138).  He indicated that at the final meeting the agent represented a bill and demanded payment at that time with no time to decide, or time to consult with an attorney.  (Id. at 140-1).

With respect to Sandra Wilson, he indicated she was paid cash for all hours worked over 40 at the rate of $2.00 per hour, which was the practice and custom at the restaurant.  (Id. at 142).

With respect to servers he hired, he indicated that he told them they would be paid $2.82 per hour plus all their tips.  (Id. at 134; Gov. Ex. 28, pp. 82, 224-5).

## IV.     ARGUMENT

**A.     THIS COURT PROPERLY GRANTED DEFENDANTS' MOTION *IN LIMINE* ON JULY 23, 2018 AND SHOULD DENY PLAINTIFF'S MOTION FOR RECONSIDERATION OF THAT RULING.**

Federal Rule of Civil Procedure 15 governs when a party may file amended or supplemental pleadings.  With respect to amending pleadings, Rule 15 allows it by consent of the parties or by leave of Court.  Fed.R.Civ.Pro. 15(a)(2).  Rule 15(d) provides that a party may file a supplemental pleading upon motion to the Court for permission to do so.  Plaintiff failed to file a written or oral motion to file either an amended or supplemental Schedule A.

Federal Rule of Civil Procedure 26 imposes mandatory duties on parties to make initial disclosures of damages to opposing parties in a case.  Fed.R.Civ.Pro. 26(a)(1)(A)(iii).  Federal Rule of Civil Procedure 26 imposes mandatory duties on parties to disclose damages and intended trial exhibits (including summaries) to opposing parties in the pretrial stage of a case 30 days before trial.  Fed.R.Civ.Pro. 26(a)(3)(A)(iii) & (a)(3)(B).  Subsection (a)(3)(B) allows the opposing party 14 days to object to the pretrial damages disclosed by another party and to the admissibility of any trial exhibits.

Plaintiff in this case clearly violated Rule 26(a)(3)(A)(iii) & (a)(3)(B) because it made the recent disclosure of a significantly higher amount of damages and more than double of the number of allegedly entitled employees on Friday, July 13, 2018 after the close of business by e-filing its Amended Pretrial Memorandum.  This Court should not accept this late disclosure and should limit Plaintiff from seeking damages in excess of its total claim for damages allegedly owed to the 23 enumerated employees as $250,692.08 as previously set forth in its April 19, 2018 Pretrial Memorandum.  Plaintiff has clearly

violated the mandatory disclosures required by Rule 26 and should be sanctioned accordingly.

The court should freely give leave when justice so requires.  "[M]otions to amend pleadings should be liberally granted."  Long v. Wilson, 393 F.3d 390, 400 (3d Cir. 2004) (citations omitted).  "Leave to amend must generally be granted unless equitable considerations render it otherwise unjust."  Arthur v. Maersk, Inc., 434 F.3d 196, 200 (3d Cir. 2006) (citing Foreman v. Davis, 371 U.S. 178, 182 (1962).  "Among the factors that may justify denial of leave to amend are undue delay, bad faith, and futility."  Id. (citing Lorenz v. CSX Corp., 1 F.3d 1406, 1414 (3d Cir. 1993)).  The test under Rule 15(a) "is in the disjunctive, meaning that if [Defendants] meet[ ] [their] burden to prove any one of these elements, the [amendment] should not be permitted."  Graham v. Progressive Direct Insurance Company, 271 F.R.D. 112, 123 (W.D. Pa 2015).  A trial court should refuse to permit an amendment of a complaint when the information and facts giving rise to the amendment(s) were available to the Plaintiff at the outset of the case or following discovery, but the Plaintiff waited for an unreasonable amount of time to file for the amendment.  George v. Kraft Foods Global, Inc., 641 F.3d 786 (7th Cir. 2011).  Allowing a Plaintiff to amend its complaint at such a juncture in a case would totally thwart discovery, and the trial court properly denied the amendment(s).

In our case, the Plaintiff had wage and payroll records of J. Nanouh, Inc. before it filed its Complaint and received additional wage and payroll records in discovery in January 2018.  In addition, Plaintiff had the opportunity to depose any witnesses it wanted, but chose to depose only Michael Nanouh on December 21, 2017.  Yet, Plaintiff did not file any updated disclosure of the amount of damages allegedly owed and the employees to whom wages were owed.  Instead, Plaintiff disguised its amended

disclosures as a trial exhibit and "Amended Pretrial Memorandum."  Plaintiff knew of all the information pertaining to the wages paid to employees and hours they worked by January 2018, but **never chose to file a motion to amend or supplement, rather it chose to file its amended information/disclosures of damages and witnesses less than 10 days before trial**.

What makes the last minute disclosures by Plaintiff so egregious is that the Court previously continued the trial at the request of the attorney for the Government.  In Plaintiff's Motion for Continuance filed on April 27, 2018, which asked for a postponement of the May 16, 2018 trial in this case, the attorney for the Government asserted that there were "new factual claims regarding the amounts of purported cash payments to employees" as one of its reason for requesting continuance of the trial.  See (Plaintiff's Motion for Continuance).  This was disingenuous and geared toward attempting to deny the Defendants' rights to a fair trial for the following reasons:  the attorney for the Government knew about cash payments to the employees since the beginning of its investigation in 2016 because the investigator interviewed numerous employees who worked at Exeter Family Restaurant, several of whom indicated they were paid some wages in cash.  Next, on the first day of trial before this Court, the counsel for the Government back pedaled on that position and told this Court when arguing against the Defendants' Motion *in Limine* to preclude additional witnesses and evidence of alleged back wages due, counsel for the Government told this Court that it had no new evidence to assert, despite saying that specifically in its April 27, 2018 Motion for the continuance.  (Notes of Testimony, Trial, Day 1 p. 25).

Counsel for the Government went on to say she was presenting no new evidence or witnesses and that there was no substantial change in what the witnesses she was going

to present were going to say, again a total 180 to what she said in her Motion for a continuance.  This representation to the Court must have also included Jason R. Mowday, who was an Assistant Director the for the Department of Labor, Wage and Hour Division, whose testimony was greatly expanded during the 90 day period from the time Plaintiff filed its first Pretrial Memo.  Remember his testimony at trial that he only completed the work on Gov. Ex. 8 approximately 2 weeks before trial.  (Day 2, p. 161).

Finally, on this point, the DOL attorney said "it is not new evidence" when pressed by the Court on why she had asked for the continuance in the first place (Day 1, pp. 26-27), which is not true, especially in light of Mowday's testimony, which the attorney for the Government vigorously argued at trial to exclude so as to keep the Court in the dark about how drastically its evidence changed between the time of the Government's request for a continuance in the beginning of May 2018 until the day trial began on July 23, 2018.  (Day 2, pp. 160-61).

Further, during counsel for the Government's argument in opposition to the Motion *in Limine* filed and argued the first day of trial, she asserted that the Government only became concerned about the tip credit in the last week or so, (Id. at 29) and that there were not new pieces of information asserted in the Government's case-in-chief. (Id.).  Again, this is in total contradiction to the alleged reason in the pretrial motion and also the fact that the Government knew about tip credit issue since Michael Nanouh's deposition, which was in December of 2017 (Id. at 22, 25).

The Trial Court properly granted the Defendants' Motion *in Limine* on the first day of trial and should not reconsider this position.  The counsel for the Government made assertions in her request for a continuance that were later shown to be hollow because of the fact that they had known about the issues, which they said were new since

the beginning of the investigation and at the very least since the deposition of Michael Nanouh in December of 2017, thus their request for a last minute of continuance of the trial date originally scheduled to begin May 16, 2018 was nothing more than an attempt to deny the Defendants right to due process and a fair trial by springing additional alleged damages and witnesses on the eve of trial.  Her own witness, Jason R. Mowday, admitted that he only finished Gov. Ex. 8 a mere 2 weeks before the July 23, 2018 trial, which is the exhibit relied upon by the Government to ask the Court to award damages to double the original number of witnesses and in an amount that was over 5 times what they asked for in its April 2018 pretrial memo and the last disclosures it filed in this case.  Fundamental fairness dictates that this Court deny the Motion for Reconsideration of its ruling on the Defendants' Motion *in Limine* on day 1 of trial.

Finally, to amplify this point, counsel for the Government objected to the Defendants calling Robin Taney and Theresa Ziemba as witness prior to any testimony being presented at trial due to the Court's ruling on the Defendants Motion *in Limine* as those witnesses were not included in the original Pretrial Memorandum filed by the DOL in April 2018, but were added to the one filed shortly before trial on July 13, 2018.  (Id. at 33).  In response to that objection, the Trial Court stated that the same rules would apply to both sides of the case, meaning that witnesses subject to exclusion based upon the pretrial ruling on Defendants' Motion *in Limine* applied to both parties, and Defendants could not call those witnesses at trial.  A reversal of that decision at this time would further erode and undermine the fairness of the trial to the Defendants as Defendants were precluded from calling witnesses who would have been beneficial to their case, i.e., Robin Taney and Theresa Ziemba.  (Day 1, p. 34).

Therefore, for all the foregoing reasons, this Honorable Court should deny Plaintiff's Motion to Reconsider this Court's Pretrial Ruling on the Motion *in Limine*, and this Court should limit Plaintiff from seeking damages in excess of its total claim for damages allegedly owed to the 23 enumerated employees as $250,692.08 as previously set forth in Schedule A to Plaintiff's April 19, 2018 Pretrial Memorandum.

**B.     MICHAEL J. NANOUH IS NOT AN EMPLOYER UDER THE FLSA, AND THIS COURT SHOULD NOT ORDER DAMAGES AGAINST HIM.**

The Government has the burden of proof under the FLSA that Michael J. Nanouh is an "employer" under Section 3(d) of the Act.  See In re: Enterprise Rent-A-Car Wage & Hour Practices Litigation, 683 F.3d 462 (3d. Cir. 2012).  Although Enterprise was a case that dealt solely with joint employers and the test for those, the case reiterated the factors a court should consider to decide whether someone is an "employer" under the FSLA.  Id. at 470.  Those factors are: (1) authority to hire and fire employees; (2) authority to make work rules and assignments, and set conditions of employment including compensation, benefits, and hours; (3) day-to-day supervision, including discipline; and (4) control of employee records, including payroll, insurance and taxes. Id. at 470.

The testimony at trial was unrebutted that Joseph Nanouh purchased the Exeter Family Restaurant in 1999 with a partner and because the sole owner in approximately 2001.  J. Nanouh, Inc. is a Pennsylvania Corporation that operates the Exeter Family Restaurant.  Joseph Nanouh is the only shareholder, officer, and director.  Michael J. Nanouh has no ownership interest in the corporation, and is an employee of the corporation.  (Day 3, p. 117, 130).  Michael Nanouh is Joseph Nanouh's son and was a young child when his father purchased the Exeter Family Restaurant.  (Day 3, pp. 114-16,

121).  Michael Nanouh is a manager because his father hired him for the job, but Joe
Nanouh is the final say over all decisions at the restaurant.  (Id. at 114-17, 130; Gov. Ex.
28 p. 40, 219).

   The Government's evidence demonstrates that Michael Nanouh hired and fired
employees, which arguably satisfies the first prong, but he does not do that if his father is
on the property that day.  (Id. at 130).  Next, he did have authority to make some rules
and assignments, but he did not set their schedules, did not set their rates of pay, or
benefits.  (Id. at 114-17, 121, 134, 156, 158, 193; Gov. Ex. 19-21, 53).  Third, he did
supervise servers when he was at the premises, but so did several other managers.
During his shifts, he seated guests, ran the cash register, and helped employees as needed.
(Day 3, pp. 115-16).  Finally, he did not engage in any payroll activities and knew only
very basic information about how the restaurant paid employees.  (Day 3, pp. 121, 134,
156, 193).  He did not secure insurance, did not pay taxes, and was not a record keeper
for the corporation, despite the fact that he may have facilitated getting the agent for the
Government records in this case.  (Id. at 114-17, 121, 134, 156, 158, 193; Gov. Ex. 19-
21, 53).  Michael Nanouh answered to his father for all decisions, and Joseph Nanouh
was not a nominal owner as argued by the Government.  (Id. at 114-17, 130; Gov. Ex. 28
p. 40, 219).  It is important to note that the records presented by the Government at trial
are all business records of J. Nanouh, Inc., including the payroll and time clock records.
(Gov. Ex. 1-2, 3-6).  Therefore, while Michael Nanouh satisfies some of the prongs of the
"employer" test, he did not have enough authority and control of the business or
employees to be deemed an "employer" who is subject to joint and several liability under
the FSLA, and this Court should conclude that any judgment that is entered should not be
entered against Michael Nanouh.

### C.     THE EMPLOYER J. NANOUH, INC. HAS DEMONSTRATED IT IS ENTITLED TO TAKE A TIP CREDIT FOR SERVERS' WAGES, SO ANY DAMAGES AWARDED SHOULD BE BASED UPON THE FEDERAL MINIMUM WAGE ALLOWED FOR TIPPED EMPLOYEED OF $2.13 PER HOUR RATHER THAN THE FEDERAL MINIMUM WAGE FOR NON-TIPPED EMPLOYEES OF $7.25 PER HOUR.

Paying employees some or all of their wages in cash and not keeping records of the cash is not a basis for the court to refuse to allow a restaurant to take a tip credit.  See Perez v. Palermo Seafood, Inc. 548 F. Supp.2d 1340 (S.D. FL. 2008).  The Department of Labor's regulation requiring employers to inform their employees of FLSA's tip credit requirements did not apply retroactively, since it did not contain any language suggesting it was intended to be retroactive.  Dorsey v. TGT Consulting, LLC, 888 F.Supp. 2d 670 (D. Md. 2012).  The fact that the regulation does not apply retroactively means that for all employees hired before the date of the regulation, the employer was held to the prior standard of informing the employees that they would be paid a minimum wage lower than the normal minimum wage rate and would get to retain all their tips, which is not at issue in this case.  Id. at 685-6.  The word "informed" differs from the word "explained" meaning that workers are entitled to knowledge about the tip-credit program, but not to a comprehensive explanation.  Schaefer v. Walker Bros. Enterprises, Inc., 829 F.3d 551, 556 (7th Cir. 2016) (citing Kilgore v. Outback Steak House of Florida, Inc., 160 F.3d 294, 298 (6th Cir. 1998)).  The 7th Circuit Court in Schaefer pointed out with respect to the tip-credit program issues the following observation: Three things are apt to matter most to employees at establishments such as these defendants:

> (a) in anticipation of tips the employer will pay less than the minimum wage; (b) how much the case wage will fall short of the current minimum wage; (c) if tips plus the cash wage do not at least match the current minimum wage, the employer must make up the difference.

The Court opined that "a person told these things has been adequately "informed" for the purpose of the statute, during the time before the Department of Labor elaborated by regulation."  829 F.3d 556-557.

The employer in <u>Schaefer</u> argued that it furnished information about the tip-credit program separately because it placed a poster furnished by the Department of Labor about the Fair Labor Standard Act and its requirements in a prominent place.  The Court noted "Federal Law requires employers to post posters about minimum-wage rules in an area that employees frequent during the work day.  <u>Id.</u> at 557.  The <u>Schaefer</u> Court found that the restaurant's basic handbook information and the poster with the FSLA information posted in the employee area of the restaurant, "together supply the restaurant's workers with three pieces of information that we believe constitute the statutory minimum [to be afforded the tip-credit]."  <u>Id.</u> at 558.

The Court should note that the Third Circuit takes the duty of an employer with tipped employees to post the Wage and Hour posters.  The Third Circuit has explained that because federal regulations require all employers to display posters advising employees of their minimum wage and overtime pay rights, "an employer's failure to post a statutorily required notice of this type tolls the running of any period of limitations. <u>Kamens v. Summit Stainless, Inc.</u>, 586 F.Supp. 324, 328 (E.D.Pa.1984) (citing <u>Bonham v. Dresser Indus.</u>, 569 F.2d 187, 193 (3d. Cir. 1978)); <u>see</u> 29 C.F.R. § 516.4.  The importance the Third Circuit places on an employer's obligation to post the required wage and hour poster(s) should carry some weight for this Court.

In our case, the representative testimony offered by the DOL indicates clearly that all servers knew the employer was paying them $2.83 per hour, which is more than the federal minimum wage.  (Day 1, pp. 37, 82, 153; Day 2 p. 25; Day 3, p. 38; Gov. Ex. 29).  The representative servers also all agreed that they knew the minimum wage was $7.25

per hour for non-tipped employees.  (Day 3, p. 57).  And finally, all representative servers agreed they were able to leave every shift from the restaurant with all their cash and credit card tips.  (Day 1, pp. 38, 62-3, 82, 134; Day 2, pp. 7, 43-4, Gov. Ex. 29). Furthermore, numerous servers acknowledged the placement of the Department of Labor poster explaining the wages on the servers' information board located where their schedule for posted in the servers' area of the kitchen in the restaurant, which they looked at every day they were at the restaurant.  (Day 1 p. 118, 127).  In fact, one employee explained in relatively graphic detail about the information contained in the poster and that she had learned that information by observing the poster during her time at the restaurant.  (Day 3, pp. 77-8).  Finally, the testimony offered by Michael Nanouh about Defendants' Ex. 1, the employee information board contained the Department of Labor poster was posted on the board that contained the servers' schedule, as well as all the other information that they were required to know.  (Day 3, pp. 125, 127; Gov. Ex. 28, p. 224).  This is also bolstered by an acknowledgement by Mr. Mowday, witness who was the representative of the Department of Labor, Wage and Hour Division, who indicated that the investigator who went to the Defendants' restaurant noted in her report that the poster required by the Department of Labor was on the premises at the time of her investigation in 2016.  (Day 3, pp. 3-5).  As the Court in <u>Schaefer</u>:  "It would be hard to fault an employer for providing exactly the information the Department of Labor then required, in the Department's own words."  829 F.3d at 558.  This Honorable Court should find as a conclusion of law that the Defendants properly notified their employees of the tip-credit provisions of the FLSA by orally informing them of their wages and rights to retain tips and by having the Department of Labor poster posted prominently on the servers' information and scheduling board in the kitchen area of the restaurant where

it indicated the Department of Labor Wage and Hour "Employee rights under the Fair Labor Standards Act", which was required to be posted by the Department of Labor and authored by the Department of Labor Wage and Hour Division.  Courts have also found that oral notice in addition to FLSA posters posted in areas frequented by employees can provide adequate notice of tip-credit.  Calabrese v. TGI Friday's Inc., 2017 WL 5010030 (E.D. PA 2017) (denying summary judgment in a case where oral notification in addition to labor law posters in a common area frequented by employees was adequate notice of a tip-credit); Koenig v. Granite Food & Brewer Ltd, 2017 WL 2061408 (W.D. PA 2017); Acosta v. Las Margaritas' Inc., 2018 WL 6812370 (E.D. PA 2018) (finding when employers orally explained to their employee servers that they would be paid $2.83 per hour and earn a difference of minimum wage and tips coupled with the Department of Labor posters hung in the restaurant where the servers frequented, which discussed minimum wage requirements, was adequate notice to support the Court's findings that the restaurant did not violate the tip-credit notice requirements of 29 U.S.C. §206(a), 29 USC §203(m), or 29 CFR §531.59(b)).  Oral notice that servers would be paid $2.13 per hour plus tips, combined with the prominent display of the FSLA poster explaining tip credit is enough to meet the requirements of Section 3(m) for an employer to take a tip credit.  Pennon v. Business Representation Int'l, Inc., 528 F. Supp.2d 1306, 1310-11 (S.D. Fla. 2007).

The Government cannot dispute that the Exeter Family Restaurant had the FLSA poster explaining minimum wages and tip-credit posted on the employee schedule board as acknowledged by numerous employees and as set forth in Defendants' Ex. 1.  Rather, they are left with a hollow argument that Defendants' Ex. 1, showing the information board in the section wherein the employee rights poster is depicted, is not legible enough

for the Court to determine what it says about a tip-credit.  (Gov. Brief, p. 29).  This argument fails because the poster depicted as obviously one generated by the Department of Labor, Wage and Hour Division, is expected to be posted to inform employees of their rights, was posted as acknowledged, and even their witness, Mr. Mowday, acknowledged that the investigator's report who visited the restaurant indicated that the proper poster was posted by designating such in her report.  All things considered, if the Department of Labor poster does not give adequate information of tip-credit to tipped employees, what is the point of requiring restaurants to post it?  See Bonham v. Dresser Indus., 569 F.2d 187, 193 (3d. Cir. 1978).

### D.    THE EMPLOYER J. NANOUH, INC. PROPERLY CONSIDERED IVAN GARCIA-LOPEZ AN EXEMPT EMPLOYEEUNDER THE FAIR LABOR STANDARDS ACT, SO DOES NOT OWE HIM DAMAGES FOR OVERTIME WAGES.

Title 29 U.S.C.  §255, provides a two-year Statute of Limitations for employees who were improperly considered as exempt from wage and overtime regulations, if the violations are not willful.  If the violations are willful, then a three-year Statute of Limitations applies.  See Blackmon v. Brookshire Grocery Company, 835 F.2d 1135, (5th Cir. 1988).  A good faith reliance that an employee is an executive or administrative exemption from wage and hour and overtime requirements, is enough to consider if in fact the employee is not exempt under the statute, a two-year period of back wage calculations, rather than a three-year period.  See Blackman; see also Gorey v. Manheim Services Corp, 788 F.Supp.2d 200 (S.D. NY  2011) (applying the two year Statute of Limitations rather than the three-year Statute of Limitations when employer relied in good faith and made a reasonable determination that the employee was exempt from wage and hour and overtime requirements under the applicable law).

Ivan Garcia-Lopez worked at the Exeter Family Restaurant for approximately 18 years and remained employed there as of the time of trial. (Notes of Testimony Trial, Day 1, p. 176). He worked as a line cook for approximately 8 years until he was promoted to Sous Chef, which is his current title. (Id. at 177-78). Since he was promoted to Sous Chef, he is the only Sous Chef in the kitchen. (Id. 179). Part of his job duties are to prepare soups, order desserts and dairy supplies for the kitchen, and to direct the work of the line cooks, who are the cooks primarily cooking the day-to-day meals served at the restaurant. (Id. at 180-81, 206). During the time period in this lawsuit, he worked Monday through Saturday 50 hours per week. (Id. at 183). He said his hourly rate was $15.00 per hour, and he got paid some of his wages in cash for the hours he worked on Sundays. (Id. at 185). In contrast, Michael Nanouh asserted that Ivan Garcia-Lopez was paid $675 in his check and $500.00 to $600.00 cash per pay period. (Gov. Ex. 28, p. 108).

Mr. Garcia-Lopez acknowledged that on Sundays and Mondays, the Executive Chef was off, so he was in charge of the kitchen. (Id. at 194). Even on days when the Executive Chef was in the restaurant, he spent much of the time in his office working on other work, rather than supervising the line cooks. During that time, Mr. Garcia-Lopez would reprimand or talk to cooks who were not doing their jobs correctly, as well as supervise their activities. (Id. at 199). In addition, at times when Darren was on vacation or out of the kitchen for a period of time, Mr. Garcia-Lopez was in charge and the restaurant did not hire an extra cook. (Id. at 205).

The testimony is unrebutted that there are at least two days per week where Garcia-Lopez works and Renninger does not, and during those days he is the person in charge of the kitchen and supervising the activity of all the line cooks. He also

supervises the activities of the line cooks even when Renninger is in the restaurant because Renninger spends much of his time in his office working on menu items, ordering, and related matters.  Further, Garcia-Lopez is in charge of ordering all desserts for the restaurant, despite the fact that he and the Government attorney tried to minimize this responsibility.

Under the executive exemption, Garcia-Lopez is in a supervisory position where he directs the employment and duties of the line cooks in the kitchen, has the authority to hire and fire (whether he has exercised it or not), and has other administrative responsibilities such as the ordering of desserts and dairy products.  It is undisputed that Garcia-Lopez is in charge of the kitchen solely on two days per week when Renninger does not even work and that he is in the kitchen when Renninger spends much of the time in his office during his work day working on menu items, etc.  Thus, under the executive exemption, Garcia-Lopez is a salaried employee and is entitled to be treated as such by Defendants, which means that they do not need to pay him any overtime or other specific wages other than his salary.

In the alternative, if this Court does not find that Ivan Garcia-Lopez falls under the executive or administrative exception to the FLSA's minimum wage and overtime requirements as set forth in 29 U.S.C. §207 and 29 C.F.R. §541.100, then the employer should not be responsible for any more than two years of back overtime because they acted in good faith in considering Garcia-Lopez as a executive employee who could be salaried under 29 U.S.C. §207 and 29 C.F.R. §541.100.

Ivan Garcia-Lopez acknowledged that until he recently he had received $300 cash per pay period for the last year or so prior to trial. (Day 1, p. 191).  However, evidence from Michael Nanouh's deposition, asserts that Garcia-Lopez was paid the following

every 2 weeks: $675.00 by check and $500 to $600 cash.  (Gov. Ex. 28, p. 108).  The

testimony of Michael Nanouh is more credible as to the cash paid to Ivan Garcia-Lopez

because the employer's payroll records, admitted into evidence by the Government at

trial, demonstrate that from August 1, 2014 through September 30, 2017 J. Nanouh, Inc.

paid Ivan Garcia-Lopez bi-weekly wages of $675.00 for 80 hours, which would be an

hourly rate of $8.44 per hour ($675/80 hours = $8.44).  However, Garcia-Lopez testified

he was paid $15.00 per hour, which is consistent with $675.00 per paycheck and $525.00

biweekly in cash [($675 + $525 = $1200) and ($1200/80 = 15)].  Therefore, this Court

should find Mr. Mowday failed to account for any cash on Gov. Ex. 8 at pages 302 and

303 where Ivan Garcia-Lopez is found.

Based upon the fact that the employer, in good faith, considered Garcia-Lopez an

exempt employee for overtime purposes, this Court will only assess two years of

damages from the time of the complaint backwards, rather then three years.  In addition,

based upon the testimony of Ivan Garcia-Lopez that he continued to receive cash in the

amount of $300 per pay period for approximately one year leading up to the date of trial,

this Court will credit $150 per week for those cash payments that were excluded from

Gov. Ex. 8, page 302 (a period of seven weeks).  Damages will be awarded to Ivan

Garcia-Lopez from March 31, 2015 to March 31, 2017, or for the pay periods closest

thereto, which would be March 26, 2015 through March 26, 2017.  Therefore, based upon

the figures supplied in Gov. Ex. 8 at pages 302 and 303, and in consideration of the

additional cash payments acknowledged by Mr. Garcia for the seven weeks at $150 per

week, back overtime wages of $1,544.88, which will not be subjected to liquidated

damages because the Court found the employer acted in good faith with respect to

considering Mr. Garcia-Lopez as a salaried employee and thus unliquidated damages for this employee are not appropriate under the FLSA.

In considering any damages for Ivan Garcia-Lopez, the Court considers that he was paid considerably more cash by the employer than he admitted in Court because Gov. Ex. 8 accounts for employer cash payments from April 2014 through February 5, 2017 of $250 per week, not the $150 per week Garcia-Lopez said at trial. In addition, based upon the hourly rate he said he was paid of $15.00 per hour, this Court finds that he was paid properly in cash by the employer for all his hours, including any overtime worked, and will not award any damages to Garcia-Lopez.

### E.   THE EMPLOYER J. NANOUH, INC. COMMITTED UNIFORM VIOLATIONS BY CHARGING SOME SERVERS FOR THEIR FIRST UNIFORMS.

With respect to employees that fall into the category of uniform violations, Defendants acknowledge, as they did on the record at trial, that the following employees are entitled to the total amount of $35.75 for uniform violations for the employer charging them for their first uniform and deducting it from their first pay, which arguably put them below the minimum wage for that particular pay week. The following employees are entitled to these damages:

Nicole Cazaman,
Alicia Clark,
Amanda Graul,
Christina Grim,
Margaret Kazimierowicz,
Mary Jo McCord,
Ella Polonski,
Sophia Polonski,
Kelly Robinson,
Teidra Schittler,
Vanessa Schlegel,
Ashley Smith,
Virginia Spatz,
Bianca Trump,

Erika Winslow, and
Janelle Yost.

Those employees would be entitled to double the amount or $71.50.  This Court

further finds that the specifically enumerated employees are not entitled to any other

damages from the employer.

**F.      THE EMPLOYER, J. NANOUH, INC., OWES SOME OF ITS
SERVERS BACK WAGES AND OVERTIME.**

Defendants dispute a bulk of the violations of the Fair Labor Standards Act with

respect to wages or overtime wages.  Rather, Defendants have used the testimony at trial

and Government Ex. 8 to recommend damages the Court should award to the affected

servers.  Additionally, the Defendants dispute liability for liquidated damages in any

respect because they properly compensated their employees, except for the admitted

uniform violations and some relatively minor variances between the handwritten

schedules and the time clock hours.  In addition, the Defendants believe that no injunctive

relief is necessary due to their already corrected measures with respect to the uniform

violations and the fact that all employees at issue are now compensated by paychecks

only for all hours worked on the time clock.

In a lawsuit under the FSLA for unpaid wages or overtime, the Plaintiff bears the

burden of proof to demonstrate she performed work that the employer did not

compensate her for doing.  Anderson v. Mt. Clemens Pottery, Co., 328 U.S. 680, 687-8

(1946).  If the employer's payroll or time records are not accurate, employee(s) has met

her burden to wages and the court may estimate those damages, then the burden shifts to

the employer to produce evidence to rebut the amount of unpaid time and damages.  Id. at

687.  The court reviewing the evidence may award approximate damages based upon all

the evidence and inferences drawn from that evidence.  Id. at 688.  In an Fair Labor

Standards Act violation case, the District Court must determine the proper award of damages, and the Court is vested with a great deal of discretion in determining the most accurate amount to be awarded.  Brock v. Norman's Country Market, Inc., 835 F.2d 823 828 (11th Cir. 1988), cert. denied, 487 U.S. 1205 (1988).  "It is for the Trial Judge to determine from all he has and sees the weight to be accorded the compliance officer's computations."  Brock, 835 F.2d at 828 (citation omitted).  According to the Department of Labor, the "regular hourly rate of pay of an employee is determined by dividing his total remuneration of employment . . . in any workweek by the total number of hours actually worked by him in that workweek for which compensation was paid."  29 C.F.R. §778.109; see alsoWalling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419 (1945) (defining regular rate).  In this case, for employees who were paid some of their wages in a workweek at the rate of pay of $2.00 and some of the wages in their paycheck at the rate of $2.83 per hour, this Court finds for each workweek, the employer paid the employees who got paid a portion of cash got paid more than the federal minimum wage of $2.13 per hour in every workweek under the FLSA.  29 C.F.R. §778.109.  Similarly, the employees who received $30 per third shift hours (9:30 p.m. to 6:00 a.m.) received wages greater than the federal minimum wage of $2.13 per hour for their workweeks during which the employer paid them the $30 rate per shift (30/8.5 = $3.53 per hour).

As the Court previously ruled that the Government would be limited to seeking damages for those employees who were listed in Exhibit A to their Pre-Trial Memo filed on April 19, 2018, this Court can individually address the remaining employees who were not uniform only violations, or Mr. Garcia-Lopez who was already addressed above.  This Court finds the following individuals are entitled to damages:

Brenda Alena,
Ashley Hines,

Rebecca Minicozzi,
Kimberly Terra, and
Sandra Wilson.

Each individual is different in some respect because their pay was different in some respect, thus they will be handled individually because of that reason, and because they all testified as witnesses in this case, except Sandra Wilson, who this Court allowed to submit a declaration in writing, rather than present live testimony due to a medical condition asserted by the Government on her behalf.  The Court should use the amount of alleged "Back Wages Plus Reimbursement" set for by the Government in Exhibit A of its April 19, 2018 Pretrial Memo as a starting point to determine damages, if any, for all the 5 servers listed above.

This Court should also consider all cash wages supported by the testimony at trial and give a credit to the employer for paying those cash wages.  Although the Government has argued hat the Court should not to consider any cash paid to the employees because there were no records of it and no exact amounts, this is not the standard the Court is tasked to employ in making the back wage calculations.  All the servers who received cash were certain they received $2.00 per hour or $30 dollars per third shift, and the Court should not ignore that, despite the urging by the Government to do so.  The witnesses presented by the Government especially, were "representative witnesses" and their testimony will exemplify the customs and practices by the employer of paying measures of cash to its employees for hours not included on the payroll.  Working in the Exeter Family Restaurant was not the oppressive atmosphere the Government attempted to paint, rather the employees were respected, treated well, and felt like a family. However, there were some pay shortages due to variances between the time clock and the payroll for which this Court should compensate the following employees.

1.    **BRENDA ALENA**

With respect to Brenda Alena, the Government found after reviewing records and making extrapolations, that Ms. Alena was due that amount of money for uncompensated time in which she was punched in on the time clock, but not paid for all those hours. However, Ms. Alena specifically testified at trial that she was paid half of her total hours worked in cash at the rate of $2.00 an hour and for half of her hours on her paycheck at the rate of $2.83 per hour.  (Day 1, pp. 151-2).  The hours she got paid in cash were obviously not included on her paychecks and were not taken into account by the Government on Gov. Ex. 8.  Therefore, this Court should credit the amount of $2.00 per hour in cash paid to Ms. Alena for the fifty percent of the hours she worked in accordance with her testimony.

In arriving at a damages calculation for Ms. Alena, this Court should not ignore her actual testimony indicating she was paid those $2.00 an hour.  Looking at Gov. Ex. 8 on pages 2 through 11, the Secretary of Labor sets out the period of time for which it asserts Ms. Alena's entitled to some back wage reimbursement.  Looking at the figures for Ms. Alena, the Court will credit $2.00 per hour for all hours for which she was not paid on payroll in an amount equivalent to the bi-weekly hours on her payroll, as this is how the Defendants were compensating this particular employee, i.e., they were paying her half of her wages on the payroll at $2.83 per hour, plus half of her scheduled hours at $2.00 per hour in cash.

Using Gov. Ex. 8, her bi-weekly payroll hours between March 30, 2014 and November 23, 2016 was virtually 16 hours, which would coincide with Ms. Alena's testimony that she worked 30-32 hours per week.  (See Gov. Ex. 8 pp 2-8).  Gov. Ex. 8 lists uncompensated hours of 23.42 for all these weeks.  The Court should credit 16 of

those uncompensated hours per week as ones the restaurant paid Ms. Alena in case, as per her trial testimony that she was paid half her hours by check and half in cash (23.42-16 = 7.42 uncompensated hours per week.  For this time period (137 weeks), the restaurant owes Ms. Alena $2,876.81, which is the uncompensated hours multiplied by the minimum wage for servers ($2.83 x 7.42 hours x 137 weeks = $2,876.81).  She is also entitled to the difference between the cash payment at $2.00 per hour and the minimum wage rate of $2.83, or $1,819.36 ($.083 x 16 hours x 137 weeks = $$1,819.36).  Thus, the total for this time period due by the restaurant to Ms. Alena is $4,696.17.

Beginning with the week of December 7, 2016, Brenda Alena's pay changed at, at her request, to all hours on her paycheck at the rate of $2.83 per hour payroll, which is consistent with her testimony.  (Day 1, pp. 151-2).  For the period of time of December 7, 2016, to August 30, 2017, Gov. Ex. 8 compared actual time clock hours for Brenda Alena versus her weekly scheduled hours and came up with a column of "uncompensated hours" for her.  Although they did not total that column on Gov. Ex. 8, this Court should add up the figures in that column to calculate what, if any wages Brenda Alena is owed from December 7, 2016 to August 30, 2017 (38 weeks).  This addition of those weeks from Gov. Ex. 8 results in -1.87 hours, which means she was actually overpaid based upon the difference between the hours she was punched in on the time clock versus the hours she was paid on the payroll.  Thus, this Court will not award any damages for that time period for Brenda Alena because she was compensated for all hours worked.

For the time period September 10, 2017 through April 1, 2018 (29 weeks), this Court will also not award damages for Ms. Alena because of the similarity in number of weeks between the prior timeframe addressed and this timeframe.  Thus this Court should find that Brenda Alena is not entitled to any damages for this time period as well.

Therefore, the total amount of damages for Brenda Alena for uncompensated hours is $4,696.17, and she is not due any overtime wages.

### 2.        ASHLEY HINES

With respect to server Ashley Hines, the initial amount of damages sought for Ashley Hines by the Government in its April 2018 pretrial memo for back wages was $12,864.17 for the timeframe from March 30, 2014 to April 18, 2018 in looking Gov. Ex. 8 on page 1 where it summarizes back wages due to Exeter Diner employees, the two categories of basic damages are minimum wage due and overtime premium due.

Ms. Hines testified on day two of the trial as a representative witness for the Government.  (N.T. Trial Day 2, pp. 3-52).  She specifically testified that the restaurant paid her $30.00 per shift in cash at times for her third shift work, which was for the period of time of 9:30 p.m. until 6:00 a.m.  (Id. at 24-5).

At arriving at damages due Ms. Hines, this Court should not ignore her unrebutted trial testimony that indicated there were third shift hours paid to her as $30.00 for that 8½ hour (9:30 p.m. to 6:00 a.m.) period of time.  In looking at Gov. Ex. 8, beginning at page 63, the Government alleges monies owed to Ms. Hines beginning March 30, 2014.  For the time period March 30, 2014 through January 11, 2015, the wages Government alleges are due to Ms. Hines are due to the fact that they claim the employers not entitled to take a tip credit for her and should pay her at the rate of $7.25 per hour rather than the federal minimum wage for a tipped server of $2.13 per hour.  (Gov. Ex. 8, pp.63-64).  This Court should find that the employer is due a tip credit and not award any wages for this time period as the Government does not allege she was not compensated for hours worked, it alleges that she is owed more money because of the allegedly deficient minimum wage payments of $2.83 per hour rather than $7.25 per hour.

For the period of time beginning the week of January 18, 2015, the Government used payroll from the restaurant's accountant and compared it to the written weekly schedule to come up with a figure of what, if any, uncompensated hours there were for Ms. Hines and did this through the week of August 30, 2015. Ms. Hines was paid $30.00 cash for all third shifts, which must be considered by this Court in calculating what, if any, damages she is owed. (Day 1, pp. 24-5). Thus, during the week of January 18, 2015 through the week ending August 30, 2015, this Court will consider the variances between the time clock hours vs. the bi-weekly payroll hours as times when Ms. Hines was working because she was obviously punched into the computer at the restaurant, but for which she was compensated in intervals of $30.00 in cash for her third shift hours, rather than those hours on her paycheck. That was the difference between the weekly hours on the schedules and her bi-weekly payroll hours. This timeframe is set forth on Gov. Ex. 8 p. 64. The total weekly hours on her schedules between January 18, 2015 and August 30, 2015 is 1,043 hours, and the total bi-weekly payroll hours during that same timeframe is 762.00, which is 281-hour difference. Taking the 281 hours that are at issue and dividing them by 8 ½ hours for third shift, we come up with 33 shifts to account for those hours that were scheduled on the schedule, but were not paid via check through the payroll system, because Ms. Hines clearly testified at trial, she was paid the flat rate of $30.00 for each third shift. Therefore, the Court will deduct the total amount of $990.00 from any minimum wage due violations for Ms. Hines because the Defendants get credit for paying her the $30.00 in cash for those shifts and no award is due to Ms. Hines for this period.

The next timeframe that this Court must look at for Ms. Hines is August 31, 2015 through August 25, 2017. The Court will pay her uncompensated hours at the rate of $2.83 per hour. During that time period, her uncompensated hours totaled August 31,

2015 through August 25, 2017 there were uncompensated hours in the total amount of 333.88 as per Gov. Ex. 8 pp. 65-71, which compared time clock hours verses bi-weekly payroll hours, for back wages due of $944.88.  It is notable that during the time period April 15, 2016 through August 25, 2017, when there were schedules from the employer showing hours that Ms. Hines worked verses her paycheck hours paid, there were 16 weeks where her weekly hours scheduled exceeded her weekly hours from the time clock, and an additional 7 weeks during that timeframe where her time clock hours exceeded her scheduled hours by less than .75 hours, and in some instances, by very small fractions of an hour.

For Ashley Hines for September 3, 2017 through April 1, 2018, this Court will not award any back wages because it is satisfied that Ms. Hines was paid properly during that time.

With respect to Ms. Hines, she is due a measure of overtime hours, which was calculated by the Government on Gov. Ex. 8 in the total amount of $177.54, and that is the figure this Court will award her for overtime due.

Therefore, this Court concludes that the employer owes Ashley Hines the total amount of uncompensated back wages plus overtime in the amount of $1,122.42.

### 3.      REBECCA MINICOZZI

With respect to Rebecca Minicozzi, the Government had a liquidated back wage plus reimbursement figure for Ms. Minicozzi in its pretrial memo filed in April of 2018. Generally, the Government found after reviewing records and making extrapolations, that Ms. Minicozzi was due that amount of money for uncompensated time in which she was punched in on the time clock, but not paid for all those hours.  However, Ms. Minicozzi

specifically testified at trial, so this Court must consider her credible testimony in arriving at what, if any, back wages she is due.

Ms. Minicozzi testified at trial that she generally worked second or third shift and did not work overtime. (Day 3, p. 40, 49). Ms. Minicozzi testified that her wages changed over the period of time encompassed by this lawsuit. At times, she was paid $30.00 in cash for her third shift wages and any other wages paid by paycheck at the rate of $2.83 per hour, and at other times, she was paid $30.00 per shift for third shift on her paycheck and all second shift hours at the rate of $2.00 per hour. (Id. at 44. 47-8). During the period of time included in this lawsuit, her third shift hours switched to all paycheck at the rate of $2.83 per hour. (Id. at 44, 47-8, 63). In looking at Gov. Ex. 8, Ms. Minicozzi's calculations are on pages 101-114. For the period of time from March 30, 2014 through August 20, 2014, Ms. Minicozzi is due no wages per the exhibit, and this Court should not award damages for that time period.

With respect to the period of time between July 27, 2014 and August 5, 2016, all monies paid to Ms. Minizozzi on her paycheck via payroll were divisible by increments of $30.00, thus the Court should infer that she was paid during that time period on her paycheck for third shift hours and any other hours she necessarily worked on second shift, based upon her trial testimony and was paid $2.00 per hour in cash. The Court should take all alleged uncompensated hours for Ms. Minicozzi during that time period and multiply them by $2.83 per hour and then give credit for $2.00 per hour for that same number of hours to arrive at uncompensated wage amount, if any, due to Rebecca Minicozzi during that time period. That time period, using the figures in Gov. Ex. 8 from September 17, 2015 through August 5, 2016 for Rebecca Minicozzi, there are 638.39 uncompensated hours during that time period per the calculations on that exhibit. If we

take 638.39 uncompensated hours multiplied by $2.83 per hour, which was the minimum

wage paid to servers by the Exeter Restaurant during the relevant timeframe, we come up

with $1,806.64.  As Ms. Minicozzi testified at trial she received $2.00 per hours in cash

for second shift hours, we will give credit of $1,276.78 for $2.00 per hour paid during

that timeframe.  The difference, which are damages owed to Ms. Minicozzi, are $529.86

($0.83 difference in pay x 638.39 hours = $529.86).

Between August 8, 2016 and April 1, 2018, Ms. Minicozzi had 102.42

uncompensated hours based upon Gov. Ex. 8, so the Court should award damages in the

amount of $289.85 ($2.83 minimum wage paid to servers at the Exeter Family Restaurant

x 102.42 uncompensated hours = $289.85).  The Court is unable to give any credit to the

employer for uncompensated time during that timeframe, as it is just too unclear about

whether she was paid any cash during that timeframe based upon her testimony at trial.

Finally, with respect to the damages owed to Ms. Minicozzi, Gov. Ex. 8 indicates

her entitlement to $660.95 in overtime wages.  The Court should also award this figure to

Ms. Minicozzi for damages, which brings her entire total of damages to $1,480.66.

### 4.      KIMBERLY TERRA

With respect to Kimberly Terra, the Government sought for compensation for her

in its April 2018 pretrial memo at Exhibit A for back wages for the timeframe from

March 30, 2014 through April 1, 2018.  Generally, the Government found that after

reviewing records and making extrapolations, that Ms. Terra was due money for

uncompensated time for which she was not paid.  However, Ms. Terra, specifically

testified at trial to the following relevant information that the Government did not

consider: she was paid $30.00 flat rate for third shift hours, and at times during her

employment was paid third shift hours in cash at $30.00 per shift, not on her paycheck.

(Day 1, p. 38, 47, 62-3). Ms. Terra usually worked six days a week, five days on third

shift and her sixth week day shift was the second shift. (Id. at 49-50).

In looking at Gov. Ex. 8, at Pages 217 through 219 for the time period from

March 30, 2014, through September 5, 2015, the Government lists uncompensated hours

for every one of those weeks of 23.41 hours. Because Ms. Terra testified at trial that she

was paid in cash at the rate of $30.00 per third shift, this Court will should that into

consideration. For the timeframe already mentioned, 23.41 hours equates to basically

three third shift periods of time, so the Court should accept as credible Ms. Terra's

testimony that she was paid in cash for those shifts and not award any damages to her

during that time period for uncompensated hours.

In looking at Gov. Ex. 8 for the time period of September 6, 2015 through

September 20, 2015 (a two-week pay period), the Government has asserted that Ms.

Terra was unpaid for 24.83 hours during that two-week pay period. The Court should

consider that as employer paying her for three third shifts at the rate of $30.00 per hour in

cash, which would take into consideration the alleged uncompensated hours, thus no

damages will be awarded for this two-week pay period.

For the two-week pay period between September 20, 2015 and October 4, 2015,

the Government avers that Ms. Terra was uncompensated for 16.58 hours, which is

roughly the equivalent of two third shifts. The Court should find that the employer paid

Ms. Terra $30.00 in cash for each of these shifts, which is why it would not be reflected

in the payroll records and thus no damages will be awarded for that period of time.

For the two-week pay period between October 4, 2015 and October 17, 2015, it is

alleged by the Government that Ms. Terra was unpaid 28.81 hours. Based upon Ms.

Terra's trial testimony that she was paid $30.00 per third shift in cash, this Court should

find that the employer paid her four third shifts during that pay period where Ms. Terra

would have been paid $30 in cash for each shift. Thus, she has only 8.81 uncompensated

hours for that time period, which the Court will award damages to her at the rate of $2.83 per hour for a total of $24.93.

From October 18, 2015 through August 6, 2016, Exeter Restaurant paid Ms. Terra on her paycheck based on number of shifts worked at the flat rate per shift of $30.00. This is consistent with Ms. Terra's trial testimony that her paycheck switched to getting paid $30.00 per shift for third shift and by cash at $2.00 per hour for all other hours worked. For this timeframe, the Court should take all uncompensated hours from Gov. Ex. 8, multiply them by $2.83 per hour and subtract $2.00 per hour for all those hours worked based upon Ms. Terra's testimony that she was paid in cash for hours off of her paycheck for that time period. The total uncompensated hours from October 18, 2015, through August 6, 2016, for Ms. Terra is 187.7, for a total damages due of $155.79 for that time period ($0.83 difference in pay x 187.7 uncompensated hours = $155.79).

For the time period beginning August 7, 2016 through April 1, 2018, this Court should consider the uncompensated hours from Gov. Ex. 8, and Ms. Terra's testimony that she was paid $2.00 per hour for hours that she was not compensated for in her paycheck. Uncompensated hours of 440.26, for which this Court gives a credit of $2.00 per hour cash payments made per Ms. Terra's trial testimony, which leaves an amount due and owing to her of $365.42, which is the difference between taking the end compensated hours multiplied by $2.83 per hour which she was due as a minimum wage and the $2.00 per hour which she testified she was actually paid ($0.83 difference in pay x 440.26 uncompensated hours = $365.42).

Finally, with regard to Ms. Terra, she is due overtime wages of $4,508.71 (Gov. Ex. 8), leaving a total damage amount due to Ms. Terra of $5,054.85.

### 5.    SANDRA WILSON

With respect to Sandra Wilson, the Government found after reviewing records for the time period March 30, 2014 to April 1, 2018, and making extrapolations for that time period that Ms. Wilson was due that amount of money for uncompensated time or

overtime for which she was not paid.  However, this Court must consider the declaration of Sandra Wilson presented by the Government as Gov. Ex. 29.  This Court admitted Gov. Ex. 29 at trial and rejected the Amended Declaration of Sandra Wilson, which was offered by the defense.

With respect to the wage calculations for Sandra Wilson, based upon the testimony in her declaration, she was paid 40 hours per week by check at the rate of $2.83 per hour, which the bi-weekly pay was 80 hours times $2.83 per hour for a total of $226.40.  On Gov. Ex. 8, at pages 270 to 284, Sandra Wilson's information, hours and pay are set forth therein.  For the time period beginning March 30, 2014 through April 1, 2018, which represents the entire timeframe the Government is pursuing in its lawsuit, Ms. Wilson was credited for pay on her payroll at the rate of $226.40, which is 80 hours at the rate of $2.83 per hour per bi-weekly pay.

The Government then took all of her uncompensated hours and considered them as overtime due and owing to Ms. Wilson.  The total amount the Government sets forth on Gov. Ex. 8 for overtime allegedly owed to Ms. Wilson is $12,612.25.  Thus, based on Gov. Ex. 29, this Court should use that as a starting figure to calculate damages owed to Ms. Wilson, if any.  This Court should also note that even though the Government's declaration that it prepared and sent to Ms. Wilson for her signature, indicates that she was paid cash for overtime hours, the Government totally ignored what she told them she was paid per hour for overtime and failed to include this in the Declaration.  In addition, the Government did not include cash she received in any of its calculations on Gov. Ex. 8, which the Court should find extremely troubling because the Government clearly interviewed Ms. Wilson and should have put that cash amount in her declaration and on Gov. Ex. 8.  The Government informed the Court during trial that, in speaking with Ms. Wilson, it knew that she was being paid cash for hours over 40 hours a week as set forth in Paragraph 6 of her declaration, but they did not take the time to put an hourly figure to that, rather they indicated that the amount was "usually around $40." (Gov. Ex. 29, ¶6-

7).  This Court however, should consider the rate of $2.00 per hour for all overtime hours as paid to Ms. Wilson because that is the representative testimony presented by the Government through other witnesses in this case, and the Court will accept that as the standard, custom and practice for the restaurant.

On Gov. Ex. 8 at pages 270-284, the Government took all uncompensated hours for Ms. Wilson and multiplied them by $3.63, which is the overtime rate due and arrived at the figure of $12,612.25.  By dividing $12,612.25 by $3.63, we arrive at the number of 3,474.45 overtime hours for which Ms. Wilson was due to be paid.  This Court should find, based upon her declaration and the testimony of the representative witnesses, that the employer paid her $2.00 an hour for overtime hours, and subtract $2.00 an hour multiplied by 3,474.45 hours, which is $6,948.90 for a total amount of overtime hours damages owed by the employer to Ms. Wilson of $5,663.35, which also represents the total amount of damages due to her for this case.

3,474.45 x $2.00 = $6,948.90 total cash paid by employer

$12,612.25 (Total OT demanded from Gov. Ex. 8) - $6,948.90 = $5,663.35

As this Court has found that the employer is due and entitled to take a tip credit, therefore the minimum wage for overtime is used for Ms. Wilson.

### G.    THE GOVERNMENT HAS FAILED TO PROVE THAT THIS COURT SHOULD AWARD LIQUIDATED DAMAGES IN THIS CASE.

In an Fair Labor Standards Act violation case, the District Court must determine the proper award of damages, and the Court is vested with a great deal of discretion in determining the most accurate amount to be awarded.  Brock v. Norman's Country Market, Inc., 835 F.2d 823 828 (11th Cir. 1988), cert. denied, 487 U.S. 1205 (1988).  "It is for the Trial Judge to determine from all he has and sees the weight to be accorded the compliance officer's computations."  Brock, 835 F.2d at 828 (citation omitted).

The governing rule for liquidated damages, 29 U.S.C. §260, permits the District Court "in its sound discretion" to award a lesser amount of liquidated damages, or none at

all, "if the employer shows to the satisfaction of the Court that the act or omission giving rise to the action was in good faith and that he had reasonable grounds for believing that his act or omission was not in violation of the Fair Labor Standards Act." To avoid liability for liquidated damages, the employer must make a showing of good faith and reasonable grounds for its conduct. If the employer fails to carry its burden in demonstrating good faith and reasonable grounds, the award of liquidated damages is mandatory. Willfulness is relevant to two inquiries in FLSA cases: The maximum recovery period (the Statute of Limitations) and the Court's award of liquidated damages…. Notably, in the Statute of Limitations context, willfulness is the Plaintiff's burden. Defendants have the burden of proof of demonstrating good faith in the damages context. The Court does not deem willfulness and the lack of good faith to be equivalence, but recognizes, the concurrence with the majority of Circuit Courts, that a finding of willfulness would preclude a finding of good faith.

In the case at bar, the employer was not perfect with respect to paying its employees. However, this Court should find that its violations of the FLSA were not willful because it kept its pay and schedule practices the same for many years and was not intentionally ignoring the law in paying the servers based upon their scheduled hours or shifts, rather than by the point of sale computer hours. Some of the representative servers, Brenda Alena and Sandra Wilson worked for the restaurant before the current owner purchased it, and the parties apparently kept the pay practices the same to suit the needs of the servers. In addition, and with the exception of the very few servers who worked consistent overtime, the employer paid all servers an average for every 2 week pay period more than $2.13 per hour when averaging all cash and check payments, which is consistent with the FLSA requirements that every pay period stands alone.

Therefore, for these reasons, this Court will not enforce the Government's request for liquidated damages against the employer.

### V.    CONCLUSION

Based on the reasons set forth above, the Government has failed to prove Michael Nanouh is an "employer" within the meaning of the FSLA, and this Court should dismiss him as a party in the case.

Based upon the reasons set forth above, the Government has established uniform violations by J. Nanouh, Inc. and awards damages to the following employees: Nicole Cazaman, Alicia Clark, Amanda Graul, Christina Grim, Margaret Kazimierowicz, Mary Jo McCord, Ella Polonski, Sophia Polonski, Kelly Robinson, Teidra Schittler, Vanessa Schlegel, Ashley Smith, Virginia Spatz, Bianca Trump, Erika Winslow, and Janelle Yost in the amount $71.50 each.  This Court further finds that the specifically enumerated employees are not entitled to any other damages from the employer.

For the foregoing reasons, the Court should find that the employer properly considered Ivan Garcia-Lopez as an exempt employee and properly paid him a salary.  In the alternative, this Court should find that the employer properly paid Ivan Garcia-Lopez due to the significant bi-weekly cash payments to him and should award him no damages.

For all the foregoing reasons, although the Government demonstrated some recordkeeping violations, and some discrepancies in wage and overtime pay, it failed and refused to consider the vast and regular cash payments to 5 servers.  The employer is entitled to take the tip credit for its employees as set forth above.  The calculations and reasoning for the damages to each of the 5 servers is set forth at length above, and this Court should award the following damages against J. Nanouh, Inc. to the following individuals:

Brenda Alena--$4,696.17, which includes all back wages due;

Ashley Hines--$1,122.42, which includes all back wages due;

Rebecca Minicozzi--$1,480.66, which includes all back wages due;

Kimberly Terra--$5,054.85, which includes all back wages due; and

Sandra Wilson--$5,663.35, which includes all back wages due.

The Court should not include liquidated damages for the reasons set forth above.

Respectfully Submitted,

Michael D. Dautrich, Esquire
Attorney for Defendants

Michael D. Dautrich, Esquire
**DAUTRICH & DAUTRICH LAW OFFICES, P.C.**
**526 COURT STREET**
**READING, PA  19601**
**610-375-9455**
**ATTORNEY I.D. #77187**

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EDWARD C. HUGLER, | : CIVIL ACTION - LAW |
| Acting Secretary of Labor, | : |
| United States, Department of Labor, | : |
|    Plaintiff | : |
| | : |
|    vs. | : |
| | : NO. 5:17-CV-01458 |
| J. NANOUH, INC., a corporation, D/B/A | : |
| Exeter Family Restaurant; and | : |
| Michael J. Nanouh, individually, and as | : |
| manager and corporate officer of the | : |
| aforementioned corporation, | : |
|    Defendants | : |

## PROOF OF SERVICE

I, Michael D. Dautrich, Esquire, being duly sworn according to law, deposes and says that a true and correct copy of Defendant's Post-trial Brief electronically filed and is available for downloading via the ECF system for the United States District Court for the Eastern District of Pennsylvania.  I further certify that a copy of the Defendants' Post-trial Brief was served on counsel for Plaintiff as listed below via the ECF system on or about January 16, 2019.

Jordana Greenwald, Esquire
Office of the Solicitor
Suite 630E
The Curtis Center
170 S. Independence Mall West
Philadelphia, PA 19106-3306

This Certificate is made subject to the penalties of 18 Pa. C.S. §4904 relating to unsworn falsification to authorities.

_____
Michael D. Dautrich, Esquire
Dautrich & Dautrich Law Offices, P.C.